# U.S. Origin Claims:

## Enforcement and Compliance Activities Since December 1997

A Report by the Federal Trade Commission

**March 1999**

# *Executive Summary*

In December 1997, the Commission completed its review of what legal standard advertisers and marketers should be held to when they choose to make "Made in USA" claims on products or packages or in advertising. After seeking public input and analyzing consumer perception and other research, the Commission concluded that the current standard, although more than 50 years old, continued to be the correct standard for judging such claims. This standard requires that products advertised or labeled as "Made in USA" be *all or virtually all* made in the United States, and those making "Made in USA" claims have support demonstrating that this standard is met. This standard basically requires that products be entirely domestically made for a seller to claim truthfully that they are of U.S. origin. However, it also recognizes that consumers believe the claim to be truthful if some negligible part of the item or if some *de minimis* portion of the labor involved in creating the product is not domestic.

When the Commission announced its decision to retain the traditional standard, it also issued an "Enforcement Policy Statement on U.S. Origin Claims" to provide industry with additional guidance on how to ensure that any domestic origin claims made are truthful and substantiated. The Commission also instituted a vigorous enforcement and compliance program to ensure that domestic origin claims are truthful and substantiated. At the same time, the Commission also reviewed catalog advertising and marketing for textile and wool products to ensure that they contained legally required domestic and foreign origin information. As a result of extensive advertising and complaint monitoring, more than 40 investigations were initiated, resulting in formal law enforcement actions against 14 companies.

One company, for example, advertised entire product lines as "Made in USA," when, in fact, some products contained significant foreign parts. Another company packaged its Chinese-made product in packaging covered with an American flag and eagle. The company incorrectly believed that it could adequately qualify this implied "Made in USA" claim by including the statement "Made in China" in small print on the bottom or side panels of its packaging. Still another company touted its product as "Made in USA of Japanese and American Components," even though the product itself was made overseas. Only the packaging and labeling were made in the United States.

These combined efforts have led to a reinforced business awareness of the "Made in USA" standard and greater public assurance that the standard is meaningful. This report describes the initiatives of the past fifteen months, including the law enforcement actions taken, investigations conducted but closed and numerous outreach and guidance activities. Below we summarize key items

from the report.

**Advertising and Complaint Monitoring**

C  Monitored "Made in USA" claims in print, broadcast, and Internet advertising, and on product labels, packaging, and products.

C  Monitored online and print catalogs selling textile and wool products to assess compliance with the country-of-origin disclosure requirements of the Textile Act and Wool Act Rules.

**Investigations**

C  Initiated over 40 investigations of companies making allegedly deceptive "Made in USA" claims or failing to make required of country-of-origin disclosures.

C  Coordinated closely with state Attorneys General and the U.S. Customs Service regarding possible law violations.

**Enforcement Actions**

C  Obtained 6 consent agreements with companies that allegedly misrepresented that their products were made in the United States.

C  Obtained 7 consent agreements with companies that allegedly failed to disclose country of origin in violation of the Textile Act and Wool Act Rules.

C  Obtained a consent agreement with a company that misrepresented its t-shirts as "Made in USA" in violation of the Textile Act and Rules.

**Business Outreach**

C  Responded to more than 600 requests for guidance about how to comply with the *all or virtually all* standard and presented speeches concerning the standard at industry conferences.

C  Disseminated a business guide on compliance with the *all or virtually all* standard.

C  Issued a business guide on compliance with the requirements of the Textile Act and Wool Act Rules.

# *Table of Contents*

**1**   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**2**   Policy Statement Enforcement Program . . . . . . . . . . . . . . . . . . . . . . . . . 3

        Advertising and Complaint Monitoring . . . . . . . . . . . . . . . . . . . . 3

        Coordinating with State Attorneys General . . . . . . . . . . . . . . . . 3

        Coordinating with U.S. Customs  . . . . . . . . . . . . . . . . . . . . . . . . 4

        Investigations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        Enforcement Actions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**3**   Textile Act and Wool Act Enforcement Program . . . . . . . . . . . . . . . . . . 7

**4**   Education and Outreach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        Enforcement Policy Statement Dissemination . . . . . . . . . . . . . . . 9

        Business Guidance on Made in USA Claims   . . . . . . . . . . . . . . . 9

        Business Guidance on Textile Act and Wool Act Requirements    10

**5**   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Endnotes

Appendix

# 1
## *Introduction*

Since at least the 1940's, the Commission has held that a product must be *wholly domestic* or *all or virtually all*[1] made in the United States to support a "Made in USA" claim under section 5 of the FTC Act.[2] To determine whether this standard continued to be appropriate in light of the increasingly global nature of the U.S. economy, from mid-1995 through the end of 1997, the Commission conducted an extensive review and evaluation of what legal standard to apply when evaluating whether "Made in USA" and other U.S. origin claims are truthful and substantiated. During the review, the Commission examined consumer research commissioned by staff and others, surveyed other U.S. governmental standards for U.S. origin claims and international standards for country-of-origin claims, solicited written comments on several occasions, and held a two-day public workshop.

