UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

```
--------------------------------------------------- X
LEVITON MANUFACTURING CO., INC.,               :

           Plaintiff,                          :

      v.                                       :

UNIVERSAL SECURITY INSTRUMENTS,                :     Civil Action No. 01 CV 3855 AMD
INC., et al.,
                                               :

           Defendants.                         :
--------------------------------------------------- X
```

**PLAINTIFF LEVITON MANUFACTURING CO., INC.'S
OPPOSITION TO DEFENDANTS' MOTION
<u>FOR SUMMARY JUDGMENT ON INVALIDITY FOR DOUBLE PATENTING</u>**

## Table of contents

FACTS FROM THE PATENTS' SPECIFICATIONS................................................2

The Disclosure Of The '338'/'945 Patents.............................................6

The Disclosure of the '894 Patent........................................................6

ARGUMENT..............................................................................................9

Construction of Claims...........................................................................9

The Claims of the '338 Patent..............................................................12

The Claims Of The '945 Patent.............................................................13

The Claims Of The '894 Patent Must Also Be Construed In
Light Of The Language Of The Claim And Of The Specification............................13

Reading The '894 Specification As It Would Be Understood By One Of Ordinary Skill In
The Art, The Claims Must Be Construed In Terms Of A GFCI System......15

The Preamble In The '894 Claim 1 Gives Life And Meaning To The Claim.............18

The Construction Of A Claim Must Reflect The Entire Patent Record....................19

Construing The 'Means Plus Function' Limitations....................................21

CONCLUSION............................................................................................23

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

-------------------------------------------------------- X

LEVITON MANUFACTURING CO., INC.,    :

        Plaintiff,    :

    v.    :

UNIVERSAL SECURITY INSTRUMENTS,    :   Civil Action No. 01 CV 3855 AMD
INC., *et al.,*

             :

        Defendants.    :

-------------------------------------------------------- X

**PLAINTIFF LEVITON MANUFACTURING CO., INC.'S
OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT ON INVALIDITY FOR DOUBLE PATENTING**

The Plaintiff, Leviton Manufacturing Company, Inc. ("Leviton"), by its undersigned counsel, respectfully submits this Opposition to Defendants' Motion for Summary Judgment. Specifically, Leviton submits that Defendants are not entitled to Summary Judgment because they have failed to meet their burden of proving that the claims of the U.S. Patent No. 4,595,894 (the "'894 Patent") are invalid for double patenting. In fact, the clear facts swiftly lead to the conclusion that the claims are not invalid in view of either of the parent patents to the '894 Patent, i.e., the '338 Patent or the '595 Patent, whether under the double patenting standard or by anticipation or obviousness.

A proper construction of the "means-plus-function" claims of the '894 Patent requires not only a consideration of Paragraph 6 of 35 U.S.C. § 112, but also an understanding that Federal Circuit precedent, as is shown *infra*, clearly requires that the claims be construed in the context of the specification of that patent, in accordance with the understanding of one skilled in the art,

and (based upon the statutorily mandated presumption of validity for each claim) in a way to maintain the validity of each claim, if at all possible.  For that reason, Leviton's proposed construction is correct and should be adopted by the Court.

The Defendants' construction of the claims of the '894 Patent is based on premises that are directly contrary to established Federal Circuit precedent.  In their statement regarding claim construction, Defendants assert that the determination of their motion "does not rely upon a clever claim construction".  Unfortunately for them, they are correct.

## FACTS FROM THE PATENTS' SPECIFICATIONS

The disclosures of the patents involved, i.e., U.S. Patent Nos. 4,595,894, (the "'894 Patent") and U.S. Patent No. 4,386,338 (the "'338 Patent"), which has a specification and drawings substantially identical to that of U.S. Patent No. 4,518,945, are directed on their face to different inventions.

The three patents are each directed to a type of switching device intended to fit into a wall electrical receptacle box.  In all cases, the switch is held in place in the receptacle box by a "strap means" formed, as is usual, of a steel sheet material.  The switch is operated by a 'solenoid' formed of a 'coil' and a 'plunger' that slides within the central axis of the coil.  When the coil is energized a magnetic field is generated which causes movement, i.e., influences the position, of the plunger, to move into the center of the coil.  The coil is placed adjacent a portion of the strap means such that a path of the magnetic field generated by the coil is defined by the portion of the strap means adjacent the coil.  The strap means is defined as being formed of a magnetic material, i.e., steel sheet.

Movement of the plunger, in response to the magnetic field, causes operation of all of the switches.  As defined in the '894 claims, and as described in the '894 specification, one

significant difference from the Remote Control Switches of the '338/'945 Patents is that the GFCI, claimed in the '894 Patent, cannot automatically, without manual assist, reclose the electrical connection.

