**CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
Washington, D.C.

In the Matter of

**CERTAIN GROUND FAULT CIRCUIT
INTERRUPTERS ("CFCIs") AND PRODUCTS
CONTAINING SAME**

**Investigation No. 337-TA-478**

**ORDER NO. 9:**   **Denying Complainant Leviton's Motion for Summary Determination
That the Accused Products of Certain Respondents Infringe the '894
Patent**

## I.      Procedural Background

By publication of the Notice of Investigation in the *Federal Register*, on August 23, 2002,

the Commission instituted this investigation, pursuant to subsection (b) of section 337 of the

Tariff Act of 1930, as amended, to determine:

> [W]hether there is a violation of subsection (a)(1)(B) of section 337
> in the importation into the United States, the sale for importation, or
> the sale within the United States after importation, of certain ground
> fault circuit interrupters or products containing same by reason of
> infringement of claim 1, 2, 3, or 4 of U.S. Letters Patent 4,595,894,
> and whether an industry in the United States exists as required by
> subsection (a)(2) of section 337.

67 Fed. Reg. 54671 (2002).[1]

The respondents named in the Notice of Investigation included Yueqing Huameili

---

[1] As indicated in the caption of this Order, and as seen the parties' filings, the term "ground
fault circuit interrupter(s)" is often indicated by the acronym GFCI(s).

Electronic Co., Ltd., d/b/a HML, Yueqing Huameili Electronic Co., Ltd., and Van-Sheen Electric Appliance Co., Ltd., d/b/a Yatai Switch Factory.[2] *Id.*

On January 8, 2003, the complainant, Leviton Manufacturing Co., Inc. ("Leviton"), pursuant to 19 C.F.R. § 210.18, filed its "Motion for Summary Determination That the Accused Products of Respondents Yueqing Huameili Electronic Co., Ltd. and Van-Sheen Electric Appliance Co., Ltd. Infringe the Asserted Claims of the '894 Patent," and a Memorandum in support thereof. Motion Docket No. 478-8.

On January 31, 2003, Respondents filed their Opposition to Leviton's Motion for Summary Determination.

On January 31, 2003, the Commission Investigative Staff of the Office of Unfair Import Investigations ("OUII") filed its Response supporting in part Leviton's Motion for Summary Determination.

The Administrative Law Judge requested the filing of replies. On February 10, 2003, Leviton and the Commission Investigative Staff filed their Replies.[3]

On February 13, 2003, Respondents filed a Motion for leave to respond to the Replies filed by Leviton and the Staff, and a Response. Motion Docket No. 478-21. Motion No. 478-21 for leave is GRANTED.

---

[2] Respondents Yueqing Huameili Electronic Co., Ltd (d/b/a/ HML) and Yueqing Huameili Electronic Co., Ltd. are referred to as "Huameili." Respondent Van-Sheen Electric Appliance Co., Ltd. (d/b/a Yatai Switch Factory) is referred to as "Van-Sheen." Huameili and Van-Sheen are referred to collectively as "Respondents."

[3] As filed on February 10, 2003, the title of Leviton's Reply refers to a Motion for Summary Determination of Validity. The document, however, addresses Leviton's Motion for Summary Determination on the question of infringement.

2

On February 21, 2003, Leviton file a Motion for leave to respond to Respondents'
Response to Leviton's Reply.  Motion Docket No. 478-23.  Motion No. 478-23 for leave is
GRANTED.

Leviton requests a summary determination that the accused products manufactured by
Respondents literally infringe the asserted claims (i.e., all claims) of the '894 patent, as construed
by Leviton.  No argument is presented with respect to the doctrine of equivalents.  *See, e.g.,*
Leviton's Motion at 1; Leviton's Memorandum at 21; OUII Response at 4 n.1.  For the purpose
of making a determination as to the question of infringement, no party has made any distinction
among the Huameili and Van-Sheen products.  *See, e.g.,* Respondents' Opposition at 6; Haynes
Declaration (Respondents' Opposition Exhibit A), ¶ 10; Leviton's Memorandum at 8; OUII
Response at 7 n.4.

## II.    Standard for Summary Determination

The Commission's Rules provide that any party may move with any necessary supporting
affidavits for a summary determination of all or any of the issues to be determined in an
investigation.  The determination sought by the moving party shall be rendered if the pleadings
and any depositions, admissions on file, and affidavits show that there is no genuine issue as to
any material fact and that the moving party is entitled to a summary determination as a matter of
law.  A party opposing a motion for summary determination may not rest upon mere allegations
or denials of the opposing party's pleading, but by affidavits, answers to interrogatories or as
otherwise provided for under the Commission's Rules, must set forth specific facts showing that
there is a genuine issue of fact for the evidentiary hearing.  19 C.F.R. § 210.18(a)- (c).  The
substantive aspects of the Commission's Rule on summary determination are analogous to

Federal Rule of Civil Procedure 56 under which summary judgment is proper if there is a showing that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party need not produce evidence showing the absence of a genuine issue of material fact, rather, the burden on the moving party may be discharged by pointing out that there is an absence of evidence to support the nonmoving party's case. *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed. Cir. 1988)(citing *Celotex*, 477 U.S. at 325).

Evidence must be viewed in a light most favorable to the nonmovant, and all reasonable inferences must be drawn in the nonmovant's favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, if the nonmovant's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *see Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163-64 (Fed. Cir. 1985)("mere allegations by declaration or otherwise do not raise issues of fact needed to defeat a motion for summary judgment"); *see also D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 50-51 (Fed. Cir. 1983), *cert. denied*, 474 U.S. 825 (1985)(affidavit which fails to raise specific issues of material fact insufficient to preclude grant of summary judgment).

