Page 1

```
 1            In The United States District Court
 2               For The District of Maryland
 3   ------------------------------------x
 4   Leviton Manufacturing, Inc.          :
                                          :
 5                    Plaintiff           : NO. 01CV3855 AMD
                                          :
 6              v                         :
                                          :
 7   Universal Security                   :
     Instruments, Inc. and USI            :
 8   Electric, Inc.                       :
 9   ------------------------------------x
10   DEPOSITION OF:
11                   Jerome Massie,
12   a witness, called by counsel pursuant to notice,
13   commencing at 10:00 a.m, which was taken at 2000 P
14   Street, NW, Washington DC.
15
16
17
18
19
20
21
```

Ovenite Court Reporting Service        310-593-0671        Washington D.C. metro area
Washington, D.C. Metro Area                                EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Case 1:01-cv-03855-AMD   Document 78-7   Filed 07/21/2003   Page 2 of 7

Jerome Massie                    June 26, 2003                    Leviton Manufacturings vs. USI

Page 2

```
 1              Appearances
 2   William E. Bradley, Esquire
 3   Cahn & Samuels, LLP
 4   Headquarters Building
 5   2000 P Street, NW, Suite 200
 6   Washington, DC  20036-6924
 7   for USI
 8
 9   Joseph G. Lee, Esq
10   Habibah Tamraz, Esq
11   Greenberg Traurig, LLP
12   885 Third Avenue
13   New York, NY  10022
14   212-801-2150
15   for Leviton
16
17
18
19
20
21
```

Page 3

```
 1            Index of Examinations
 2                                    Page
 3   Mr. Bradley ......................... 4
 4
 5            - - -
 6            Index of Exhibits
 7                                    Page
 8   Exhibit 1 ........................... 68
 9   Exhibit 2 ........................... 80
10   Exhibit 3 ........................... 88
11   Exhibit 4 ........................... 93
12   Exhibit 5 ........................... 93
13   Exhibit 6 ........................... 103
14   Exhibit 7 ........................... 107
15   Exhibit 8 ........................... 107
16   Exhibit 9 ........................... 110
17   Exhibit 10 .......................... 123
18   Exhibit 11 .......................... 135
19   Exhibit 12 .......................... 153
20   Exhibit 13 .......................... 181
21
```

Page 4

```
 1   Whereupon,
 2            Jerome Massie
 3   was called for examination by counsel and,
 4   after having been duly sworn, was examined
 5   and testified as follows:
 6        BY MR. BRADLEY:
 7        Q.  Can you state your name and address for
 8   the record.
 9        A.  Jerome Weston Massie, IV. 8180 Greenboro
10   Drive, Suite 800, McLean, Virginia 22102.
11        Q.  Do you know who Larry Goffney is?
12        A.  Yes.
13        Q.  And who is Larry Goffney?
14        A.  He's currently a private practitioner. He
15   was formerly an assistant examiner. He also
16   returned to the Patent Office in the 90's. He works
17   as assistant commissioner or in that capacity at
18   that level.
19        Q.  Were you present at his deposition in this
20   matter?
21        A.  Yes, I was.
```

Page 5

```
 1        Q.  Why were you present at his deposition?
 2        A.  I had been asked to sit with Mr. Mannak in
 3   regard to the deposition. If I noted anything that
 4   he might want to raise as a question, to just jot
 5   down on a note and advise him during the breaks.
 6        Q.  Do you disagree with anything that
 7   Commissioner Goffney said in his deposition?
 8        A.  In terms of generalities, no. I thought
 9   he did a good job of providing a history to the
10   Patent Office. With regard to the specifics of a
11   particular question, with regard to practice, or
12   this current litigation, there were some items which
13   I thought he did not characterize well.
14        Q.  Can you think of one of these specifics?
15        A.  The one that comes to mind probably was,
16   the one I was the most surprised at, was the
17   calculation of the electronic system that the Patent
18   Office maintains, which is called PALM in 1990's.
19   Became a dual system called PALM PAIR, in that he
20   stated that it is not the official record of the
21   Patent Office. And I was a little surprised he had
```

