L. Goffrey

1

```
1              UNITED STATES DISTRICT COURT
2                 DISTRICT OF MARYLAND
3       -------------------------------x
4    LEVITON MANUFACTURING              :
5    CO., INC.,                         :
6                       Plaintiff       :
7              v.                       :    Case No.
8    UNIVERSAL SECURITY                 :    01CV3855 AMD
9    INSTRUMENTS, INC., et al.,         :
10                      Defendants      :
11      -------------------------------x
12
13              Videotaped Deposition of
14          LAWRENCE G. GOFFNEY, JR.
15              Washington, D.C.
16          Tuesday, June 3, 2003
17                  10:17 a.m.
18
19
20
21
22
23
24
25
```

L. Goffrey

1     Videotaped deposition of Lawrence G.

2 Goffney, Jr., held at the offices of:

3

4     Greenberg Traurig

5     Suite 500

6     800 Connecticut Avenue, Northwest

7     Washington, D. C. 20006

8     (202) 331-3100

9

10

11

12     Pursuant to agreement, before Jacquelyn C.

13 Scott, Registered Professional Reporter and Notary

14 Public in and for the District of Columbia.

15

16

17

18

19

20

21

22

23

24

25

L. Goffrey

4

1                      C O N T E N T S

2    EXAMINATION OF LAWRENCE G. GOFFNEY, JR.          PAGE

3         By Mr. Manak                                    6

4

5

6                      E X H I B I T S

7                 (Retained by Counsel)

8    GOFFNEY EXHIBIT                                   PAGE

9    1    Declaration of Jerome W. Massie dated

10        6-14-02 with Exhibits A through I           49

11   2    Expert Report of Jerome W. Massie

12        dated 3-10-03 with Exhibits A through T     50

13   3    Patent Number 4,595,894, with 2

14   4    Expert Witness Report of Lawrence J.

15        Goffney, dated February 24, 2002           114

16   5    Order Denying Motion for Summary

17        Judgment Leviton v. Orbit, dated 12-7-01   128

18   6    File history of U.S. Patent 4,518,945      146

19   7    File history of U.S. Patent 4,386,338      147

20   8    File history of Patent Application

21        Serial Number 558,262                      147

22

23

24

25

L. Goffrey

3

```
 1              A P P E A R A N C E S

 2

 3      ON BEHALF OF THE PLAINTIFF:

 4            JOSEPH M. MANAK, ESQUIRE

 5            HABIBAH TAMRAZ, ESQUIRE

 6            Greenberg Traurig, LLP

 7            21st Floor

 8            885 Third Avenue

 9            New York, New York 10022-4834

10            (212) 848-1000

11

12

13      ON BEHALF OF THE DEFENDANTS:

14            MAURICE U. CAHN, ESQUIRE

15            WILLIAM BRADLEY, ESQUIRE

16            Cahn & Samuels, LLP,

17            Suite 200

18            2000 P Street, Northwest

19            Washington, D. C. 20036

20            (202) 331-8777

21

22

23      ALSO PRESENT:

24            JEROME W. MASSIE, IV

25            SCOTT FORMAN, Videographer
```

1    for a particular patent.

2       Q    Was the RAM system unreliable in the

3    1982-1986 time period?

4       A    I don't know, but it's unreliable for trying

5    to decide what is the official record at the Patent

6    Office.  It is not acknowledged as an official record

7    of the file history of a patent.  It is not a

8    substitute for the official record of the file history

9    of a patent.  It is a backup system for the Patent

10   Office to try to find papers to try to find out where

11   things are, to find out whether or not they're being

12   paid on time, and all of those other things.

