**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | | |
|---|---|---|
| LEVITON MANUFACTURING, INC. | ) | |
| | ) | |
| (Plaintiff) | ) | |
| | ) | |
| v. | ) | 01CV3855 AMD |
| | ) | |
| UNIVERSAL SECURITY INSTRUMENTS, INC. | ) | |
| | ) | |
| USI ELECTRIC, INC. | ) | |
| | ) | |
| (Defendants) | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY**
**JUDGMENT THAT THE DEFENDANTS' PRODUCTS INFRINGE THE**
**ASSERTED CLAIMS OF THE '894 PATENT**

# Table of Contents

ARGUMENT ................................................................................................................ 1

I.     THERE IS EVIDENCE THAT DEFENDANTS' GFCIs FROM OCTOBER 2002 TO
THE EXPIRATION OF THE PATENT (June 2003) DO NOT INFRINGE ANY CLAIM
OF THE '894 PATENT ............................................................................................. 1

   A.    Defendants Changed to a New GFCI Design in October 2002 ......................... 1

   B.    Plaintiff Was Provided Samples of the Shanghai GFCIs and Was Aware of the
   Design Change .................................................................................................... 3

   C.    Plaintiff's Discovery Responses ........................................................................ 4

   D.    Defendants' 2003 UL 943 GFCIs ...................................................................... 5

II.    THERE IS NO GENUINE ISSUE OF FACT AS TO THE NON-INFRINGMENT
OF THE '894 PATENT BY ANY OF USI'S GFCIs WHEN THE CLAIMS ARE
PROPERLY CONSTRUED ...................................................................................... 6

   A.    Standards for Determining Infringement ........................................................... 6

      1.    Interpreting the Claims .................................................................................. 6

      2.    Comparing the Interpreted Claims to the Accused Device ............................ 7

   B.    What is the "Strap Means" ................................................................................ 8

      1.    Plain Language and the Specification ........................................................... 8

      2.    The Structures Incorporated-by-Reference Include "Portions" Which Form a
      Conduit ............................................................................................................... 9

      3.    In Related Proceedings, the Criticality of the "Portions" Limitation Has Been
      Recognized......................................................................................................... 10

      4.    Leviton's Prior Testimony ............................................................................. 11

III.   PLAINTIFF'S CLAIMS MUST BE STRICTLY LIMITED TO THE ACTUAL
STRUCTURES DISCLOSED AND PLAINTIFF CANNOT ASSERT EQUIVALENCE
UNDER 35 U.S.C. §112, SIXTH PARAGRAPH ....................................................... 13

   A.    Apart from the Patent Text Itself, There Is No Way for the Public to Know What
   Scope of Protection Is Afforded to the '894 Patent Claims Without the File History13

      1.    The Patent File and Thus the Prosecution History Is Lost............................ 13

      2.    The '894 Patents PAIR/PALM Printouts Are Incomplete and Unreliable ..... 14

3.    The Official File History Is the Only Record Which Protect the Public ......... 16

4.    37 C.F.R. §1.251 Requires Patent Owners to Assist in Lost File
Reconstruction ................................................................................................. 16

5.    Reissue as a Remedy for Lost Files ........................................................... 17

CONCLUSION ............................................................................................................. 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

LEVITON MANUFACTURING, INC.     )
                            )
     (Plaintiff)          )
                            )
     v.                  )     01CV3855 AMD
                            )
UNIVERSAL SECURITY INSTRUMENTS, INC.)
                            )
USI ELECTRIC, INC.           )
                            )
     (Defendants)       )

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT THAT THE DEFENDANTS' PRODUCTS INFRINGE THE
ASSERTED CLAIMS OF THE '894 PATENT**

Defendants, Universal Security Instruments, Inc. and USI Electric, Inc. (hereafter

collectively referred to as "USI"), through their attorneys, submit this memorandum in

opposition to Plaintiff's motion for summary judgment on the issue of infringement.

