UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

'03 MAR 17 P5:07

OFC OF THE SECRETARY
US INT'L TRADE
RECEIVED

---

In the Matter of

**CERTAIN GROUND FAULT CIRCUIT
INTERRUPTERS ("CFCIs") AND PRODUCTS
CONTAINING SAME**

**Investigation No. 337-TA-478**

---

**ORDER NO. 11:**    **(1) Order Denying Complainant's Motion for Summary
Determination of Validity and Enforceability (Motion No. 478-14);
and**

**(2) INITIAL DETERMINATION Granting in Part Respondents'
Cross-Motion (Motion No. 478-22)**

**I.    Background**

By publication of the Notice of Investigation in the *Federal Register*, on August 23, 2002,

the Commission instituted this investigation, pursuant to subsection (b) of section 337 of the

Tariff Act of 1930, as amended, to determine:

> [W]hether there is a violation of subsection (a)(1)(B) of section 337
> in the importation into the United States, the sale for importation, or
> the sale within the United States after importation, of certain ground
> fault circuit interrupters or products containing same by reason of
> infringement of claim 1, 2, 3, or 4 of U.S. Letters Patent 4,595,894,
> and whether an industry in the United States exists as required by
> subsection (a)(2) of section 337.

67 Fed. Reg. 54671 (2002).[1]

---

[1] As indicated in the caption of this Order, and as seen the parties' filings, the term "ground
fault circuit interrupter(s)" is often indicated by the acronym GFCI(s).

The Notice of Investigation named Leviton Manufacturing Co., Inc. ("Leviton") as the complainant. The respondents named in the Notice of Investigation include Yueqing Huameili Electronic Co., Ltd., d/b/a HML, Yueqing Huameili Electronic Co., Ltd., and Van-Sheen Electric Appliance Co., Ltd., d/b/a Yatai Switch Factory (referred to collectively as "Respondents"). *Id.*

All active parties seek termination of this investigation. For example, on December 30, 2002, Respondents filed a Motion to terminate this investigation based on the fact that the '894 patent asserted in this investigation will soon expire on June 17, 2003. Motion Docket No. 478-5. On March 3, 2003, Leviton filed its "Motion to Terminate Investigation on the Basis of Withdrawal of the Complaint." Motion Docket No. 478-28. However, several Motions requesting summary determination are also pending which could be dispositive of this investigation. In view of the substantial record associated with certain summary determination Motions, the Administrative Law Judge has determined to address some of those pending Motions. *See* Order No. 9 (Denying Complainant Leviton's Motion for Summary Determination That the Accused Products of Certain Respondents Infringe the '894 Patent). This is not the first time in section 337 practice that circumstances have been presented in which it is appropriate to decide a request for summary determination while a motion to terminate is pending. *See Certain Vehicle Security Systems and Components Thereof*, Inv. No. 337-A-355, Order No. 18 (Denying Complainant's Motion to Terminate Based on Withdrawal of Complaint; Initial Determination Terminating Investigation Based on Summary Determination of On-Sale Bar); Notice of Commission Decision Not to Review (June 3, 1994).

The patents in this investigation are presumed to be valid and enforceable. *See* 35 U.S.C. § 282; *SRI Int'l, Inc. v. Advanced Technology Labs., Inc.*, 127 F.3d 1462, 1464 (Fed. Cir. 1997).

2

Nevertheless, it has been acknowledged by Leviton and other parties that because the asserted patent will soon expire, there should be no evidentiary hearing, and thus Leviton can prevail in its Complaint only on the basis of summary determination. Leviton has filed a number of motions requesting summary determination.[2]

Of particular pertinence to this Order and Initial Determination is the fact that on January 22, 2003, Leviton filed, pursuant to 19 C.F.R. § 210.18, its "Motion for Summary Determination of Validity and Enforceability for the '894 Patent," and Memorandum in support thereof. Motion Docket No. 478-14. During the pendency of this investigation, Leviton has learned of several allegations made by Respondents concerning grounds for alleged invalidity and unenforceability of the asserted '894 patent. In its Motion, Leviton seeks summary determination in its favor as to those allegations. *See* Leviton Memorandum at 3, 9-10.

On January 13, 2003, the Commission Investigative Staff of the Commission's Office of Unfair Import Investigations ("OUII") filed its Response supporting Leviton's Motion in part and opposing it in part.

On January 13, 2003, Respondents filed their "Conditional Cross-Motion for Summary Determination of Invalidity and Unenforceability," and a Memorandum in support thereof. Motion Docket No. 478-22. Respondents refer to their Cross-Motion as "conditional" because they assert that Leviton's Motion was filed out of time, and because at the time of filing they believed it likely that the Administrative Law Judge would find that outstanding factual issues preclude the granting of any summary determination. *See* Cross-Motion at 1-2. The

---

[2] The parties do not agree as to whether Leviton has requested summary determination of all the elements necessary to establish a section 337 violation.

3

Administrative Law Judge defers ruling on the procedural question of whether or not Leviton's

Motion under consideration and other Leviton Motions are timely because in view of the

Motions to terminate, it does not appear that such a determination will have to be made.

