Case 1:01-cv-03855-AMD   Document 86-12   Filed 08/07/2003   Page 1 of 10

Jerome Massie                June 26, 2003              Leviton Manufacturings vs. USI

Page 1

1        In The United States District Court
2           For The District of Maryland
3    ------------------------------------x
4    Leviton Manufacturing, Inc.           :
                                           :
5              Plaintiff                   : NO. 01CV3855 AMD
                                           :
6                  v                       :
                                           :
7    Universal Security                    :
     Instruments, Inc. and USI             :
8    Electric, Inc.                        :
9    ------------------------------------x
10   DEPOSITION OF:
11              Jerome Massie,
12   a witness, called by counsel pursuant to notice,
13   commencing at 10:00 a.m, which was taken at 2000 P
14   Street, NW, Washington DC.
15
16
17
18
19
20
21

Ovenite Court Reporting Service      310-593-0671        Washington D.C. metro area
Washington, D.C. Metro Area                              EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Jerome Massie                    June 26, 2003                    Leviton Manufacturings vs. USI

Page 18

1  Q. And the PALM system.
2  A. Yes.
3  Q. In your expert report you have a PALM
4  printout for the '894 patent, I believe it is.
5  A. Yes, I think it's one of the exhibits.
6  Q. That got faxed from the tech center.
7  A. That's something I have done thousands of
8  times; yes. It's very likely.
9  Q. If it's accessible from your computer, why
10 would you need it to be faxed to you?
11 A. Good question. Some of that has to do
12 with the fact that my firm did not want to go
13 through the expense of installing PAIR on every
14 single computer. So they only installed it on two
15 partners computers out of the 262 partners they
16 have.
17    It wasn't until, oh, gosh, I would say
18 late last summer that they finally made the decision
19 to install it on everybody's computer. We still
20 didn't have access, now you have to license or
21 register, you get what they call an encrypted key

Page 19

1  from the Patent Office. That also took quite a bit
2  of time. Because I didn't have access to the system
3  through the electronic desktop, I had to call,
4  either that or go down there. Either one is
5  available. That is pretty much what I did.
6  Q. Would I be able to get PALM records as
7  opposed to PAIR records for the patents '894, "9455
8  and "338 patents?
9  A. Just by calling the technology center. Or
10 going to the Patent Office.
11 Q. Do you have PALM records as opposed to
12 PAIR records for the "945 and '338 patents?
13 A. It's not currently one of my exhibits. I
14 would say I probably did not print it out for the
15 "945 or the earlier '338. Of course, for the '894
16 we have it as an exhibit, both the PALM and PAIR
17 record.
18 Q. When is the last time you looked at the
19 PALM and PAIR printouts for the '894 Patent?
20 A. I most definitely looked at it, again,
21 when I prepared the expert report in response to Mr.

Page 20

1  Goffney's expert report, which would be the March
2  time frame, early March of 2003.
3  Q. You're aware that there was a second
4  Certificate of Correction issued to the '894 Patent
5  on December 11th, 2001?
6  A. Yes, sir.
7  Q. There's no indication of that on the PALM
8  or PAIR printouts for the '894 Patent.
9
10    MR. LEE: Objection to form.
11    BY MR. BRADLEY:
12 Q. Are you aware whether or not there is an
13 indication of that second Certificate of Correction
14 on the PALM or PAIR printout?
15 A. Yes, I am aware there is no entry in the
16 PALM record for the second PAIR printout.
17 Q. Are you aware, or is it your understanding
18 that there also is no record of the PTO receiving a
19 second request for a Certificate of Correction?
20 A. Yes.
21 Q. On the PALM and PAIR printouts of the '894

Page 21

1  Patent there were two miscellaneous incoming letters
2  listed. Do you remember that?
3  A. April 1st and 2nd of 1995.
4  Q. From the PALM and PAIR printouts there's
5  no way of knowing what those letters were; correct?
6     MR. LEE: Object to the form.
7     BY MR. BRADLEY:
8  Q. Is there any way to tell by looking at the
9  PALM and PAIR printout what the content of those
10 letters were?
11 A. No, you can't tell exactly what they are
12 by looking at that document.
13    MR. LEE: Is there still a pending
14 question? I think he started to answer.
15    THE WITNESS: However, as an experienced
16 patent person, you can get a good feel by being
17 familiar with the PALM system that those documents
18 were not certain types of documents.
19    And I discussed very briefly that in my
20 expert report, in that the Patent Office does a
21 number of chores, very rudimentarily, several

