# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (Baltimore Division)

------------------------------------------------------------X

LEVITON MANUFACTURING CO., INC.,    )

                     )

          Plaintiffs,     )

                     )     Civil Action No. 01 CV 3855 AMD

    vs.               )

                     )

UNIVERSAL SECURITY        )

INSTRUMENTS, INC.,         )

                     )

and                 )

USI ELECTRIC, INC.

          Defendants.

## EXPERT REPORT OF JEROME W. MASSIE IN RESPONSE TO THE DEFENDANTS EXPERT REPORT OF LAWRENCE J. GOFFNEY, JR.

I, JEROME W. MASSIE, declare as follows:

1.    I am a resident of the Commonwealth of Virginia, employed since February 28, 2001, as a registered patent agent with the firm of Nixon Peabody LLP, having an office at 8180 Greensboro Drive, McLean, Virginia 22102. My *curriculum vitae* is attached hereto as Exhibit A.

2.    From August 1972 until the end of February 2001, I was employed by the United States Patent & Trademark Office (the "USPTO"). I was an Examiner from 1972 until 1978, and then a Primary Examiner until 2001. In the period between 1988 and 1990 my duties and

responsibilities were as a Supervisory Patent Examiner ("SPE"), and then as the first ever examining group Special Program Examiner ("SPRE") (1990-2001), During 2001, I was appointed to be the acting Director of Technology Center 1700. My duties as Primary Examiner, SPE, SPRE, and acting Director included the examination of more than 1100 applications for a patent  (Exhibit B), administration of approximately 350 examiners handling matters involved with the statutes and rules regarding the patentability of applications  (Exhibit C), development of numerous manuals and training materials for the training of patent examiners and staff, teaching more than a dozen courses in the USPTO Patent Academy, e.g., Reasons for Allowance (Exhibit D), Lack of Unity of Invention, 35 USC 102 & 103, Patent Cooperation Treaty practice, 35 U.S.C. 101(utility) & 112 (first paragraph), and preparation of more than 1500 decisions on petition regarding issues of USPTO practice, procedure and law.

3.      I am personally familiar with the facts set forth herein or I am basing my stated information and belief upon the examining practice and procedures of the USPTO set forth in the Manual of Patent Examining Procedure (MPEP).

4.      I have reviewed the expert report of Mr. Lawrence J. Goffney, Jr. dated **"February 24, 2002"**, and I submit this Declaration to confirm or rebut portions of that report in an effort to aid the Court in its determination of validity and enforcibility of U.S. Patent No. 4,595,894 (" '894 ") to Leviton.

5.      I hereby expressly incorporate by reference, as if repeated in full herein, the entire subject matter of my earlier "DECLARATION OF JEROME W. MASSIE" dated June 17, 2002, including without limitation all of the factual statements I made and any expressions of

2

opinion given therein.

6.      During the approximately 5 years that I was employed as an Assistant Examiner and the approximately 23 years that I was employed as a Primary Examiner, as a Supervisory Patent Examiner and Special Programs Examiner at the USPTO, I was assigned the responsibility of performing the examination for U.S. patent applications in which I would follow the examination procedure outlined by Mr. Goffney's Expert Report at paragraphs 43-64. Additionally, I have reviewed and ruled on numerous requests for Certificates of Correction for U.S. patents, filed by patentees or their assignees. As will be discussed in further detail to follow, a required part of my review of such requests, I would read the file history of the patent, including without limitation, the originally filed application, which includes the Declaration (or oath), the specification, claims and drawings. Further, it was/is proper USPTO procedure to receive and to review the file history of the patent receiving a request for Certificate of Correction, as set forth in the Manual of Patent Examining Procedure ("MPEP") Chapter 1485 (a copy of which is attached as Exhibit E).

7.      I am familiar with the Patent Application Information Retrieval system (PAIR") available on line from the USPTO (www.USPTO.GOV). This system is intended to provide to the public a record of "transactions" and identify the "movement" with respect to individual applications and issued patents. This is done by providing each application with a unique Bar Code Label identifying the application by its serial number, e.g. 06716991, which is the application serial number of the patent application from which the U.S. Patent No. 4,595,894 ('894) patent issued, and will be hereinafter referred to as the " '894 patent application.". Each time an application is "moved" or a "transaction" is needed, the Bar