The review revealed that the Commission's traditional standard accurately reflects consumer perception of unqualified U.S. origin claims and that the *all or virtually all* standard remains the correct standard for assessing the truthfulness of such claims. Based on this comprehensive review, in December 1997, the Commission announced it was retaining its traditional *all or virtually all* standard and issuing an "Enforcement Policy Statement On U.S. Origin Claims." The Enforcement Policy Statement provides general guidance on how the Commission will apply the *all or virtually* all standard, as well as guidance on other issues related to the interpretation and substantiation of both unqualified and qualified U.S. origin claims. A copy of the Enforcement Policy Statement is attached to this report in the Appendix.

Chapter 2 of this report describes how the Commission investigated domestic origin claims and summarizes the enforcement actions brought since the Commission announced the Policy Statement. Chapter 3 describes the Commission's project to investigate compliance with the requirements in the Textile Act and Wool Act Rules that sellers include origin disclosures in Internet and print catalogs. It also summarizes the enforcement actions filed under those Rules during the same time period. Chapter 4 describes the assistance the Commission has provided industry, which included disseminating the Policy

Statement and preparing and disseminating business guides that advise sellers on how they can comply with the Policy Statement and the Textile Act and Wool Act Rules, and providing advice to individual sellers upon request.  Last, the Conclusion at Chapter 5 emphasizes the Commission's dedication to maintaining a strong enforcement presence in this area and providing guidance to assist sellers in complying with these requirements.

# 2
## Policy Statement Enforcement Program

After the Commission issued the Enforcement Policy Statement, staff implemented a multi-faceted enforcement program to detect and investigate possible deceptive or misleading "Made in USA" and other U.S. origin claims. This ongoing program has included actively monitoring what domestic origin claims were being made in the marketplace and following up on complaints sent to the Commission by competitors and consumers. This monitoring, and the investigations subsequently initiated by staff, revealed a variety of compliance problems in this area. As discussed below, six companies have entered into consent agreements with the Commission settling allegations that they have violated section 5 of the FTC Act by misrepresenting the U.S. origin of their products.

### Advertising and Complaint Monitoring

To identify advertising containing domestic origin claims, staff extensively monitored broadcast, print, and Internet advertising. Staff obtained advertisements containing U.S. origin claims through commercial print and broadcast services (to supplement staff's own monitoring of media advertising) and through searches on the Internet. Virtually all advertising containing such claims was scrutinized. Consumer complaints also provided investigatory targets.[3] For example, a number of consumers advised staff that a product package was marked "Made in USA," but that the product itself was marked with a foreign country of origin. Several companies also informed staff, based on knowledge of their particular industry, of allegedly improper "Made in USA" claims made by competitors.

### Coordinating with State Attorneys General

Staff also consulted and coordinated with state Attorneys General on an ongoing basis.[4] For example, FTC staff and the offices of the Connecticut and Missouri Attorneys General conducted a joint investigation of The Stanley Works. This company entered into a consent agreement with the FTC settling allegations

that it violated section 5 of the FTC Act by misrepresenting the U.S. origin of its products. The company also entered into consent decrees with Connecticut and Missouri and has agreed to pay a monetary penalty of $50,000 to each state. FTC staff is also conducting a joint investigation with Connecticut in one other matter.

### Coordinating with U.S. Customs

Staff also has frequently consulted with the U.S. Customs Service regarding marketers who are making allegedly improper "Made in USA" claims and who may also be violating the Tariff Act by failing to mark their goods with a foreign country of origin. Staff and Customs, for example, are simultaneously investigating one company who has advertised and labeled its product "Made in USA," even though Customs may not consider the product to be substantially transformed in the United States and would therefore require that this product be marked with a foreign country of origin.[5]

### Investigations

After the issuance of the Enforcement Policy Statement, the Commission approved an omnibus resolution authorizing the use of compulsory process in "Made in USA" investigations. The resolution authorizes the use of Civil Investigative Demands to compel the production of documents and information. Civil Investigative Demands can be enforced in federal court, if necessary. Thus far, companies have voluntarily provided requested information and compulsory process has not been used. The presence of the resolution, however, likely encourages the voluntary submission of data. Staff has initiated 35 investigations against companies who may have made improper "Made in USA" claims. At present, 9 investigations are still pending.