The '894 Patent is a continuation-in-part of the '945 Patent, which in turn is a continuation of the '338 Patent. I.e., the '338 Patent is the parent. The latter two patents are both directed to two-way switches which can be triggered to automatically open and subsequently triggered again to reclose an electrical connection. The disclosures of those latter two patents are identical, including the drawings. The basis for the "c-i-p" status of the '894 Patent relative to the '945 Patent, is that they both are operated by a solenoid having an electromagnetic coil adjacent a magnetic strap means, so that the adjacent portion of the strap means will "define a path of the magnetic field" when the coil is energized. The strap means are slightly different in design. The '894 'strap means' is shown and described as having a pair of tabs extending out from the strap means towards the coil. One of the tabs is adjacent one end of the coil, and extends to the central axis of the coil. The second tab is spaced away from the coil and is extremely short, extending only to the edge of the coil. There are no similar tabs in the strap described and shown in the '945 Patent. In both cases, however, portions of the strap means inherently define a path of the coil's magnetic field due to their juxtaposition in the electrical receptacle.

The structure of the GFCI of the '894 Patent is otherwise different from that of the Remote Control Switch of the '338/'945 Patent because of the difference in its functions  The '894 GFCI functions only to interrupt a circuit, and not to provide for a subsequent automatic reclosing of the circuit.

The claims of both of these patents include 'means plus function' limitations, and thus the structure of the claimed device, which is not described in so many words in the claim, must be defined by what is described in the specification and drawings as providing for each of the listed functions for the claimed invention.

### The Disclosure Of The '338'/'945 Patents

The '338 patent is directed to a "Remote Control System".  The portion of the specification setting out the "SUMMARY OF THE INVENTION" of the '338 patent, summarizes the "objects" and "features "of the claimed invention as follows:

> "Accordingly, *the present invention teaches a remote control system* which, throughout this specification, is also referred to as a universal switch receptacle system.

> \* \* \* \*

> Another object of the present invention is to provide a receptacle which is shallow enough in depth and small enough in size so as to provide switching and circuit breaking functions of a type compatible with either remote control systems or ground fault circuit breaking signals.

> \* \* \* \*

> Another feature of the present invention resides in a novel cam arrangement *which can only be appreciated from the following more detailed description of the drawings and the components of the present invention disclosed therein, but suffice it to say that not only is a flip-flop cam arrangement taught by the present invention,* but its placement about a ground receptacle opening is a unique approach to space saving reliability of functioning."

Col. 1, line 38 - Col. 2, line 2 of the '338 patent.

In the subsequent section, beginning at col. 4 of the '338 patent, headed "DESCRIPTION OF A PREFERRED EMBODIMENT", the details of the remote control switch of the '338

patent invention are described. The "flip-flop cam arrangement" is described beginning at col. 7,

line 29 as follows:

> "The reader's attention is now turned to a novel cam arrangement which serves as a flip-flop reciprocating rotor. A cam 132 shown in perspective in Fig. 13, is also shown in plan views within figs. 7, 8, 9, 10 and 11.

* * * *

> Cam 132 is further formed with a pair of oppositely extending wing members 156 and 158 whose outer cam surfaces 160 and 162 are adapted to bear against and move surfaces 164 and 166, respectively, of leaf spring contact supporting members 168 and 170. (Col. 7, 11.61 *et seq.*)

* * * *

> In operation, assuming a normal condition wherein fixed contacts 214 and 216 are engaged by their movable respective counterparts, 196 and 198, thereby providing current flow to a lamp or appliance, e.g., actuation of coil 74 in response to a signal generated by the electronic components heretofore described, will result in retraction of the body portion 96 of plunger 94 toward the center of opening 102 within coil 74. This retraction occurs against the biasing forces of helical spring 112 with the resulting movement of actuating member 104 and its kicker leg 120 in the same direction as plunger 94 (Col. 8, line 61 – Col. 9, line 5)

* * * *

> …Yet further movement of kicker leg 120 … results in clockwise rotation of cam member 120(*sic*) [132] (Col. 9, 11. 16-18)

* * * *

> In moving from the position shown in FIG. 9 to that of FIG. 10, the cam surfaces 160 and 162 of cam 132 have engaged and forcibly urged surfaces 164 and 166, together with their respective contact-carrying members 168 and 170, outwardly away from the axis of rotation of cam 132 (which is coaxial with the longitudinal axis of post 86), with the result that movable contacts 196 and 198 have been moved away from their respective contacted fixed contacts 214 and 216 to the position in Fig. 10. This clockwise motion of cam 32 as a result of the actuation of coil 74 has thus

resulted in breaking the electrical circuit as between the fixed and movable contacts herein described. It should also be noted that in the rest position shown in FIG. 10, cam 132 and its wings 156 and 158 *maintain disconnection of electrical connection as between the fixed and movable contacts at all times until the next sequential actuation of coil 74.* (Col. 9, 1123 – 40) (Emphasis Added)

\* \* \* \*

Thus, upon the next sequential actuation of coil 74, ... cam 132 is urged in a counter clock-wise direction to the position originally described for FIG. 7 (Col. 9, Line 50–Col. 10, Line 1)

\* \* \* \*

With this counter clock-wise shifting of cam 132, interference between surfaces 160 and 162 with their respective surfaces 164 and 166 is eliminated, such that movable contacts 196 and 198 are able to return under the inward biasing influencing of spring members 168 and 170 until these contacts come into engagement and electrical communication with their fixed contacts counterparts, contacts 214 and 216.