Summary judgment under the Federal Rules, and analogously under the Commission's Rules, should not be regarded "as a disfavored procedural shortcut, but rather as an integral part of the . . . Rules as a whole, 'which are designed to secure the just, speedy and inexpensive determination of every action.'" *Avia*, 853 F.2d at 1560 (quoting *Celotex*, 477 U.S. at 327). Nevertheless, summary judgment "is not designed to substitute lawyers' advocacy for evidence, or affidavits for examination before the fact-finder, when there is a genuine issue for trial."

4

*Continental Can Co. USA, Inc. v. Monsanto Co.*, 1264, 1265 (Fed. Cir. 1991). Similarly, on

appeal, an "appellate tribunal must assure itself that there is no reasonable version of the facts, on

the summary judgment record, whereby the nonmovant could prevail, recognizing that the

purpose of summary judgment is not to deprive a litigant of a fair hearing, but to avoid an

unnecessary trial. *EMI Group North America, Inc. v. Intel Corp.* 157 F.3d 887 891 (1998), *cert.*

*denied*, 526 U.S. 1112 (1999).

## III.    The Asserted Claims

The '894 patent issued on June 17, 1986, based on a continuation-in-part of Application

Serial No. 558,262 (Dec. 5, 1983), and a continuation-in-part of Application Serial No. 431,982

(Sept. 30, 1982), U.S. Patent No. 4,518,945.[4]  *See* '894 Patent (a copy of which is attached to

Leviton's Memorandum as Exhibit A).[5]  The '894 patent incorporates by reference the '945

patent. *See, e.g.*, '894 Patent. col. 1, lines 6-16 ("The present application . . . incorporates by

reference as if fully set forth herein the entire contents and subject matter thereof and of any and

---

[4] The '945 patent issued on May 21, 1985, as a continuation-in-part of Application Serial No. 207,534 (Nov. 17, 1980), U.S. Patent No. 4,386,338. *See* '945 Patent (a copy of which is attached hereto, and to Leviton's Memorandum as Exhibit E). Leviton represents that the disclosures of the '945 patent and the '338 patent are identical, including the drawings. Leviton Memorandum at 4-5.

Leviton states the '894 patent is only a partial continuation-in-part of the '945 patent because of the difference in its function (which is only to open a circuit, and not to provide for a subsequent change in the switching system). Leviton Memorandum at 5.  The general function of the switching apparatus claimed in the '894 patent (to open a circuit in certain circumstances), and detailed discussion concerning the function of a disputed claim limitation or element (a "strap means"), are discussed later in this Order.

[5] For the convenience of the reader, copies of the '894 and '945 patents are attached hereto.

all of their respective 'parent' patent applications to which they are co-pending.").[6]  According to

the '894 specification, the preferred embodiment disclosed therein is a "'second' preferred

embodiment," which "is meant to denote another in a continuous series of technical

developments relating, directly and indirectly, to the breaking or interruptions of circuits upon

the existence of predetermined conditions." *See Id.*, col. 1, lines 19-24.

The '894 patent specification sets forth several objects of the claimed invention and

particularly of the so-called "second" embodiment, which is the embodiment illustrated in the

'894 patent, including the following:

> In addition to the advantages of the present invention already set forth
> in copending applications noted above, the contents of which are
> incorporated herein by reference, the second embodiment of this
> invention concentrates upon the ground fault circuit interrupting
> features of the invention. In other words, in use, should
> predetermined conditions exist, such as by way of example only, a
> threat to life or property as a result of what is known in the art as a
> "fault", the second embodiment of the present invention will cause an
> interruption of the circuit within which the fault appears, in a
> sufficiently short response time, so as to attempt to avoid injury or
> serious shock. No claim is being made within the present application
> for any possible novel circuitry or electrical means, but rather this
> application is directed to the novel electromechanical and mechanical
> means by which, in response to a signal, the circuit is interrupted by
> a physical separating of electrically conducting contacts.

'894 Patent, col. 1, lines 32-50.

The claims of the '894 patent are:

---

[6] It appears that at least at the time that the '894 patent application was filed and the patent
issued (and subsequently thereto), a patent could incorporate essential material by reference to
another United States patent or allowed application, although not to a non-patent publication.
*See Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1377 (Fed. Cir.
1999)(citing, *inter alia*, *Manual of Patent Examining Procedure* § 608.01(p) (4th ed., Rev. 8,
1981)).

1. Switching apparatus for selectively interrupting an electrical connection between input and output conductors, or the like, comprising, in combination: a housing; magnetizable plunger means disposed within a portion of said housing for movement between first and said [second positions; electromagnetic coil means disposed within][7] housing for moving said plunger means when energized from the first position to the second position; an input contact electrically connected to said input conductor; an output contact electrically connected to said output conductor; strap means for mounting the switching apparatus upon a selected surface, said strap means including portions thereof which define a path of the magnetic field generated by said coil means to influence the position of said plunger means, and movable means responsive to movement of said plunger means for influencing a separation of said input and output contacts, thereby interrupting electrical connection between them, said movable means including first and second movable members, movement of said second member being caused by movement of said first member.

2. Switching apparatus according to claim 1, wherein said first member is movable with and opperatively [sic] connected to said plunger means.