2 (Pages 2 to 5)

Ovenite Court Reporting Service         310-593-0671         Washington D.C. metro area
Washington, D.C. Metro Area                                  EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Case 1:01-cv-03855-AMD   Document 78-7   Filed 07/21/2003   Page 3 of 7

Jerome Massie                    June 26, 2003                    Leviton Manufacturings vs. USI

Page 66

1   A. He was a member of what is called the
2   executive staff to what Patent Office. The Patent
3   Office at the time had a structure slightly
4   different than what this today. The Commissioner
5   was an appointed official. Usually changed fairly
6   regularly. The assistant commissioners were
7   political appointees. The deputy assistant
8   commissioners were the people who were the career
9   senior executive service people and often referred
10  to as the executive staff.
11      Mr. Goffney filled the middle position
12  that I had just mentioned. And, of course, had a
13  number of the executive staff personnel. Good
14  example is a group technology office director
15  working for him. He made reference to those people
16  several times during his deposition.
17  Q. So was he your boss when he was Assistant
18  Commissioner?
19  A. That's correct.
20  Q. Earlier this morning we talked about
21  Ceclia Neumann. Do you recall that?

Page 67

1   A. Yes.
2   Q. When you spoke with her in the fall of
3   2002, did she mention that she was busier than
4   usual?
5   A. I never spoke to Ceclia Neumann. I did
6   mention this morning that during that time frame I
7   did call the office. They have a customer service
8   like every office in the Patent Office.
9   Q. Earlier this morning you mentioned the
10  PALM codes. Do you recall talking about that?
11  A. Yes.
12  Q. There were 500 some odd codes?
13  A. At the time that I was a PALM specialist,
14  I had a clearance to do transactions beyond what a
15  regular employee would have access to. That is a
16  reasonably good estimate. Now the number of PALM
17  codes may have increased. I just don't know. I'm
18  not privy to that information.
19  Q. For Certificate of Corrections are there
20  separate codes for an applicant's mistake and PTO
21  mistake for entering a PALM record?

Page 68

1   A. Yes, there should be; yes.
2   Q. Do you know what the different codes are?
3   Do you know what the codes were when you were
4   responsible --
5   A. By number I do not.
6   Q. If a patent claim is missing language, can
7   an examiner reject that under 35 U.S.C. 112 being
8   indefinite?
9   A. Yes, that is one of the options an
10  examiner has.
11  Q. If a claim term is lacking an antecedent
12  basis, can an examiner reject the claim under 35
13  U.S.C. 112?
14  A. Could you clarify the time frame you are
15  asking this question.
16  Q. How about today?
17  A. Today the answer is no.
18  Q. What would an examiner do today?
19  A. They would issue an objection to the
20  claim.
21  Q. What about ten years ago?

Page 69

1   A. They would have, depending on the
2   examiner, issued either an objection or a rejection.
3   Q. When you were an examiner, did you ever
4   reject a patent claim under 35 U.S.C. 112 for lack
5   of antecedent basis?
6   A. Yes.
7   Q. Did you ever reject a claim under 35
8   U.S.C. 112 on the grounds of indefiniteness?
9   A. Yes.
10  Q. Did you ever reject a claim under 35
11  U.S.C. 112 on the grounds of indefiniteness because
12  the claim was missing language?
13  A. I do not recall a specific instance, but
14  having done probably close to 1600 or 1700
15  applications during my current Patent Office, it's
16  very likely.
17      MR. BRADLEY: I would like to mark as
18  Massie Exhibit 1, U.S. Patent '4595894.
19      BY MR. BRADLEY:
20  Q. Can you identify this document.
21  A. Yes. This appears to be a copy of the