13      Q    Is it a system which keeps track of what

14   fees were assessed in a particular transaction in the

15   PTO?

16      A    For management purposes at the Patent and

17   Trademark Office, for managing the Patent and

18   Trademark Office, for making sure that people are

19   accountable for -- you know, for the fees that have to

20   be paid.  The Patent Office is -- from the time I was

21   there, not at that particular time, but at the time I

22   was there it was a totally fee maintained -- at the

23   time that I was an executive there, it's a fee-funded

24   agency.  So it's all paid for by fees and not by

25   taxes.  In fact, taxes, sometimes the --

63

1    Q   Yes, they take it out of it.

2    A   The budget is taken out from the Patent

3   Office.

4    Q   Yes.

5    A   But notwithstanding that, of course, any

6   responsible agency would want to find out whether or

7   not fees are being paid, whether people are doing

8   things.  And there are unofficial ways that we've

9   carried that out.  There is nothing in the laws, or

10   the records, or the MPEP that would sustain this as

11   being a basis for deciding what is file history or

12   what has happened to a particular patent at the Patent

13   and Trademark Office.

14    Q   In the 1982-1986 time period, if a

15   Certificate of Correction was issued in the PTO under

16   37 CFR 1.323, would a fee be recorded in the RAM

17   system for that request?

18    A   It may or may not be.  I mean, as I said,

19   there may be wanding problems or things like that.

20   But if a fee were paid in that, it is for the internal

21   use of the Patent and Trademark Office itself.

22    Q   If the system, if the PTO system is working

23   correctly, would that fee be recorded in the RAM

24   system?

25    A   I don't understand what you mean by

64

1   correctly. Correctly is an administrative thing in

2   the Patent Office, but is not a public thing for the

3   public itself in understanding what has happened at

4   the Patent Office.

5      Q    If people are doing their jobs correctly in

6   the U.S. Patent and Trademark Office in the 1982-1986

7   time period, if a Certificate of Correction was issued

8   for applicant's error, would a fee be recorded in the

9   RAM system for that request for that patent?

10     A    When you say correctly, do you mean

11  correctly as a part of the operations of the granting

12  of patents? No.

13     Q    People are doing their job the way they're

14  supposed to be doing it.

15     A    No, no, if they're doing their job as

16  accountants in the Patent Office, they would have put

17  it in there for our basis of making a decision. But

18  it has nothing to do with the records, the official

19  records of the prosecution of a patent in the Patent

20  and Trademark Office. Has nothing to do with that.

21  That's a separate thing, it's not even dealt with, it

22  doesn't come under Title 35, it doesn't -- it's not a

23  part of the patent laws, it doesn't come under 37 CFR,

24  at least -- I'm not sure about that, I'd have to look

25  and see. But yes, that has nothing to do with this

65

1    operation.

2        Q    Do you agree when a certificate of

3    correction is issued under PTO rules -- and this is

4    with respect to the 1982-1986 time period -- if the

5    mistake in the patent which is sought to be corrected

6    is a mistake of the PTO rather than a mistake of the

7    applicant or his representative, then the PTO would

8    not charge the applicant a fee?

9        A    Yes.

10            MR. CAHN:  Objection to the form of the

11    question.

12            THE WITNESS:  Officially speaking, that's

13    the case.

14    BY MR. MANAK:

15        Q    And officially speaking, if the mistake was

16    on the part of the applicant or his representative,

17    the applicant would be charged a fee by the PTO; is

18    that correct?

19        A    Yes.

20        Q    Do you know Cecelia Newman?

21        A    Probably -- maybe yes, maybe no, I don't

22    recall.

23        Q    Do you recall ever working with her?

24        A    It's not important.  I know Olik Chaudhuri,

25    to know his family and everything else.  But that

66

1    doesn't mean anything.  That has nothing to do with

2    the official position of the U.S. Patent and Trademark

3    Office.  They are not acting as themselves, they are

4    acting as the commissioner.  And so it doesn't make a

5    difference.

6        MR. MANAK:  Would you read back my question,

7    please.

8        (The Reporter read the record as follows:

9        "Q    Do you recall ever working with

10       her?")