**ARGUMENT**

**I.  THERE IS EVIDENCE THAT DEFENDANTS' GFCIs FROM OCTOBER 2002 TO
THE EXPIRATION OF THE PATENT (June 2003) DO NOT INFRINGE ANY CLAIM
OF THE '894 PATENT**

**A.  Defendants Changed to a New GFCI Design in October 2002**

Prior to October 2002, Defendants imported the accused Ground Fault Circuit

Interrupters ("GFCI") from Yatai Switch Factory.  For nomenclature purposes those units

will be referred to herein as "Yatai GFCIs."  In the autumn of  2002, Defendants

commenced selling GFCI devices from a new manufacturer, Shanghai Meiho. *See*

Declaration of Harvey Grossblatt dated August 7, 2003 at ¶ 5.  (Exhibit 1).   For

nomenclature purposes herein, those units will be referred to herein as "Shanghai pre-

2003 GFCIs."  Commencing in 2003, USI imported GFCI's from the manufacturer, Shanghai Meiho, which structurally resemble the Shanghai pre-2003 GFCIs but incorporate features to comply with the new 2003 Underwriter's Laboratories standard (UL943).[1]  For nomenclature purposes herein, those units will be referred to herein as "2003-compliant Shanghai GFCIs."  The internal elements of both the Shanghai pre-2003 GFCIs and the 2003 compliant Shanghai units are similar to each other but are different both structurally and in mode of operation than the Yatai GFCI's.  (*See* Exhibit 2, Photographs of the various units).

The Yatai GFCIs were the accused devices that served as the basis of this suit, the sister suits around the country including the case pending before Judge Pregersen in California, and the Complaint filed with the International Trade Commission (ITC).  However, despite knowing that USI changed from the Yatai GFCI's to the Shanghai GFCIs and that both the Shanghai pre-2003 GFCIs and the 2003-compliant Shanghai GFCIs do not contain the banger and/or banger dog structures contained in the Yatai units, Plaintiff contends that:

> …the Court should find that if one of defendants' GFCIs infringe the '894 Patent, they all do.

Plaintiff's Br. at 11.

Plaintiff has no basis in fact or in law to assert infringement of the '894 patent based on either of the Shanghai pre-2003 GFCIs and the 2003-compliant Shanghai GFCIs.  Accordingly, unless Plaintiff limits the accused infringement to the Yatai models and agrees that the Shanghai pre-2003 GFCI's and the 2003-compliant Shanghai

---

[1]  These 2003-compliant Shanghai GFCIs are the subject matter of the newly filed litigations pending before this Court:  03cv1701AMD and 03 2137AMD.

GFCIs do not infringe the '894 patent, Plaintiff cannot be acting in either objective or

subjective good faith and may press forward only at their own peril.

**B. Plaintiff Was Provided Samples of the Shanghai GFCIs and Was Aware of the Design Change**

During discovery, Plaintiff was provided with a sample of each of the GFCIs ever

sold by Defendants for destructive testing.[2]  Upon opening the Shanghai pre-2003

GFCI's and the 2003-compliant Shanghai GFCIs, it becomes immediately apparent to

anyone, including a layman, that both of the Shanghai pre-2003 GFCI's and the 2003-

compliant Shanghai GFCIs include a single metal post projecting from the back of the

reset switch and do not include a banger or banger dog of the type found in the Yatai

GFCIs. (*See* Exhibit 2, photographs of opened units).  Plaintiff's own technical expert's

report only deals with the Yatai GFCI and is silent about the Shanghai pre-2003 GFCI's

and the 2003-compliant Shanghai GFCIs.

Is Plaintiff improperly attempting to lump all three GFCI structures together? The

answer is apparently, yes.  In its opening brief, making general reference to USI's

President, Harvey Grossblatt's 30(b)(6) deposition testimony, Leviton asserts

> [t]he Defendants have admitted that all of the GFCI'S that they market and sell
> are virtually identical, as regards the switch operating components.