Additionally, the parties have engaged in substantial briefing with respect to the validity and

enforcement issues. The Administrative Law Judge finds that while outstanding factual issues

preclude the granting of Leviton's Motion and most portions of Respondents' Cross-Motion, the

record is more than adequate to grant one portion of Respondents' Motion, which relates purely

to a legal question of patent validity.

On February 28, 2003, Leviton filed its Motion for leave to reply in support of its Motion,

and a Reply and Opposition to Respondents' Cross-Motion. Motion Docket No. 478-26. Motion

No. 478-26 is GRANTED. On March 4, 2003, Leviton filed a corrected version of this Reply

and Opposition.

On February 28, 2003, the Commission Investigative Staff filed its Response to

Respondents' Cross-Motion.

On March 4, 2003, Respondents filed their Motion for leave to respond to Leviton's and

the Staff's filings concerning Leviton's Motion and Respondents' Cross-Motion, and a

Response. Motion Docket No. 478-29. Motion No. 478-29 is GRANTED.

## II.    Standard for Summary Determination

The pending Motion and Cross-Motion seek summary determinations. The

Commission's Rules provide that any party may move with any necessary supporting affidavits

for a summary determination of all or any of the issues to be determined in an investigation. The

determination sought by the moving party shall be rendered if the pleadings and any depositions,

4

admissions on file, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary determination as a matter of law. A party opposing a motion for summary determination may not rest upon mere allegations or denials of the opposing party's pleading, but by affidavits, answers to interrogatories or as otherwise provided for under the Commission's Rules, must set forth specific facts showing that there is a genuine issue of fact for the evidentiary hearing. 19 C.F.R. § 210.18(a)- (c). The substantive aspects of the Commission's Rule on summary determination are analogous to Federal Rule of Civil Procedure 56 under which summary judgment is proper if there is a showing that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Summary judgment under the Federal Rules, and analogously under the Commission's Rules, should not be regarded "as a disfavored procedural shortcut, but rather as an integral part of the . . . Rules as a whole, 'which are designed to secure the just, speedy and inexpensive determination of every action.'" *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed. Cir. 1988)(quoting *Celotex*, 477 U.S. at 327). Nevertheless, summary judgment "is not designed to substitute lawyers' advocacy for evidence, or affidavits for examination before the fact-finder, when there is a genuine issue for trial." *Continental Can Co. USA, Inc. v. Monsanto Co.*, 1264, 1265 (Fed. Cir. 1991). Similarly, on appeal, an "appellate tribunal must assure itself that there is no reasonable version of the facts, on the summary judgment record, whereby the nonmovant could prevail, recognizing that the purpose of summary judgment is not to deprive a litigant of a fair hearing, but to avoid an unnecessary trial. *EMI Group North America, Inc. v. Intel Corp.* 157 F.3d 887 891 (1998), *cert. denied*, 526 U.S.

5

1112 (1999).

**III.    Mootness and Genuine Issues of Material Fact Exist As to Certain Issues**

Leviton, in its Motion, requests summary determination that the '894 patent is not

anticipated by prior art under 35 U.S.C. § 102, specifically that the patent is not anticipated by

the six references cited by one of Respondents' experts, Mr. Haynes, in his expert report, i.e.,

U.S. Patent No. 4,001,652; U.S. Patent No. 4,010,431; U.S. Patent No. 4,209,762; U.S. Patent

No. 4,263,637; U.S. Patent No. 4,386,338; and U.S. Patent No. 3,813,579. Leviton

Memorandum at 10-11. Leviton requests a summary determination that the asserted patent is not

obvious under 35 U.S.C. § 103, specifically with respect to the six aforementioned prior art

citations, all of which are patents. *Id.* at 12-18. Leviton requests summary determination that the

claims of the '894 patent are not the same as, or obviously similar to, the invention claimed in the

'338 and '945 patents, both of which are related to the '894 patent. Specifically, it is argued that

contrary to the arguments of Respondents' experts, the claims of the '894 patent are not "genus"

claims that encompass products of the '945 and '338 patent claims. *Id.* at 18-20. Finally,

Leviton requests a summary determination that there is no basis for any allegations that Leviton

committed inequitable conduct during the prosecution of the '894 patent with respect to the '338

patent, the '762 patent (referred to sometimes as "the Samborski patent") or the '579 patent. *Id.*

at 20-23.

In their Cross-Motion, Respondents argue that the '894 patent is invalid due to

anticipation and/or obvious-type double patenting based on the '338 patent. Additionally,

Respondents argue that the '894 patent is invalid due to anticipation or obviousness based on the

prior art. Specifically, Respondents cite the '637, '652 and '431 patents, either alone or in

6

combination with the '338 patent. Respondents argue that the '894 patent is invalid due to an

on-sale bar under 35 U.S.C. § 112(b) because Leviton sold, or offered for sale, products allegedly

covered by the '894 patent more than 12 months prior to the April 1, 1985 filing date of the '894

patent. Respondents argue that there is evidence showing that the '894 patent is unenforceable

due to fraud on the PTO by not presenting on-sale bar activity, and by not disclosing material

prior art (specifically, the '579 patent). Finally, Respondents argue that there is evidence that the

'894 is unenforceable due to unclean hands in the filing of the Complaint in this investigation

with the intention to damage Respondents' business. Respondents' Memorandum at 6-7.