6 (Pages 18 to 21)

Ovenite Court Reporting Service         310-593-0671         Washington D.C. metro area
Washington, D.C. Metro Area                                  EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Jerome Massie                    June 26, 2003            Leviton Manufacturings vs. USI

Page 78

1  column 6, claim 1, line 53 would type column 7, line
2  3, claim 2?
3      A.  Are you asking my opinion as a patent
4  professional?
5      Q.  As someone who had worked in approving
6  Certificate of Corrections for a number of years?
7      A.  Yes, I think that's when a very strong
8  likelihood.
9      Q.  Why do you say that?
10     A.  As I mentioned earlier, one of the
11 problems that the Patent Office had in preparing
12 patents for issue in the mechanical error where
13 there was physical data entry of data was the error
14 rate in the actual entry of that data, both in the
15 initial creation of the record, as well as the
16 rekeying operation during the publication of the
17 document, when the document was being prepared for
18 issue.
19        The same folks who do the rekeying of the
20 patent also do the Certificates of Correction. It's
21 the same branch. Publication branch. They,

Page 79

1  unfortunately, are under contract. It was a private
2  contractor at the time who was allowed an error rate
3  which was acceptable to the Patent Office but
4  unacceptable to practitioners. The rate that was
5  promulgated during the mid 80's was 5%. They were
6  allowed to make 5% errors.
7        If you take that in the context of the
8  patents issued every year, in the 80's U.S. Patent
9  Office issued approximately, probably 70,000 in 1980
10 and probably 110,000 per year in 1989, that ten year
11 span.
12       If you look at 5% of that number, that's a
13 whole lot of rekeying errors that had been made.
14 All those could be subject to a Certificate of
15 Correction.
16       The downside to that is, the same folks
17 who were doing Certificate of Corrections are the
18 same people who had the contract with 5% errors.
19 You're going to see that the Certificate of
20 Corrections also have errors in them. They are
21 transcriptional errors, simple mistakes, their eyes

Page 80

1  scanned down too many lines, et cetera.
2      Q.  Would Certificate of Corrections back in
3  1988, did the applicant fill out a form that had or
4  indicated where the error occurred?
5      A.  1988, I think, it was optional. Current
6  rules the Patent Office requires you to, I don't
7  know the form number, you probably see that on the
8  form. There it is. It is present in the document
9  on the most recent one. PTO SB 44. If you look at
10 the manual patent examining procedure in the area
11 1485 Certificate of Correction it tells the
12 applicant they should send in this completed
13 document, as well as the request for Certificate of
14 Correction when you submit it.
15     Q.  Given the error rate with rekeying errors
16 at the Patent Office, are patentees and/or their
17 representatives prudent to review the patent
18 applications after it issues to check for errors?
19     A.  Yes, it is.
20     Q.  Given the error rate with Certificate of
21 Correction in rekeying, is it prudent for the

Page 81

1  patentee or their representative to check for
2  rekeying errors?
3      A.  Yes.
4      Q.  Without the file history, is there any way
5  to know precisely what transpired at the Patent
6  Office?
7      A.  No, there is not.
8      Q.  Without the file history, is there any way
9  to know exclusively whether or not there was an
10 examiner's amendment in the '894 Patent?
11     A.  My opinion would be, as a patent
12 professional, that you can not tell for certain
13 without the application file before you.
14     Q.  Would the same hold true of whether there
15 was an examiner's interview?
16     A.  Yes.
17     Q.  Would the same hold true whether or not
18 there were reasons for allowance?
19     A.  Yes.
20        MR. BRADLEY: I would like to mark as
21 Exhibit 2 the PALM intranet printout for U.S. Patent

21 (Pages 78 to 81)

Ovenite Court Reporting Service         310-593-0671          Washington D.C. metro area
Washington, D.C. Metro Area                                   EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Jerome Massie                June 26, 2003                Leviton Manufacturings vs. USI