Code Label is scanned identifying the location and to prepare the application for the transaction to be performed. Prior to issuance of the patent, the information is maintained confidentially in an umbrella electronic system, known as PALM ("Patent Application Location and Monitoring system"), which is not available to the public but from which all the information for the PAIR records are drawn. In addition to these two record keeping systems, the USPTO also maintains separate electronic financial records system with respect to each application and patent, which is known as "RAM" ["Revenue Account Management"]. Finally, in addition to the paper file known as the "application file wrapper", the USPTO also maintains a microfiche record for all applications as they were originally filed, at least during the period of 1982-1986. This system was replaced by a electronic scanning/imaging system in the 1990's. I have not reviewed the '894 patent application paper file history since I was informed no paper record exists in counsel's records or in the USPTO files. I have received a fax of a certified copy (Exhibit F) of the microfilm copy retrieved from the USPTO for the '894 patent application.

8.    The RAM system provides a record of all transactions involving a fee for each patent or patent application. The information provided includes the amount of any fee paid for a particular transaction, the mail receipt date of any payment received by the USPTO, the date the transaction was completed (i.e., the date of collection of the fees), the 'fee code', which identifies the type of transaction to which the fee is applied, and the manner of payment, i.e., check, deposit account charge, credit card, or cash. As an example, if a certificate of correction was issued under 37 CFR 1.323 (for applicant's error), a fee would be recorded in the RAM system for that request for that patent. Alternatively, if a request for a Certificate of Correction were made based upon an asserted USPTO error (under 37 CFR 1.322), there

4

would be no fee transaction recorded in the RAM system for that request since no fee is required to be paid for such an error.

9.      I have reviewed documents that relate to the file history of the '894 patent application, and the subsequent history of the issued '894 patent. These include the PAIR/RAM electronic record for the '894 patent (Exhibit G, hereto), the file wrappers of the two copending priority applications 06/431,982 (now U.S. Patent 4,518,945) and 06/558,262 (as well as the PAIR electronic record for each), the second Request for the Certificate of Correction, dated July 17, 2001 (Exhibit H), as well as a subsequent faxed copy, dated October 18, 2001 (Exhibit I), that was sent directly to Ms. Cecilia Newman, who I know to be the individual USPTO employee supervising the issuance of Certificates of Correction.  I noted her stamped signature on a copy of the request for the Certificate of correction, which indicated the request has been "APPROVED" on October 23, 2001.

10.     My initial comments are in regard to the questions raised by Mr. Goffney's Expert Report, at paragraphs 95-99, regarding the content of the '894 patent application and the examination process performed by Mr. E. A. Goldberg and Mr. Lincoln Donovan, who were the examiners responsible for examination of the '894 patent application.

        10.1.   Having been a primary examiner, in the Patent Examining Corps, during the period of April 1, 1985 to December 9, 1985, I was well aware of the USPTO examination practice and use of the PALM system (which evolved into the current PALM/PAIR system in the late 1990's).

        10.2.   It is stated, at paragraph 97 of Mr. Goffney's Expert Report, that the PAIR system, which was referred to by Examiners as "PALM" in 1985, indicates that a

5

Miscellaneous Letter on April 1, 1985 was filed but there was no indication of the content of this letter. However, a detailed review of the PALM record reveals that in fact two "Miscellaneous Incoming Letters" were received, with the second being received on April 2, 1985. Further, based upon the USPTO practice for recording electronic transactions outlined above, it can be determined that Miscellaneous Letters of April 1st and 2nd were not amendments since such documents, if received prior to examination, would have the PALM entries of "Preliminary Amendment." This USPTO practice is clearly exemplified by the PALM record (Exhibit J) for the related '945 patent which shows receipt of two such preliminary amendments, which are noted by Mr. Goffney's Expert Report at paragraphs 75 and 78, prior to examination of the '945 patent application. Further, it is unlikely that the two Miscellaneous Letters were citations of relevant prior art since the PALM record would reflect the transaction for each as "Information Disclosure Statement (IDS) Filed" as shown in the PALM record for U.S. Patent 4,723,456 (Exhibit K).