Staff closed 20 investigations after determining that formal action was not warranted. In some instances, a marketer substantiated that the product at issue was all or virtually all made in the United States. In others, the violations were inadvertent and quickly remedied. For these matters, staff prepared and placed closing letters on the public record. These letters provide marketers with additional guidance as to how the FTC enforces the *all or virtually all* standard.

### Enforcement Actions

The Commission has issued for public comment agreements containing consent orders settling allegations that the following six companies have violated section 5 of the FTC Act by misrepresenting that their products were made in the United States:[6]

C   *American Honda Motor Company* -- The Commission's complaint charged that American Honda Motor Company misrepresented in advertising and labeling that three lawn mower models were all or virtually

all made in the United States. The complaint alleged that a significant portion of the components of the lawn mowers is, or has been, of foreign origin.

C   ***Johnson Worldwide Associates*** -- The Commission's complaint charged that Johnson Worldwide Associates misrepresented on packaging and in advertising that its Super Mono monofilament fishing line was made in the United States of American and Japanese components. The complaint alleged that the Super Mono fishing line was totally made in Japan with Japanese labor and components, and only the spool on which the fishing line was wrapped and the package, labeling, and package inserts contained American labor or components. In addition, the complaint alleged that in many advertisements, the qualifying language "of American and Japanese components" was not visible at all, so consumers only saw a "Made in USA" claim.

C   ***Kubota Tractor Corporation*** --  The Commission's complaint charged that Kubota Tractor Corporation misrepresented in advertising and labeling that certain of its lawn tractors and lawn and garden tractors were made in the United States. The complaint alleged that these products actually contained a significant percentage of foreign parts. In addition, the complaint charged that Kubota misrepresented that entire product lines of lawn tractors and lawn and garden tractors were made in the United States. The complaint alleged that in one product line, one of the three lawn tractor models in the product line contained significant foreign parts; in a second product line, both of the lawn and garden tractor models in that line contained significant foreign parts.

*C*   ***Rand International Leisure Products, Inc.*** -- The Commission's complaint charged that Rand International Leisure Products, Inc. misrepresented on its packaging for its "self-sealing" bicycle tire tubes that the tubes were made in the United States. The complaint alleged that the tubes were finished in the United States from imported tubes that were manufactured in Taiwan.

C   ***The Stanley Works*** -- The Commission's complaint charged that The Stanley Works misrepresented that certain of its mechanics tools, such as wrenches and ratchets, were made in the United States. The complaint alleged that a significant percentage of their content was of foreign origin.

C   ***USDrives Corporation*** -- The Commission's complaint charged that USDrives Corporation misrepresented that its CD-ROM drives were made in the United States through express "Made in USA" claims and through the depiction of the American eagle, the Statue of Liberty, and the American flag. The complaint alleged that the drives were actually assembled in the United States of almost all imported parts. In addition, USDrives packaged

its Chinese-made products in packages that featured the American eagle and the American flag and included the statement "Made in China" only in small print on side or bottom panels of the packages. The Commission's complaint also charged that USDrives misrepresented that CD-ROM drives that were made in China of primarily non-U.S. parts were made in the United States.

The consent orders issued for public comment by the Commission in these matters prohibit the companies from misrepresenting the extent to which their products are made in the United States. They also provide a safe harbor consistent with the Enforcement Policy Statement that allows the companies to represent that a product is made in the United States so long as all, or virtually all, of the components or parts of the product are made in the United States and all, or virtually all, of the labor in manufacturing the product is performed in the United States.[7]

# 3
## *Textile Act and Wool Act Enforcement Program*

The Textile Fiber Products Identification Act and Wool Products Labeling Act, statutes enforced by the Federal Trade Commission, require country of origin disclosure on the labels of most textile and wool products.[8]  In addition, these statutes were amended in 1984 to require that mail order catalogs and other mail order promotional materials offering textile and wool products for direct sale to consumers disclose whether each item was made in the U.S., imported, or both.[9]  Accordingly, in 1985, the Commission implemented the Congressional mandate by adding this requirement to its rules pursuant to the Textile and Wool Acts.[10]  Last year when the Commission updated and streamlined its Textile and Wool Rules, it revised the definitions of "mail order catalog" and "mail order promotional material" to include catalogs disseminated electronically via the Internet.[11]  Thus, the Commission sought to ensure continued fulfillment of the Congressional intent to make origin information available to consumers who buy textile and wool products in a manner that does not allow examination of the item prior to purchase.