*The cycles just described may be repeated any number of times as a result of signals generated either remotely or via other means.*" (Col. 10, 11. 5-15) (Emphasis added).

The drawings and the detailed description in the '338 specification thus make it clear that this "flip-flop cam" arrangement in the Remote Control Switch of the '338 Patent, permits continuing cycles of interrupting and completing of an electrical circuit automatically as a result of an electrical or electronic signal.

### The Disclosure of the '894 Patent

The '894 patent is directed to a "Ground Fault Circuit Interrupting system". The specification of the '894 Patent begins by explaining that it is a "continuation-in-part application", and listing the earlier applications which it "incorporates by reference", as follows:

The present application is a continuation-in-part of applicants' both pending United States patent applications Ser. Nos. 431,982 now U.S. Pat. No. 4,518,945, filed Sept. 30, 1982 and entitled "REMOTE CONTROL SYSTEM" and Ser. No. 558,262 filed Dec. 5, 1983 and entitled "SHOCK HAZARD PROTECTION SYSTEM", and incorporates by

reference as if fully set forth herein the entire contents and subject matter thereof *and of any and all of their respective "parent" patent applications to which they are co-pending*.

(Col. 1, Lines 6-16) (Emphasis added).

Both sides agree that the '338 Patent expressly incorporated by reference is a *parent* to the '945 Patent and has a substantially identical specification and drawings.

The portion of the '894 specification setting out the "BACKGROUND AND SUMMARY OF THE INVENTION" of the '894 Patent, summarizes the "objects" and "features "of the claimed invention, and distinguishes it from the earlier patents, including the '338 Patent, and explains the reasons for incorporating the earlier applications, as follows:

> What is referred to herein as a "second" preferred embodiment of the present invention simply is meant to denote another in a continuous series of technical developments relating, directly and indirectly, to the breaking or interruptions of circuits upon the existence of predetermined conditions. Because of this common thread that runs through these developments, the author hereof has chosen to group same within this continuation-in-part application, rather than file same in a separate and distinct patent application. This will also serve to aid the Examiner in considering, collectively, the prior art of record in all applications.

(Col. 1, 11. 20-31) (Emphasis added).

> …*the second embodiment of this invention concentrates upon the ground fault circuit interrupting features of the invention*. In other words, in use, should predetermined conditions exist, such as by way of example only, a threat to life or property as a result of what is known in the art as a "fault", the second embodiment of the present invention will cause an interruption of the circuit within which the fault appears, in a sufficiently short response time, so as to attempt to avoid injury or serious shock … this application is directed to the novel electromechanical and mechanical means by which, in response to a signal, the circuit is interrupted by a physical separating of electrically conducting contacts.

(Col. 1, 11. 35-50) (Emphasis added).

In addition to other objects already set forth herein, it is, accordingly, *an object of the second embodiment of the present invention to provide a dedicated ground fault circuit interrupting system* within a device small enough to fit within a standard outlet or receptacle box or those of varying shapes and configurations.

It is a further object of the present invention to provide such a circuit interrupting system, in which same may function as an ordinary household electrical wall receptacle, while also providing protective features.

Another object of this embodiment resides in a novel operation of mechanical components in response to a predetermined signal, thereby opening or interrupting a circuit.

(Col. 1, 11. 51– 64)

In the subsequent section, beginning at col. 2 of the '894 patent, headed "DESCRIPTION OF PREFERRED EMBODIMENTS", the details of operation of the "circuit interrupting or switching system or apparatus" of the '894 patent invention are described, beginning at col. 5, line 46, as follows:

Upon the occurrence of a "fault" condition, which is predetermined, a signal is received by the electronic circuitry associated with system 310 but which is not part of the invention being presently claimed hereby, with the result that coil assembly 346 is energized. The energization of coil 346 results in the generation of a magnetic field therearound with the aid of mounting strap 326, with the further result that plunger 348 is forcibly drawn toward coil 346. FIGS. 6 and 7 illustrate the disposition of latching members 426 and 428 at portions 464 between front and rear banger dogs 360 and 362 within their respective gaps 364 described above.

Upon energization of coil 346 and the forcible movement of plunger 348 toward the coil and against the compressive forces of banger return spring 370, the banger is thus to likewise move, with the result that rear banger dogs 362 "bang" or hit against latching member portions 470, dislodging latching fingers 430 from engagement with the undersides of ends 460 of the movable contacts as a result of rearward pivotal movement of the latching members, with the further result that the movable contact arms 462 swing downwardly under spring pressure such that the movable and fixed contacts are separated, thereby "breaking" or interrupting the normally closed operating circuit. *The circuit remains open until reset by means of the reset button 444 in the manner already described.*

(Col. 5, line 46 – Col. 6, line 4) (Emphasis added.)

The automatic features of the GFCI of the '894 Patent clearly end after the first circuit interruption, thereafter requiring manual interaction from an operator.  The incorporation by

reference of the disclosure of the '338 and '945 Patents do not change what is the invention of the '894 Patent.