3. Switching apparatus according to claim 1, wherein said plunger means comprises a plunger member formed with a relatively elongated portion which extends into portions of said electromagnetic coil means.

4. Switching apparatus according to claim 1, further including spring means for returning said plunger means to said first position after energization of said coil means.

'894 Patent, col. 6, line 49 - col. 8, line 6.

Although Leviton's Motion for Summary Determination seeks a determination that

Respondents' accused products infringe all claims of the '894 patent, Leviton's Memorandum

and Respondents' Opposition primarily address only independent claim 1. Indeed, based on the

---

[7] The portion of this claim text within brackets is supplied by a Certificate of Correction (Dec. 11, 2001), a copy of with is included in Exhibit A to Leviton's Memorandum.

7

pleadings filed in connection with the pending Motion, and as discussed herein, an analysis of

Leviton's infringement allegation with respect to independent claim 1 is sufficient to decide the

pending Motion.

## IV.  Analysis

Any infringement analysis requires two steps: construction of the claims, to determine

their scope and meaning, and comparison of the properly construed claims to the allegedly

infringing device or method.  *Cybor Cop. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.

Cir.1998)(*en banc*).  Claim construction, including a determination of the meaning and scope of

means-plus-function claim limitations, is a matter of law.  The comparison of claims to the

accused device or method, and the corresponding determination of infringement, whether literal

or under the doctrine of equivalents, is a question of fact.  *Tanabe Seiyaku Co. v. United States

Int'l Trade Comm'n,* 109 F.3d 726, 731(Fed. Cir.1997); *Markman v. Westview Instruments, Inc.,*

52 F.3d 967, 976, 979 (Fed. Cir. 1995)(*en banc*), *aff'd,* 517 U.S. 370 (1996).

To construe a claim, one first looks to the claim language. *Pitney Bowes, Inc. v.

Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999); *Comark Communications, Inc. v.

Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). Then, one looks to the other intrinsic

evidence, beginning with the specification and concluding with the prosecution history,

if in evidence.[8]  *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996);

*Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a

---

[8] No prosecution history has been offered in connection with the Leviton's Motion for
Summary Determination beyond a copy of the application that led to the '894 patent (and a copy
of the assignment of the patent to Leviton and a copy of the '945 patent). It appears that the '894
patent issued without any Office Action.  *See* Leviton's Memorandum at 3, Exhibits A
through E.

part."). If the claim language is clear on its face, then a court's consideration of other intrinsic

evidence is restricted to determining if a deviation from the clear language of the claims is

specified.[9] *Interactive Gift Express*, 231 F.3d at 865. If the claim language is not clear on its

face, then a court's consideration of the remaining intrinsic evidence is directed to resolving, if

possible, the lack of clarity.[10] *Id.*

One looks "to the specification to ascertain the meaning of the claim term as it is used by

the inventor in the context of the entirety of his invention," and not merely to limit a claim

term.[11] *Comark*, 156 F.3d at 1186-87. In general, when using the specification to construe claim

---

[9] A deviation may be necessary if, for example, "a patentee [has chosen] to be his own lexicographer and use[s] terms in a manner other than their ordinary meaning." *Id.* (quoting *Vitronics*, 90 F.3d at 1582). Any such special definition given to a word must be clearly defined in the specification. *Markman*, 52 F.3d at 1580. A deviation may also be necessary if a patentee has "relinquished [a] potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 231 F.3d 859, 865 (Fed. Cir. 2000)(quoting *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999).

[10] If the meaning of the claim limitation is apparent from the totality of the intrinsic evidence,. then the claim has been construed. If, however, a claim limitation remains unclear, one may look to extrinsic evidence to help resolve the lack of clarity. Relying on extrinsic evidence to construe a claim is "proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997); *Vitronics*, 90 F.3d at 1583-85 ("Such instances will rarely, if ever, occur."). Extrinsic evidence may always be consulted, however, to assist in understanding the underlying technology. *See Pitney Bowes*, 182 F.3d at 1309 ("[C]onsultation of extrinsic evidence is particularly appropriate to ensure that [a judge's] understanding of the technical aspects of the patent is not entirely at variance with the understanding of one skilled in the art."); *Vitronics*, 90 F.3d at 1585 ("Had the district court relied on the expert testimony and other extrinsic evidence solely to help it understand the underlying technology, we could not say the district court was in error."). Extrinsic evidence may never be used "for the purpose of varying or contradicting the terms in the claims." *Markman*, 52 F.3d at 981.

[11] As stated in the in the *Markman*, opinion, "the focus in construing disputed terms in claim language is not the subjective intent of the parties to the patent contract when they used a

(continued...)

terms, care must be taken to avoid reading "limitations appearing in the specification ... into [the] claims." *Intervet Am., Inc. v. Kee-Vet Lab., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989).

The specifications of the '894 patent and the incorporated '945 patent play an especially important role in the interpretation of the claims of the '894 patent because the claims contain "mean-plus-function" language. Section 112 of the Patent Act provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and *such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.*

Section 112, ¶ 6 (emphasis added).

The scope of a "means" limitation "is sharply limited to the structure disclosed in the specification and its equivalents. Moreover, the extent of equivalents must be interpreted in light of the disclosure of the invention in the specification, as a whole, as well as the prosecution history."[12] *J & M Corp. v. Harley-Davidson, Inc.* 269 F.3d 1360, 1367 (Fed. Cir. 2001).

---

[11] (...continued)
particular term. Rather the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." 52 F.3d at 986. *Accord Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996)(The court assigns a claim term the meaning that it would be given by persons experienced in the field of the invention.).