18 (Pages 66 to 69)

Ovenite Court Reporting Service        310-593-0671        Washington D.C. metro area
Washington, D.C. Metro Area                                EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Case 1:01-cv-03855-AMD   Document 78-7   Filed 07/21/2003   Page 4 of 7

Jerome Massie                           June 26, 2003                Leviton Manufacturings vs. USI

Page 70

1  certified issued U.S. Patent '894, as well as a copy
2  of the certified Certificate of Correction.
3      Q. Please turn to column 6, line 49. From
4  line 49 to the bottom of column 6 what is that? Is
5  the fair to call that claim 1?
6      A. Yes, that is claim 1.
7      Q. Do you agree that claim 1 is missing
8  language?
9      A. If you read the claim, it has, very often
10 because of claim structure a patent practitioner
11 will phrase the various components of an apparatus
12 claims, they would use semicolons to separate
13 distinct elements.
14      In just reading it very quickly, you see a
15 bit of a disjoint at 53, it looks like. I'll read
16 lines 52 to 53. Comprising in combination a
17 housing; magnetizable plunger means disposed within
18 a portion of said housing for movement between first
19 and said housing for moving said plunger means,
20 that's continuing on to line 54.
21      And what you see there is sort of like a

Page 71

1  bit of a disconnecting thought. You were describing
2  the magnetizable plunger. Then you are going back
3  to referring to the housing at the later part of
4  line 53.
5      Q. Based on your experience as a patent
6  examiner, would an examiner have allowed this claim
7  as it appears in column 6?
8      A. Working from the assumption that the
9  examiner has read the application, patent
10 application in its entirety, I would assume a patent
11 examiner who is one of ordinary skill in the art
12 would in reading the claim see as well notice the
13 disjoint at line 53, and obviously would have made
14 some sort of comment, either a rejection of an
15 objection, depending on whether they regard it as
16 severe. That is a grammatical change versus an
17 indefinite issue.
18      Q. Would be entirely proper for a examiner to
19 reject a claim missing language as being indefinite?
20      A. If in the examiner's opinion the examiner
21 felt there was something missing that rendered the

Page 72

1  claim indefinite or an informality which rendered
2  the claim objectionable, they would do either one of
3  those.
4      Q. In line 55 where it says, the second
5  position. Do you agree that the second position in
6  this claim is written is lacking antecedent basis?
7      A. I think, again, I'm not one of ordinary
8  skill in the art here, just reading the claim as a
9  person of mechanical aptitude, you do see that there
10 appears to be a disjointure between lines 51, which
11 has the phrase, comprising, and continues on to 55
12 where it says, as you repeated earlier, to the
13 second position semicolon.
14      An examiner reading that, would, I think,
15 make a reasonable judgment there appears to be a
16 disjointure. The use of the term "the" may have
17 been a key to that person recognizing the
18 disjointure. I can't speak for one of ordinary
19 skill in the art.
20      Q. Have you ever rejected a claim as, under
21 112, for lack of antecedent basis?

Page 73

1      A. Yes.
2      Q. When was the last time you read the '894
3  Patent?
4      A. The most recent time that I went through
5  the patent, as well as the Certificate of
6  Correction, was in the preparation of my Declaration
7  regarding Mr. Goffney's expert report.
8      Q. Do you recall if there was anything in the
9  text of the '894 Patent that tells the public or one
10 of ordinary skill in the art the exact language that
11 is missing from this claim?
12      A. Having not read it in a month or two, what
13 I would say is, that a patent examiner, one of
14 ordinary skill in the art, such as a patent examiner
15 upon reading the disclosure, getting to the claim,
16 would realize something was missing.
17      The exact language, I do not recall the
18 exact language of a first and second position
19 specifically being in the patent. I'm not sure that
20 exact quote is in there. I couldn't recall it for
21 you at this moment.