11   BY MR. MANAK:

12       Q    Do you recall ever working with Cecelia

13   Newman?

14       A    I don't recall the name as I sit here.  I

15   mean, well, maybe I -- in the back reaches.  I was the

16   top person in the Patent Office itself.  As the top

17   person in the Patent Office, I worked with a lot of

18   people.  I don't remember them.  I just don't remember

19   by name.  For example, when I taught a 155-member

20   class at the University of Texas, I would know every

21   last one of them during the class when the class was

22   in session, but the day after finals I didn't remember

23   one name.  It's funny how the mind works that way.  I

24   don't know.

25       Q    Did you ever review any certificates of

1    correction when you were in the Patent Office?

2        A    Sure.

3        Q    How many?

4        A    Oh, I don't recall how many, but there were

5    times when it would come up to me, yes.

6        Q    More than ten?

7        A    Oh, I don't remember, but I would think it

8    would probably be less than that, because I delegate

9    those things out to other people.

10       Q    Who did you delegate them to?

11       A    Sometimes I'd delegate them to one of my

12   deputy commissioners, sometimes I would delegate them

13   to a director.  If there was an issue about the first

14   person who would look at it when the SPE -- Spree

15   Program came about -- SPE program came about, not

16   Spree, the -- sometimes there were questions that came

17   up, sometimes there were real issues about whether or

18   not a correction was the right thing.  And if it comes

19   up to me, I'd look at it.

20           And there were times when I was able to

21   voice my notion about it independent of the

22   recommendations.  But for the most part I would go

23   back to the people who do this all the time and simply

24   say what do you think about this, do you think this is

25   proper under the circumstances, and they would act

68

1    accordingly.

2        Q    While you were at the Patent Office, was

3    reviewing requests for certificates of correction ever

4    one of your primary responsibilities?

5        A    I was running the whole Patent Office.  My

6    primary responsibility is to make sure that everything

7    in the Patent Office would be done in accordance with

8    the rules and regulations and the MPEP.  And so when

9    you say my primary responsibilities, did I do this on

10   a daily basis, heck no, I didn't do that.  No.

11       Q    You're in private practice now, I assume; is

12   that correct?

13       A    I'm in private practice as a consultant on

14   patent litigation and as an expert witness.

15       Q    Do you have private clients?  You have

16   clients that pay you for your services and your

17   advice?

18       A    I have clients that ought to be paying me

19   for my services and advice.  Some of them do.

20       Q    Okay, with that qualifier, is it a yes?  I

21   hope you get paid.  I can't help you, but I hope you

22   get paid?

23       A    I think my wife is in your corner on that.

24       Q    Let me give you a hypothetical.

25       A    Yes.

69

1    Q   You are consulting on a patent case and your

2    client comes to you and says, got this patent, file

3    history in the attorney's office is lost, attorney

4    can't find the file history.  We went to the PTO

5    records, usual channels, couldn't find the file

6    history.  Turned everything upside down, asked

7    everyone we could, we can't find the file history.

8    But we really want to find it, or at least part of it,

9    because the case is in litigation.  Would you do any

10   of the things that Mr. Massie has done?

11    A   Oh, sure, but that doesn't make it -- that

12   doesn't make it a part of the official record.  Sure,

13   you would try to use any kind of means.  I question,

14   but I don't question Mr. Massie's sincerity in this,

15   but I question whether you're supposed to use those

16   private means within the Patent Office for this type

17   of thing, especially for a fee for someone else.  I

18   just question that.  And I may be wrong about that.

19   So I'm not sitting here, I'm not judging you,

20   Mr. Massie, I'm just -- I question that, as to whether

21   that's a proper use of one's history.

22        I know very much so about that, because at

23   my level when I was in the Patent Office there were

24   all kinds of ethical standards, that I had to make

25   sure I was not using my personal leverage in order to

1 accomplish, or my personal knowledge of relationships

2 that are necessary for running the Patent and

3 Trademark Office to profit by them in a way that

4 normal people couldn't do.