Plaintiff's Br. at 10-11.  This assertion is hogwash.  The deposition testimony contains

no such admission as is evident from Mr. Grossblatt's deposition testimony, reproduced

below:

> Q.    Let me ask it a different way.  Would the inner working parts of all of the
> GFCIs which have been marked as USI 1 through USI 19 have either the internal

---

[2] Two of USIs GFCIs were only available for inspection due to the fact that they are the last two of their kind.  Defendants stipulated that their structure and mode of operation were the same as the other Yatai GFCIs.

construction of the GFCIs provided by Wenzhou Yatai or the later construction provided by the Shanghai company?

A.  Yes.

Depo. Tr. H. Grossblatt at 90:16-92:8. (Exhibit 3).

Implicit in his use of the disjunctive "or" in his question about the manufacturer, "Yatai **or** the later Shanghai construction," even Plaintiff's counsel acknowledged that the Yatai GFCIs and Shanghai GFCIs are different.  Yet, Plaintiff, in its motion seeks to lump all three of the GFCI structures into one group for its infringement contentions.

For summary judgment on infringement, Plaintiff bears the burden of proving that every limitation of the '894 patent is found in each of the three, Yatai, Shanghai pre-2003 GFCI's and the 2003-compliant Shanghai GFCIs sold by USI.  Notably, other than the mischaracterized cited testimony of the Mr. Grossblatt, both Plaintiff and its expert are silent.  Asserting the '894 patent against the Shanghai pre-2003 GFCI's and the 2003-compliant Shanghai GFCIs is not supportable on the record.  Thus, under the facts now pending, summary judgment of infringement is not appropriate.  Indeed, Plaintiff, in good faith, cannot pursue infringement of the '894 patent claims by Shanghai pre-2003 GFCI's and the 2003-compliant Shanghai GFCIs against Defendants.

## C.  Plaintiff's Discovery Responses

In response to Interrogatory No. 20, which included a chart of the '894 patent's claims to be filled in with Plaintiff's contention as to what features of USI's GFCIs satisfied the claim limitations, Plaintiff indicated that a "banger" and a "banger dog and latch" were the movable means.  *See* Plaintiff's Response to Defendants' Third Set of Interrogatories 18-20.  (Exhibit 4).

A simple visual comparison of the device with the patent will indisputably show the absence of key claim features. The Shanghai GFCIs have a depending central post from the rest switch, and do not have either a banger dog and latch mechanism or a banger. (*See* Exhibit 2). There is simply no genuine issue of fact as to the non-infringement of the claims of the '894 patent by Defendants' Shanghai GFCIs.

### D.  Defendants' 2003 UL 943 GFCIs

In order to comply with new requirements from Underwriter's Laboratories (UL 943), Defendants began importing and selling the next generation, 2003-compliant Shanghai GFCIs. The mechanical features of the 2003-compliant Shanghai GFCI are nearly identical to the Shanghai pre-2003 GFCIs. Certain changes are evident upon casual inspection such as the shape of the reset button's post and complementary pairs of contacts, rather than a single contact. Neither of the Shanghai pre-2003 GFCI's nor the 2003-compliant Shanghai GFCIs possess 1) a banger dog and latch mechanism or 2) a banger associated with its plunger. Samples of the Shanghai pre-2003 GFCIs were made available for Plaintiff's inspection in November 2002 and samples of both the Shanghai pre-2003 GFCIs and 2003-compliant Shanghai GFCIs provided to the Plaintiff in the Spring 2003. However, there is no mention of them in the July 18, 2003 expert submission appended to Plaintiff's opening brief. Nevertheless it is logical to assume that Plaintiff had studied the 2003-compliant Shanghai GFCIs before filing its Summary Judgment Motion in July in view of the fact that in its June 10, 2003 Complaint (03cv1701) Plaintiff has now asserted six new patents against these very same GFCIs. For the reasons discussed above, there is no genuine issue of material fact as to the non-infringement of the '894 patent by the 2003-compliant Shanghai GFCIs.