As discussed previously, Leviton and Respondents made these filings in special

circumstances in which there will be no evidentiary hearing, and in which Leviton could prevail

only by means of summary determinations. Furthermore, Respondents have taken the position

that all but one of the summary determination Motions filed by Leviton are already untimely, and

in view of statements made by Respondents in connection with the pending Motions to terminate

the investigation, it is clear that Respondents will not seek any additional summary

determinations. Consequently, with no evidentiary hearing or additional summary

determinations possible, unless Respondents have sought summary determination on a particular

question of validity or unenforceability in their Cross-Motion, Leviton's requests for summary

determination are moot inasmuch as the asserted patent cannot and will not be attacked on any

other grounds.

Respondents' Memorandum serves as both an Opposition to Leviton's Motion and a

Memorandum in support of Respondents' Cross-Motion. Respondents argue in opposition to

Leviton's Motion that the '894 patent is invalid and unenforceable, or rather that there is

7

evidence of invalidity or unenforceability. In most instances, however, notwithstanding the

opening paragraphs of their Cross-Motion, Respondents do not develop their arguments to the

point of requesting summary determination in their favor. This is apparently due in large part to

the conditional nature of Respondents' Cross-Motion. *See, e.g.*, Respondents' Memorandum at

6, 36-39, 42.

Indeed, as to some allegations made in Respondents' Memorandum, evidence is clearly

lacking for summary determination. For example, their allegations concerning on-sale bar are

predicated on a finding that certain Leviton products practice the '894 patent, a finding that has

not been made. *See* Order No. 9 at 14 n.13. Other arguments made by Respondents, and also by

Leviton, could only be properly evaluated in view of a complete construction of the claims of the

'894 patent, including the interpretation of claim limitations (such as the strap means) that may

be in dispute. Such a claim construction has not been made, and cannot be made at this time.

*See* Order No. 9. Furthermore, the sufficiency of discovery relating to validity and enforceability

issues in general has been, and remains, the subject of much controversy in this investigation.

*See, e.g.*, Order No. 7 (Granting in Part Respondents' Motion to Compel). In addition, the expert

Declarations filed in connection with the pending Motion and Cross-Motion leave several areas

of doubt as to the strength of the movants' cases, and raise genuine issues of material fact,

particularly with respect to the question of obviousness. *See, e.g.*, OUII Response at 7-11

(summarizing some of the questions remaining in view of the Declarations). If this investigation

were in a normal procedural posture, i.e., in a discovery phase leading to a hearing, the

Administrative Law Judge would at a minimum permit more discovery and require more briefing

before making determinations on most of the issues presented by the Motion and Cross-Motion,

8

particularly, for example, on the factual issues which may underlie claim interpretation conclusions. Furthermore, the Administrative Law Judge might find it appropriate to defer ruling on most questions of validity and enforceability until after the evidentiary hearing on the question of violation of section 337.

Nevertheless, Respondents specifically request a summary determination that the '338 patent is invalid due to anticipation and/or obviousness-type double patenting. *See, e.g.,* Respondents' Memorandum at 42. Respondents' request for summary determination is an attack on the '894 patent which could prevent Leviton from prevailing in this investigation, if it were fully litigated. Leviton expected that such an allegation would be made, and briefed the question in its initial Memorandum. The question of anticipation or double patenting relating to the '338 patent was also briefed by the parties in filings that followed Respondents' Cross-Motion. The parties' filings show the legal nature of the questions and disputes that have been raised among the parties pertaining to anticipation or double patenting in relation to the '338 patent. Moreover, unlike the arguments and evidence pertaining to other prior art, the particular positions taken by the parties concerning the disclosures and claims of the '338 and '894 patents make further discovery or briefing unnecessary, and render the issue relating to the '338 patent appropriate for determination at this time.

## IV.    Invalidity Due to the '338 Patent

The'894 patent asserted in this investigation is related to the '338 patent, as a matter of procedure and substance. The '894 patent, entitled "Ground Fault Circuit Interrupting System," issued on June 17, 1986, based on Application Serial No. 716,991 (Apr. 1, 1985), which was a continuation-in-part of Application Serial No. 558,262 (Dec. 5, 1983); and a continuation-in-part

9

of Application Serial No. 431,982 (Sept. 30, 1982), which issued as U.S. Patent No. 4,518,945.

*See* '894 Patent (a copy of which is attached to Leviton's Memorandum as Exhibit A). No

prosecution history has been offered for the '894 patent, and there may be none because Leviton

claims that the patent issued on a first Office Action. The lack of a prosecution history

continues, however, to be a subject of considerable controversy in this investigation due at least

in part to the loss of prosecution-related files that were in the possession of Leviton's counsel and

the loss by the Patent and Trademark Office ("PTO") of at least some other papers pertaining to

the '894 patent. *See, e.g.,* Leviton Memorandum at 3 (concerning, among other things, the

PTO's loss of the inventors' assignment of the '894 patent to Leviton).