Page 94

1  would not enter papers in the table of contents, and
2  the electronic record here is, of course, a table of
3  contents.
4       The clerks would not necessarily enter the
5  papers in order, so you would have constant out of
6  order dates in the file. So in a sense in terms of
7  true accuracy chronologically very often the
8  electronic record was much better than the paper
9  record in the file.
10      I can give you an example, if you would
11 like.
12      Q. No. That is okay. Have you ever looked
13 at the PAIR printout for the '338 Patent or the PALM
14 record?
15      A. I would say, yes, I have.
16      MR. BRADLEY: Let's mark as Massie Exhibit
17 4 a copy of the PAIR patent application information
18 retrievable record United States Patent 4386338.
19      I would like to mark as Massie Exhibit 5,
20 uncertified copy of the file history of United
21 States Patent 4386338.

Page 95

1       BY MR. BRADLEY:
2       Q. Would Massie Exhibit 5, with that there
3  are what we call Bates numbers. Are you familiar
4  with what Bates numbers are. USI 1554.
5       A. I'm not familiar with those.
6       Q. When producing documents, to help people
7  identify the document, the person producing
8  documents puts a number down in the bottom
9  right-hand corner.
10      I'm going to direct you to certain things
11 in that file history. If you could first flip to
12 USI 1613 in Massie Exhibit 5. Can you identify what
13 that is for the record.
14      A. This appears to be an office action cover
15 sheet for the file 06207534.
16      Q. What was the date that that office action
17 was mailed?
18      A. I have got some handwriting over the date
19 mailed. I think it's a 3.
20      Q. Does that date appear to be 11-3-81?
21      A. Reasonable assumption.

Page 96

1       Q. Turning to Massie Exhibit 4. What does it
2  say the date that non-final office action was
3  mailed?
4       A. 10-15-81.
5       Q. Is it fair to say, that's incorrect?
6       A. Yes.
7       Q. Massie Exhibit 4, the PAIR printout, it
8  says non-final rejection, 10-15-81. Entry 2,
9  non-final rejection, 10-15-81. If you turn to USI
10 1616, there's a date down at the bottom of that
11 page. What is that date?
12      A. 10-22.
13      Q. Is it fair to say, the PAIR record has an
14 incorrect date?
15      MR. LEE: Where are we?
16      MR. BRADLEY: USI 1616. Page 4 of the
17 office action.
18      BY MR. BRADLEY:
19      Q. USI 1616. You're on that page?
20      A. Yes.
21      Q. Can you identify what that page is?

Page 97

1       A. It appears to be the page 4 of the office
2  action that we had discussed previously of 11-3-81.
3       Q. There's a date down in the bottom
4  left-hand corner. What is that date?
5       A. Normally that's the date that the examiner
6  created the office action.
7       Q. Okay. And that would be October 22nd,
8  1981; right?
9       A. Yes.
10      Q. Massie Exhibit 4 has a date of 10-15-81?
11      A. Yes.
12      Q. Is it fair to say, the PAIR record has an
13 incorrect date?
14      MR. LEE: Object to the form.
15      THE WITNESS: I can answer. I did address
16 this in one of my expert reports. It is not
17 uncommon for a junior examiner to create an office
18 action, turn it into the docket clerk that I
19 mentioned to you. The docket clerk do all the work,
20 turn it back to a supervisor for their final
21 signature, and the supervisor say, absolutely not.

25 (Pages 94 to 97)

Ovenite Court Reporting Service         310-593-0671         Washington D.C. metro area
Washington, D.C. Metro Area                              EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Jerome Massie                June 26, 2003                Leviton Manufacturings vs. USI

Page 98

1  Go research it; rewrite it; this is not written
2  well. Then she would do that. Take it back to the
3  supervisor. The clerk has already printed the cover
4  sheet with the mail date originally of 10-15. The
5  clerk knows you can't do that. Unfortunately, she
6  didn't enter when she remailed it. The clerk did
7  not do an updated date on it. They did not run the
8  transaction -- these were two different systems.
9  One did not transpose -- this system right here is a
10 standalone that would date office actions. Someone
11 actually had to actually go back and edit this date.
12 So this is a fairly common concurrence for junior
13 examiners.
14     Q. Flip real quick to USI 1558. It's the
15 cover page -- can you identify what USI 1558 is?
16 What is that page that we are looking at? What does
17 it appear to be?
18     A. This is the cover page for the issued U.S.
19 Patent 4386338.
20     Q. Top right-hand corner it says, primary
21 examiner. It lists a name.