10.3. Additionally, a review of the related '262 patent application file reveals that the Office Action of March 14, 1985, about which the applicants for the '894 patent application could have been aware, recited only a single obviousness rejection under 35 U.S.C. §103 based upon the U.S. Patent 4,001,647 (Klein – '647). While a review of the Klein '647 patent indicates that its disclosure is virtually the same as that of the U.S. Patent 4,010,432 (Klein – '432) which was actually cited by the Examiner in the '894 patent application, any comments in the Miscellaneous Letters of April 1 & 2, 1985 relating to the Klein '647 cited in the March 13, 1983 Office Action is unlikely. From my experience as a Primary Examiner and now as a registered Patent Agent, since the March 14, 1985 date of mailing of the Office Action in the '262 application is so close to the April 1, 1985 filing date

6

of the '894 patent application, it is very unlikely that the applicants for the '894 patent application had sufficient time to receive, analyze, and determine an appropriate response to the March 14, 1985 Office Action before the April 1st and April 2nd filings of the Miscellaneous Letters in the '894 patent application.

10.4    Again, from my experience as a Primary Examiner, it is very difficult to determine the content of the April 1st and 2nd Miscellaneous Letters without some sort of physical or electronic evidence as to their intent or content. However, it can be determined from the electronic PALM record discussed above, with reasonable certainty, that the Miscellaneous Letter were not amendments to the claims or information disclosure statements.

10.5.    A further issue has been raised, at paragraphs 99 and 116 of Mr. Goffney's Expert Report, with regard to the allowance of the '894 patent application and the content of the Notice of Allowance.    Continuing with the review of the '894 PALM record, that record reveals that the application was docketed to Examiner Donovan on November 7, 1985. Further, as is evident from the issued '894 patent, the '894 patent application was examined on its merits by Assistant Examiner Donovan and his Primary Examiner Mr. E. A. Goldberg resulting in the mailing of a Notice of Allowability on December 9, 1985.

Based upon my knowledge of procedures at the USPTO at that time, an Examiner charged with the examination of an application would have retrieved all related parent applications for review, as is required by MPEP Chapter 904 (Exhibit Q), to decide upon:

1)    Formality issues, such as filing and issue dates for determining proper

continuation-in-part status of the '894 patent from the '945 and '338 patents,

7

as well as

2)   <u>Substantive matters,</u> such as proper support, under 35 U.S.C. 112, for the subject matter of the '894 patent in both the '945 and '338 patents, and to determine if any relevant prior art had been cited in the related parent applications, as is also required by MPEP Chapter 904 (Exhibit Q).

Further, Examiners Donovan and Goldberg, upon noting that a Terminal Disclaimer was approved in the '945 patent, would also <u>review the claims of the patent serving as the basis for such a disclaimer,</u> i.e., the '338 patent, as is required by MPEP Chapter 804 at Charts II-A and II-B (Exhibit T).  Mr. E. A. Goldberg, the Primary Examiner for the '894 patent, who was known to me to have the reputation of being diligent about following required examination procedures, would necessarily have reviewed the '338 patent claims (and the '945 patent claims), as well as the references cited in each application, before allowing the '894 patent application, in order to:

a.   Determine if an issue of obviousness-type double-patenting would also apply to the claims of the '894 patent application, and to

b.   Determine if an issue of unpatentability, under 35 U.S.C. § 102 and/or § 103, over prior art would apply to the claims of the '894 patent application..

Since no Office Action rejecting the claims of the '894 Patent (i.e. for obviousness-type double patenting rejection) had been issued by Examiners Donovan and Goldberg, and since no Terminal Disclaimer appears in either the electronic PAIR and RAM records for the '894 patent application (in contrast to the related '945 patent application in which a Terminal

8

Disclaimer was filed to overcome an obviousness-type double patenting rejection), it is evident that the Examiners in charge of the examination of the '894 patent determined that there was no issue of unpatentability under § 102 and/or § 103 over prior art, and no issue of obviousness-type double patenting in the '894 with regard to the claims of either the '945 patent or the '338 patent.

It is also noted that the PALM record for the '894 patent lists only the "Notice of Allowability" and "Notice of Allowance." No "Examiner Amendment" is listed in the PALM record along with the two allowance transactions. If an Examiner's Amendment to the claims had been made affecting even a single word of the claims, Examiner's Donovan and Goldberg would have had to prepare an Examiner's Amendment. That Examiner's Amendment would have to summarize an interview with the patent applicants' representative, Mr. Sutton, granting the Examiner permission to effect an amendment to the claims, as set forth in MPEP 1302.04 (Exhibit S). If such an amendment took place, the PALM record would reflect such an occurrence, again as was done in the related '945 patent application where, in addition to the "Notice of Allowability" and "Notice of Allowance," an "Examiner's Amendment Communication" is also listed in the PALM record. Since I have been informed that no communication between the Applicant's representative, Mr. Sutton, and the Examiners took place prior to issuance of the '894 patent application, and since the PALM record for the '894 patent application does not reveal any "Examiner's Amendment", it is clear that the '894 patent application claims 1-4 were allowed by Examiners Donovan and Goldberg as originally filed without any preliminary amendment or Examiner's Amendment to the claims.