In August 1998, in order to assess compliance with the amended rules, Commission staff conducted an Internet surf of websites offering textile and wool products for direct sale to consumers.  The surf, and other relevant information examined by FTC staff, resulted in investigations of several online and print catalog sellers of textile and wool products.  The Commission has accepted for public comment agreements containing consent orders with seven manufacturers or retailers.  *Wal-Mart Stores, Burlington Coat Factory Warehouse Corporation, Woolrich, Gottschalks, Delia's,* and *Bugle Boy Industries* all failed to make origin disclosures in their online catalogs, thus violating the Textile Act Rules and, in those instances where wool products were offered for sale, the Wool Act Rules.  *Delia's* and *Abercrombie & Fitch* also failed to make appropriate disclosures in their print catalogs.  All the consent agreements prohibit similar violations in the future.  Additional investigations of catalog sellers of textile and wool products are ongoing.  The Commission expects that announcement of these consent agreements will draw significant attention to the requirement for origin disclosures for textile and wool products, resulting in substantial voluntary compliance in the

future.

The Commission also actively enforces the requirement that textile products be labeled with accurate country-of-origin information. For example, the Commission's recent complaint against *Design Zone, Inc.* charged this women's apparel manufacturer with violating the Textile Act and Rules by removing "Made in China" labels from t-shirts and replacing them with "Made in USA" labels. The consent order, agreed to by Design Zone, requires future compliance with the Textile Act Rules, and prohibits misrepresentations regarding the country of origin of any textile product.

# 4

# Education and Outreach

In addition to conducting investigations and pursuing enforcement actions, to assist companies in adhering to the law, the Commission has provided compliance guidance to companies in a number of ways.

## Enforcement Policy Statement Dissemination

Since the Commission issued the Enforcement Policy Statement on December 1, 1997, staff has sent out more than 1500 copies of the statement and/or the press release announcing the Policy Statement. This distribution included many trade associations which, in turn, disseminated information to their members through their normal channels. The Policy Statement is also available on the Commission's webpage. More than 3,000 visitors have accessed the Policy Statement since it was posted in December 1997.

## Business Guidance on Made in USA Claims

Staff estimates it has responded to more than 600 requests for informal oral advice about proposed labeling and advertising claims. Staff also has given a number of speeches at industry conferences and indicated its willingness to do this for other industries.

In addition, in December 1998, the Commission issued a business guide on the Policy Statement titled "Complying with the Made in USA Standard." The guide supplements the Policy Statement by providing advertisers and marketers with further guidance on how to properly make domestic origin claims. It reflects the frequently asked questions staff received throughout 1998 about proposed labeling and advertising claims. Many companies, for example, indicated that they were not certain whether or not they could make a "Made in USA" claim or asked for assistance in developing a qualified U.S. origin claim for a product that includes U.S. content or processing but does not meet the criteria for an unqualified "Made in USA" claim. The business education publication incorporates many of these questions and the advice given by staff and provides detailed examples to illustrate how marketers can properly make unqualified and

qualified "Made in USA" claims.

Because several businesses also asked staff to clarify how the FTC's Enforcement Policy Statement is related to U.S. Customs' laws and regulations, the business guide addresses the interaction between the FTC and Customs regarding country-of-origin claims. The publication emphasizes that even if Customs determines that an imported product does not need a foreign country-of-origin mark, it is not necessarily permissible to promote that product as "Made in USA." The FTC considers additional factors to decide whether a product can be advertised, labeled, or otherwise promoted as "Made in USA." These factors, which are set forth in the Enforcement Policy Statement, are also explained in the business guide with illustrative examples. The business guide also explains that the FTC has jurisdiction over foreign origin claims on products and in packaging, beyond the marking disclosures required by Customs, and over such claims in advertising and other promotional materials. More than 2,300 visitors have accessed the business guide since it was posted in December 1998.

### Business Guidance on Textile Act and Wool Act Requirements

The Commission recently published a new, plain-English business guide for members of the textile industry: *Threading Your Way Through the Labeling Requirements Under the Textile and Wool Acts*. This booklet provides a comprehensive explanation of the three basic disclosure requirements of those Acts, as implemented by the Commission's rules: (1) fiber content; (2) identity of the manufacturer, importer, or other seller; and (3) country of origin. This guide was published and distributed in cooperation with the American Apparel Manufacturers Association. In addition, the guide is available on the Commission's web page.