As Steve Campolo explains in his Expert Report (Exhibit C) and in his Declaration (Exhibit B) filed concurrently herewith, a GFCI may not automatically close a circuit responsive to an electrical signal.

## ARGUMENT

### Construction of Claims

Both sides apparently agree that before reaching a determination as to whether the claims of the '894 Patent are patentably distinct from the claims of the '338 Patent, the court must construe the claims of both patents, and then determine the differences. *Eli Lilly v. Barr*, 251 F.3d 955, 967, 58 U.S.P.Q. 2d 1869, 1878 (Fed. Cir. 2001), citing *Georgia-Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322, 1326, 52 U.S.P.Q. 2d 1590, 1593 (Fed. Cir. 1999). After determining the differences between the claims, the court next "determines whether the differences in subject matter between the two claims render the claims patentably distinct." *Id*. Defendants are plainly wrong, however, to limit the "cannons (*sic*)of claim construction at play in the present motion" to "only ... those surrounding the doctrine of incorporation by reference and those surrounding interpretation of claims drafted in 'means-plus-function' format pursuant to 35 U.S.C. 112, Sixth Paragraph."

Similarly, in order to determine infringement of a patent's claims, a court must first construe the meaning and scope of a claim. The proper construction of a claim presents a

question of law for the court.[1] *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (in banc), *aff'd*, 116 S. Ct. 1384 (1996).

The defendants implicitly dismiss, and in their subsequent arguments avoid, discussing the significant requirements that all claims are to be construed as they would be understood by one skilled in the art in the context of the specification of that patent, and that if possible the claim should be construed so as to find it valid, in order to conform to the statutory presumption of validity of an issued patent. The law mandates that a patent is presumed valid[2] and its language and disclosures must determine the meaning of its claim terms. *Modine Manufacturing Co. v. U.S. International Trade Commission*, 75 F.3d 1545, 1556 (Fed. Cir. 1996) ("[w]hen claims are amenable to more than one construction, they should when reasonably possible be interpreted so as to preserve their validity").

As the Federal Circuit has made clear, "It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field." *Hoechst Celanese Corp. v. B.P. Chems. Ltd.*, 78 F. 3d 1575, 1578 (Fed. Cir. 1996). Moreover, even "words of ordinary usage must nonetheless be construed in the context of the patent documents. Thus, the court must determine how a person of experience in the field of this invention would, upon reading the

---

[1]    The Federal Circuit acknowledged in *Markman* that a court may construe patent claims in the context of dispositive motions such as Rule 56 summary judgment motions. *See Markman*, 52 F.3d at 981.

[2]    Issued patents are presumed valid.  35 U.S.C. § 282.  The presumption of validity applies independently to each claim of the patent, *id.*, and can be overcome only by clear and convincing evidence of invalidity. *Massey v. Del Lab, Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997).

patent documents, understand the words used to define the invention." *Toro v. White Cons Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999). In seeking to avoid any kind of a "clever" claim construction", the defendants also completely avoided any discussion of the "person skilled in the art" and how such a person would read the claims in light of the specification and drawings (in the case of both the '894 patent-and-suit and of the plaintiff's earlier '338/'945 patents). Thus, the defendants completely failed to even try to apply the legal requirement that the Federal Circuit precedent recognizes to be necessary.

It is well settled that when reviewing a claim it is necessary to review the claim in the context of the specification disclosure, which constitutes the 'intrinsic evidence'. The objective and contemporaneous record provided by the intrinsic evidence is the most reliable guide to help the court determine which of the possible meanings of the terms in question was intended by the inventor to particularly point out and distinctly claim the invention. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250, 48 USPQ 2d 1117, 1122 (Fed. Cir. 1998) ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").

By failing to give consideration to how a person skilled in the art would read the claims of the '894 patent, in the context of the specification, the defendants have completely failed to make any rational showing that would allow the court to properly construe the claims of either patent. Accordingly, the plaintiff Leviton shall review the claims of both the '338/'945 patents and of the '894 patent-in-suit in the context of their respective specifications and in light of the knowledge of one skilled in the art, in order to obtain a true construction of the claims.

**The Claims of the '338 Patent**

There are four claims in the '338 patent, only Claim 1 being an independent claim. Accordingly, that claim shall be construed first in this discussion. When construing Claim 1 of the '338 Patent,[3] the reference in the 'preamble' to "Switching apparatus for selectively completing or interrupting an electrical connection between input and output conductors," clearly refers to the "flip-flop cam arrangement" described in the 'SUMMARY' of that specification, recited above (Col. 1, line 67, of the '338 Patent), which permits remotely controlled, continuing cycles of interrupting and completing of a circuit, in response to an electrical or electronic signal.

The defendants' conclusion regarding the '338 claims seems to be correct, in that they agree that the claims are directed to the device shown in the drawings and described in the specification, as having the cycling flip-flop cam system.

Claim 2, which is dependant on Claim 1 of the '338 Patent, merely adds a specific reference to the "movable actuating means" which works with the 'armature' to operate the cam means.