[12] Leviton relies to some extent on the language of the Court of Appeals for the Federal Circuit in its opinion in *Ishida Co., Ltd. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000)(citing *Serrano v. Telular Corp.*, 111 F.3d 1578, 1583 (Fed; Cir 1997). *See* Leviton's Memorandum at 10. The particular language employed by the Federal Circuit in that opinion indicates the narrow aspects of interpreting a means-plus-function claim limitation. As quoted by Leviton, the *Ishida* opinion provides: "proper application of § 112 ¶ 6 generally reads the claim element to embrace distinct and alternative described structures for performing the claimed function. Specifically, '[d]isclosed structure includes that which is *described* in a patent specification, including any alternative structures *identified*.'" 221 F.3d at 1316 (emphasis added). It is also noteworthy that
(continued...)

With respect to the factual determination of whether literal infringement exists, "the patentee must show that the accused device contains every limitation in the asserted claims. If even one limitation is missing or not met as claimed, there is no literal infringement." *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir.1998)(citations omitted). In order to establish literal infringement of a means-plus-function claim, such as that asserted by Leviton in connection with the pending Motion for Summary Determination, "the patentee must establish that the accused device employs structure *identical or equivalent* to the structure disclosed in the patent and that the accused device performs the *identical* function specified in the claim." *WMS Gaming, Inc. v. International Game Tech.*, 184 F.3d 1339, 1350 (Fed. Cir. 1999)(emphasis added); *see also General Elec. Corp. v. Nintendo Co., Ltd.*, 179 F.3d 1350, 1354-55 (Fed. Cir. 1999)("the fact-finder must determine whether the accused device performs an identical function to the one recited in the means-plus-function clause. . . . If the identical function is performed, the fact-finder must then determine whether the accused device utilizes the same structure or materials as described in the specification, or their equivalents.").

The Motion for Summary Determination and the Opposition thereto focus on one particular limitation of claim 1 of the '894 patent, i.e., the strap means. As may been seen in claim 1, that means is claimed, as follows: "strap means for mounting the switching apparatus upon a selected surface, said strap means including portions thereof which define a path of the magnetic field generated by said coil means to influence the position of said plunger means . . . ."

---

[12] (...continued)
in the *Ishida* opinion, the Federal Circuit pointed out that in construing a mean-plus-function claim, a court is not required "to formulate a single claim interpretation to cover multiple embodiments. Rather, § 112 ¶ 6 requires only identification of the structure, or structures, in the specification that perform the recited function." *Id.*

Thus, this "strap means" is used for mounting the entire claimed switching apparatus on a selected surface, and is referred to in the '894 specification as a "mounting strap." *See, e.g.,* '894 Patent, col. 3, line 12; col. 5, lines 52-53. Yet, as can been clearly seen from the plain language of claim 1, the strap also must include portions to "define a path of the magnetic field generated by said coil means to influence the position of said plunger means."

As discussed above, one of the objects of the claimed invention of the '894 patent is to provide an apparatus that opens, or "breaks" an electrical circuit if a "fault" occurs. The '894 specification provides an explanation of how the magnetic field, the coil, the strap and plunger means function so as to interrupt an electrical circuit. The '894 patent specification discloses that "fault" conditions are to be predetermined. *See* '894 Patent, col. 1, lines 19-44; col. 5, lines 46-50. If a fault occurs as per predetermined conditions, a signal is received by electronic circuitry (which is expressly not part of the claimed invention) with the result that a coil assembly, depicted as **346** in the Figures, is energized. '894 Patent, col. 5, lines 46-50. The energization of the coil **346** results in the generation of a magnetic field, with the aid of the mounting strap **326**, with the further result that the plunger **348** is forcibly drawn toward the coil **346**. Upon energization of the coil **346** and the forcible movement of the plunger **348** toward the coil and against the compressive forces of a banger return spring, the banger moves. Movement of the banger results in the banger dogs "banging" or hitting against certain so-called "latching member portions," and eventually (after a few more mechanical movements within the apparatus) the physical separation of movable and fixed contacts, thereby "breaking" or interrupting the normally closed circuit. In the embodiment of the '894 patent, the circuit remains open until reset by means of a reset button. *See* '894 Patent, col. 5, line 50 - col. 6, line 4.

12

The strap means is discussed in several portions of the '894 specification. The discussion

in column 3 addresses the physical structure of the strap and the function associated with the

electromagnetic field. The '894 patent specification provides in pertinent part:

> Mounting strap **326** is formed with a pair of end tab portions **330** and
> **332**, the latter, unlike the former, including a generally square
> opening **334** formed therethrough. A second relatively square opening
> **336** is formed through a relatively central central [sic] strap portion
> **338** of strap **326**, each of these openings **334** and **336** being defined
> by surfaces of the strap which lie adjacent rivet posts **340** integrally
> formed with strap **326**.