19 (Pages 70 to 73)

Ovenite Court Reporting Service         310-593-0671          Washington D.C. metro area
Washington, D.C. Metro Area                                   EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Page 154

1  Q. If you wanted to know if prosecution
2  counsel had a general practice of interviewing
3  examiners in cases, would prosecution counsel be a
4  primary source for that kind of information?
5  A. If an interview is what I was interested
6  in finding out took place, that certainly would be a
7  person you would ask.
8  Q. Would prosecution counsel be a
9  particularly significant source of information, if
10 the inventor of the patent is dead?
11 A. I would think that the patent person
12 prosecuting the case, the principal attorney in the
13 case would be a very, very relevant personal to ask
14 regarding the prosecution of a particular patent
15 application.
16 Q. Do you know if Mr. Sutton spoke to Ceclia
17 Neumann in 2001?
18 A. I do not know the answer to that. I do
19 not recollect if I did ask, what the answer was.
20     MR. BRADLEY: I want to hand you what is
21 Massie Exhibit 12.

Page 155

1     BY MR. BRADLEY:
2  Q. Have you ever seen Massie Exhibit 12?
3  A. I think I have. I think I have seen this.
4  Pages 5, 6 and 7 are familiar to me. I may have
5  seen them when I visited the office of Greenberg
6  Traurig in the summer of 2002.
7  Q. If you can turn to the 5th page. Before
8  we do that. Can you describe what Massie Exhibit 12
9  appears to be?
10 A. 12 is a message confirmation containing
11 what looks like a copy of a fax to Paul McQuade and
12 Joseph Keselyak from Paul J. Sutton on 10-18. I'm
13 assuming 10-18 of 2002. 2001.
14 Q. On the 5th page of this --
15     MR. LEE: Has this been produced?
16     MR. BRADLEY: I think it was produced by
17 you guys, if I'm not mistaken. It might have been
18 an exhibit earlier in a case.
19     MR. LEE: I would like to take a break. I
20 need to consider whether this is privileged
21 material. Can we take a ten-minute break.

Page 156

1     (Recess)
2     MR. BRADLEY: With respect to Massie
3  Exhibit 12, I believe you would like --
4     MR. LEE: With regard to Exhibit 12, this
5  appears to be a ten-page fax from Paul Sutton. We
6  reserve the right to withdraw this document in the
7  event that it was inadvertently produced as
8  privileged. And you can proceed.
9
10    MR. BRADLEY: Okay. Objection duly noted.
11 To the extent the 4th Circuit allows withdrawal of
12 inadvertently produced documents to which privilege
13 is claimed, duly recognized.
14    In your expert report you have as Exhibit
15 I, I believe, Exhibit H and I. Can you identify
16 that?
17 A. Exhibit H is the copies of pages -- I
18 don't have Exhibit 12. It's a copy of pages 5 and 7
19 of Massie Exhibit 12. It also includes a copy of a
20 postcard in Exhibit H. And a copy of a stamped
21 postcard, which would be the reverse side of the

Page 157

1  same postcard mentioned previously.
2     Exhibit I is the approval by Olik Chauduri
3  on 10-22-01 of the transmittal letter Certificate of
4  Correction that was sent as part of Exhibit H, and
5  is in fact a copy of page 5 of Exhibit 12. Page 6
6  of Exhibit 12. Same as Exhibit H, page 1 of Exhibit
7  H.
8  Q. From Exhibit I, where you see what you
9  have identified as Mr. Chaudhuri's initials, can you
10 tell whether or not he looked at the file history of
11 the '894 Patent before allowing this Certificate of
12 Correction to be published?
13 A. From the single page of the exhibit that
14 would not be evident. There's no place on the
15 exhibit page to indicate that they reviewed the file
16 wrapper. If I might add, the Exhibit 12 that you
17 have given me, which I assume is of the entire
18 portion of communication sent to Cecila Neumann on
19 October 18th of 2001, which included a copy of the
20 transmittal request, which is Exhibit I in Massie's
21 Exhibit 9, includes a cover letter, transmittal