5      So that's -- that's my only comment about

6 that. But to the extent that I would try to lean on

7 somebody in a proper way, each time thinking about it,

8 and that perhaps is the kind of judgment that

9 Mr. Massie used here in trying to do that, of course,

10 of course you do that. The question is, once you try

11 to do all these things, what are you left with? I

12 mean, you may be left with the idea that you got a

13 pretty good idea that this is what happened here, and

14 a pretty good idea that this happened here, and a

15 guess there, and an educated guess here that that

16 happened. And there's nothing wrong with that.

17 Q    Right.

18 A    I mean, we all speculate in the world to try

19 to do things. The question is does it stand up to the

20 official standards required of the office.

21 Q    Let's talk about the --

22 A    So yes, I mean, I might do that, and I

23 don't -- I was impressed with his investigatory

24 skills. The question is what did he finally come up

25 with. And what he came up with was some guesses and

1    some speculation that made sense to me, some of them

2    made sense.  Some of them I recognized were

3    speculation, and a contrary thing could have happened.

4    And that's what happens.

5        There's a statement in Rule 56, talks about

6    disclosure, but the statement is general, it doesn't

7    go just to Rule 56, in that it says a patent is

8    affected with the public interest.  And basically what

9    that's about is that the patent system of the United

10    States is an exception to the notion that people

11    cannot exercise power over ideas, so that they can

12    hold them as their own.  There's a patent system that

13    allows ideas to be held as your own when they fit all

14    of the standards required by Title 35.

15        There is a copyright system which deals a

16    wholly different thing about the expression of ideas.

17    So that you can use the ideas, you just can't express

18    them the way another person did.  And that's the

19    copyrights office concern, and it's a lot more freedom

20    you have.  But in general the patent -- and, of

21    course, there's a Trademark Office that says you can't

22    go around using other people's good will simply

23    because you've got freedom of expression, you can't

24    use it for profit on somebody else's good will.  But

25    you can express it, you can talk about it.  And you

1    can even use it, as long as it's not an unfair

2    business practice type of thing as stated in the

3    trademark laws.

4        Q    Let's -- I'm sorry, go ahead.

5        A    For all of that -- just a last statement,

6    for all of that the notion is that as it is affected

7    with a public interest, the public ought to have the

8    same kind of access as anyone else to understand what

9    the claims of the patent preclude and to understand

10   what the -- what happened in order to define those

11   claims.

12       Q    Let's go back to our hypothetical for a

13   moment.  You've got this patent, and the official file

14   history is lost.  Both the attorney's copy of the file

15   history and the official PTO file history is lost.

16   And let's also assume in this hypothetical that the

17   investigations done by Mr. Massie are okay ethically,

18   assume that for the purposes of this hypothetical.

19          Would you rather have the information that

20   Mr. Massie found in his investigations, or would you

21   rather have nothing because you couldn't get a copy of

22   the official record?  What would you prefer to have?

23       A    I would rather have the ideas that

24   Mr. Massie had for his investigation, would give me a

25   sense of where these things are or what may have

73

1    happened.  But that doesn't necessarily mean it gives

2    any better rights or rights back to the patent holder.

3        Q    Right.

4        A    It just basically means that my curiosity

5    has been met.  And there's nothing wrong with that.

6        Q    But doesn't it also mean you got more

7    information about the patent?

8        A    You may have more information, but do you

9    have information that can be used in order to justify

10   decisions made on the patent.

11       Q    Well, it's better than nothing, isn't it?

12       A    Well, it's not a nothing or -- better than

13   nothing or anything else.  The idea is to have a baby.

14   And you can be a little bit of pregnant or less

15   pregnant, but if you don't have a baby, then it

16   doesn't make any difference.  So, you know, it may be

17   a great feeling to have.  I know my own experience as

18   a male who had a wife who was pregnant, there were

19   times during the stage of development that I was

20   ecstatic about it.  But the end product is what you

21   need to have.