## II. THERE IS NO GENUINE ISSUE OF FACT AS TO THE NON-INFRINGMENT OF THE '894 PATENT BY ANY OF USI'S GFCIs WHEN THE CLAIMS ARE PROPERLY CONSTRUED

### A. Standards for Determining Infringement

"Infringement is a factual inquiry." *Baxter Healthcare Corp. v. Spectramed, Inc.* 49 F.3d 1575, 1582 (Fed. Cir. 1995). "In determining whether there has been infringement, a two step analysis is required. First, the claims must be correctly construed to determine the scope of the claims. Second, the claims must be compared to the accused device." *Kahn v. General Motors Corp.,I 135 F.3d 1472, 1476 (Fed. Cir. 1998*).

1. Interpreting the Claims

Words in the claims are to be given their ordinary and accustomed meaning, unless the terms have been given a special meaning. *York Products, Inc. v. Central Tractor Fam & Family Center,* 99 F.3d 1568, 1572 (Fed. Cir. 1996)("Without an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning"); *Vitronics Corp. v. Conceptronic, Inc.* 90 F.3d 1576, 1582 (Fed. Cir. 1996)("[A] patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history."). Where claim elements are expressed in "means plus function" format, the scope of the element includes the structure(s) disclosed in the specification for performing the recited function plus equivalents to those structures. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1307-08 (Fed. Cir. 1998) ("Such a [means-plus-function] limitation must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."). When multiple embodiments in the

6

specification correspond to the claimed function, proper application of 35 U.S.C. §112, sixth paragraph, generally reads the claim element to embrace each of those embodiments.  When alternative structures corresponding to the claimed function are described in a specification, the district court should not limit the "means" to the specific structures of the preferred embodiment. *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

2.  Comparing the Interpreted Claims to the Accused Device

In order to infringe, every limitation of the claim must be found in the accused device, either literally or under the doctrine of equivalents.  *General Mills, Inc. v. Hunt-Wesson, Inc.* 103 F.3d 978, 981 (Fed. Cir. 1997).  To prove infringement, the patentee must show that the accused device contains each limitation of the asserted claim, or an equivalent of each limitation. *Electro. Sci. Industries v. Dynamic Details, Inc.,* 307 F.3d 1343, 1350 (Fed. Cir. 2002).

Furthermore, the proper comparison is between the accused device and the claims of the patent, not the patentee's commercial embodiment.  *Zenith Laboratories, Inc. v. Bristol-Myers Squibb Co.,* 19 F.3d 1418, 1423 (Fed. Cir. 1994)("[I]t is error for a court to compare in its infringement analysis the accused product or process with Applicants' commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent.").

An accused product which is not the same as or equivalent to the corresponding structure in the patent does not infringe. Moreover, there is no infringement if the accused device does not perform the identical function recited in the "means" clause. *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1320 (Fed. Cir. 2003).

**B. What is the "Strap Means"**

Claim 1 is the only independent claim in the patent.  Accordingly, if claim 1 is not

infringed, then by definition, none of the claims depending therefrom is infringed.  *See*

35 U.S.C. §112, fourth paragraph.  One of the elements of claim 1 is that the device has

a "strap means for mounting the switching apparatus upon a selected surface."  Claim 1

then recites further functional structure of the strap:  "said strap means including

portions thereof which define a path of the magnetic field generated by said coil means

to influence the position of said plunger means."

1.  Plain Language and the Specification

The plain language of the claim requires that the strap include "portion**s**" which

define a path of the magnetic field.  In discerning what is meant by "portion**s**" in the

claim language, resort must be made to the patent's specification.  The specification of

the '894 patent clearly discloses, depicts and describes that a **pair** of tabs located on

opposite sides of the coil are the claimed "portion**s**."

> As in the case of strap 22, mounting strap 326 is preferably formed from steel
> sheet metal by means of a progressive die blanking and stamping and forming
> procedure, ***and further includes a pair of relatively depending tabs 342 and
> 344 located on opposite sides of coil assembly.***

'894 Patent at Col. 3, ln 12-17 (emphasis added).

The claim language, the specification and the drawings all call for "portion**s**" not

"a portion."