The '894 patent specification sets forth several objects of the claimed invention and

particularly of the so-called "second" embodiment,[3] which is the embodiment illustrated in the

'894 patent, including the following:

> In addition to the advantages of the present invention already set forth
> in copending applications noted above, the contents of which are
> incorporated herein by reference, the second embodiment of this
> invention concentrates upon the ground fault circuit interrupting
> features of the invention. In other words, in use, should
> predetermined conditions exist, such as by way of example only, a
> threat to life or property as a result of what is known in the art as a
> "fault", the second embodiment of the present invention will cause an
> interruption of the circuit within which the fault appears, in a
> sufficiently short response time, so as to attempt to avoid injury or
> serious shock. No claim is being made within the present application
> for any possible novel circuitry or electrical means, but rather this
> application is directed to the novel electromechanical and mechanical
> means by which, in response to a signal, the circuit is interrupted by

---

[3] According to the '894 specification, the preferred embodiment disclosed therein is a
"'second' preferred embodiment," which "is meant to denote another in a continuous series of
technical developments relating, directly and indirectly, to the breaking or interruptions of
circuits upon the existence of predetermined conditions." *See* '894 Patent, col. 1, lines 19-24.

a physical separating of electrically conducting contacts.

'894 Patent, col. 1, lines 32-50.[4]

The specification of the '894 patent incorporates by reference the aforementioned '945

patent. *See, e.g.,* '894 Patent. col. 1, lines 6-16 ("The present application . . . incorporates by

reference as if fully set forth herein the entire contents and subject matter thereof and of any and

---

[4]    The claims of the '894 patent are:

**1.** Switching apparatus for selectively interrupting an electrical connection between input and output conductors, or the like, comprising, in combination: a housing; magnetizable plunger means disposed within a portion of said housing for movement between first and said [second positions; electromagnetic coil means disposed within] housing for moving said plunger means when energized from the first position to the second position; an input contact electrically connected to said input conductor; an output contact electrically connected to said output conductor; strap means for mounting the switching apparatus upon a selected surface, said strap means including portions thereof which define a path of the magnetic field generated by said coil means to influence the position of said plunger means, and movable means responsive to movement of said plunger means for influencing a separation of said input and output contacts, thereby interrupting electrical connection between them, said movable means including first and second movable members, movement of said second member being caused by movement of said first member.

**2.** Switching apparatus according to claim **1,** wherein said first member is movable with and opperatively [sic] connected to said plunger means.

**3.** Switching apparatus according to claim **1,** wherein said plunger means comprises a plunger member formed with a relatively elongated portion which extends into portions of said electromagnetic coil means.

**4.** Switching apparatus according to claim **1,** further including spring means for returning said plunger means to said first position after energization of said coil means.

'894 Patent, col. 6, line 49 - col. 8, line 6 (The portion of the claim text within brackets is supplied by a Certificate of Correction (Dec. 11, 2001)).

all of their respective 'parent' patent applications to which they are co-pending.").[5] The '945

patent issued on May 21, 1985, based on Application Serial No. 431,982 (Sept. 30, 1982), which

was a continuation of Application Serial No. 207,534 (Nov. 17, 1980). The latter '534

Application also issued as U.S. Patent No. 4,386,338. *See* '945 Patent (a copy of which is

attached to Respondents' Memorandum as Exhibit P); '338 Patent (a copy of which is attached to

Respondents' Memorandum as Exhibit O). It appears that the disclosures of the '945 and '338

patents are identical, including the Figures. *See* '945 Patent; '338 Patent; Leviton's Reply and

Opposition (corrected version) at 8; *see also* Order No. 9 at 4 n.4 (citing Leviton's

representation as to that fact).

The '338 patent, entitled "Remote Control System," summarizes the objects and features

of the claimed invention, as follows:

> Accordingly, the present invention teaches a remote control system
> which, throughout this specification, is also referred to as a universal
> switch receptacle system. In order to fit within the confines of the
> duplex receptacle box without departing from standard configurations
> and dimensions, the present invention enables the user to accomplish
> the foregoing with room to spare for associated electronic and logic
> circuitry.
>
> Another object of the present invention is to provide a receptacle
> system which is shallow enough in depth and small enough in size,
> so as to provide *switching and circuit breaking functions of a type
> compatible with either remote control systems or ground fault circuit
> breaking signals*.

---

[5] It appears that at least at the time that the '894 patent application was filed and the patent
issued (and subsequently thereto), a patent could incorporate essential material by reference to
another United States patent or allowed application, although not to a non-patent publication.
*See Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1377 (Fed. Cir.
1999)(citing, *inter alia, Manual of Patent Examining Procedure* § 608.01(p) (4th ed., Rev. 8,
1981)).

The present invention accomplishes these ends and distinguishes from the known prior art by providing a receptacle having a number of novel and interesting features. These include, without limitation, the provision of a mounting strap which not only serves its traditional mounting function, but additionally serves as a portion of the magnetic circuitry associated with the solenoid-type mechanism; and further serves as the support for integral ground terminals adapted to be engaged by the ground prong of a three-wired plug.