Page 99

1     A. Yes.
2     Q. Is that the same Glenn Swan that signed
3  the office action dated 10-22-81?
4     A. Yes. Look on the cover sheet. It's Gray.
5  They used to be married. Julian Gray. Yep. It
6  appears to be the same examiner.
7     Q. If you could turn to USI 1618. What is
8  that document?
9     A. This is a request for extension of time
10 for the serial number 207534. It has a certificate
11 of mailing February 1st, 1982. And I cannot read
12 the U.S. Patent Office receipt date in the corner.
13 It appears to be something 3-1982.
14    Q. If you look at Massie Exhibit 4, does this
15 request for extension of time appear on that PAIR
16 printout?
17    A. No, it does not.
18    Q. Turn the page. Can you identify what this
19 document is?
20    A. This is an amendment for serial number
21 207534.

Page 100

1     Q. Is serial number 207534 the application
2  which came U.S. patent 4386338?
3     A. No, this amendment is not in there.
4     Q. This amendment does not appear on the PAIR
5  printout. If you flip to USI 1622. If you flip
6  through this amendment, can you confirm that the
7  claims were amended in this amendment?
8     A. Yes, the amendment covered changes to the
9  drawings, the specification and at least claim 1.
10    Q. On USI 1622 can you confirm there is an
11 amendment to claim 6?
12    A. Yes.
13    Q. On USI 1624 can you confirm there was an
14 amendment to claim 7?
15    A. Yes.
16    Q. For the record, this amendment does not
17 appear on the PAIR printout in the '338 Patent. Can
18 you turn to USI 1627.
19       Can you identify what the document at USI
20 1627 is?
21    A. This document is what is often referred to

Page 101

1  by an examiner as a bona fide attempt letter. The
2  applicant, patent applicant attempted to file a
3  paper of some sort, and for whatever reason it was
4  defective and the Patent Office is not going to
5  accept it as an official document. In this case it
6  didn't meet the Rule 121.
7     Q. Is this communication reflected on the
8  PAIR printout?
9     A. No, it is not.
10    Q. Can you turn the page to USI 1628. Can
11 you identify that document?
12    A. This appears to be an amendment. Is an
13 amendment for 207534 patent application.
14    Q. Does this amendment appear on the PAIR
15 printout of the '338 Patent?
16    A. No, it does not.
17    Q. Turn to page USI 1629. Can you identify
18 that document for the record?
19    A. This document is an office action for
20 06207534, and that page itself is actually the cover
21 letter.

26 (Pages 98 to 101)

Ovenite Court Reporting Service          310-593-0671          Washington D.C. metro area
Washington, D.C. Metro Area                                    EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Jerome Massie                          June 26, 2003                    Leviton Manufacturings vs. USI

Page 102

1  Q.  The date aside, is this the final
2  rejection listed as number 4 on Massie Exhibit 4?
3  A.  Yes. I can't make out the date on the
4  cover letter. I'm willing to venture a guess at
5  what it is.
6  Q.  Okay. If you turn to USI 1632, can you
7  identify that document for the record?
8  A.  Yes. This is a, one of the many forms, an
9  indication that claims are allowable in a case.
10 Often used term is, notice of allowability. Form
11 itself has many, many variations. This is for
12 serial number 0620753 -- I can't read the --
13 Q.  Turn the page. Can you see the serial
14 number at the top of that page. Can you confirm
15 that that is the application serial number which
16 occurred to U.S. Patent --
17 A.  Yes.
18 Q.  Down at the bottom, does this reflect an
19 examiner's amendment?
20 A.  Yes.
21 Q.  Down at the bottom it says, authorized by

Page 103

1  Paul J. Sutton, in an interview with the examiner on
2  8 October 1982?
3  A.  Yes.
4  Q.  Is this the fact that an examiner's
5  amendment occurred in this case reflected on the
6  PAIR printout?
7  A.  No, part of the notice of allowability.
8  Q.  Seeing the PAIR entry, it says notice of
9  allowability. You would not know if there was an
10 examiner's amendment in that case.
11 A.  That's right.
12 Q.  Turning page USI 1634, can you identify
13 what that document is?
14 A.  06207534. It lists Mr. Paul J. Sutton as
15 a participant, and Mr. Glenn A. Swan as a
16 participant.
17 Q.  Does this have a separate paper number
18 than the notice of allowance? Does it have a
19 separate paper number?
20 A.  On the actual office action that's mailed,
21 usually not. Examiner chose to number it 8.