10.6    I also note that the '945 Patent, but not the '338 Patent, is listed on the face of

9

the '894 Patent as a reference. This is also in accordance with the USPTO procedure at the time. The listing of the '338 Patent would have been considered unnecessarily duplicative, and undesirable, because the '945 Patent was an "continuation" of the '338 Patent, and therefore had an identical disclosure.

10.7 An issue has also been raised, by paragraphs 100 to 107, 109 and 113 to 117 of Mr. Goffney's Expert Report, that the Certificate of Correction of July 17, 2001 to add the missing line of text in the issued Claim 1 of the '894 patent was without basis and that a third party would not be apprized of the scope (given notice) of the actual invention from "unintelligible" text of the issued Claim 1.

As mentioned earlier, as a required part of my review of requests for Certificates of Correction during my employment as a Primary Examiner, I would read the file history of the patent, including without limitation, the originally filed application, which includes the Declaration (or oath), the specification, claims and drawings. It was normal and accepted USPTO procedure to receive and to review the application file of the patent receiving a Certificate of Correction request, as set forth in the Manual of Patent Examining Procedure ("MPEP") Chapter 1485.

I have also reviewed documents that relate to the prosecution history of the '894 patent application, and the subsequent history of the issued '894 patent. Those documents include the PAIR (PALM) record for this patent (Exhibit G), the file wrappers of the two copending priority applications, i.e., the '262 abandoned application and the '945 patent application, the second Request for the Certificate of Correction, dated July 17, 2001, as well as a subsequent faxed copy, dated October 18, 2001, that was sent directly to Ms. Cecilia

10

Newman, who I know to be the individual USPTO employee supervising the issuance of Certificates of Correction. I have noted Ms. Newman's stamped signature on a copy of the request for the Certificate of Correction, which indicated the request had been "APPROVED" on October 23, 2001 (Exhibit I).

10.7.1     I am familiar with the usual procedures followed by SPE's in Technology Center 2800 (where the Certificate of Correction for this patent had been reviewed) when carrying out that process.

Initially, upon receipt by the USPTO, the July 17, 2001 Request for the Certificate of Correction would be matched by the Certificate of Correction Branch personnel with the '894 patent application file wrapper (i.e., the paper documents of the prosecution of the application). Additionally, since the Certificate of Correction dealt with a change to the claims, Ms. Newman would have been required, by MPEP Chapter 1485, to forward the request and file wrapper to the Director of Technology Center 2800. The process in Technology Center 2800 was to give the Certificate of Correction request to an SPE for approval/disapproval of the request. The '894 patent application file, with the second Request for the Certificate of Correction, appears to have been forwarded to SPE Olik Chaudhuri, as can be seen from his initials "oc" with the date "10/22/01" and the indication "PUBLISH", on the approved July 17, 2001 Certificate of Correction request (Exhibit I).

I had spoken with SPE Chaudhuri on June 14, 2002, and he confirmed that he was the designated SPE performing the approval of certificates of correction during the period of October 2001. However, it is my understanding from speaking to SPE Chaudhuri that for a period of time, the USPTO allowed the approval of requests for certificates of correction

without the file if the requested correction was an obvious typographical error, but, SPE Chaudhuri had no recollection of that being the situation, i.e., approval without the file wrapper, for the '894 patent.

Since the Deposit Account record and the RAM fee record (Exhibit G) indicates, for the July 17, 2001 Request for Certificate of Correction, that no fee (code "145") was applied with respect to the July 17, 2001 Certificate of Correction issued to the '894 patent and since the postcard receipt for the Certificate of Correction request and the Request itself does not indicate that a check was sent with the Request. The above facts indicate to me that the USPTO in granting the Certificate of Correction:

    A.    Accepted responsibility for the error in the patent, and

    B.    Found the error "is clearly disclosed in the records" in accordance with 35 U.S.C. 254, and 37 CFR 1.322, and

    C.    Did not charge the patentee for issuing the second Certificate of Correction

    10.7.2    Additionally, I have reviewed the PALM record for the '894 patent application, for the period from April 1, 1985 to June 18, 1986, which includes the period during which the examination of the application for the '894 patent application occurred by Examiners Donovan and Goldberg. That record shows that the Examiners performed an examination on or after November 7, 1985 and as the first and only Office Action, issued a Notice of Allowability on December 9, 1985. It is further noted that the PALM record indicates no (preliminary or Examiner's) amendment or other comments by either of the Examiner's or the applicant prior to issue of the '894 patent application on June 17, 1986.