# 5
## Conclusion

Through its extensive review of "Made in USA" and other domestic origin claims, the Commission has learned that consumers care deeply about the accuracy of such claims and still expect that products promoted as "Made in USA" are all or virtually all made in the United States. Since its re-affirmation of the traditional *all or virtually all* standard, the Commission has vigorously enforced the standard. The Commission believes that, through the efforts described in this report, it has sent a strong message to marketers that "Made in USA" claims must be truthful and substantiated. The Commission will continue to maintain a strong enforcement presence in this area, while also providing guidance to companies to assist them in making accurate and substantiated country-of-origin claims.

# Endnotes

1. *See, e.g.*, *Windsor Pen Corp.*, 64 F.T.C. 454 (1964); *Vulcan Lamp Works, Inc.*, 32 F.T.C. 7 (1940). The *all or virtually all* language was first used in the cases of *Hyde Athletic Industries*, Docket No. C-3695 (consent agreement accepted subject to public comment Sept. 20, 1994) and *New Balance Athletic Shoes, Inc.*, Docket No. 9268 (complaint issued Sept. 20, 1994). In light of its decision to review the standard for U.S. origin claims, the Commission later modified the complaints in these cases to eliminate the allegations based on the *all or virtually all* standard. Consent agreements based on the remaining allegations in the revised complaints were issued on December 4, 1996 (*Hyde*), 122 F.T.C. 427 (1996), and December 2, 1996 (*New Balance*), 122 F.T.C. 544 (1996).

2. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair or deceptive acts or practices." As set out in the Commission's Deception Policy Statement (Letter from the Commission to the Honorable John D. Dingell, Chairman, Committee on Energy and Commerce, U.S. House of Representatives (Oct. 14, 1983); *reprinted in Cliffdale Associates, Inc.*, 103 F.T.C. 110, appendix (1984)), the Commission will find an advertisement or label deceptive under section 5, and therefore unlawful, if it contains a representation or omission of fact that is likely to mislead consumers acting reasonably under the circumstances, and that representation or omission is material. In addition, objective claims carry the implication that they are supported by a reasonable basis. It is therefore deceptive to make a claim unless, at the time the claim is made, the marketer possesses and relies upon a reasonable basis substantiating the claim. *See* FTC Policy Statement Regarding Advertising Substantiation Doctrine, 49 Fed. Reg. 30,999 (1984); *reprinted in Thompson Medical Co.*, 104 F.T.C. 648, appendix (1984).

3. Many consumer complaints were found in the Commission's Consumer Response Center ("CRC") database, a central information network for law enforcement. In addition to responding to consumer inquiries, the CRC enters data into the Consumer Information System, the FTC's electronic consumer protection database. It also provides statistics and other information for public education and for targeting the problems causing the greatest injury.

4. State Attorneys General actively participated in the Commission's "Made in USA" review proceeding and favored a high standard.

5. Section 304 of the Tariff Act, 19 U.S.C. § 1304, administered by the Secretary of the Treasury and the Customs Service, requires that all products of foreign origin imported into the United States be marked with the name of a foreign country of origin. Where an imported product incorporates materials and/or processing from more than one country, Customs considers the country of origin to be the last country in which a "substantial transformation" took place. A substantial transformation is a manufacturing or other process that results in a new and different article of commerce, having a new name, character and use that is different from that which existed prior to the processing.

6. The Commission's rules provide for placing consent orders on the public record for 60 days. When this comment period has ended, the Commission reviews any comments received and makes a determination as to whether to issue a consent order as initially accepted or to withdraw its acceptance and/or seek changes in the agreement. If the Commission decides to issue a consent order, the consent order then becomes final.

7. Because the matters involve different circumstances, the complaints and consent decrees include slightly different allegations and requirements.

8. Textile Fiber Products Identification Act, 15 U.S.C. § 70 *et seq*., and Wool Products Labeling Act, 15 U.S.C. § 68 *et seq.* The FTC's implementing regulations are found at 16 C.F.R. Parts 303 and 300, respectively. In addition to disclosure of country of origin, these statutes and regulations require disclosure of fiber content and identity of the manufacturer or another business in the chain of distribution of the product.

9. 15 U.S.C. § 70(b)(i) and 15 U.S.C. § 68b(e).

10. 16 C.F.R. §§ 303.34 and 300.25a.

11. 16 C.F.R. §§ 303.1(u) and 300.1(h). 63 *Fed. Reg.* 7508 (Feb. 13, 1998). The effective date of the amendments was March 16, 1998.