### The Claims Of The '945 Patent

As explained above, the '945 Patent disclosure, i.e., the specification and drawings, are substantially identical to that of the '338 Patent. As a result, when construing the claims the same invention is generally disclosed. The claims of the '945 Patent (Exhibit A2) are more detailed than those of the '338 Patent, in defining the invention. The preamble to the sets of claims in both patents are identical, i.e., "[s]witching apparatus for selectively completing or interrupting an electrical connection between input and output conductors ...", and clearly is directed to the same generic invention as is discussed above, with respect to the '338 Patent. In both patents, the claims define a Remote Control Switch, which is cyclically operated by a "flip-

---

[3] Claim 1 is set forth in Exhibit A1 hereto.

flop cam" arrangement, which can be cyclically and continuously rotated from an interrupted circuit position to a completed circuit position , in response to successive electrical signals.

### The Claims Of The '894 Patent Must Also Be Construed In Light Of The Language Of The Claim And Of The Specification

The more interesting discussion relates to the proper way to construe the claims of the '894 Patent (Exhibit A3), particularly Claim 1, the only independent claim. Clearly, the same general rules apply, and the claim must be construed in the context of the language of the claim and of the specification, as they would be understood by one skilled in the art. Furthermore, if possible, the construction should be one resulting in a valid claim. When a claim is being construed in accordance with 35 U.S.C. § 112, ¶ 6, the scope of the claim must be limited so as to exclude any equivalent structures which are disclosed in the prior art. *Wang Laboratories, Inc. v. America Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999). Thus, as long as the construction of a claim is consistent for determining both the issue of infringement and the issue of prior art anticipation, the claim must be construed with respect to equivalent structures to that shown in the specification, sufficiently narrowly as required to avoid the prior art. *Id.*

For the '894 Patent, defendants seek to confuse the issues by implying that the 'incorporation by reference' in the '894 Patent of the "entire contents and subject matter" of the '945 Patent, another earlier filed, copending application (which never issued as a patent) and "any and all of their respective 'parent' patent applications to which they are co-pending" (Col. 1, lines 12-16), increased the scope of the '894 Patent claims to one where they are invalid for double patenting in view of the claims of the '338 and '945 Patents. As all sides agree, the '338 Patent and the '945 Patent disclosures are identical. In the opening paragraph of the "BACKGROUND AND SUMMARY OF THE INVENTION", the '894 patentees explain the reasons for choosing "to group" the present invention of the '894 Patent "within this

continuation-in-part application, rather than file same in a separate and distinct application", i.e., because of a "common thread that runs through these developments", and to "also serve to aid the Examiner in considering, collectively, the prior art of record in all applications." (Col. 1, lines 20-30).

The specification also explains the meaning of the term "second preferred embodiment of the present invention" as being intended to "denote another in a continuous series of technical developments relating, directly and indirectly, to the breaking or interruptions of circuits upon the existence of predetermined conditions", which form a "common thread". Most significantly, the specification also distinguishes this "second embodiment" from what came before in that it "concentrates upon the ground fault circuit interrupting features of the invention." That is should there be a "'fault', the second embodiment of the present invention will cause an *interruption of the circuit*... so as to attempt to avoid injury or serious shock." (col. 1, 11. 40-44). To one skilled in the art, as explained by Leviton's expert, Steve Campolo, in his Declaration (Exhibit B, paragraph 8), this has a special meaning which could not include the 'flip-flop' cam switch of the '338 patent, which would automatically cycle back to a closed circuit.

The language of the claim parallels the language of the specification, in that the preamble refers to "Switching apparatus for selectively interrupting an electrical connection ...."

Defendants argue that because "the entire contents and subject matter" of the '338/'945 Patents was incorporated into the '894 Patent, the claims of the '894 Patent must also encompass the switch of the '338 Patent. However, the reasons for this incorporation by reference was explained by the inventors in the specification, and it was further expressly stated that the invention of this ['894] patent "concentrates upon the ground fault circuit interrupting features of the invention."(Col. 1, ll. 35-37). Accordingly, the '894 claims must cover that type of 'switch,

which only calls for responding to an electrical signal by 'interrupting' a circuit, but does not permit the system to 'complete' a circuit upon receiving further electrical signals.

### Reading The '894 Specification As It Would Be Understood By One Of Ordinary Skill In The Art, The Claims Must Be Construed In Terms Of A GFCI System

Fully construing the claims of the '894 Patent includes the 'means-plus-function' limitations in the '894 Patent, namely the "plunger means" and the "movable means responsive to movement of said plunger means." Construction of these means-plus-function limitations requires reference only to the drawings and specification of the '894 Patent to determine the structural nature of these limitations based upon their stated function, as understood by one of ordinary skill in the art. Defendants seek to insinuate the incorporated disclosure of the '338 Patent into the construction of these terms. However, in the overall context of the '894 Patent, which limits the scope of the incorporation by reference to certain 'common threads', it is seen that the 'flip-flop' cam means of the '338 disclosure does not meet the required function of the claims of the '894 Patent, which are directed to ground fault circuit interrupters.