> *As in the case of strap **22**, mounting strap **326** is preferably [sic]*
> *formed from steel sheet metal by means of a progressive die blanking*
> *and stamping and forming procedure, and further includes a pair of*
> *relatively depending tabs **342** and **344** located on opposite ends of*
> *coil assembly **346** (see FIG. 3 as well).* Coil assembly **346** includes
> a plurality of conductor windings which generate and induce an
> electromagnetic field, the path of which extends through strap **326**, as
> in the case of strap **22**. This magnetic field influences the position of
> an armature or plunger **348**, which responds to the energizing of coil
> assembly **346** by being drawn toward the center of the coil assembly
> in the manner of plunger **94**. However, in the case of plunger **348**, a
> lesser diameter neck **350** thereof cooperatively engages the yoke **352**
> of what the inventors hereof refer to as a "banger" member **354**
> which, in turn, extends between said yoke **352** near one end **356**
> thereof to an opposite end **358** adjacent which a pair of oppositely
> facing pairs of front and rear banger dogs **360** and **362**, respectively,
> are situated within a relatively common plane. Dogs **360** and **362** are
> spaced from one another to define gaps **364**.

'894 Patent, col. 3, lines 4 - 33 (emphasis added).

In the highlighted sentence above, one learns that mounting strap **326** is preferably

formed from steel sheet metal, and further that the strap includes a pair of relatively depending

tabs, labeled in the Figures as **342** and **344**, which are located on opposite ends of coil assembly,

labeled as **346**. The reader is also told that the strap of the preferred embodiment of the '894

13

patent is like strap **22**. However, strap **22** is found in the specification of the '945 patent, which, as detailed above, is incorporated into the '894 specification by reference.

It is uncontested that Respondents' accused products have a strap structure that satisfies claim 1 with respect to mounting a switching apparatus on a selected surface. Further, it is undisputed that although the strap depicted and described in the '894 patent has two tabs, the strap in Respondents' accused products do not. Leviton characterizes Respondents' products by stating that "[o]ne insubstantial difference is that the strap means in the Leviton product has one of the tabs described above, which extends across one end of the coil to its central axis. The GFCI products being sold by Respondents are substantial copies of the Leviton products, including the use of strap means that have the same single tab."[13] Leviton Memorandum at 7-8. Respondents represent that their devices "differ from the Leviton patent because they lack a feature which is the same as or equivalent to Tab. No. **344** described in the '894 patent . . . ." Respondents' Opposition at 6; *see also Id.* at 10 (indicating that the tab in the accused products resembles more closely tab **342** in the '894 patent, and that the accused products lack a tab that resembles tab **344**). Thus, it is undisputed that the strap in Respondents' accused products have a tab resembling the longer of the tabs depicted in the '894 specification, and do not have a tab

---

[13] At several points in its Memorandum, Leviton argues that Respondents have willfully infringed the '894 patent, or that Respondents may be seen to infringe the '894 patent, because Respondents have copied Leviton's products. *See, e.g.,* Leviton's Memorandum at 2, 6, 7, 8, 19. Such arguments might be accorded some weight only if it were determined that Leviton's products practice the '894 patent. *See Zenith Labs., Inc. v. Bristol-Myers Squibb Co.,* 19 F.3d 1418, 1423 (Fed. Cir. 1994)("[I]t is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent."); *Atlantic Thermoplastics Co. v. Fayttex Corp.,* 970 F.2d 834, 846 (Fed. Cir. 1992)("This court has repeatedly emphasized that infringement analysis compares the accused product with the patent claims, not an embodiment of the claims.").

14

resembling the shorter of the depicted tabs.

Consequently, in order to make a determination as to whether Respondents' accused products literally infringe claim 1 of the '894 patent, the strap means claim must be construed as a question of law, and a factual determination must be made as to whether the single-tabbed strap in Respondents' products is an equivalent of that disclosed in the specifications. Also, a determination must be made as to whether Respondents' strap with a single tab performs a function that is identical to the function recited in the pertinent limitation of claim 1 (i.e., "define a path of the magnetic field generated by said coil means to influence the position of said plunger means").

Leviton argues that there is no question of fact with respect to the structure and operation of Respondents' GFCIs:

> The function of the tabs 342, 344 on the strap, referred to above, is not set forth in the '894 patent. However, *it noted that the strap 22 described in the specification of the '945 Patent does not include such tabs (see* Fig. 12, '945 Patent). The '945 Patent does state that strap 22 does "part of the magnetic circuit" generated by the coil (Col. 7, ll. 22-23).

Leviton's Memorandum at 13 (emphasis added).

Leviton also argues:

> The structure of the strap of the accused product is only insignificantly different from the straps depicted in the drawings of the '894 or of the '945 Patent. The only difference from the '894 Patent strap is the absence in the accused strap of a very small "tab" below one end of the coil. The *only difference* from the '945 Patent strap is the presence in the accused strap of a relatively large "tab" adjacent one end of the coil, and which extends across the end of the coil.

Leviton's Memorandum at 18 (emphasis added).

15

Leviton's Reply states the following:

> It is not denied by Respondent[s] that the straps in their GFCI
> products are all made of a magnetic material, specifically steel. It is
> also not denied that the straps are juxtaposed to the solenoid coil in
> their GFCI products in the identical fashion as is shown in the '894
> Patent, except that there is only the single large tab extending across
> and in contact with the top of the coil, and no lower tab. It is also not
> denied that the straps in the Respondent GFCI products are intended
> to support the GFCI on a wall. Accordingly, that is sufficient to meet
> the two requirements of the claim, that the strap provide a path for the
> magnetic field and that it support the GFCI on a wall. *More detailed
> consideration is not permitted.*

Leviton's Reply at 6-7 (citing *Micro Chem. Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258
(Fed. Cir.1999)).