40 (Pages 154 to 157)

Ovenite Court Reporting Service          310-593-0671          Washington D.C. metro area
Washington, D.C. Metro Area                                    EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Jerome Massie                           June 26, 2003                    Leviton Manufacturings vs. USI

Page 158

1  form, another copy of the transmittal letter that
2  occurred, that was filed in July 17th of 2001. A
3  completed PTO SB 44 form, which did not exist prior
4  to February of 2001, and a copy of the front side of
5  a postcard and back side of the postcard showing
6  mailing to the Patent Office, receipt by the Patent
7  Office of the Certificate of Correction on July 18th
8  of 20001.
9       If I may continue. What is important
10 about this information is, there is no explanation
11 in this fax to Ms. Neumann that would explain to Mr.
12 Chaudhuri what the error was. The only way the
13 examiner, Mr. Chaudhuri, would be able to determine
14 would be to look at the file and see where the error
15 was, had it occurred inadvertently, Patent Office
16 error or applicant's error. No explanation in the
17 documentation.
18      Mr. Chaudhuri would have had to look at
19 the file to determine if in fact an error had taken
20 place, and whose responsibility was it.
21   Q.  Is it your testimony that you believe Mr.

Page 159

1  Chaudhuri reviewed the file history of the '894
2  Patent before allowing the Certificate of Correction
3  to issue?
4       MR. LEE: Misstating his testimony his
5  last.
6       BY MR. BRADLEY:
7   Q.  If he didn't look at the file, would he
8  have been wrong to allow the Certificate of
9  Correction to issue not knowing the source of the
10 error?
11  A.  It would not have been -- it would have
12 approached irresponsible, to be honest with you. It
13 would not have been professionally correct thing to
14 do.
15  Q.  In your years of approving Certificate of
16 Corrections, is it your testimony that it would have
17 been irresponsible or -- it would not have been
18 following proper procedure to issue the Certificate
19 of Correction?
20      MR. LEE: Object to the form.
21      BY MR. BRADLEY:

Page 160

1   Q.  You can answer.
2   A.  I would add to that question, if I
3  understand it correctly, without the file wrapper.
4   Q.  Without the file wrapper?
5   A.  I would say that yes, it does not, for
6  example, proper procedure to approve a Certificate
7  of Correction without file wrapper.
8   Q.  In your years of approving Certificate of
9  Corrections did you ever approve a Certificate of
10 Correction without the file wrapper?
11  A.  No. In my personal experience I don't
12 know anyone who ever did.
13  Q.  When you spoke to Mr. Chaudhuri in June of
14 last year, 2002, he didn't recall this Certificate
15 of Correction for the '894 Patent?
16  A.  Specifically he did not recall that
17 particular Certificate of Correction.
18  Q.  How many Certificate of Corrections to
19 correct errors in claims do you think Mr. Chaudhuri
20 would have had to look at in fall of 2001?
21  A.  I would have no way of finding that

Page 161

1  information out. I do not know the answer to that
2  question.
3   Q.  Do you know if the Patent Office ever
4  asked for a copy of the file from prosecution
5  counsel?
6   A.  I am not aware, and I never asked the
7  prosecution parties, for example, Mr. Sutton, if
8  they ever were asked to file or provide a copy of
9  the file history.
10  Q.  If they were asked, would that be an
11 indication that the Patent Office lost their copy of
12 the file history?
13  A.  Yes, it could be some indication, that is
14 correct. One of the interesting things about the
15 process of reconstruction is that they also, even
16 though not supposed to, they don't stop looking for
17 the file. The reconstructions that I have taken
18 part in, a good example is, we had 107 applications
19 become lost due to damage, due to environmental
20 conditions. Some of them were lost, just lost.
21      We found some of those 107 after we

41 (Pages 158 to 161)