22           And so I have no problem with all of the

23   things that he did, short of my reservations, which

24   again, I'm not here to judge, but short of my

25   reservations about the ethics of such an investigation

1   or using the information.

2       I mean, you know, between you and me, and

3   here's where the ethics come in, what happens if you

4   go down and you talk to somebody and say, well, do you

5   recall what happened on that, do you think really --

6   you know this woman over here who's the clerk, isn't

7   she smart and diligent?  Yes.  And you know

8   Mr. Goldstein over here, you know he's a good

9   examiner, isn't he?  Yes.  So why don't you go up

10  there and issue the Certificate of Correction, because

11  you know those people didn't do the wrong thing.  You

12  may not have a basis for it in the sense that you have

13  documents, but why don't you do it, because you know

14  they're good people, you know they wouldn't have done

15  anything.  No, no good, wrong, it's unethical, and it

16  shouldn't take place under those circumstances.

17      Q   Have you seen any evidence in this case

18  demonstrating that what you just described happened?

19      A   Oh, no, and I wasn't accusing him of that,

20  no.  The reason I'm saying that, I'm just trying to

21  show you the futility of the investigation.  No, I

22  don't think Mr. Massie did that.

23      My experience, incidentally, and I can say

24  this very positively about Mr. Massie, as long as

25  we're both speculating about things, I would speculate

75

1   that he didn't do anything that he thought was a lack

2   of propriety, because I have great faith in those

3   people who have been at the Patent Office in

4   understanding what their role is.  I mean, a lot of

5   people could take that information out, could sneak it

6   to other people, could do all kinds of things.  And

7   I've found patent examiners to be very ethical, and

8   there's no reason to believe that the day they come

9   out of being patent examiners and work for a law firm

10  that they're going to be different, although some

11  people might say something like that.  But I wouldn't

12  think that would be the case, I think they would

13  continue with the kind of integrity that I think

14  examiners have.

15      So that's the reason why I was very

16  hesitant, even though I have these feelings that that

17  shouldn't have been what happened with the use of the

18  PALM and the use of those other facilities.  But,

19  having said that, again, I come back to the fact that

20  I have great faith that examiners, Mr. Massie,

21  ex-examiners, show the kind of integrity that I

22  happened to see in the Patent Office.

23      And those files up in the ceiling and the

24  files down the shaft were dramatic when they happened,

25  but were not exemplary of the Patent -- the examiners

1   in the Patent Office.

2          So all of that is well and done, but again,

3   the question is what do you have in the end?  You

4   know, you've got a little bit more knowledge, great,

5   that's wonderful.  And it might be worth it to get a

6   little bit more knowledge.  But the reason I was

7   talking about this other matter is it's the same

8   thing, you'd have more knowledge, you'd know more

9   about it if you came up there and said wouldn't you --

10   or you may have had a result by having the patent

11   issued, because of all the things that this report

12   would want us to believe are pertinent to this case.

13   It's not that I disbelieve what he said, but are they

14   pertinent.

15          And if I told the person who is in charge of

16   that, you know it's Goldstein, you know it's Ms. so

17   and so, and I talked to Goldstein, he says I don't

18   quite remember rejecting that, and all of that.  So,

19   you know that, let's go ahead and issue that

20   Certificate of Correction.  It would be wrong, would

21   be absolutely wrong.

22     Q    Your role in this case as a testifying

23   expert, does your role include deciding what evidence

24   is relevant, admissible at trial?

25     A    Well, I can say what I just now said, and if

77

1    the judge comes back, who is finding the role, and

2    simply says, well, I still think it's relevant and

3    everything, hey, I'm not there to jump, I'm not going

4    to appeal it.

5        Q    Are you going to testify on the rules of

6    evidence in this case?

7        A    On the rules of -- no, I'm not.  That's not

8    my role, again, that's law.

9        Q    Are you going to testify as to whether a

10   piece of evidence is relevant and admissible in this

11   case?

12       A    I know from an administrative standpoint

13   about what the Patent Office depends on and what

14   records are the true intrinsic records for the court

15   to decide on.  I know in the fact that I'm trying to

16   assemble those records and make sure people know what

17   these records are that they don't include these

18   databases that we use for the internal running the

19   Patent and Trademark Office.  So those are not the

20   official record of the Patent and Trademark Office.

21   And no one depends on them.  And we may feel it's very

22   important for report generating and understanding

23   where we're going in the Patent Office, but it's not

24   the basis for what we're going to talk about.

25       Q    Let's talk about the official records in the

78

1   Patent Office for a minute.  Say you've got a

2   patent -- you're consulting on a case for one your

3   clients, you've got a patent, you order up an official

4   copy of the file history.  You go through the file

5   history and it's as perfect as perfect can be,

6   everything is in there, the application, every IDS,

7   every official action, every response and amendment,

8   everything is in there.

9       A   In order?

10      Q   In order.

11      A   Okay.  Because often they're in there, but

12   they're not in order.

13      Q   I understand.  And often they're in there

14   and often things are missing in official records?

15      A   Sure, because those records are shared with

16   the public, and they often come out.  So it may not be

17   the examiner who did anything, but subsequently things

18   become missing.

19      Q   Let's stay with this hypothetical for a

20   second, come back to it.

21      A   Okay.

22      Q   You've got a very good official record.

23      A   Yes.

24      Q   Does that official record really tell you

25   everything that happened in the prosecution of that

79

1   patent?

2       A   Yes.

3       Q   Every single thing?

4       A   Yes.

5       Q   Does it tell you what the examiner thought

6   and every thought he had?

7       A   It doesn't matter what the examiner thought

8   or what he had.  That doesn't matter, that's

9   irrelevant.

10      Q   But does it tell you that?

11      A   It doesn't.  But it's not relevant.

12      Q   It contains interview summary records.

13      A   Yes.

14      Q   Did you ever see those?

15      A   Yes.

16      Q   They can be very brief, right?

17      A   Yes.

18      Q   Do those interview summary records really

19  tell you everything that happened in an interview?

20      A   They tell you everything you need to know,

21  everything that is a part of the official record of

22  the Patent Office, yes.  That's what they do.

23      Q   Is it better than having a videotape of that

24  interview?

25      A   Until the records say that you can have a

1   videotape.  We actually talked about that.  And there

2   are reasons why that would be important, if you had a

3   videotape behind all of that.  I once saw an attorney

4   in a case actually walk behind a big screen that was

5   used for the exhibits, and he said in a very dramatic

6   fashion, "He took this application and he had an

7   interview with the examiner."  And he walked behind

8   the video -- the screen so that the jury couldn't see

9   him.  And they worked something out, and he came back.

10  And he was trying to be disparaging about the

11  interview.  Then the other attorney walked behind the

12  same place, and he says, and they talked about

13  something, and that's a summary of it.  And that's

14  what's supposed to be a part of the record.  Now, if

15  you want to know more --

16      Q    Is it always in there?

17      A    -- that's nice, but you don't need to know

18  that.

19      Q    Is it always in there?

20      A    It should be in there.  If it's not there,

21  then it's a missing part of the file.

22      Q    Is every phone call with the applicant's

23  attorney and the examiner always recorded in the

24  summary?

25      A    It is not, it is not.  But you know what, if

1    it's not there, it ain't a part of the record, it just

2    doesn't exist.

3        Q    But the official record is not perfect, is

4    it?

5        A    Yes, it's perfect by definition.  That's

6    what I'm trying to tell you.

7        Q    Well, tell me.

8        A    It's perfect by definition.  That's what

9    they're defining as the official record.  So by nature

10   of it, it's perfect by definition.  If someone were to

11   come into that record later and add I was there at the

12   interview and this is really what happened during the

13   interview, it's not a perfect record, because

14   everything should be in writing when it happened,

15   compiled in these official formats.  And anything else

16   that was said is extrinsic to the record, even though

17   it might be very good to know about.  It would make a

18   nice book.

19       Q    Let's look at page 6 of Goffney Exhibit 2.

20   And I'd ask you just to focus on for a moment that

21   first paragraph.

22       A    Yes.

23       Q    There's a sentence, I think, in the second

24   line which begins with the words, "However, a detailed

25   review."

82

1    A    Yes.

2    Q    And the end of the paragraph ends with

3    Exhibit K.  Do you see that?

4    A    Yes.

5    Q    I know you've reviewed this already, so do

6    you want to take a moment just to review that again?

7    A    All the way from "however" to --

8    Q    Yes.

9    A    Okay, I see.

10        MR. CAHN:  And during this break I'm going

11    to voice an objection to the interrogation regarding

12    something called a PALM record that's allegedly

13    attached to Mr. Massie's expert report, insofar as

14    that PALM record does not appear to have been

15    certified as an official government record.

16        THE VIDEOGRAPHER:  One minute, please.

17        MR. MANAK:  Want to take a break now, so --

18    because the video fellow has to change the tape.

19        MR. CAHN:  Yes.  Want to do lunch?

20        MR. MANAK:  Do you want to do lunch now?

21        MR. CAHN:  I mean, it's 12:30.

22        MR. MANAK:  Yes, sure.

23        THE VIDEOGRAPHER:  This marks the end of

24    tape 1 in the deposition of Mr. Goffney.  We are going

25    off the record.  The time is 12:26 p.m.

83

1          (A luncheon recess was taken.)

2          THE VIDEOGRAPHER:  This marks the beginning

3   of tape 2 in the deposition of Mr. Goffney.  We are

4   back on the record.  The time is 1:57 p.m.

5              (Discussion off record.)

6   BY MR. MANAK:

7      Q    Mr. Goffney, look again at page 6 of Goffney

8   Exhibit 2.  Do you have that in front of you?

9      A    Yes, I do.

10     Q    In that first paragraph there's reference to

11  two miscellaneous letters, April 1 and April

12  2 -- April 1st and April 2nd.

13     A    Yes.

14     Q    And here Mr. Massie says that those two

15  miscellaneous letters were not amendments to the

16  application for patent suit.  Do you agree with that?

17     A    Actually, I don't know what those letters

18  are.  I just don't know what they are.

19     Q    You don't know what they are?

20     A    No.  Mr. Massie says that it's likely that

21  they're not, and he may be very true about that.  I

22  might agree with him that there's a good chance that

23  they're not, but there's no -- no proof.

24     Q    If they were -- if one or both of them were,

25  in fact, amendments to the application, in the

1    ordinary course of business at the PTO would the PALM

2    records reflect that they were amendments rather than

3    miscellaneous letters?

4        MR. CAHN:  Objection to the form of the

5    question.

6        THE WITNESS:  I don't know what the room for

7    error is, but people have to key in certain things and

8    swipe them in with bar codes and things like that.

9    And there are times when the record is not as complete

10   and proper as we'd like it to be.

11   BY MR. MANAK:

12       Q    The PALM system you're talking about?

13       A    Yes.

14       Q    What was your involvement in the PALM

15   system?

16       A    Oh, my involvement -- well, I was an

17   examiner at one time and I used it.  And then after

18   that there were often discussions about how we were

19   going to move during my term in the Patent Office, how

20   we're going to move to all the electronic patent

21   system.  And there were all kinds of questions about

22   how we were going to keep these records on hand, how

23   the records would be used, questions about even how

24   the Federal Rules of Evidence would apply for the

25   records.