Plaintiff disregards the plural nature of this language.  When asked to identify

what structure in the accused devices satisfied this limitation, Plaintiff's interrogatory

response was "[c]entral portion of accused strap."  Notably, the response is singular

because none of the accused Yatai GFCIs have straps with "portion**s**."  Indeed, the

parties do not dispute that the accused Yatai GFCIs do not have the feature of Tab No. 344.  (Leviton Deposition pg. 46, ln 25 to 47 ln 4 and pg. 209 ln 5-9, Exhibit 5).  If after construing the claims, the Court finds that the strap requires tabs or ribs, in the plural, pursuant to the plain language, then there is no genuine issue of fact as to the non-infringement of the '894 patent by Yatai GFCIs.

2. The Structures Incorporated-by-Reference Include "Portions" Which Form a Conduit

The plain and ordinary meaning of the plural "portion**s**" requires at least two and certainly more than one.  Even given the fact this element is written in means-plus-function format and thus, that the structures from the '945 patent and the '262 application incorporated by reference are considered, the plurality of the language leads to the same conclusion.  Plaintiff attempts to deny the true structures disclosed and incorporated by reference in the '894 patent and the absence of any equivalent feature in the accused GFCIs.

The '945 patent describes a strap structure including a pair of opposed ribs that extend the length of and form a conduit around the coil:

> Strap 22 is created from blanked steel sheet metal by means of progressive die stamping and forming procedure, and further includes a pair of relatively **upstanding boundary ribs 48 and 50** located on opposite sides of a coil opening 52 formed therethrough.
> * * *
> A coil or stator 74 is mounted centrally within housing portion 14, and is located with respect to strap 22 such that the coil or stator 74 and its windings are disposed within the opening 52 **bounded on either side by ribs 48 and 50 of the strap**.

'945 Patent at Col.5, ln 27-31 and 56-60 (emphasis added). (Exhibit I attached to Plaintiff's Infringement Summary Judgment Motion).  The '945 strap does indeed have a portion in the front of the coil and the back of the coil, with ribs on each side of the coil.

*See* '945 Patent at Figs. 2, 4, and 12.  In the ITC proceeding, Leviton's Expert, Mr. Campolo admitted the boundary ribs act as a conduit for the magnetic lines of force.

Mr. Campolo has already conceded that tabs 342 and 344, and ribs 48 and 50, provide a conduit for the magnetic lines of force:

> Q.  Now the '894 patent describes two tabs on the strap, is that right?
> A.  Yes.
> Q.  And do you understand that those tabs will provide a conduit for the magnetic lines of force?
> A.  Yes.

Campolo Depo. Tr. at  264:7 to 264:13  (Exhibit 6).

Correspondingly, the '262 application from which the '894 patent claims priority, provides a "frame means for defining a path of a magnetic field generated by said coil." (*See* Claim 1 and element 664 in Figure 9 of Exhibit 7).  The criticality of the tabs or ribs in creating a conduit for the magnetic lines of force was fully set forth by the Respondents expert, Mr. Gene Haynes, in his expert submissions to the ITC.  *See* Exhibit 8, Excerpts from Expert Submissions of Mr. Gene Haynes, ITC Investigation No. 337-TA-478.  Hence, the "portion**s**" of claim 1 of the '894 patent are those structures that form a conduit around the coil.  Given that the Yatai GFCIs do not have a structure having "portions" forming a frame, ribs, or tabs (a "conduit around the coil"), there is no genuine issue of fact as to the non-infringement of the '894 patent.

3.  In Related Proceedings, the Criticality of the "Portions" Limitation Has Been Recognized

In denying a similar motion for summary determination of infringement brought by Leviton in the ITC, Judge Harris found that there was at least a genuine issue of material fact with respect to the absence of a structure equivalent to Tab No. 344 of the

'894 patent.  *See* Exhibit 9, Order No. 11, ITC Investigation No. 337-TA-478, dated March 17, 2003.

In addition to the foregoing, the defendants in the California litigation produced an opinion of counsel from the 1990s attesting to the non-infringement of the Yatai devices due to the absence of "portions" which define a path of the magnetic field around the coil.  This opinion would have been provided to the Court with this memorandum; however, the opinion is amongst the documents identified by Defendants for copying in June which Plaintiff still has not produced.[3]

In sum, the absence of Tab No. 344 or its equivalent as described and claimed in the '894 patent in the strap of the Yatai GFCIs, at a minimum, precludes a finding of infringement.  The Yatai GFCIs do not have the structure and thus are incapable of forming a conduit around the coil of the type claimed in the '894 patent.

4.   Leviton's Prior Testimony

On page 14 of his expert report, Mr. Campolo of Leviton asserts that he "do[es] not know whether the second tab, even though it is not directly in contact with the coil, will further enhance the function of the coil." (Attached to Plaintiff's Br. as Exhibit L).  It is proper to conclude from this admission that, Mr. Campolo has no personal knowledge and has not conducted any tests to determine what the effect of a two tab (or two rib) strap is on the position of the plunger.  The only test conducted by Mr. Campolo concerns a comparison between a **non-metallic strap** with no tabs or ribs and a strap having only one tab.  The results of Mr. Campolo's experiments are inconsistent and

---

[3] Many of the documents identified in Defendants' June 23, 2003 letter to Plaintiff after its inspection in New York still have not been produced, even after a letter to chambers was sent by Defendants. Accordingly, Defendants request the ability to supplement its papers once the Plaintiff is compelled to produce the requested documents.

unreliable, as pointed out by Mr. Gene Haynes in his declaration.  *See* Declaration of Gene Haynes at ¶¶ 22-25.  (Exhibit 8).  Significantly, without knowledge as to the specific effect the presence or absence of Tab No. 344, as associated with a metallic strap, has on the position of the plunger, Mr. Campolo's testimony should be assigned no weight.

In the present case, Mr. Campolo, contends that  "the lack of the second tab does not change the functioning of the strap as required by the claim."  (*See* Plaintiff's Br. at Exh. L, p. 14).  But, as quoted above, Mr. Campolo conceded that tabs 342 and 344, and ribs 48 and 50, provide a conduit for the magnetic lines of force.  Furthermore, Mr. Campolo's present contention belies his testimony he gave during the ITC proceedings:

> Q.    Is it your opinion that the tabs would have some influence on the position of the plunger?

> MR. SUTTON:  Objection.  Please answer.

> A.   Without actually doing some tests I couldn't tell you, but some is probably safe.

Campolo Depo. Tr. at 277:3 to 279:6. (Exhibit 6).

A jury may find after cross-examination that one of ordinary skill in the art reading the '894 patent would recognize that the purpose of both tabs 342 and 344, the corresponding sides of the metallic frame 664 in the '262 application, and the boundary ribs 48 and 50 of the '945 patent, is to provide a conduit or path for the magnetic field generated by the solenoid 346, and that these conduit designs are successful in causing the solenoid to produce a force applied to the plunger which is stronger than a device without such a conduit.  Accordingly, within its own body of testimony, Leviton

has provided inconsistent and contradictory testimony about the functionality and

behavior of the strap structure subject to the '894 patent.  Therefore, drawing all

inferences in favor of the Defendants, there at least exists a genuine issue of material

fact to preclude summary judgment as to the single-tab Yatai GFCIs.

**III.  PLAINTIFF'S CLAIMS MUST BE STRICTLY LIMITED TO THE ACTUAL STRUCTURES DISCLOSED AND PLAINTIFF CANNOT ASSERT EQUIVALENCE UNDER 35 U.S.C. §112, SIXTH PARAGRAPH**

   **A.  Apart from the Patent Text Itself, There Is No Way for the Public to Know What Scope of Protection Is Afforded to the '894 Patent Claims Without the File History**

      1.  <u>The Patent File and Thus the Prosecution History Is Lost</u>

   No one knows what transpired during prosecution.  The U.S. Patent &

Trademark Office has lost its copy of the file history over a decade ago; and, neither

Plaintiff nor its prosecution counsel have a copy.  Regardless of this fact, in its

"statement of facts," Plaintiff represents to the Court that the '894 patent was a "First

Action Allowance" and, as such,

> there was no 'prosecution' of the claims, so that no limitation on the scope of the
> '894 Patent claims need be [sic] considered under the doctrine of prosecution
> history estoppel.

Plaintiff's Br. at 5-6.

   There is no way to know if there was any prosecution history or estoppel creating

events during the pendency of the '894 patent without the file history.  *See* Expert

Report of Lawrence J. Goffney at ¶112 (Exhibit 10) (hereinafter "Goffney Report").

Plaintiff's own patent expert concedes as much.  *See* Deposition of Jerome Massie at

81: 4-19 (Exhibit 11)(hereinafter "Massie Depo. Tr.").

2.  The '894 Patents PAIR/PALM Printouts Are Incomplete and Unreliable

Plaintiff's primary contention regarding the absence of prosecution is that the publicly available Patent Application Information Retrieval (PAIR) system, which is based on the PTO's internal Patent Application Location and Monitoring (PALM) system, shows only one office action being issued by the Examiner.  *See* Expert Report of Jerome Massie at ¶10 (Exhibit 12)(hereinafter "Massie Report").  However, former Commissioner of Patents Lawrence Goffney testified that such collateral materials are not suitable surrogates for the official file history due to problems of inaccuracy and incompleteness.  *See* Goffney Report at ¶ 96, 115; Deposition of Lawrence J. Goffney at 62:2 to 84:13. (Exhibit 13)(hereinafter "Goffney Depo. Tr.").  The PTO's PAIR/PALM system printout for the '894 patent in this case, is virtually conclusive of the inaccuracy and incompleteness of those materials.  *See* '894 Patent PAIR and PALM records (Exhibit 14).

Immediately apparent upon the briefest perusal and in contrast to the entries relating to the first Certificate of Correction in 1988, is the absence of any records or entries associated with the second Certificate of Correction of 2001.  There is no entry reporting the original June 18, 2001 Request, the October 18, 2001 resubmission of the Request, the October 22, 2001 approval of the Request, and/or the December 11, 2001 issuance of the second Certificate of Correction.  Yet according to the very PAIR/PALM system relied upon by Plaintiff, the second Certificate of Correction does not exist. What events transpired in connection with the '894 patent file -- amendments, Examiner's Interviews, Examiner's Amendments, Reasons for Allowance -- that do not appear on the PAIR/PALM system?  Simply put, there is no way to tell.  Consequently,

14

without the file history, clearly the PAIR/PALM printout relied upon by Plaintiff cannot be deemed official or complete.

In addition to the problems relating to the PAIR/PALM printout, it contains two "Miscellaneous Incoming Letters" entries, the content of which are a complete mystery. Plaintiff's own expert concedes that the content of those miscellaneous communications cannot be definitively known without examining the contents of the official file history. *See* Massie Depo. Tr. at 20:21 to 21:12 (Exhibit 11). But Plaintiff has never identified or attempted to identify the content of those communications. Did they address matter or rejections raised in connection with the parent applications? Did they contain Plaintiff's statements and explanations regarding patentability? Did they contain an Examiner's "Reasons for Allowance" with the Notice of Allowability.[4] *C.f.* Massie Depo. Tr. at 173:13-17. Even Plaintiff's own expert agrees that it was possible that the Examiner issued reasons for allowance in the '894 patent along the lines that "the prior art does not disclose a strap having a pair of depending tabs on opposite ends of the coil defining the magnetic path." *See* Massie Depo. Tr. at 173:18 to 174:5 (Exhibit 11).

Indeed within the framework of this case, PAIR and PALM printouts for another patent illustrates the inadequacy/incompleteness of those records. Plaintiff's expert conceded the absence of key prosecution events in PAIR during his deposition. *See* Massie Depo. Tr. at 99:7 to 104:17. The PAIR printout for the prior art '338 patent (Exhibit 15) is missing a number of substantive entries that transpired during the prosecution. Consequently there is no way the Plaintiff or the public, could conclude that there was no prosecution history or estoppel creating events.

---

[4]An Examiner's reasons for allowance are absolutely binding on the patentee, absent an objection by the patentee thereto. *See Apex, Inc. v. Raritan Computer, Inc.* 187 F.Supp.2d 141, 155 (S.D.N.Y. 2002)(citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17 (1997)).

3. <u>The Official File History Is the Only Record Which Protect the Public</u>

The official File History is the only record from which the public (and the PTO) can discern the events that occurred during prosecution, the materials considered by the Examiner, and the scope and meaning of the claims.  *See* Goffney Report at  ¶112; Goffney Depo. Tr. at 62:2 to 84:13.  As demonstrated above with respect to the unreliability of unofficial documents (e.g., the PAIR and PALM system printouts), Commissioner Goffney elaborated on why the official file history of a patent must be used as the sole source of information relating to patents.  *See* Goffney Depo. Tr. at 62:2 to 84:13.

In the event the PTO loses a file history, there are in place a number of remedial measures available to the patentee.  Notably, Leviton never undertook to remediate the problem associated with the missing file history.  Consequently, Leviton should not be able to benefit from its absence at the expense of accused infringers by expanding the interpretation of the claims beyond the exact structures depicted, described, and disclosed in the '894 patent.  There is simply no way for the public to know what was surrendered during prosecution by argument, amendment or agreement without the '894 patent's file history, or Examiner's Reasons for Allowance.  *See Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.,* 66 F.3d 285, 291 (Fed. Cir. 1995).

4. <u>37 C.F.R. §1.251 Requires Patent Owners to Assist in Lost File Reconstruction</u>

The Code of Federal Regulations sets forth a particular procedure the PTO is to follow in the event it cannot locate the file history of an application or patent.  37 C.F.R. §1.251.  In essence, the PTO places the burden of reconstructing the file history on the applicant/patentee.  When the official PTO file history of a patent or application is lost,

the PTO notifies the owner and allows the owner to reconstruct the prosecution history by submitting copies of all the correspondence in the owner's or prosecution counsel's files.  In the event a patent applicant cannot reconstruct the file history, the application is abandoned.

In a situation such as the present case, soundness of the logic of this rule is obvious.  However, the patent owner is in the best position to assist the PTO in file reconstruction.  With due regard to the presumption of validity of an issued patent, if the patent owner is not able to assist in file reconstruction, then the owner, and not the public, should suffer any adverse inferences in interpretation of claims scope, e.g., strictly construing the patent claim scope to the exact embodiments disclosed.  The present case illustrates why.

Hypothetically, if a patentee realizes that a patent examiner's Reasons for Allowance prevent asserting a claim interpretation needed to cover the competitor's product and the PTO's copy of the file history conveniently disappears coupled with the patentee's "loses" of its own file thereby preventing PTO reconstruction, then that patentee would be able to assert any claim construction that suitable to its purposes.  As a policy matter, the patent owner should no be allowed to advance claim interpretation not supported squarely within the four corners of the patent.  Unless the non-production of the file history is used against the patentee, for example, to preclude the assertion of any claim interpretation beyond the exact embodiments disclosed in the specification, the public notice function of the claims and the official file history fails.

5.  Reissue as a Remedy for Lost Files

The fact that neither the Plaintiff nor its prosecution counsel had a copy of the file history does not foreclose the construction of a new official record.  There were other

remedial measures in the statute to put the public on notice as to the scope of the claims, if any, beyond the particular embodiments set forth in the specification.  In particular, Commissioner Goffney opines that reissue was "particularly suited for this case, because during the prosecution of the reissue application, a new prosecution history would be developed."  Goffney Decl. at ¶ 118.  In his opinion, reissue "would be the only alternative that would protect the public."  *Id.*  Absent an official file history, the public simply does not know what was surrendered during prosecution.

## CONCLUSION

In view of the foregoing, Defendants' respectfully request that Plaintiff's motion for summary judgment of infringement be denied.

Respectfully submitted,

UNIVERSAL SECURITY INSTRUMENTS INC.
USI ELECTRIC, INC.

By:_____/s/_____
Maurice U. Cahn, Esq.
Frederick N. Samuels, Esq.
William E. Bradley, Esq.
CAHN & SAMUELS, LLP
2000 P Street, NW, Suite 200
Washington, D.C.  20036
(202) 331-8777 (Phone)
(202) 331-3838 (FAX)