Another feature of the present invention resides in a novel cam arrangement which can only be appreciated from the following more detailed description of the drawings and the components of the present invention disclosed therein, but suffice it to say that not only is a flip-flop cam arrangement taught by the present invention, but its placement about a ground receptacle opening is a unique approach to space saving reliability of functioning.

'338 Patent, col. 1, line 38 - col. 2, line 2 (emphasis added).[6]

---

[6]    The claims of the '338 patent are:

**1.** Switching apparatus for selectively completing or interrupting an electrical connection between input and output conductors, or the like, comprising, in combination: a housing; a magnetizable armature disposed within a portion of said housing and being movable between first and second positions; electromagnet coil means disposed within said housing for moving said armature when energized from the first position to the second position; an input contact electrically connected to said input conductor; an output contact electrically connected to said output conductor; strap means for mounting the switching apparatus upon a selected surface, said strap means including portions thereof which define a path of the magnetic field generated by said coil means to influence the position of said armature, and movable cam means responsive to movement of said armature for influencing a separation of said input and output contacts, thereby interrupting electrical connection between them.

**2.** Apparatus according to claim **1**, further including movable actuating means having portions thereof in contact with said armature means for influencing the position of said cam means.

**3.** Apparatus according to claim **2**, wherein said cam means includes portions thereof disposed in the path of said actuating means.

(continued...)

13

It cannot be determined whether or not the Examiner considered the '338 patent prior to allowing the '894 patent claims. The '338 patent is not mentioned on the face of the '894 patent, and, as indicated above, there is effectively no prosecution history available for the '894 patent. The '894 patent's Application is, however, related to the earlier application upon which the '338 patent issued. It is undisputed that due to its date of issue, the '338 patent can be cited against the '894 patent as prior art. *See* Leviton's Reply and Opposition (corrected version) at 5-6; Respondents' Cross-Motion at 13; OUII Response to Respondents' Cross-Motion at 6 n.2.

Respondents first argue that the '338 patent anticipates, and therefore renders invalid, all claims of the '894 patent. Respondents' anticipation argument does not depend on the fact that the cited reference is a patent (or on the fact that there is a relationship between the underlying Applications upon which the '894 and '338 patents issued). The anticipation argument is based on 35 U.S.C. § 102 and the '338 patent's status simply as prior art.

"Anticipation under 35 U.S.C. § 102 requires the disclosure in a single piece of prior art of each and every limitation of the claimed invention." *Electro Med. Sys. S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1052 (Fed. Cir. 1994). The disclosure in the single prior art reference may be made expressly or under the principles of inherency. *RCA Corp. v. Applied Digital Data Sys., Inc.*, 730 F.2d 1440, 1444 (Fed. Cir. 1984), *cert. dismissed*, 468 U.S. 1228 (1984). Anticipation depends, of course, on first arriving at a proper claim construction. *See*

---

[6] (...continued)

> **4.** Apparatus according to claim **1**, wherein said cam means is supported for rotary movement about an axis which substantially coincides with an axis of entry of an electrical connector to be joined with the switching apparatus.

'338 Patent, col. 10, lines 24 - 54.

*Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000). Furthermore, when an element is expressed in means-plus-function terms, as in the case of the '894 patent, absent structure in the prior art reference that is capable of performing the functional limitation of the "means," the prior art reference does not meet the claim. *RCA Corp.*, 739 F.2d at 1444.

Respondents also argue that in the alternative the claims of the '894 patent are invalid due to obvious-type double patenting. This sort of patent invalidity is based on a judicially created doctrine, which the Court of Appeal for the Federal Circuit (and its predecessor court) has found necessary to prevent a patent term extension through claims in a second patent that are not patentably distinct from those in the first patent. *See In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985). First, the patent claims of the two patents in question are to be interpreted, and then a determination is made as to whether the later claims are patentably "distinct" or distinguishable." Such terms are used to refer to the question of whether or not differences between the claims of the two patents being compared "would have been obvious to one of ordinary skill in the art." *Georgia-Pacific Corp. v. United States Gypsum Co.,* 195 F.3d 1322, 1326-27 (Fed. Cir.1999); *General Foods Corp. v. Studiengesellschaft Kohle*, 972 F.2d 1272, 1279 (Fed. Cir.1992). With respect to such distinctness or patentability, it has been recognized that genus claims in a later patent application may be rejected by the PTO for obvious-type double patenting due to species claims in an earlier patent. *See In re Berg*, 140 F.3d 1428, 1437 (Fed. Cir. 1998). Similarly, a court may hold invalid later-issued patent claims due to obvious-type double patenting when alleged differences between patents are in genus-species form, and the earlier patent claimed elements more specifically and the later patent claims elements more generally. *See In re Lonardo*, 119 F.3d 960 967 (Fed. Cir. 1997).

15

There appears to be no conflict between simultaneously arguing (or finding) anticipation and obvious-type double patenting. Indeed, using language associated with both anticipation and double patenting, the Federal Circuit's predecessor court long ago recognized that "[i]t is well settled that a generic claim cannot be allowed to an applicant if the prior art discloses a species falling within the claimed genus; in other words, whatever would infringe if subsequent will anticipate if prior." *In re Slayter*, 276 F.2d 408, 411 (C.C.P.A. 1960); *see also In re Gosteli* 872 F.2d 1008, 1010 (Fed. Cir. 1989)("Section 102(e) bars the issuance of a patent if its generic claims are anticipated by prior art disclosing individual chemical species."). However, as discussed herein, it is clear that the claims of the '338 patent anticipate, and therefore render invalid, the claims of the later '894 patent. It is not necessary to resolve the additional dispute as to whether a claim of the '338 patent claims a species as to which the '894 claims represent a genus.

One must understand what the inventors of a suit patent (in the '894 patent) claimed as their invention in order to determine whether or not a cited prior art reference anticipated that claimed invention. Consequently, claim construction is a first step in making a determination of the question of anticipation. In this instance, there is no dispute as to the proper construction of most claim elements of the '894 patent, at least with respect to the question of whether or not the '338 contains structures capable of performing the functional limitations of the means of the '894 patent claims.[7] The actual dispute among the parties, with respect to proper claim interpretation,

---

[7] Respondents' Memorandum in support of their Cross-Motion contains specific comparisons of elements of the '894 and '338 patent claims. *See* Respondents' Memorandum at 13-22. Except for the controversy concerning the closing of the circuit, which is discussed, *infra*, in the text, no disputes have arisen.

(continued...)

and how differences and similarities in the '894 and '338 patents should be analyzed, is brought

into focus in Leviton's Reply and Opposition (Feb. 28, 2003, corrected Mar. 4, 2003) and in

Respondents' Response to Leviton's and the Staff's filings concerning the Motion and

Cross-Motion (Mar. 4, 2003).

Central to Leviton's argument is its position that the '894 patent (like all other patents

cited by Respondents) discloses a GFCI that must be turned back on manually, while the '338

patent describes a product that is primarily a remote control switch that can be remotely turned

on and off sequentially. Leviton's Reply and Opposition at 6. Leviton argues that this function

is achieved in the '338 patent design by a cam-operated switch that pivots back and forth

between positions for opening the circuit and closing the circuit as it receives successive

electrical signals. Thus, according to Leviton, the claims of the '338 patent "describe a switch

capable of 'selectively completing or interrupting an electrical connection between input and

output conductor.'" *Id.* Leviton argues that in contrast, the '894 patent defines a switching

apparatus for selectively interrupting an electrical connection. It is argued, that the automatic

reconnection upon receipt of a second signal as disclosed in the '338 patent is unsafe. *Id.* at 6-7

(citing deposition testimony of Leviton's expert).

Leviton argues that the switching portion of the device defined by the claims of the '894

patent cannot be the same as the rotating cam system of the '338 patent. According to Leviton,

---

[7] (...continued)

Leviton states that in fact there is no factual dispute with respect to the disclosure of the '338
patent. *See* Leviton's Reply and Opposition (corrected version) at 6. Leviton agrees that the
'338 patent defines a device that is intended to be compact enough to fit within a wall receptacle,
and which contains a solenoid wherein the coil is immediately adjacent to or in direct contact
with the strap. *Id. See also* Respondents' Response (Mar. 4, 2003) at 3, 4 (noting agreement
among the parties as to nearly all elements contained in claims 1 - 4 of the '894 patent).

17

the '894 patent requires linearly moving members to remove a latch which permits a biased contact arm to move away from its electrical contact, and does not permit the automatic re-closing of the circuit. It is argued that in contrast, the '338 patent has a cam which, as it rotates, pushes apart the contact arm and the stationary contact, which are biased toward each other, so that when the cam is caused to rotate again, the contact arm snaps back into contact with the stationary arm, thereby closing the circuit. Leviton argues that Respondents do not show how the biased closed cam means switch of the '338 patent would in any way make obvious or anticipate the linearly moveable, biased open switch of the '894 patent. *Id*. Moreover, it is argued, the claim preamble in the '894 patent provides "meaning and vitality" to the claim as it describes an interrupting switch rather than an on-and-off switch. Leviton argues that although the '894 patent incorporates by reference the '945 patent specification (which is agreed to be identical to that of the '338 specification) because of a certain "common thread that runs through these developments," the '894 patent is intended to be a ground fault circuit interrupting feature. Leviton argues that the differences between the '894 and '338 patents are not minor, that the '894 patent clearly distinguishes over its parents, including the '338 patent; and that the '894 patent is limited to circuit interrupting by stating "this application is directed to the novel electrotechnical and mechanical means by which, in response to a signal, the circuit is interrupted by a physical separating of electrically conducting contacts." *Id*. at 8 (quoting '894 Patent, col. 1, lines 46-50).

Respondents argue that the '894 preamble (to independent claim 1) merely describes an intended purpose or use, and thus should not be used to limit the claim. It is argued that there is nothing in the claim language which recites that a device covered by the claim "only" interrupts a

circuit, a word which appears nowhere in the claim language, and should not be read into the claim. Respondents argue that the '894 specification must describe a device that is closed as well as interrupted inasmuch as the device would not work if the circuit could not be closed after being interrupted. Respondents further argue that there is no basis in the '894 patent claim language for limiting the claims to a device that can be manually closed rather than "automatically" closed, and that the claims merely require a device which interrupts the circuit. Respondents argue that there is no dispute that the device described in the '338 patent meets this description. Respondents' Response (Mar. 4, 2004) at 3-4. Respondents argue that because the '894 patent incorporates the structures of the '945 and '338 patent, the movable means element of the '894 patent must include the moveable means disclosed in the '338 patent. *Id.* at 4.

Respondents argue that there is no factual dispute concerning anticipation. It is argued that the self-serving testimony of Leviton's expert to the effect that the device of the '338 patent is "unsafe," lacks any factual basis, including any suggestion in the '338 patent that its device is unsafe. Respondents point out that in fact the '338 specification states that the claimed invention disclosed therein is usable for, among other things, a ground fault circuit interrupting system *Id.*

The dispute between Leviton and the Respondents is not factual. It is based on the meaning of the '894 patent claims, and the scope of the '338 patent disclosure. A starting point for determining which set of arguments presented by the parties, if any, accurately reflects the relationship between the '894 and '338 patents is the invention of the '894 patent as contained in its claims, and the effect of the preamble.

A claim preamble may serve to limit a patent claim. *In re Paulsen*, 30 F.3d 1475, 1479 (Fed. Cir. 1994)(Terms appearing in a preamble may be deemed limitations of a claim when they

19

give meaning to the claim and properly define the invention.). However, "no litmus test can be given with respect to when the introductory words of a claim, the preamble, constitute a statement of purpose for a device or are, in themselves, additional structural limitations of a claim . . . . The effect preamble language should be given can be resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). An intended use or purpose usually will not limit the scope of the claim because such statements usually do no more than define a context in which the invention operates. Preamble language will limit the claim if it recites not merely a context in which the invention may be used, but the essence of the invention without which performance of the recited steps is nothing but an academic exercise. *Griffin v. Bertina,* 285 F.3d 1029, 1033 (Fed. Cir. 2002). In other words, a preamble simply stating the intended use or purpose of the invention will usually not limit the scope of the claim, unless the preamble provides antecedents for ensuing claim terms and limits the claim accordingly. *C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1350 (Fed. Cir.1998).

As quoted above, the preamble of claim 1 of the '894 patent states: "Switching apparatus for selectively interrupting an electrical connection between input and output conductors, or the like, comprising, in combination . . . ." At the outset, this language appears to state merely the context or intended purpose of the means-plus-function elements to follow. The preamble does not set forth a limitation on the elements that follow. Indeed, as one reads through the subsequent elements or limitations, in conjunction with the specification, there is no indication that the reference to "selectively interrupting" in the claim preamble means that a GFCI covered

20

by the '894 patent must be turned back on "manually," as argued by Leviton, or that the

"movable means," including "first and second movable members," only interrupts a circuit. As

argued by Respondents, a device that only interrupts a circuit would not be useful.

With respect to the question of whether the '338 patent discloses a device suitable for use

as a ground fault circuit interrupter, the answer must be in the affirmative. The deposition

testimony relied on by Leviton concerning safety does not raise a genuine issue of material fact.

It is not denied that the interruption of a circuit is included in the structure and function of the

device disclosed in the '338 patent. The device is used to turn a circuit on and off, or to close it

and to open it. Moreover, as to whether or not the device disclosed by the '338 patent would be

used as a ground fault circuit interrupter, the '338 patent specification, as quoted initially above,

makes it plain that:

> Another object of the present invention is to provide a receptacle
> system which is shallow enough in depth and small enough in size,
> so as to provide switching and circuit breaking functions of a type
> compatible with either remote control systems or ground fault circuit
> breaking signals.

'338 Patent, col. 1, lines 46 - 51.[8]

No party has argued that the specification of the '338 patent fails to disclose a device

---

[8] The '338 patent in fact contains numerous references to use of the device disclosed therein as a ground fault circuit interrupter. *See, e.g.,* '338 Patent, col. 4, lines 4 - 17 (description of the *preferred* embodiment)("Before referring in more detail to the drawings of the present specification, it is important here to emphasize the universality of the switch receptacle system being described here. By that, what is meant is that the basic switching arrangement described below may be utilized not only in conjunction with remote control wireless switching systems, but also in conjunction with circuit breaking mechanisms and systems, such as of the ground fault circuit interrupting type. Furthermore, in the form to be described below, costs and extraneous features aside, the universal switch receptacle system according to the present invention may be used simply as an ordinary household receptacle under circumstances making this desirable.").

capable of meeting the stated objects of the invention. Nor does the Administrative Law Judge

find anything in the '338 patent specification to indicate that it fails to meet this particular stated

object of the claimed invention. Indeed, the specification discloses and teaches the following:

> In moving from the position shown in FIG. **9** to that of FIG. **10**, the
> cam surfaces **160** and **162** of cam **132** have engaged and forcibly
> urged surfaces **164** and **166**, together with their respective
> contact-carrying members **168** and **170**, outwardly away from the axis
> of rotation of cam **132** (which is coaxial with the longitudinal axis of
> post **86**), with the result that movable contacts **196** and **198** have been
> moved away from their respective contacted fixed contacts **214** and
> **216** to the position shown in FIG. **10**. *This clockwise motion of cam*
> *132 as a result of the actuation of coil 74 has thus resulted in*
> *breaking the electrical circuit as between the fixed and movable*
> *contacts herein described. It should also be noted that in the rest*
> *position shown in FIG. 10, cam 132 and its wings 156 and 158*
> *maintain disconnection of the electrical connection as between the*
> *fixed and movable contacts at all times until the next sequential*
> *actuation of coil 74.*

'338 Patent, col. 9, lines 23 - 40 (emphasis added).

Use of the device claimed by the '338 patent to interrupt or break a circuit is accordingly

reflected in the '338 patent claims. The preamble to claim 1 of the '338 patent refers to

"selectively completing *or* interrupting an electrical connection." Moreover, the elements which

follow refer only to "interrupting" the electrical connection.[9] *See* '338 Patent, col. 10, lines 24 -

54 (claims quoted in full above).

The particular cam disclosed in the '338 patent specification may be useful for closing

and opening a circuit by remote operation. That does not, however, detract from the fact that the

device disclosed by the '338 patent specification is structured for, and does perform, the function

---

[9] *See also* '338 Patent, Claim 1, col. 10, lines 39 - 42 (". . . and movable cam means
responsive to movement of said armature for influencing a separation of said input and output
contacts, thereby interrupting electrical connection between them.").

22

of interrupting an electrical connection between input and output conductors. The '338 specification further emphasizes that the embodiment disclosed therein maintains disconnection of the electrical circuit until that disconnection is no longer desired. The '338 patent specification recognizes that the disclosed device is particularly adapted for use as a ground fault circuit interrupter.

A comparison of the '894 patent to the '338 patent shows clearly and convincingly that each element of the invention as claimed by the '894 patent was disclosed by the prior art '338 patent, and thus the claims of the '894 patent are anticipated and invalid.

## V.    Conclusion

Accordingly, Leviton's Motion No. 478-14 for summary determination is DENIED, and Respondents' Motion No. 478-22 for summary determination is GRANTED IN PART.

Pursuant to 19 C.F.R. § 210.42(h), this initial determination shall become the determination of the Commission unless a party files a petition for review of the initial determination pursuant to 19 C.F.R. § 210.43(a), or the Commission, pursuant to 19 C.F.R. § 210.44, orders on its own motion a review of the initial determination or certain issues contained herein.

Sidney Harris
Administrative Law Judge

Issued:  March 17, 2003

23

CERTAIN GROUND FAULT CIRCUIT
INTERRUPTERS ("GFCIs") AND PRODUCTS
CONTAINING SAME

INV. NO. 337-TA-478

### CERTIFICATE OF SERVICE

I, Marilyn R. Abbott, hereby certify that the attached Order was served upon
David H. Hollander, Jr., Esq. and upon the following parties via first class mail, and air mail
where necessary, on ___March 18_____, 2003.

Marilyn R. Abbott, Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

## FOR COMPLAINANT LEVITON MANUFACTURING CO., INC.:

Paul J. Sutton, Esq.
Barry G. Magidoff, Esq.
Joseph Manak, Esq.
Daniel Ladow, Esq.
**Greenberg Traurig, LLP**
885 Third Avenue
New York, New York   10022

Cecilia H. Gonzalez, Esq.
Bert C. Reiser, Esq.
Margaret D. Macdonald, Esq.
**Howrey Simon Arnold & White, LLP**
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

CERTAIN GROUND FAULT CIRCUIT                           INV. NO. 337-TA-478
INTERRUPTERS ("GFCIs") AND PRODUCTS
CONTAINING SAME


**FOR RESPONDENT YUEQING HUAMEILI ELECTRONIC CO., LTD, d/b/a HML, YUEQING HUAMEILI ELECTRONIC CO., LTD., OF CHINA, AND VAN-SHEEN ELECTRIC APPLIANCE CO., LTD., d/b/a YATAI SWITCH FACTORY OF CHINA:**

Gary M. Hnath, Esq.
Fei-Fei Chao, Esq.
**Venable, Baetjer, Howard & Civiletti, LLP**
1201 New York Avenue, N.W., Ste. 1000
Washington, D.C. 20005-3917

**FOR RESPONDENT JIAMEI ELECTRICAL ENGINEERING CO., LTD., OF CHINA:**

Jiamei Electrical Engineering Co., Ltd.
Xuezhai Liushi Town
Yueqing Zhejiang
Peoples Republic of China  325604

**FOR RESPONDENT SAMMAX INTERNATIONAL LTD., OF HONG KONG:**

Irving M. Kriegsman, Esq.
**Kriegsman & Kriegsman**
Attorneys at Law
665 Franklin Street
Framingham, Massachusetts  01702

## PUBLIC MAILING LIST

Donna Wirt
LEXIS - NEXIS
1150 18th Street, NW
Suite 600
Washington, D.C. 20036

Ronnita Green
West Group
901 Fifteenth Street, NW
Suite 230
Washington, D.C. 20005