Page 104

1  Q.  Does the examiner interview summary record
2  appear on PAIR printout, '338 Patent?
3  A.  No. It was included in the notice of
4  allowability form. Referenced as part of the form.
5  Q.  So seeing notice of allowability, the
6  public cannot tell without the file history if an
7  interview with the examiner took place; is that
8  correct?
9  MR. LEE:  Object to the form.
10 BY MR. BRADLEY:
11 Q.  Seeing a PAIR printout indicating a notice
12 of allowability does not inform someone whether or
13 not an examiner's interview took place in that case;
14 is that correct.
15 MR. LEE:  Same objection.
16 THE WITNESS:  With regard to this case
17 that is an accurate statement.
18 BY MR. BRADLEY:
19 Q.  Okay. I want to just go back really
20 quickly. Let me mark as Massie Exhibit 6 a copy of
21 the PAIR patent applicant information retrieval

Page 105

1  record for United States Patent 4518945.
2  Can you identify what Massie Exhibit 6 is?
3  A.  This is the public PAIR record 406431982.
4  Q.  If I could direct your attention to
5  entries numbers 26, 27, 28 and 29. Can you tell
6  us -- entry number 29 says, case found; is that
7  correct?
8  A.  Yes.
9  Q.  So earlier, when we were looking at the
10 '894 Patent, we saw termination of official search
11 without indication case was found. Is it now safe
12 to say that the case wasn't found; otherwise, there
13 would have been case found entry on the PAIR
14 printout?
15 MR. LEE:  Object to the form.
16 THE WITNESS:  The answer, I personally
17 think in terms of my experience at the Patent Office
18 as a practitioner who had editing capability in the
19 PALM system, as a PALM specialist, or
20 troubleshooter, this record reflects a very diligent
21 PALM specialist who did on the same day what the

27 (Pages 102 to 105)

Ovenite Court Reporting Service          310-593-0671           Washington D.C. metro area
Washington, D.C. Metro Area                                     EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Case 1:01-cv-03855-AMD   Document 86-12   Filed 08/07/2003   Page 7 of 10

Jerome Massie                    June 26, 2003                    Leviton Manufacturings vs. USI

Page 106

1  manual prescribes you to do, which is, to do both
2  transactions.
3      That is, on 6-27-01 they terminated the
4  search, and they did the second set of transactions
5  with the file to indicate that the case had been
6  found. In the record that we have looked at
7  previously for the '894 Patent, you can see there's
8  been quite a number of these searches done, and in
9  each instance the PALM specialist or troubleshooter
10 did what most PALM specialists very often do, they
11 only enter one transaction of the two.
12     I think it would be fair to say, it would
13 a speculation on my part to say, the case was found,
14 only from my experience; yes, they did one of the
15 transactions that a flag came off, that the case was
16 found, and they give it to whoever wants it and be
17 done with it.
18    Q. Does following the manual indicate
19 diligence? Do you understand what I mean by that?
20    MR. LEE: Objection.
21    THE WITNESS: On whose part?

Page 107

1     BY MR. BRADLEY:
2    Q. Person entering the data into the PAIR
3  system.
4    A. Repeat the question, please.
5    Q. May I have one second.
6        (Recess)
7     BY MR. BRADLEY:
8    Q. Earlier you mentioned that in your opinion
9  the individual that took care of the PAIR system did
10 a particularly good job following the manual and
11 making sure all the entries were --
12   A. I made mention that the person who was the
13 troubleshooter at the time of the case being found
14 on 6-27-2001, that person is usually a special
15 program examiner or supervisory patent examiner.
16   Q. Are they supposed to indicate the case is
17 found, if the case is found?
18   A. Yes, they should.
19   Q. In your opinion that doesn't necessarily
20 always happen?
21   A. Yes. I was guilty of that as well.

Page 108

1    Q. Is it fair to say, sometimes PTO employees
2  don't follow the procedures they are supposed to?
3    A. Yes, that's reasonable.
4    Q. I want to take a look at one last PAIR
5  record and one last file history.
6        I want to mark as Massie Exhibit 7 a copy
7  of the PAIR printout for U.S. Patent Number 6040967.
8        As Massie Exhibit 8, an uncertified copy
9  of U.S. Patent Number 6040967.
10       To expedite the process, I paper clipped a
11 few pages out of the file history.
12   MR. LEE: Has this been produced to us?
13   MR. BRADLEY: Has what been produced? No.
14 These are Leviton patents that we just got sued on
15 maybe a month ago, two weeks ago.
16   MR. LEE: These new patents you're talking
17 about.
18   MR. BRADLEY: Yes. This is one of the six
19 patents that Leviton has sued USI on within the last
20 month.
21   MR. LEE: I'm going to object to the whole

Page 109

1  line of questioning.
2     BY MR. BRADLEY:
3    Q. That's fine. Can you identify that first
4  page there?
5    A. Yes. It's an interview summary for Patent
6  09138955. The attendees to the interview were
7  Ronald Leja and Paul Sutton. The date of the
8  interview is November 18, 1999.
9    Q. Is this the interview or the interview
10 summary reflected on the PAIR printout to that
11 patent?
12   A. No. It appears to be included with the
13 notice of allowability on November 19th, 1999.
14   Q. Without the file history, the person in
15 the public would have no way of knowing if an
16 interview took place?
17   A. Without looking at the file history; that
18 is correct.
19   Q. Can you tell me if there was an examiner's
20 amendment entered in that case?
21   A. No, just looking at the PALM record, I

28 (Pages 106 to 109)

Ovenite Court Reporting Service         310-593-0671         Washington D.C. metro area
Washington, D.C. Metro Area                                  EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Jerome Massie                    June 26, 2003              Leviton Manufacturings vs. USI

Page 110

1  they should say PAIR, it does not appear to be.
2     Q. Look through the file history, does there
3  appear to be an examiner's amendment?
4     A. Yes, on page 2 of the notice of
5  allowability, four pages below the interview
6  summary.
7     Q. Does that examiner's amendment add
8  language to the claims?
9     A. Yes, it did.
10    Q. Were there reasons for allowance in the
11 notice of allowability?
12    A. No, there does not appear to be.
13    Q. If you flip to the notice of
14 allowability -- flip to -- there is an office action
15 on April 5th, 1999?
16       MR. LEE: Objection.
17       THE WITNESS: Is it before or after.
18       MR. BRADLEY: Before.
19       MR. LEE: What page are you on?
20    A. Paragraph 8, office action of May 20, 1999
21 the following is a statement of reasons for the

Page 111

1  indication of allowable subject matter. The prior
2  art of record to include newly cited foster junior.
3  Do you wish me to continue?
4        BY MR. BRADLEY:
5     Q. No, I think -- one last question. Reasons
6  for allowance reflected on the PAIR record?
7     A. No, would not normally be.
8     Q. So without the file history there's no way
9  someone in the public would know if there were
10 reasons for allowance?
11    A. Without the file would a because there was
12 an office action that preceded it.
13       MR. BRADLEY: I'm going to mark as Massie
14 Exhibit 9 a document titled, expert report of Jerome
15 W. Massie in response to the defendant's expert
16 report Lawrence J. Goffney, Jr.
17       BY MR. BRADLEY:
18    Q. Do you recognize Massie Exhibit 9?
19    A. Yes. I'm going through the exhibits right
20 now just to make sure all the exhibits are in there.
21 Yes.

Page 112

1     Q. What is Massie Exhibit 9?
2     A. It was a report that I prepared on
3  March 10, 2003, entitled expert report of Jerome W.
4  Massie in response to Defendant's expert report of
5  Lawrence J. Goffney.
6     Q. On page 20, under the sentence, I declare
7  under the penalty of perjury of laws of United
8  States that the foregoing is true and correct to the
9  best of my knowledge, information and belief.
10 There's a signature. Do you recognize that
11 signature?
12    A. Yes, sir.
13    Q. Is that your signature?
14    A. Yes.
15    Q. Okay. If you will flip to page 3. There
16 is a paragraph 64. Do you see that?
17    A. Paragraph 6.
18    Q. It says: Additionally, I have reviewed
19 and ruled on numerous requests of Certificate of
20 Corrections to U.S. patents filed by patentees and
21 their assignees. Is that a true and accurate

Page 113

1  statement?
2     A. Yes.
3     Q. In your tenure at the Patent Office
4  performing this duty, did you ever approve the
5  Certificate of Correction to the claims of a patent
6  without the file history?
7     A. Never, not to my recollection, ever.
8     Q. If you flip to page 4, the first full
9  sentence; can you read that for the record.
10    A. Prior to the issuance of patent the
11 information is maintained confidentially in an
12 umbrella electronic system known as PALM, patent
13 applicant location and monitoring system, which is
14 not available to the public, but from which all the
15 information for the PAIR records are drawn.
16    Q. This says that PALM is not available to
17 the public. Did you mean -- what do you mean by,
18 which is not available to the public? The PALM
19 system operates as a level of secrecy called, for
20 your eyes only.
21       As such, PALM or patent applications and

29 (Pages 110 to 113)

Ovenite Court Reporting Service          310-593-0671                Washington D.C. metro area
Washington, D.C. Metro Area                                          EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Page 170

1  A. Yes.
2  Q. If he didn't, he would not have been
3  following proper PTO procedures?
4  A. That's correct.
5  Q. Turning back to Massie Exhibit 9, your
6  expert report. In paragraph 10.7.3 on page 13 in
7  the last sentence of the first full paragraph. Can
8  you read that into the record.
9  A. 10.7.3.
10 Q. Last sentence of that paragraph.
11 A. Okay. In my experience at the PTO I have
12 not seen a situation where a primary examiner would
13 have allowed on the first official office action a
14 claim that was so obviously missing a line of text
15 as to make the claim "unintelligible".
16 Q. That claim we are referring to is claim 1
17 of the '894 Patent?
18 A. That's correct.
19 Q. Would you agree that claim 1 of the '894
20 Patent, as it issued in 1986, would have been
21 rejected by an examiner in the form that it was

Page 171

1  presented?
2  A. It would have had, in my experience, some
3  communication between the examiner and the patent
4  applicant by telephone or written communication. If
5  it was a written communication, it could be a
6  objection or rejection. There are a number of
7  options.
8  Q. Turning to page 14, that first full
9  paragraph. If you could read that into the record.
10 A. Additionally, it would have been obvious
11 to a skilled patent examiner or interested third
12 party upon reading the "unintelligible" claim 1 in
13 the '894 Patent that a review of the original
14 application file would be needed.
15     Then, upon making the above simple
16 comparison, the two versions of claim one, that is,
17 originally filed versus patented, the proper scope
18 of protection sought by the '894 Patent was the
19 scope outlined in claim one as originally filed.
20     And further, that the claim one in the
21 '894 Patent needed correction due to an obvious

Page 172

1  clerical error on part of the USPTO in printing the
2  '894 Patent.
3  Q. Without the file history and knowing what
4  transpired in the Patent Office, is there really any
5  way interested third party can determine the
6  protection afforded by the '894 Patent?
7  A. I think as a patent practitioner in my
8  experience, in two years plus that have been
9  practicing on the outside, and the amount of time I
10 spent in the Patent Office, what is stated in here
11 is what experienced patent professionals would
12 assume, that since the office action was, first
13 office action to allow the case occurred initially,
14 there did not appear to be any changes in the
15 record, that a third party could deduce, not
16 definitively, with absolute certainty, but could
17 very reasonably deduce that the claim that was
18 originally filed was in fact the claim that was
19 allowed. That defines the scope of coverage.
20     I think one of the things that further
21 reinforces it is that, it is also very clear that

Page 173

1  the examiner did an informal examiners amendment,
2  which he is allowed to do by rule and regulation for
3  adding such things as the continuity date, if they
4  want to correct the continuity date to the proper,
5  to add the headers. So are sort of things that
6  reinforce to me that nothing was done to the claims
7  in terms of an examiners amendment. Looking at the
8  entirety of the record that is available to us.
9  Q. No way for a third party to know if a
10 particular interpretation of the claim was forfeited
11 during prosecution?
12 A. That's correct.
13 Q. No way for an interested third party to
14 know if the examiner gave reasons for allowance in
15 allowing the case?
16 A. Definitively it can not be deduced without
17 the file record.
18 Q. So it is possible that Examiner Goldberg
19 in allowing the '894 Patent issued reasons for
20 allowance, such as the prior art does not disclosed,
21 a strap having a pair of depending tabs on opposite

44 (Pages 170 to 173)

Ovenite Court Reporting Service        310-593-0671              Washington D.C. metro area
Washington, D.C. Metro Area                                      EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba

Jerome Massie     June 26, 2003     Leviton Manufacturings vs. USI

Page 174

1 ends of the coil defining magnetic path through
2 which the circuit flowed?
3      MR. LEE: Object to the form.
4      THE WITNESS: Yes. Yes, it is possible he
5 could have issued that sort of statement.
6      BY MR. BRADLEY:
7      Q. Without the file history anything is
8 possible, the reasons for allowance, isn't that
9 correct?
10      A. Certainly, anything is possible with
11 regard to a prosecution.
12      Q. Jump to paragraph 11 on page 16 of your
13 expert report. You offer an opinion as to
14 anticipation and obviousness type double patten?
15      A. I offer opinion of how an examiner would
16 go about determining an obviousness patenting
17 rejection is appropriate in the, during the
18 examination of the '894 Patent.
19      Q. In 1985 how were means plus function
20 claims interpreted by an examiner for purposes of
21 examination?

Page 175

1      A. In the 80's the Donaldson decision had not
2 come to the fore. Examiners following the MPEP
3 Sections 2111, 2112, I think, which would interpret
4 the claim elements with the broadest reasonable
5 interpretation, not limiting it to only those
6 interpretations that are within the four corners of
7 the specification of the application. After
8 Donaldson that is not the case. The examining
9 practice changed.
10      Q. After Donaldson what would an examiner do
11 interpreting means plus function language?
12      A. Immediately after the decision came out,
13 the Patent Office instituted a program to educate
14 all the supervisors and primary examiners with
15 regard to the changes that affected the U.S.
16 practice for interpreting claimed features.
17      That training took almost three years to
18 finish. And at the end of that, of course, they
19 also had formal training classes for the new
20 examiners, the assistant examiners as well. That
21 process required of the examiner to, when evaluating

Page 176

1 the claimed technology, which is a means plus
2 course, step or function, either one of the two,
3 that they must follow the criteria in Donaldson,
4 which is that the interpretation of that claimed
5 feature must look only to the specification of the
6 patent and reasonable equivalence.
7      And they would give, the hardest part of
8 the training was to learn the phrase reasonable
9 equivalence and not extend it beyond those
10 equivalences. I did the training for some of those
11 classes personally.
12      Q. If the examiner didn't see the '945 patent
13 and the '626 Application were incorporated by
14 reference in their entirety, might he not consider
15 those structures when interpreting the claim?
16      A. He might not. If he didn't see them. You
17 can't knowingly form an opinion about something you
18 haven't seen. Examiners are looking for the quick
19 way to gather very relevant prior art or formalities
20 or information with regard to an application.
21 Therefore, looking at any related case to that is

Page 177

1 the first and foremost thing that an examiner does.
2      That's what led me to believe that the
3 examiner must have looked at them. It's the thing
4 that jumps out right a way. The first paragraph.
5 First page. Talks about related applications.
6      Q. In the Massie Exhibit F, on page 2 of the
7 application, continuation part application. Lists
8 priority data. Might an examiner not have noticed
9 that it says, and incorporates by reference as fully
10 set forth herein the entire contents?
11      A. From my personal experience, a junior
12 examiner might overlook that, once they read this is
13 a continuing case. They are thinking of somebody
14 else has done my job, maybe; let me go get those
15 files, or let me ask the clerk to bring those files
16 to me.
17      A more experienced examiner, such as Mr.
18 Goldberg, would highlight to the examiner that every
19 word, picture and drawings in those two previous
20 applications are in this case, even though you can't
21 see them right now, they are incorporated by

45 (Pages 174 to 177)

Ovenite Court Reporting Service     310-593-0671     Washington D.C. metro area
Washington, D.C. Metro Area                                                        EMAIL SEARCHABLE TRANSCRIPT

3b97bac0-a8b7-11d7-ac75-0030843153ba