This confirms that the application Claim 1 as originally filed was allowed unchanged.

10.7.3         The above facts also confirm to my mind that the error that appeared in Claim 1 of the printed '894 patent publication occurred at some point after the '894 application was allowed by the Examiner. Further, based on the above facts a skilled patent examiner, such as SPE Chaudhuri, or an interested third party, such as Universal Security Instruments, Inc. or USI Electric, Inc., would have quickly recognized the "unintelligible" character of the published Claim 1 through a quick comparison of the Claim 1 as filed (in the '894 patent application or microfilm copy) with the Claim 1 of the '894 patent. In my experience at the USPTO, I had not seen a situation where a Primary Examiner would have allowed, on the first official offce action, a claim that was so obviously missing a line of text as to make the claim "unintelligible."

To the contrary, in view of the standard examination practice for Examiners of analyzing, or diagramming, each feature of the claim in order to understand the scope of the invention, so that a comprehensive search of the prior art could be properly accomplished, see MPEP Chapter 904 and 904.1 (Exhibit Q), Examiners Donovan and Goldberg would have necessarily noticed missing text, and would have required amendment of the text of Claim 1, either by Examiner's Amendment or by an applicant's amendment following an office action rejecting at least Claim 1. Since neither of these actions were taken, i.e., see the PALM record for the period from November 7, 1985, to December 9, 1985 which shows no "Amendment" transaction, it would have been extremely unlikely for the Claim 1, as originally filed, to have omitted the clause set out in the July 17, 2001 Certificate of Correction.

Additionally, it would have been obvious to a skill patent examiner or interested third party, upon reading the "unintelligible" Claim 1 in the '894 patent, that a review of the original application file would be needed. Then upon making the above simple comparison of the two versions of Claim 1 (i.e., originally filed versus patented), the proper scope of protection sought by the '894 patent was the scope of protection outlined in the Claim 1 as originally filed and further that the Claim 1 in the '894 patent needed correction due to the obvious clerical error on the part of the USPTO in printing the '894 patent.

10.7.4    Still further, I performed a review of the certified copy of the application as filed (Exhibit F) and Claim 1, as originally filed, shows that the phrase corrected by the July 17, 2001 Certificate of Correction was in fact present in the original Claim 1 as examined by the Examiners Donovan and Goldberg. Please note that the certified copy of the text of the original '894 patent application does not agree with the text of the '894 patent since the Examiner inserted, prior to allowance, the section headers such as "BACKGROUND AND SUMMARY OF THE INVENTION" as well as a brief description of the drawings, in order to comply with the required sections of the application, as set forth in 37 CFR 1.77. This "informal examiner's amendment" procedure by Examiners Donovan and Goldberg is proper at allowance and does not require the patent applicant's approval, see the guidelines for "informal examiner's amendment" in MPEP Chapter 1302.04 (Exhibit S).

10.7.5    The procedures in the USPTO, subsequent to the notice of allowance being mailed, during the period 1985 through 1987 were as follows. After mailing of the "Notice of Allowance", the application undergoes an "issue revision" process in the technology center for only formal matters. Thereafter, the application would be sent to the Office of Publication to be prepared for issue. Subsequent to payment of the Issue Fee, the

application would be forwarded to a contractor who would re-key the text of the application for purposes of photocomposition of the patent. It is particularly noted that the PALM record does not show any paper received, during the period from the mailing of the "Notice of Allowance" on December 10, 1985 until the issuance of the patent on June 17, 1986, which would require an Examiner's attention. That is, only the "Issue Fee Payment" was received by the USPTO on March 6, 1986. Since USPTO practice was not to place the re-keyed text of the application in the application file wrapper, this means that Examiners Donovan and Goldberg never saw or reviewed the file or the re-keyed text before the patent was printed, on June 17, 1986. Therefore, it is my opinion that the error in the issued Claim 1 arose at some point after the Notice of Allowance was mailed, as a result of the "re-keying" by the USPTO. This is confirmed by my review of Claim 1 in the '894 patent which is missing the phrase inserted by the July 17, 2001 Certificate of Correction and which is present in the originally filed Claim 1 of the '894 patent application.

10.7.6    Finally, it is my opinion that since the USPTO found the July 17, 2001 Certificate of Correction Request as correcting an "obvious" clerical error which "is clearly disclosed in the records of the [PTO]", under 37 C.F.R.. 1.322 (Office Mistake), the approval of the Certificate of Correction Request was the proper avenue for correcting Claim 1 of the '894 patent. My opinion is consistent with MPEP Chapter 1402 (Exhibit R) which clearly states that an "error", under 35 U.S.C. § 251 (Reissue):

> has not been presented where the correction to the patent is one of spelling, or grammar, or a typographical, editorial or clerical error which does not cause the patent to be deemed wholly or partly inoperative or invalid for the reasons specified in 35 U.S.C. 251. These corrections do not provide a basis for reissue...These corrections may be via a certificate of correction; see MPEP § 1481.

15

The assertion, at paragraph 117-118 of Mr. Goffney's Expert Report, that the filing of a Reissue application (for the purpose of correction the clerical error by the USPTO in printing the '894 patent application) would be the proper avenue for correction the "894 patent is not consistent with the USPTO practice as outlined in the MPEP Chapters 1402 (Exhibit R) and 1485 (Exhibit E) guidelines.

11.     An issue has further been raised, at paragraphs 121-124 of Mr. Goffney's Expert Report, regarding anticipation or obviousness (that is, obviousness-type double patenting) with regard to at least Claim 1 of the '894 in light of the claims of the related, previously filed copending U.S. Patent 4,518,945 ('945) and U.S. Patent 4,386,338 ('338).

My initial comments on this issue are that an obviousness double patenting (ODP) rejection is made regarding the claims of an earlier filed and commonly owned patent(s) and the claims of an application only when the required two-part analysis is satisfied. In order to perform this two-part analysis, an Examiner, would refer to the MPEP Chapter 804 for the detailed guidance in performing the analysis. To summarize this two-part analysis, first part requires that the claims of the patent(s) and the application be construed (analyzed and understood) which is followed by a comparison (overlay) of the claimed features of the patent(s) and application to determine whether the application claims encompass the subject matter previously claimed.      Thereafter, the second part of the analysis requires a determination as to whether the differences between the claims of the patent and the application would have been obvious to one of ordinary skill in the prior art at the time of the invention. See MPEP Chapter 804 at page 800-22 (Exhibit L)

The Examiners Donovan and Goldberg, who were in charge of the examination of the

'894 patent application, would have performed the two-part ODP analysis with regard to the claims of the U.S. Patent 4,518,945 ('945) which had been specifically incorporated by reference, and then looked at the claims of the U.S. Patent 4,386,338 ('338), which is the parent application of the '945 patent. (Please note that during the examination of the '945 patent application a "terminal disclaimer" was filed with regard to the '338 patent in order to avoid/obviate an ODP rejection being made by the examiner in the '945 patent application. Therefore, Examiners Donovan and Goldberg would have also necessarily retrieved the '338 patent to analyze the claims therein for the ODP analysis.)

In performing the two-part ODP analysis with regard to the claims of the '945 patent and the claims of the '894 patent application, the Examiners would first construe each relevant claim, i.e., Claim 1 of '894 patent application and Claim 1 of '945 patent, and then overlay the claims of each to determine the similarity and differences therebetween. Thereafter, the Examiners would have to determine if the differences would have been obvious to one of ordinary skill in the prior art, as outlined in MPEP Chapter 804 at page 800-22. It is in the performance of the second part of the two-part analysis that two-part analysis fails to establish that an ODP exists, and where the Examiners in charge of the examination of the '894 patent application arrived at the conclusion that the ODP did not exist with regard to the claims of the '945 patent.

11.1    Specifically, I conducted a review of Claim 1 of the '894 patent application and Claim 1 of the '945 patent (see Exhibit M). That review immediately illustrates that the claim 1 of the '945 patent is drawn to an apparatus for both "completing" and "interrupting" an electrical connection via a "movable actuating means" for:

17

"contacting and causing alternating rotary and counter-direction rotary movements of said cam means in response to movement of said armature, said rotary and counter-direction rotary movements <u>causing electrical paths to open and close</u>, said movable cam means being formed with an opening therethrough, thereby providing a recess into which a conducting pin of an electrical plug is able to be positioned, during use, without interfering with the operation of both the cam means and parts with which it cooperatively engages." (emphasis added)

In contrast, Claim 1 of the '894 patent application is drawn to an apparatus for "selectively <u>interrupting</u> an electrical connection." That is, the switching apparatus of the '894 patent application includes a "movable means" which functions <u>only</u> for "influencing a separation of said input and output contacts, thereby interrupting electrical connection between them…" Examiners Donovan and Goldberg, as persons of ordinary skill in the prior art, in order to satisfy the second part of the two-part ODP analyis, would have to determine if these differences would have been obvious.

Since the Examiners allowed the application on the first office action, the Examiners must have determined that to render obvious the "interrupting" <u>only</u> function of Claim 1 of the '894 patent application the Claim 1 from the '945 patent claim 1, one of ordinary skill in the prior art would have realized that to do so would have destroyed the apparatus of the '945 patent for its intended purpose and changed the very principle of its operation. Specifically, by removing from claim 1 of the '945 the "movable cam means" performing both the interruption and completion of an electrical contact, claim 1 of the '945 patent would no longer function for interrupting and completing an electrical connection, i.e., the apparatus of claim 1 of the '945 patent would be rendered unsatisfactory for its intended purpose.

An Examiner is taught (see MPEP Chapter 2143.01 at pages 2100-124 and 125, Exhibit N) if it is necessary to modify a teaching of a reference (claim 1 of '945 patent here)

18

to arrive at the claimed invention (claim 1 of '894 patent application) such that the reference would be rendered inoperative for its intended use or change its principle operation, then the differences between the claimed invention (claim 1 of '894) cannot be obvious over the teachings of the reference (claim 1 of the '945 patent). Therefore, Examiner Donovan and Primary Examiner Goldberg, upon performing the two-part ODP analysis for Claim 1 of the '894 patent application and Claim 1 of the '945 patent would have found that the second part of the two-part analysis is not satisfied and an ODP rejection would have been (and still is) inappropriate with regard Claim 1 of the '894 patent application based upon Claim 1 of the '945 patent.

11.2.     With regard to a determination that an ODP rejection would similarly be appropriate with regard to Claims 1 and 2 of the '338 patent and Claim 1 of the '894 patent application as inferred at paragraphs 121-124 of Mr. Goffney's Expert Report, the completion by Examiners Donovan and Goldberg of the second part of the two-step analysis for Claims 1 and 2 of the '338 patent (see Exhibit O) would have a similar result as that for Claim 1 of the '945 patent outlined above. That is, since elimination of the '338 means, i.e., "movable cam means", for effecting both completing and interrupting of the electrical connection would destroy the '338 patent for its intended purpose, an ODP rejection would have been (and still is) inappropriate with regard Claim 1 of the '894 patent application based upon Claims 1 and 2 of the '338 patent..

11.3     Finally, with regard to any "anticipation" rejection of the claims 1-4 of the '894 patent, under 35 U.S.C. §102, over the teachings of the '945 and/or '338 patents, it must be pointed out that Examiner Donovan and Goldberg would have understood that:

1.    Since each of the '894, '945 and '338 patents lists the inventors as Richard C. Doyle and Lester Rivera, and

2.    Since the '894, '945 and '338 patents have an unbroken lineage of continuing status, under 35 U.S.C. § 120, neither the '945 or the '338 patent are available as prior art under any section of 35 U.S.C. § 102 for any common subject matter among the three disclosures, as set forth in MPEP 2133.01.

11.4       The facts and analysis, outlined above, would preclude any finding currently or by Examiners Donovan or Goldberg in December 1985 that that Claims 1-4 of the '894 patent application is unpatentable over Claims 1 and 2 of the '338 patent under § 102 "anticipation." or the judicially established obviousness-type double patenting standard.

I declare, under penalty of perjury of the laws of the United States, that the foregoing is true and correct to the best of my knowledge, information and belief.


DATE:    McLean, Virginia
         March _10_, 2003

         _Jerome W. Massie IV_
         Jerome W. Massie IV

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent by first class mail, postage prepaid, to Maurice U. Cahn and Frederick N. Samuels, Cahn & Samuels, LLP, Headquarters Building, 2000 P Street, N.W., Suite 200, Washington, DC 20036 on this 10th day of March, 2003.

Joseph G. Lee