When construing a "means-plus-function" limitation in accordance with 35 U.S.C. § 112, ¶ 6, the specification must be reviewed to determine the structure disclosed to carry out the particular function defined in the claim, and their equivalents. *Odetics, Inc. v. Storage Technology Corp.*, 185 F.3d 1259, 1264 (Fed. Cir. 1999). In respect to the claims of the '894 Patent, any such 'function' must be one associated with ground fault circuit interrupters, as that would be understood by persons skilled in the art. *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473 (Fed. Cir. 1998); *see also, E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430 (Fed. Cir. 1988).

In *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1341, 1345 (Fed. Cir. 2001), the Federal Circuit held that "[w]here the specification makes clear

that an invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent." *Scimed*, 242 F.3d at 1345. It further provided that where a patentee has "specifically identified, criticized and disclaimed" a configuration of his patent, "the patentee cannot now invoke the doctrine of equivalents to embrace a structure that was specifically excluded from the claims." *Id* A particular structure can be deemed outside the reach of the claims because that structure is clearly excluded from the claims, whether the exclusion is express or implied.

As is explained by Steve Campolo in his Expert Report and concurrently filed Declaration, one skilled in the art would not consider using the flip-flop cam system of the '338/'945 Patents, which require that a "sequential actuation of coil 74" permit the circuit to be completed ('338 Patent, Col. 9, line 50 – Col. 10, line 15), in a GFCI system (Exhibit B, ¶8). Such a cam system is not at all suitable for the GFCI invention of the '894 Patent, because the requirements of the art-recognized standards for a GFCI do not permit the GFCI to automatically reclose a circuit upon the receipt of a subsequent electrical or electronic signal. That is, although the '338/'945 Patents "cam means" disclosure, may be incorporated into the '894 Patent specification, it must be excluded from the claims of the '894 Patent because its function is not part of what one skilled in the art would recognize as proper for an invention directed to a GFCI, *Multiform Dessiccants*, *supra,* and *Scimed, supra*.

When reference is made to the '894 specification, it is clear from the Title ("GROUND FAULT CIRCUIT INTERRUPTING SYSTEM") and from the text of the "BACKGROUND AND SUMMARY OF THE INVENTION" portion of the specification, that the invention disclosed and claimed in this '894 Patent is a "ground fault circuit interrupting system," or device. The system defined by the '894 claims is one that is useful for "selectively interrupting an electrical connection between input and output conductors," as is described in the claim

preamble, that reflects the Summary of the Invention, in Columns 1-2 of the '894 Patent, and is more fully described in the subsequent description of the drawings, and incorporated by the "means-plus-function" limitations of the claims, as is more fully explained below.

### The Preamble In The '894 Claim 1 Gives Life And Meaning To The Claim

The significance of the preamble in the claims of the three patents under consideration, *i.e.*, the '338/'945 Patents and the '894 Patent, is that they reflect their respective disclosures. Specifically, the preamble to Claim 1 of each of the '338/'945 Patents recites "[s]witching apparatus for selectively completing or interrupting an electrical connection between input and output conductors." That language clearly describes the continuously cycling, flip-flop cam arrangement of that '338/'945 specification. The preamble to Claim 1 of the '894 Patent recites "[s]witching apparatus for selectively interrupting an electrical connection between input and output conductors...." That language clearly describes the GFCI, which only responds to an electrical or electronic signal by *interrupting* the circuit. A GFCI cannot, and should not, recycle to complete the circuit, as does the switch of the '338/'945 Patents (Exhibit B, ¶8) . Clearly, the preambles in these three patents delineate the invention intended to be claimed, in accordance with the invention disclosed in their respective specifications. The preambles thus are significant in defining the invention covered by the respective claims. *Bell Comm. Research , Inc. v. Vitalink Comm. Corp.*, 55 F.3d 615, 620-621 (Fed. Cir. 1995).

The invention defined by the claims of the '894 Patent, including the preamble to Claim 1, is a switch which only "interrupts" a circuit. The "effect preamble language should be given can be resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.", *Corning Glass Works, v*

*Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251, 1257, 9 U.S.P.Q. 2d 1962 (Fed. Cir. 1989).  To read the claim in light of the specification indiscriminately to cover all types of switches, including both the GFCI type, which only interrupts the circuit, and the on/off flip flop type switches, that can signal both on and off remotely, "would be divorced from reality and from the context of the specification.  The invention of the '894 Patent is restricted to those" switches that are circuit interrupters, only. *Id.*

### The Construction Of A Claim Must Reflect The Entire Patent Record.

When construing claims of a patent, the claims must be read in terms of the disclosure of the specification and is limited by what is disclosed in the specification, *C.R. Bard, Inc. v. M3 Systems Inc.,* 157 F.3d 1340, 1343 (citing *Slimfold Mfg. Co. v. Kinkead Indus., Inc.,* 810 F.2d 1113, 116 (Fed. Cir. 1987) (observing that claims are not interpreted "in a vacuum" but are read and understood in light of the specification of which they are a part.); *see also Bell Comm.,* 55 F.3d at 621 (holding that it is legal error to construe a claim by considering it in isolation.  A claim must be read in view of the specification of which it is a part).  This is especially true in the case of a "means-plus-function" limitation, which must be construed in accordance with 35 U.S.C. § 112, ¶ 6.  That statute requires that the specification be reviewed to determine the structure disclosed to carry out the particular function defined in the claim, and their equivalents. *Odetics*, 185 F.3d at 1264.

The specification of the '894 Patent makes very clear that its invention is a "Ground Fault Circuit Interrupting System."  As such, when the '894 claims are construed in accordance with the specification and drawings in the '894 Patent, as they would be understood by one of ordinary skill in the art, they must define such a Ground Fault Circuit Interrupting System.

*Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473 (Fed. Cir. 1998); *see also, E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430 (Fed. Cir. 1988).

Although the "entire contents and subject matter" of the '945/'338 Patent and the '262 application are incorporated by reference in the present patent, together with "any and all of their respective 'parent' patent applications" it is clear that it is incorporated only in the context of supporting the embodiment which is actually disclosed in the original text of this '894 patent. (col. 1, lines 20-68). Just as in an interference count the interpretation of a term "must be taken from the application in which the counts originated", *Kropa v Robie*, 187 F. 2d 150, 88 U.S.P.Q. 478 (CCPA, 1951), in this case the meaning of the means plus function language must be taken from the description in the '894 Patent itself.

Accordingly, construing the language of the claims of the '894 Patent requires reference to the embodiment that meets the limitation of only providing for the "interrupting an electrical connection", which is the embodiment set out in the body of the '894 Patent.

It is incontestable that the '894 Patent, on its face, "incorporates by reference as if fully set forth herein the entire content and subject matter of" the parent and grandparent applications and patents. However, the subject matter of this patent remains a ground fault circuit breaker, and not a "Remote Control System," as in the '338 Patent. To the extent one skilled in the art would recognize that portions of the Remote Control system may be useful in explaining the operation of the GFCI, it would be considered. But the flip-flop cam is clearly outside of claims to an invention for a GFCI, that require that the ultimate function be "selectively interrupting an electrical connection ...," and not both "selectively completing or interrupting ...," which is the hallmark of a remote control, on-off, or "flip-flop" switch.

**Construing The 'Means Plus Function' Limitations**

Once it has been determined that GFCIs are the subject matter of the '894 Patent, the "movable means" can only be a part of the GFCI system described and shown in the specification and drawings of the '894 application as filed, and includes a "first movable means" that is a longitudinal element that moves longitudinally when the plunger is moved by the magnetic field generated by the coil means, and a "second movable means," which is a "latching means" that is moved away from the movable contact by the "first movable means." Specifically, the plunger 348 (referring to figure 6 of the '894 Patent) as it moves upwardly and into the coil 346, pulls the longitudinal element 354, referred to as the "banger," which in turn as it moves upwardly, moves the latching member portions 470, which causes the latching finger 430 to be dislodged and moved away from the spring-loaded movable contact arm 462, which is thus released, releasing the spring-biased movable contact 466 to move away from the stationary contact 468, thus "interrupting" the electrical connection.  As can be seen from the views of Figures 7 and 8 of the '894 Patent, even if the coil were to receive a further signal to energize and thus move the plunger again, movement of the plunger and of the banger 354 would have no effect on reclosing the contacts 466, 468, which are spring biased apart.  Accordingly, the claims of the '894 Patent do not include the "flip-flop", "movable cam means" of the claims of the '338/'945 Patents.  Therefore, the same invention is not described in the claims of the '338/'945 Patents as in the claims of the '894 Patent.

The only 'evidence' submitted by the defendants contrary to the above review of the intrinsic evidence of the patents, is a reference to a decision by an Administrative Law Judge ("ALJ") of the International Trade Commission ("ITC") which found that the published disclosure of the '338 Patent 'anticipates' the claims of the '894 Patent.  However, under clear appellate precedent, such a decision is not evidence, and is not collateral estoppel to the present

case.  See, *Texas Instruments Inc. v Cypress Semi-conductor Corp.*, 90 F.3d, 1558, 1569 (Fed. Cir. 1996); and *Bio-Technology General Corp. v. Genentech Inc.*, 80 F.3d 1553, 163-4 (Fed. Cir. 1996).  Moreover, with all due respect to the ALJ, the decision is wrong, and is not as yet an order of the ITC.

Accordingly, following the binding precedent of the Federal Circuit, the claims of the '894 Patent define a mechanism for a ground fault circuit interrupting switch that is different from the "flip-flop" remote switching mechanism disclosed in the specification and drawings of, or claimed in the claims of, the '338/'945 Patents.  There is no basis for construing the GFCI claims of the '894 Patent as including the switch structure of the '338/'945 Patents.

It is clear that when the claims are construed properly in accordance with 35 U.S.C. § 112, ¶ 6, there is no anticipation of claim 1 of the '894 Patent by either the claims or the specification disclosure of the '338 Patent or the '945 Patent.

## CONCLUSION

Based on the foregoing, the Court should deny USI's motion for summary judgment, and should construe the claims of the '894 Patent as set out above by Leviton, so that they are all directed to a GFCI, in accordance with the language of the patent specification and claims. As a result, the Court should deny the instant motion, by finding the construction requested by plaintiff.

Dated: April 14, 2003                         Respectfully submitted,

_____

Paul J. Sutton
Joseph M. Manak
Barry G. Magidoff
Joseph G. Lee
GREENBERG TRAURIG, LLP
885 Third Avenue
New York, New York 10022
Telephone: (212) 801-2100
Facsimile: (212) 688-2449

D. Christopher Ohly, Esq.
BLANK ROME COMISKY & McCAULEY, LLP
250 West Pratt Street
Suite 1100
Baltimore, MD 21201
Telephone: (410) 659-1400
Facsimile: (410) 659-1414

Attorneys for Plaintiff
LEVITON MANUFACTURING CO., INC.

TABLE OF AUTHORITIES

Page(s)

### Federal Cases

*Azioni,*
  158 F.3d 1243, 1250, 48 USPQ 2d 1117, 1122 (Fed. Cir. 1998) ..............................11

*Bell Comm. Research , Inc. v. Vitalink Comm. Corp.,*
  55 F.3d 615, 620-621 (Fed. Cir. 1995) ............................................................ 18, 19

*Bio-Technology General Corp. v. Genentech Inc.,*
  80 F.3d 1553, 163-4 (Fed. Cir. 1996) ....................................................................... 22

*C.R. Bard, Inc. v. M3 Systems Inc.,*
  157 F.3d 1340, 1343 ................................................................................................ 19

*Corning Glass Works, v Sumitomo Electric U.S.A., Inc.,*
  868 F.2d 1251, 1257, 9 U.S.P.Q. 2d 1962 (Fed. Cir. 1989) ................................... 19

*Eli Lilly v. Barr,*
  251 F.3d 955, 967, 58 U.S.P.Q. 2d 1869, 1878 (Fed. Cir. 2001) ............................. 9

*Georgia-Pacific Corp. v. United States Gypsum Co.,*
  195 F.3d 1322, 1326, 52 U.S.P.Q. 2d 1590, 1593 (Fed. Cir. 1999) ......................... 9

*Hoechst Celanese Corp. v. B.P. Chems. Ltd.,*
  78 F. 3d 1575, 1578 (Fed. Cir. 1996) ..................................................................... 11

*Kropa v Robie,*
  187 F. 2d 150, 88 U.S.P.Q. 478 (CCPA, 1951) ...................................................... 20

*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967, 970-71 (Fed. Cir. 1995) (in banc), aff'd, 116 S. Ct. 1384 (1996) ....... 10

Massey v. Del Lab, Inc.,
  118 F.3d 1568, 1573 (Fed. Cir. 1997) ..................................................................... 10

*Modine Manufacturing Co. v. U.S. International Trade Commission,*
  75 F.3d 1545, 1556 (Fed. Cir. 1996) ....................................................................... 10

*Multiform Desiccants, Inc. v. Medzam Ltd.,*
  133 F.3d 1473 (Fed. Cir. 1998) ......................................................................... 16, 20

*Nemours & Co. v. Phillips Petroleum Co.,*
  849 F.2d 1430 (Fed. Cir. 1988) ......................................................................... 16, 20

*Odetics, Inc. v. Storage Technology Corp.,*
  185 F.3d 1259, 1264 (Fed. Cir. 1999) ............................................................... 16, 19

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.,*
  242 F.3d 1337, 1341, 1345 (Fed. Cir. 2001) .................................................... 16, 17

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.,*
   810 F.2d 1113, 116 (Fed. Cir. 1987) ............................................................... 19

*Texas Instruments Inc. v Cypress Semi-conductor Corp.,*
   90 F.3d, 1558, 1569 (Fed. Cir. 1996) ............................................................... 22

*Toro v. White Cons Indus., Inc.,*
   199 F.3d 1295, 1299 (Fed. Cir. 1999) ............................................................... 11

*Wang Laboratories, Inc. v. America Online, Inc.,*
   197 F.3d 1377, 1383 (Fed. Cir. 1999) ............................................................... 14

## State Cases

38 - Col. 2 .................................................................................................................. 4

46 - Col. 6 .................................................................................................................. 8

50 - Col. 10 .............................................................................................................. 16

58 - Col. 6 .............................................................................................................. 25

61 - Col. 9 .............................................................................................................. 5

67 - Col. 3 .............................................................................................................. 25

## Federal Statutes

35 U.S.C. § 112, ¶ 6 ......................................................................................... passim

35 U.S.C. § 282 ...................................................................................................... 10

35 U.S.C. 112 ............................................................................................................ 9

Paragraph 6 of 35 U.S.C. § 112 ............................................................................ 1

## Other Authorities

U.S. Patent No. 4,386,338                                                                              2

U.S. Patent No. 4,518                                                                              2, 6

U.S. Patent No. 4,595                                                                              1, 2