Thus, Leviton argues that the '894 patent depicts a strap with two tabs, and the '945 strap

has none. Indeed, Leviton would reduce the strap limitation of claim 1 of the '894 patent to a bar

made of metal or magnetic material that is suitable for mounting on a wall and which is

juxtaposed to the solenoid-like coil. Indeed, Leviton's expert conducted tests which purportedly

show that use of a nonmetallic strap results in markedly less force than use of a metallic strap

with one tab. *See, e.g.*, Campolo Declaration, ¶ 9; Haynes Declaration, ¶ 20.[14] While the Federal

Circuit's *Micro Chemical* opinion, relied on by Leviton to prohibit consideration of the presence

or number of tabs, does not permit the incorporation of structures from the written description

beyond that necessary to perform the claimed function, that opinion does not prohibit

consideration of the physical features that are plainly depicted in the illustrations and described

and emphasized in the specification as part of the novelty of the claimed invention, namely the

statements in the specification of the '945 patent incorporated by reference into the suit patent.

---

[14] Alleged inconsistencies in Leviton's tests are discussed in the Declaration of Respondents'
expert. *See* Haynes Declaration, ¶¶ 22-28.

As Respondents point out in their Opposition, Leviton's representations concerning the straps disclosed in the '945 and '894 specifications fail to mention that while the strap **22** disclosed in the '945 has no tabs, it has other structures that are expressly described in the '945 patent specification and linked to the electromagnetic function associated with the strap. The specification of the '945 patent states that:

> Before going on to a description of other components of the present invention and system, *it is very strongly emphasized here that a novel feature of the present invention includes the use of and provision of the strap and its upstanding ribs 48 and 50 to serve as means by which the magnetic circuit associated with coil 74 and plunger 94 flows and is conducted.* In other words, *portions of strap 22* in the form of its configuration and disposition with respect to the coil **74** serve as a path and an inducement of the magnetic circuit which enables coil **74** and its plunger **94** to act in a solenoid-like fashion. Strap **22** serves the function of a coil frame and actually includes part of the magnetic circuit upon the firing of coil **74**. This is the same mounting strap **22** which also supported riveted integral ground terminals.

'945 Patent, col. 7, lines 10 - 24 (emphasis added).

Thus, the '945 patent specification, in its own words, "strongly emphasizes" that a "novel" feature of the claimed invention is the use a strap with ribs (labeled **48** and **50** in the Figures) to serve as means by which the magnetic circuit associated with coil and plunger flows and is conducted. Furthermore, the '945 patent specification does not state that the mere use of a strap results in the required electromagnetic function. Rather, it expressly states that "portions" of the strap in the form of its "configuration" and disposition with respect to the coil serve as a path and an inducement of the magnetic circuit which enables the coil and its plunger to act in a

17

solenoid-like fashion.[15]  Consequently, the strap's ribs, which are depicted and described in the

'945 patent specification, are part of a purportedly novel feature in the claimed invention.

Inasmuch as the entire '945 specification is incorporated into the '894 specification, the

novel structure disclosed in the '945 patent and its associated function cannot be ignored when

construing the claims of the '894 patent.  Indeed, the specification of the '894 patent indicates

that "*[a]s in the case of strap 22*, mounting strap 326 is preferrably [sic] formed from steel sheet

metal by means of a progressive die blanking and stamping and forming procedure, and *further*

*includes a pair of relatively depending tabs 342 and 344* located on opposite ends of coil

assembly 346 (see **FIG. 3** as well)."  '894 Patent, col. col. 3, lines 12 - 16 (emphasis added).  As

highlighted, the '894 specification tends to imply that the tabs are presumably an equivalent of

the ribs disclosed in the '945 patent because the strap disclosed in the '894 patent, "as in the case

of strap **22** . . . further includes a pair of relatively depending tabs . . . ."  The '894 specification

does not appear to contradict the '945 specification by indicating that the rib structure can be

discarded.  Rather, the '894 specification, by generally incorporating the '945 patent and by

making specific reference to strap **22** of the '945 specification, makes a connection between the

---

[15] The term "solenoid" or "solenoid-like" appears in the parties' filings and in the text of the '945 patent specification.  The precise term does not appear to be used in the '894 patent specification, nor does it seem to be used as a particular term of art in the '945 patent.  A basic definition of "solenoid" is "a coil of wire usually in cylindrical form that when carrying a current acts like a magnet so that a movable core is drawn into the coil when a current flows and that is used especially as a switch or control for a mechanical device (as a valve)."  *Merriam-Webster Dictionary, www.m-w.com* (accessed Feb. 13, 2003).

Indeed, the strap means as set forth in the independent claims of the '945 patent (i.e., claims 1, 4 and 5), reads on a "strap means for mounting the switching apparatus upon a selected surface, said strap means including portions thereof which define a path of the magnetic field generated by said coil means to influence the position of said armature."  *See* '945 Patent, col. 10, lines 22- 26; col. 11, lines 32 - 34; col. 12, lines 34 - 36.

configuration and disposition of the straps disclosed in the two specifications and the associated electromagnetic or solenoid-like function of the coil and plunger.

After Respondents pointed out the existence of the upstanding ribs in the '945 disclosure, Leviton acknowledged that the strap **22** disclosed in the '945 patent "has no tabs either above or below the coil, but has two curved side portions extending around and immediately adjacent to, i.e., in direct contact with, the circumferential surface of the coil." Leviton's Reply at 4. Yet, as a matter of claim construction, Leviton argues that whether a strap has two such ribs or two tabs (or one tab) does not matter. According to Leviton, "[w]hat is necessary, and common between the two devices, is that they be made of magnetic material and are immediately adjacent, i.e., in direct contact with, the coil. The advantage of the claimed invention is that it provides a device wherein two functions are provided by a single element, and thus saves space in a device that must be placed within a common wall receptacle box." Leviton's Reply at 4. Leviton's proposed interpretation of claim 1, in view of the entirety of the '894 and 945 specifications, dismisses the importance of the ribs disclosed in the '945 patent and the use of tabs in the '894 patents. The proposed construction conflicts with the '945 specification's explicit and "strongly emphasized" statement concerning the novelty of the claimed strap, and the need to construe a mean-plus-function limitation in view of the specification.

Although the '945 and '894 patent specifications address the use of metal for the strap, neither specification indicates that mere use of metal or metal in juxtaposition to a solenoid to induce or conduct an electromagnetic field is a novel feature or adequate to perform the required function. Presented with a mean-plus-function strap limitation in claim 1 of the '894 patent, one turns to the specifications to find two embodiments of metal straps with two metal ribs or two

19

metal tabs that are juxtaposed along two sides of the coil, and an express teaching concerning the novelty of the strap and that portions of the strap are associated with magnetic circuit flow and the solenoid-like function. Consequently, a proper construction of the strap means claimed by independent claim 1 of the '894 patent, must take into account the ribs disclosed in strap **22** of the '945 patent and the tabs disclosed in the '894 patent.

As discussed initially, the question of whether or not the accused products literally infringe claim 1 of the '894 patent depends on whether or not a metal strap with only the longer of the two tabs disclosed in the '894 specification is an equivalent structure, and whether such a structure performs the required electromagnetic function. Such a factual determination in this instance is complicated by the fact that although the importance of the disclosed straps, including the ribs or tabs, is emphasized by the relevant specifications, neither the '945 patent nor the '894 patents details how the straps work, whether with ribs or tabs. There is no discussion of why ribs or tabs are used, and how the tabs are equivalent to ribs. Furthermore, it is observed that the Figures of the '945 patent (e.g., Figs. 2, 12, 14) and the '894 patent (e.g., Figs. 3, 10) show the ribs and tabs to have noticeably different physical features. For example, the ribs disclosed in the '945 patent specification are long and slender, whereas the structures of the strap of the '894 specification are quite aptly described as "tabs," with the top tab being longer than the bottom tab. The upstanding ribs are formed along the length of the strap in the '945 specification (i.e., vertically), whereas in the '894 patent, the tabs are formed on the short width of the strap (i.e., horizontally). Indeed, as one would expect given the different geometrical orientation of the structures, it appears that in relation to the coil and plunger, the ribs are present along the sides of the coil and plunger, whereas the tabs are found at the top and bottom of the coil and plunger. In

view of the lack of information from the patent specifications concerning the strap, including the ribs or tabs, and the questions raised when the disclosures of the two ribs are compared to the two tabs, it is difficult to make a factual determination as to whether a strap with a single tab, as used in Respondents' devices, is an equivalent structure to that claimed by the '894 patent. Nor is it clear precisely what role the strap plays in Respondents' devices with respect to the solenoid function. It is clear, however, that to the layman, a one-tabbed strap is not a structure that is described or identified as an alternative by the Figures or the text of the '894 patent or the incorporated '945 specification.

It is possible that during a trial or hearing, an expert could explain how one of ordinary skill in the art would view the disclosure of the '945 and '894 patents, to demonstrate that the structures of the accused products are equivalent to the disclosed structures, and also to show that the accused structures perform an identical required function. Yet, in connection with its Motion for Summary Determination, Leviton has not made an adequate effort to explain how one of ordinary skill in the art would approach the asserted '894 patent.[16]

---

[16] Neither Leviton's Memorandum nor the Declaration of its expert, Mr. Campolo, presents evidence or otherwise addresses the question of the level of ordinary skill in the art. *See* Leviton Memorandum and the Campolo Declaration (attached thereto); OUII Response at 4 n.2. Yet, patent claims cannot be construed without taking into account the level of ordinary skill in the art and how one having such knowledge would understand the terms of the patent claims. *See, e.g., Markman*, 52 F.3d at 983, 986; *Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1324 (Fed. Cir. 2001)("In approaching claim construction, we must always be conscious that our objective is to interpret the claims from the perspective of one of ordinary skill in the art . . . not from the viewpoint of counsel or expert witnesses retained to offer creative arguments in infringement litigation.").

The Commission Investigative Staff, while noting the lack of any definition of the level of ordinary skill in Leviton's Memorandum, states that "the claim language of the '894 patent can be readily understood by resort to the specification, and there appear to be few if any genuine

(continued...)

21

Respondents presented evidence in the form of a Declaration by its expert, Mr. Haynes,

as follows:

> I have considered the level of ordinary skill in the art at the time of
> the invention of the '894 patent. Such individuals who were engaged
> in the design of GFCI units would be qualified in power electricity,
> electromagnetic theory and mechanical concepts. They would have
> more in depth technical expertise in electrical engineering concepts
> concerning magnetic field generation using solenoid coil techniques
> and in power interruption concerns in terms of arc quenching of
> opening the contacts under a load. The GFCI mechanical design
> issues regarding component packaging, frictional latches and simple
> forces required to dislodge latch assemblies were typically the duty
> of a mechanical designer utilizing forms of drafting skills. Therefore,
> an electrical engineer with one year experience in power electricity
> and electromagnetic design concepts with a mechanical aptitude
> would be sufficient to develop this and similar devices using solenoid
> driven latch mechanisms.

Haynes Declaration, ¶ 4.

This evidence from Respondents is unopposed, and there is an absence of any reason not

to accept it. Nevertheless, genuine questions remain as to how one skilled in this manner would

interpret the disclosures of the '945 and '894 patent, including whether such a person would

understand claim 1 of the '894 patent to include single-tabbed structures such as those used in

Respondents' devices.

Furthermore, inasmuch as Leviton and its expert have taken the position that the

---

[16] (...continued)
claim construction issues." OUII Response at 4 n.2. However, the Administrative Law Judge
finds no authority under applicable case law to dismiss altogether consideration of how one of
ordinary skill in the art would read the '894 patent specification (with its incorporated '945
specification), including the claims. Moreover, as amply illustrated by the filings made in
connection with Leviton's Motion for Summary Determination, and in the discussion contained
in this Order, there are genuine and material disputes among the parties with respect to claim
construction.

existence of ribs or tabs (one, two or none) is of no importance with respect to the question of infringement, Leviton has not offered evidence to address the specific question of whether Respondents' single-tabbed strap is the equivalent of the two-tabbed strap disclosed in the '894 specification. Instead, Leviton has focused only on the question of whether Respondents' strap is suitable for hanging on a selected surface, its location and the fact that it is metal. Even with respect to function, evidence has not been presented to demonstrate that Respondents' specific structure preforms an electromagnetic function identical to that disclosed in the patent.

Conversely, Respondents presented some evidence that it is "probably safe" to expect that a tab, particularly a tab close to the coil, would have some influence over the position of the plunger. *See* Campolo Dep. (Opposition Exhibit B) Tr. 70-71. Additionally, Respondents' expert, Mr. Haynes, declared that to the extent that tab **342** has a significant effect on the pull exerted on the plunger, he would expect that the single tab **344** also has a significant effect, insofar as it is close to the solenoid and located in the direct line of the magnetic field generated by the solenoid. Haynes Declaration, ¶ 20 (Attached to Respondents' Opposition).

Mr Haynes explained in his Declaration that "[a]ccording to the patent, this mounting strap is magnetically coupled to the solenoid coil and provides a magnetic circuit path through the switch plate **326**, which incorporates two tabs Nos. **342** and **344**. These tabs are in the direct magnetic path and provide a conduit or path for the magnetic field generated by solenoid No. **346** to be shunted from one end of [the] solenoid coil to the other. * * * According to the patent, this means that in this magnetic circuit design, the solenoid will produce a stronger force applied upon the plunger than without the tabs, **342** and **344**." *See* Haynes Declaration, ¶¶ 6, 8. Contrary to Leviton's argument concerning the sufficiency of Mr. Haynes' Declaration (*see* Leviton's

Response at 3-4), the Declaration is clear that the position of the plunger is not influenced by the strap alone, rather by the magnetic field that travels through the path provided by the strap, including the tabs. Furthermore, and also contrary to Leviton's argument, Mr. Haynes has not provided a mere "self-serving and conclusory declaration" unworthy of being accorded any weight. In his Declaration, Mr. Haynes has attempted to ascertain the level of ordinary skill in the art, then to explain how the suit patent discloses the structure and function of the solenoid and the strap, including the tabs. Such information is useful in making a determination of how one of ordinary skill would understand the claimed strap means in view of the "corresponding structure, material, or acts described in the specification and the equivalents thereof," as required by section 112 of the Patent Act. By contrast, Leviton argues that "the issue of whether the second smaller tab 344 may improve the effectiveness of the strap in enhancing the plunger motion is . . . not material." Leviton Response at 3.

Based on the filings made in connection with Leviton's Motion for Summary Determination, genuine and material questions of fact remain about how one of ordinary skill in the art would interpret the strap means in view of the entire specification, which includes the '945 and '894 patents. Further, with respect to the issue of infringement, genuine issues of material fact exist concerning (1) whether or not the structure of Respondents' accused devices is equivalent to the structures disclosed in the specifications, and (2) what effect Respondents' strap would have on the electromagnetic circuit. To conclude that a metal strap, with or without tabs, is better at conducting or inducing an electromagnetic field than a nonmetal strap, or to ignore the language and teachings of the patent specifications concerning the structure of the claimed strap does not answer any of these material questions. Leviton has not carried its burden with respect

24

to its Motion for Summary Determination.

Due to the procedural posture of this investigation a trial cannot be held to assist the

Administrative Law Judge in construing the claims of the '894 patent or to make determinations

on the infringement issue.[17]  However, the standards applied to the pending Motion must be the

same as those applied to any other request for a summary determination.  Given the nature of the

questions and evidence presented, a summary determination that Respondents' accused products

infringe the '894 patent cannot be granted.

## V.    Conclusion

Accordingly, for the reasons discussed above, complainant Leviton's Motion No. 478-8

for a summary determination of infringement is DENIED.

By February 28, 2003, each party shall submit to the Office of the Administrative Law

Judge a statement as to whether or not it seeks to have any portion of this document deleted from

the public version thereof.  The parties' submissions may be made by facsimile and/or hard copy.

By the aforementioned date, any party seeking to have any portion of this document deleted from

the public version must submit to this Office a copy of this document with red brackets

indicating any portion asserted to contain confidential business information.  The parties'

submissions concerning the public version of this document need not be filed with the

Commission Secretary.

---

[17] *See, e.g.*, Order No. 8 (canceling the hearing in view of the parties' recognition that the '894 patent will expire before the target date for this investigation).