Ovenite Court Reporting Service          310-593-0671          Washington D.C. metro area
Washington, D.C. Metro Area                                 EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Case 1:01-cv-03855-AMD    Document 78-7    Filed 07/21/2003    Page 7 of 7

Jerome Massie                         June 26, 2003         Leviton Manufacturings vs. USI

Page 170

1    A. Yes.
2    Q. If he didn't, he would not have been
3    following proper PTO procedures?
4    A. That's correct.
5    Q. Turning back to Massie Exhibit 9, your
6    expert report. In paragraph 10.7.3 on page 13 in
7    the last sentence of the first full paragraph. Can
8    you read that into the record.
9    A. 10.7.3.
10   Q. Last sentence of that paragraph.
11   A. Okay. In my experience at the PTO I have
12   not seen a situation where a primary examiner would
13   have allowed on the first official office action a
14   claim that was so obviously missing a line of text
15   as to make the claim "unintelligible".
16   Q. That claim we are referring to is claim 1
17   of the '894 Patent?
18   A. That's correct.
19   Q. Would you agree that claim 1 of the '894
20   Patent, as it issued in 1986, would have been
21   rejected by an examiner in the form that it was

Page 171

1    presented?
2    A. It would have had, in my experience, some
3    communication between the examiner and the patent
4    applicant by telephone or written communication. If
5    it was a written communication, it could be a
6    objection or rejection. There are a number of
7    options.
8    Q. Turning to page 14, that first full
9    paragraph. If you could read that into the record.
10   A. Additionally, it would have been obvious
11   to a skilled patent examiner or interested third
12   party upon reading the "unintelligible" claim 1 in
13   the '894 Patent that a review of the original
14   application file would be needed.
15        Then, upon making the above simple
16   comparison, the two versions of claim one, that is,
17   originally filed versus patented, the proper scope
18   of protection sought by the '894 Patent was the
19   scope outlined in claim one as originally filed.
20        And further, that the claim one in the
21   '894 Patent needed correction due to an obvious

Page 172

1    clerical error on part of the USPTO in printing the
2    '894 Patent.
3    Q. Without the file history and knowing what
4    transpired in the Patent Office, is there really any
5    way interested third party can determine the
6    protection afforded by the '894 Patent?
7    A. I think as a patent practitioner in my
8    experience, in two years plus that have been
9    practicing on the outside, and the amount of time I
10   spent in the Patent Office, what is stated in here
11   is what experienced patent professionals would
12   assume, that since the office action was, first
13   office action to allow the case occurred initially,
14   there did not appear to be any changes in the
15   record, that a third party could deduce, not
16   definitively, with absolute certainty, but could
17   very reasonably deduce that the claim that was
18   originally filed was in fact the claim that was
19   allowed. That defines the scope of coverage.
20        I think one of the things that further
21   reinforces it is that, it is also very clear that

Page 173

1    the examiner did an informal examiners amendment,
2    which he is allowed to do by rule and regulation for
3    adding such things as the continuity date, if they
4    want to correct the continuity date to the proper,
5    to add the headers. So are sort of things that
6    reinforce to me that nothing was done to the claims
7    in terms of an examiners amendment. Looking at the
8    entirety of the record that is available to us.
9    Q. No way for a third party to know if a
10   particular interpretation of the claim was forfeited
11   during prosecution?
12   A. That's correct.
13   Q. No way for an interested third party to
14   know if the examiner gave reasons for allowance in
15   allowing the case?
16   A. Definitively it can not be deduced without
17   the file record.
18   Q. So it is possible that Examiner Goldberg
19   in allowing the '894 Patent issued reasons for
20   allowance, such as the prior art does not disclosed,
21   a strap having a pair of depending tabs on opposite

44 (Pages 170 to 173)

Ovenite Court Reporting Service        310-593-0671          Washington D.C. metro area
Washington, D.C. Metro Area                                  EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba