UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

---------------------------------------------------------- X
LEVITON MANUFACTURING CO., INC.,                           :

          Plaintiff,                            :

   v.                                                    :

UNIVERSAL SECURITY INSTRUMENTS,     :     Civil Action No. 01 CV 3855 AMD
INC., *et al.,*

          Defendants.                           :

                                 :
---------------------------------------------------------- X

**PLAINTIFF LEVITON MANUFACTURING CO., INC.'S
MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT ON INVALIDITY FOR DOUBLE PATENTING
AND IN SUPPORT OF LEVITON'S CROSS-MOTION
<u>FOR SUMMARY JUDGMENT OF NO INVALIDITY FOR DOUBLE PATENTING</u>**

## TABLE OF CONTENTS

**PAGE**

FACTS FROM THE PATENTS' SPECIFICATION ..........................................................2

The Disclosure Of The '338'/'945 Patent. ........................................................5

The Disclosure of the '894 Patent. ..................................................................7

ARGUMENT ..................................................................................................10

Construction of Claims ................................................................................10

The Claims of the '338 Patent. ......................................................................14

The Claims Of The '945 Patent. ....................................................................14

The Claims Of The '894 Patent Must Also Be Construed In
Light Of The Language Of The Claim And Of The Specification ...................15

Reading The '894 Specification As It Would Be Understood By One Of Ordinary
Skill In The Art, The Claims Must Be Construed In Terms Of A GFCI System ..........17

The Preamble In The '894 Claim 1 Gives Life And Meaning To The Claim.................19

The Construction Of A Claim Must Reflect The Entire Patent Record.........................20

Construing The 'Means Plus Function' Limitations .........................................21

CONCLUSION ..............................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343 (Fed. Cir. 2001) ....................... 11

*Azioni,* 158 F.3d 1243, 1250, 48 USPQ 2d 1117(Fed. Cir. 1998) ................................................. 14

*Bell Comm. Research , Inc. v. Vitalink Comm. Corp.,* 55 F.3d 615 (Fed. Cir. 1995)............. 20, 21

*Bio-Technology Gen. Corp. v. Genentech Inc.,* 80 F.3d 1553 (Fed. Cir. 1996) ......................... 25

*C.R. Bard, Inc. v. M3 Systems Inc.,* 157 F.3d 1340 (Fed. Cir. 1998) ......................................... 21

*Corning Glass Works, v Sumitomo Electric U.S.A., Inc.,* 868 F.2d 1251, 9
   U.S.P.Q. 2d 1962 (Fed. Cir. 1989) ........................................................................................ 21

*Eli Lilly v. Barr,* 251 F.3d 955, 58 U.S.P.Q. 2d 1869 (Fed. Cir. 2001) ........................................ 10

*Georgia-Pacific Corp. v. United States Gypsum Co.,* 195 F.3d 1322,  52 U.S.P.Q.
   2d 1590 (Fed. Cir. 1999)................................................................................................... 10, 11

*Hoechst Celanese Corp. v. B.P. Chems. Ltd.,* 78 F. 3d 1575 (Fed. Cir. 1996)........................... 13

*Kropa v Robie,* 187 F. 2d 150, 88 U.S.P.Q. 478 (CCPA, 1951)................................................... 22

*Markman v. Westview Instruments, Inc.,* 52 F.3d 967(Fed. Cir. 1995) (in banc),
   aff'd, 116 S. Ct. 1384 (1996)................................................................................................. 11

Massey v. Del Lab, Inc., 118 F.3d 1568 (Fed. Cir. 1997) ............................................................ 13

*Modine Mfg. Co. v. U.S. Int'l Trade Commission,* 75 F.3d 1545 (Fed. Cir. 1996) ...................... 13

*Multiform Desiccants, Inc. v. Medzam Ltd.,* 133 F.3d 1473 (Fed. Cir. 1998) ............................. 24

*Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430 (Fed. Cir. 1988)................................ 24

*Odetics, Inc. v. Storage Technology Corp.,* 185 F.3d 1259 (Fed. Cir. 1999) .............................. 23

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.,* 242 F.3d
   1337 (Fed. Cir. 2001)............................................................................................................ 18

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.,* 810 F.2d 1113 (Fed. Cir. 1987) ............................... 21

*Smithkline Diagnostics, Inc. v. Helena Lab. Corp.,* 859 F.2d 878 (Fed. Cir. 1989)................... 12

*Texas Instruments Inc. v Cypress Semi-conductor Corp.,* 90 F.3d 1558 (Fed. Cir.
   1996).................................................................................................................................. 25

*Toro v. White Cons Indus., Inc.,* 199 F.3d 1295 (Fed. Cir. 1999) ............................................... 13

*Wang Lab., Inc. v. America Online, Inc.,* 197 F.3d 1377 (Fed. Cir. 1999).................................. 16

## Federal Statutes

35 U.S.C. § 112, ¶ 6 ......................................................................................... passim,1,9

35 U.S.C. § 282.......................................................................................................... 10

***Other Authorities***

U.S. Patent No. 4,386,338................................................................................................... 2

U.S. Patent No. 4,518,945............................................................................................... 2, 6

U.S. Patent No. 4,595,894............................................................................................... 1, 2

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

```
------------------------------------------------------  X
LEVITON MANUFACTURING CO., INC.,                        :

                    Plaintiff,                          :

        v.                                              :

UNIVERSAL SECURITY INSTRUMENTS,                         :    Civil Action No. 01 CV 3855 AMD
INC., et al.,
                                                        :
                    Defendants.
                                                        :
------------------------------------------------------  X
```

**PLAINTIFF LEVITON MANUFACTURING CO., INC.'S
OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT ON INVALIDITY FOR DOUBLE PATENTING**

The Plaintiff, Leviton Manufacturing Company, Inc. ("Leviton"), by its undersigned counsel, respectfully submits this Opposition to Defendants' Motion for Summary Judgment. Specifically, Leviton submits that Defendants are not entitled to Summary Judgment, but that Summary Judgment should be granted in favor of Leviton because, as a matter of law, the claims of U.S. Patent No. 4,595,894 (the "'894 Patent") are not invalid for double patenting with respect to either of the parent patents to the '894 Patent, i.e., the '338 Patent or the '595 Patent, under the double patenting standard.

A proper construction of the "means-plus-function" claims of the '894 Patent requires not only a consideration of Paragraph 6 of 35 U.S.C. § 112, but also an understanding that Federal Circuit precedent, as is shown *infra*, clearly requires that the claims be construed in the context of the specification of that patent, in accordance with the understanding of one skilled in the art, and (based upon the statutorily mandated presumption of validity for each claim) in a way to

maintain the validity of each claim, if at all possible. For that reason, Leviton's proposed claim construction is correct as a matter of law, and thus should be adopted by the Court. When such claim construction is adopted, it is clear that there can be no double patenting because the '894 claims do not encompass the invention of the '338 or '945 patents.

The Defendants' proposed construction of the claims of the '894 Patent is based on premises that are directly contrary to established Federal Circuit precedent.

## FACTS FROM THE PATENTS' SPECIFICATIONS

The disclosures of the two parent patents, i.e., U.S. Patent No. 4,386,338 (the "'338 Patent"), and U.S. Patent No. 4,518,945, (the "'945 Patent") include substantially identical specification and drawings, and their claims were found to be directed to inventions that are not obviously different from each other (as shown by the required "terminal disclaimer"). Although all the three patents are generally related, in that they are all directed to a switching device intended to fit into a wall electrical receptacle box, the earlier two patents are directed to different inventions than is the patent in suit, U.S. Patent No. 4,595,894, (the "'894 Patent"). The '894 Patent invention is a Ground Fault Circuit Interrupter ("GFCI") switch, capable of automatically opening, or breaking, an electric circuit. The earlier two patents are directed to Remote Control Switches operated by a "a flip-flop cam arrangement"('945 Patent, Col. 2, line 2) that cyclically opens <u>and closes</u> an electric circuit, in response to successive electrical or electronic signals.

The 'part' of the systems common to the switches in all three patents, is the juxtaposition of the solenoid coil immediately adjacent the steel strap that structurally supports the switches in the wall receptacle. The switch is actuated by the 'solenoid' formed of an 'electromagnet coil' and a 'plunger' that slides within the central axis of the coil. The immediately adjacent strap (formed of magnetic material) forms part of the magnetic circuit of the solenoid coil. When the

coil is energized a magnetic field is generated which causes movement, i.e., influences the position, of the plunger, to move into the center of the coil, which serves to actuate the switch. The coil is placed immediately adjacent a portion of the strap means such that a path of the magnetic field generated by the coil is defined by the portion of the strap means adjacent the coil. This is the basis of the '894 Patent being a "continuation-in-part" of the '945 Patent.

The differences among the three patents, and specifically between the '894 Patent and the earlier two, are the result of the different functions required for the '894 GFCI switch and the Remote control "flip-flop cam" switches of the earlier two patents. The GFCI claimed in the '894 Patent, and described in the '894 specification, is "a dedicated ground fault circuit interrupting system" which acts "in response to a predetermined signal, thereby opening or interrupting a circuit ." ('894 Patent, col. 1, L.l. 53-64)  The patent also describes as "another object" providing "such a system, in which a reset button and function is included." ('894 Patent, col. 2, L.l. 6-7).  Clearly, the GFCI invention described in the "SUMMARY OF THE INVENTION" section of the '894 Patent, and defined by the claims, is intended to automatically break a circuit in response to a ground fault signal, but requires a "button" in order to manually "reset" the system.

The '894 Patent is a continuation-in-part ("c-i-p") of the '945 Patent, which in turn is a continuation of (that is identical to) the '338 Patent, i.e., the '338 Patent is the ultimate parent. The latter two patents are both directed to flip-flop cam switches which can be triggered to automatically open and subsequently triggered again to automatically reclose an electrical connection.  The "cycles just described may be repeated any number of times as a result of signals generated either remotely or via other means."  (The '945 Patent, col. 9,line 23 through col. 10, line 3, and the '338 Patent, col. 9,line 23 through col. 10, line 15.)  The disclosures of

those latter two patents are identical, including the drawings. The basis for the "c-i-p" status of the '894 Patent relative to the '945 Patent, is that they both are operated by a solenoid having an electromagnetic coil adjacent a magnetic strap means, so that the adjacent portion of the strap means will "define a path of the magnetic field" when the coil is energized. The plunger operated by the coil then actuates the switch. Accordingly, "the basic switching arrangement described" in the three patents, that is the solenoid coil (and immediately adjacent magnetic strap) and plunger and the first movable member moved by the plunger are common to all three patents. The difference is the function of the switch, i.e., to turn electrically operated devices on and off, in substantially endless alternating automatic cycles, or to swiftly interrupt a circuit that has become dangerous because of a ground fault, and requiring a manual resetting. The defined mechanisms must be different, as described in the patents, in order to accomplish the two different functions.

The structure of a suitable GFCI, as in the '894 Patent, must not permit reclosing of the circuit upon the coil receiving another electrical signal. The remote controlled flip-flop switch of the '338/'945 Patent must be able to alternately open and close a circuit in response to successive electrical remote signals. The claims of both of these patents include "means plus function" limitations, and thus the structure of the claimed device, which is not described in so many words in the claim, must be defined by what is described in the specification and drawings as providing for each of the listed functions for the claimed invention.

### The Disclosure Of The '338'/'945 Patents

The '338 patent is directed to a "Remote Control System". The portion of the specification setting out the "SUMMARY OF THE INVENTION" of the '338 patent, summarizes the "objects" and "features "of the claimed invention as follows:

> "Accordingly, *the present invention teaches a remote control system* which, throughout this specification, is also referred to as a universal switch receptacle system.
>
> * * * *
>
> Another object of the present invention is to provide a receptacle which is shallow enough in depth and small enough in size so as to provide switching and circuit breaking functions of a type compatible with either remote control systems or ground fault circuit breaking signals.
>
> * * * *
>
> Another feature of the present invention resides in a novel cam arrangement *which can only be appreciated from the following more detailed description of the drawings and the components of the present invention disclosed therein, but suffice it to say that not only is a flip-flop cam arrangement taught by the present invention,* but its placement about a ground receptacle opening is a unique approach to space saving reliability of functioning."

Col. 1, line 38 - Col. 2, line 2 of the '338 patent.

In the subsequent section, beginning at col. 4 of the '338 patent, headed "DESCRIPTION OF A PREFERRED EMBODIMENT", the details of the remote control switch of the '338 patent invention are described. It is also stated, however, that "the basic switching arrangement described below may be utilized not only in conjunction with remote control wireless switching systems, but also in conjunction with circuit breaking mechanisms and systems, such as of the ground fault circuit interrupting type." (Col. 4, lines 2-7.)

The "flip-flop cam arrangement" invention is described beginning at col. 7, line 29 as follows:

"The reader's attention is now turned to a novel cam arrangement which serves as a flip-flop reciprocating rotor. A cam 132 shown in perspective in Fig. 13, is also shown in plan views within figs. 7, 8, 9, 10 and 11.

* * * *

Cam 132 is further formed with a pair of oppositely extending wing members 156 and 158 whose outer cam surfaces 160 and 162 are adapted to bear against and move surfaces 164 and 166, respectively, of leaf spring contact supporting members 168 and 170. (Col. 7, 11.61 *et seq.*)

* * * *

In operation, assuming a normal condition wherein fixed contacts 214 and 216 are engaged by their movable respective counterparts, 196 and 198, thereby providing current flow to a lamp or appliance, e.g., actuation of coil 74 in response to a signal generated by the electronic components heretofore described, will result in retraction of the body portion 96 of plunger 94 toward the center of opening 102 within coil 74. This retraction occurs against the biasing forces of helical spring 112 with the resulting movement of actuating member 104 and its kicker leg 120 in the same direction as plunger 94 (Col. 8, line 61 – Col. 9, line 5)

* * * *

…Yet further movement of kicker leg 120 … results in clockwise rotation of cam member 120(*sic*) [132] (Col. 9, 11. 16-18)

* * * *

In moving from the position shown in FIG. 9 to that of FIG. 10, the cam surfaces 160 and 162 of cam 132 have engaged and forcibly urged surfaces 164 and 166, together with their respective contact-carrying members 168 and 170, outwardly away from the axis of rotation of cam 132 (which is coaxial with the longitudinal axis of post 86), with the result that movable contacts 196 and 198 have been moved away from their respective contacted fixed contacts 214 and 216 to the position in Fig. 10. This clockwise motion of cam 32 as a result of the actuation of coil 74 has thus

resulted in breaking the electrical circuit as between the fixed and movable contacts herein described. It should also be noted that in the rest position shown in FIG. 10, cam 132 and its wings 156 and 158 *maintain disconnection of electrical connection as between the fixed and movable contacts at all times until the next sequential actuation of coil 74.* (Col. 9, 1123 – 40) (Emphasis Added)

\* \* \* \*

Thus, upon the next sequential actuation of coil 74, … cam 132 is urged in a counter clock-wise direction to the position originally described for FIG. 7 (Col. 9, Line 50–Col. 10, Line 1)

\* \* \* \*

With this counter clock-wise shifting of cam 132, interference between surfaces 160 and 162 with their respective surfaces 164 and 166 is eliminated, such that movable contacts 196 and 198 are able to return under the inward biasing influencing of spring members 168 and 170 until these contacts come into engagement and electrical communication with their fixed contacts counterparts, contacts 214 and 216.

*The cycles just described may be repeated any number of times as a result of signals generated either remotely or via other means.*" (Col. 10, 11. 5-15) (Emphasis added).

The drawings and the detailed description in the '338 specification thus make it clear that this "flip-flop cam" arrangement in the Remote Control Switch of the '338 Patent, permits continuing cycles of interrupting and completing of an electrical circuit automatically as a result of successive electrical or electronic signals.

### The Disclosure of the '894 Patent

The '894 patent is directed to a "Ground Fault Circuit Interrupting system". The specification of the '894 Patent begins by explaining that it is a "continuation-in-part application", and listing the earlier applications which it "incorporates by reference", as follows:

The present application is a continuation-in-part of applicants' both pending United States patent applications Ser. Nos. 431,982 now U.S. Pat. No. 4,518,945, filed Sept. 30, 1982 and entitled "REMOTE CONTROL SYSTEM" and Ser. No. 558,262 filed Dec. 5, 1983 and entitled "SHOCK HAZARD PROTECTION SYSTEM", and incorporates by

reference as if fully set forth herein the entire contents and subject matter thereof *and of any and all of their respective "parent" patent applications to which they are co-pending.*

(Col. 1, Lines 6-16) (Emphasis added).

Both sides agree that the '338 Patent expressly incorporated by reference is a *parent* to the '945 Patent and has a substantially identical specification and drawings.

The portion of the '894 specification setting out the "BACKGROUND AND SUMMARY OF THE INVENTION" of the '894 Patent, summarizes the "objects" and "features "of the claimed invention, and distinguishes it from the earlier patents, including the '338 Patent, and explains the reasons for incorporating the earlier applications, as follows:

> What is referred to herein as a "second" preferred embodiment of the present invention simply is meant to denote another in a continuous series of technical developments relating, directly and indirectly, to the breaking or interruptions of circuits upon the existence of predetermined conditions. Because of this common thread that runs through these developments, the author hereof has chosen to group same within this continuation-in-part application, rather than file same in a separate and distinct patent application. This will also serve to aid the Examiner in considering, collectively, the prior art of record in all applications.

(Col. 1, 11. 20-31) (Emphasis added).

> *...the second embodiment of this invention concentrates upon the ground fault circuit interrupting features of the invention.* In other words, in use, should predetermined conditions exist, such as by way of example only, a threat to life or property as a result of what is known in the art as a "fault", the second embodiment of the present invention will cause an interruption of the circuit within which the fault appears, in a sufficiently short response time, so as to attempt to avoid injury or serious shock ... this application is directed to the novel electromechanical and mechanical means by which, in response to a signal, the circuit is interrupted by a physical separating of electrically conducting contacts.

(Col. 1, 11. 35-50) (emphasis added).

> In addition to other objects already set forth herein, it is, accordingly, *an object of the second embodiment of the present invention to provide a dedicated ground fault circuit interrupting system* within a device small enough to fit within a standard outlet or receptacle box or those of varying shapes and configurations.

It is a further object of the present invention to provide such a circuit interrupting system, in which same may function as an ordinary household electrical wall receptacle, while also providing protective features.

Another object of this embodiment resides in a novel operation of mechanical components in response to a predetermined signal, thereby opening or interrupting a circuit.

(Col. 1, 11. 51– 64)

Finally:

> Yet another object is to provide such a system, in which a reset button and function is included.
>
> (Col. 2, lines 6-7.)

In the subsequent section, beginning at col. 2 of the '894 patent, headed "DESCRIPTION OF PREFERRED EMBODIMENTS", the details of operation of the "circuit interrupting or switching system or apparatus" of the '894 patent invention are described, beginning at col. 5, line 46, as follows:

> Upon the occurrence of a "fault" condition, which is predetermined, a signal is received by the electronic circuitry associated with system 310 but which is not part of the invention being presently claimed hereby, with the result that coil assembly 346 is energized. The energization of coil 346 results in the generation of a magnetic field therearound with the aid of mounting strap 326, with the further result that plunger 348 is forcibly drawn toward coil 346. FIGS. 6 and 7 illustrate the disposition of latching members 426 and 428 at portions 464 between front and rear banger dogs 360 and 362 within their respective gaps 364 described above.
>
> Upon energization of coil 346 and the forcible movement of plunger 348 toward the coil and against the compressive forces of banger return spring 370, the banger is thus to likewise move, with the result that rear banger dogs 362 "bang" or hit against latching member portions 470, dislodging latching fingers 430 from engagement with the undersides of ends 460 of the movable contacts as a result of rearward pivotal movement of the latching members, with the further result that the movable contact arms 462 swing downwardly under spring pressure such that the movable and fixed contacts are separated, thereby "breaking" or interrupting the normally closed operating circuit. *The circuit remains open until reset by means of the reset button 444 in the manner already described.*
>
> (Col. 5, line 46 – Col. 6, line 4) (emphasis added.)

The automatic features of the GFCI of the '894 Patent clearly end after the first circuit interruption, thereafter requiring manual interaction from an operator to reclose the circuit. The incorporation by reference of the disclosure of the '338 and '945 Patents does not change what is the invention of the '894 Patent.

As Steve Campolo explains in his Expert Report (Exhibit B) and in his Declaration (Exhibit C) filed concurrently herewith, a GFCI must not automatically close a broken circuit responsive to another electrical signal. Furthermore, one of ordinary skill in this art would be aware that a GFCI is prohibited from automatically closing in response to subsequent electrical signals, and thus the function of the GFCI may not be met by the mechanical system shown in the '338/'945 patents. The function of the GFCI, i.e., "selectively interrupting an electrical connection" is set forth in the preamble to the claims of the '894 Patent. Contrariwise, the functions of the Remote Control Switch, of the '338/'945 Patents, i.e., "selectively completing or interrupting an electrical connection", are set forth in the preamble to the claims in those patents.

## ARGUMENT

### Construction of Claims

Both sides apparently agree that before reaching a determination as to whether the claims of the '894 Patent are patentably distinct from the claims of the '338 Patent, the court must construe the claims of both patents, and then determine the differences. *Eli Lilly v. Barr*, 251 F.3d 955, 967, 58 U.S.P.Q. 2d 1869, 1878 (Fed. Cir. 2001), citing *Georgia-Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322, 1326, 52 U.S.P.Q. 2d 1590, 1593 (Fed. Cir. 1999). After determining the differences between the claims, the court next "determines whether the differences in subject matter between the two claims render the claims patentably distinct." *Id.* Clearly, both of these steps, involving the proper construction of a claim, presents a question of

law to be determined by the Court.[1]  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (in banc), *aff'd*, 116 S. Ct. 1384 (1996).

Plaintiff has construed the claims in its earlier motion for Summary Judgment That Defendants' Products Infringe The Asserted Claims Of The '894 Patent, filed with this court on July 21, 2003.  Clearly, however, there are additional points that must be discussed in this brief to point out the legal errors in defendants' position, and thus to further support the earlier construction as covering the structure disclosed in the drawings filed as part of the application for the '894 Patent, and their equivalents, and not the structure in the drawings of the '338/'945 Patents.  This additional discussion was not needed to construe the claims for purposes of finding infringement.  It is pointed out that the construction shown in this motion is identical to that in the prior motion.   It is well settled that a claim construction for purposes of determining infringement must not be different from the claim construction for purposes of determining validity.  *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses"); *Smithkline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 882 (Fed. Cir. 1989).

Defendants are plainly wrong, however, in asserting that "the only canons of claim construction at play in the present motion are those surrounding the doctrine of incorporation by reference and those surrounding interpretation of claims drafted in 'means-plus-function' format pursuant to 35 U.S.C. 112, Sixth Paragraph."  Although 35 U.S.C. 112 is clearly critical to determining the proper construction of the claims of the '894 Patent, the administrative rules

---

[1]     The Federal Circuit acknowledged in *Markman* that a court may construe patent claims in the context of dispositive motions such as Rule 56 summary judgment motions.  *See Markman*, 52 F.3d at 981.

regulating acceptable 'incorporation by reference', as set forth in the MPEP, are not binding on the courts. Rather, it is explained in the MPEP that such rules are intended to insure that there is a full disclosure of all "essential material" required for a full disclosure necessary to support the invention claimed in the patent. They do not affect the proper construction of the claims.

The defendants implicitly dismiss, and in their subsequent arguments avoid, discussing the significant requirements that all claims are to be construed as they would be understood by one skilled in the art in the context of the specification of that patent, and that if possible the claim should be construed so as to find it valid, in order to conform to the statutory presumption of validity of an issued patent. These will be discussed herein.

The Federal Circuit has made clear that "[I]t is the person of ordinary skill in the field of the invention through whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field." *Hoechst Celanese Corp. v. B.P. Chems. Ltd.*, 78 F. 3d 1575, 1578 (Fed. Cir. 1996). Moreover, even "words of ordinary usage must nonetheless be construed in the context of the patent documents. Thus, the court must determine how a person of experience in the field of this invention would, upon reading the patent documents, understand the words used to define the invention." *Toro v. White Cons Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999). The defendants completely avoided any discussion of the "person skilled in the art" and how such a person would read the claims in light of the specification and drawings (in the case of both the '894 patent-in-suit and of the plaintiff's earlier '338/'945 patents). Thus, the defendants completely failed to even try to apply this legal requirement that the Federal Circuit precedent has recognized to be necessary.

It is also well settled that the law mandates that a patent is presumed valid[2] and its language and disclosures must determine the meaning of its claim terms. *Modine Mfg. Co. v. U.S. Int'l Trade Commission*, 75 F.3d 1545, 1556 (Fed. Cir. 1996) ("[w]hen claims are amenable to more than one construction, they should when reasonably possible be interpreted so as to preserve their validity").

Further, the Federal Circuit has determined that when reviewing a claim it is necessary to review the claim in the context of the specification disclosure, which constitutes the "intrinsic evidence". The objective and contemporaneous record provided by the intrinsic evidence is the most reliable guide to help the court determine which of the possible meanings of the terms in question was intended by the inventor to particularly point out and distinctly claim the invention. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250, 48 USPQ 2d 1117, 1122 (Fed. Cir. 1998) ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").

By failing to give consideration to how a person skilled in the art would read the claims of the '894 patent, in the context of the specification, the defendants have completely failed to make any rational showing that would allow the court to properly construe the claims of either patent. Accordingly, the plaintiff Leviton shall review the claims of both the '338/'945 patents and of the '894 patent-in-suit in the context of their respective specifications and in light of the knowledge of one skilled in the art, in order to obtain a true construction of the claims.

---

[2]    Issued patents are presumed valid.  35 U.S.C. § 282.  The presumption of validity applies independently to each claim of the patent, *id.*, and can be overcome only by clear and convincing evidence of invalidity. *Massey v. Del Lab, Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997).

### The Claims of the '338 Patent

There are four claims in the '338 patent, only Claim 1 being an independent claim. Accordingly, that claim shall be construed first in this discussion. When construing Claim 1 of the '338 Patent,[3] the reference in the 'preamble' to "Switching apparatus for selectively completing or interrupting an electrical connection between input and output conductors," clearly refers to the "flip-flop cam arrangement" described in the 'SUMMARY' of that specification, recited above (Col. 1, line 67, of the '338 Patent), which permits remotely controlled, successive cycles of interrupting and completing of a circuit, in response to a series of electrical or electronic signals.

The defendants' conclusion regarding the '338 claims seems to be correct, in that they agree that the claims are directed to the device shown in the drawings and described in the specification, as having the cycling flip-flop cam system.

Claims 2 and 3, which are both ultimately dependant on Claim 1 of the '338 Patent, merely add specific details to the "movable actuating means" which works with the 'armature' and to "the cam means". Dependant Claim 4 adds a further detail to the location of an electrical conductor entering through the axis of the cam means.

### The Claims Of The '945 Patent

As explained above, the '945 Patent disclosure, i.e., the specification and drawings, are substantially identical to that of the '338 Patent. As a result, when construing the claims the same invention is generally disclosed. The claims of the '945 Patent (Exhibit A2) are more specific than those of the '338 Patent, in defining the remote control switch invention. The preamble to the sets of claims in both patents are identical, i.e., "[S]witching apparatus for selectively completing or interrupting an electrical connection between input and output

---

[3] Claim 1 is set forth in Exhibit A1 hereto.

conductors ...", and clearly is directed to the same generic invention as is discussed above, with respect to the '338 Patent. In both patents, the claims define a Remote Control Switch, which is cyclically operated by a "flip-flop cam" arrangement, which can be cyclically and successively rotated between an interrupted circuit position to a completed circuit position, in response to successive electrical signals.

**The Claims Of The '894 Patent Must Also Be Construed In
Light Of The Language Of The Claim And Of The Specification**

It is believed that there is no significant difference between the parties as to the scope of the claims of the '338/'945 Patents. The more interesting discussion relates to the proper way to construe the claims of the '894 Patent (Exhibit A3), particularly Claim 1, the only independent claim. Clearly, the same general rules apply, and the claim must be construed in the context of the language of the claim and of the specification, as they would be understood by one skilled in the art.

Furthermore, if possible, the construction should be one resulting in a valid claim, as discussed *supra*. Accordingly, when a claim is being construed in accordance with 35 U.S.C. § 112, ¶ 6, the scope of the claim must be limited so as to exclude any equivalent structures which are disclosed in the prior art. *Wang Lab., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999). Thus, as long as the construction of a claim is consistent for determining both the issue of infringement and the issue of validity, the claim must be construed with respect to equivalent structures to that shown in the specification, sufficiently narrowly as required to avoid the prior art. *Id.*

The 'incorporation by reference' into the '894 Patent of the "entire contents and subject matter" of the '945 Patent, another earlier filed, copending application (which never issued as a patent) and "any and all of their respective 'parent' patent applications to which they are co-

pending" (Col. 1, lines 12-16), does not increase the scope of the invention defined by the '894 Patent and its claims to one where they are invalid for double patenting in view of the claims of the '338/'945 Patents. In the opening paragraph of the "BACKGROUND AND SUMMARY OF THE INVENTION", the '894 patentees explain the reasons for choosing "to group" the present invention of the '894 Patent "within this continuation-in-part application, rather than file same in a separate and distinct application", i.e., because of a "common thread that runs through these developments", and to "also serve to aid the Examiner in considering, collectively, the prior art of record in all applications." (Col. 1, lines 20-30).

The specification also explains the meaning of the term "second preferred embodiment of the present invention" as being intended to "denote another in a continuous series of technical developments relating, directly and indirectly, to the breaking or interruptions of circuits upon the existence of predetermined conditions", which form a "common thread". Most significantly, the specification also distinguishes this "second embodiment" from what came before by stating that "this invention concentrates upon the ground fault circuit interrupting features of the invention." That is, should there be a "'fault', the second embodiment of the present invention will cause an *interruption of the circuit*... so as to attempt to avoid injury or serious shock." (emphasis added) (col. 1, 11. 40-44). To one skilled in the art, as explained by Leviton's expert, Steve Campolo, in his Declaration (Exhibit C, paragraph 8), the reference to "ground fault circuit interrupting" has a special meaning which could not include the 'flip-flop' cam switch of the '338 patent. As Mr. Campolo explains, a ground fault circuit interrupter must not automatically cycle back to a closed circuit, upon receiving a further electrical signal.

The preamble of the claim reflects the language of the specification, in being limited to "Switching apparatus for selectively interrupting an electrical connection ....". Thus, the

language of both the specification and the claim makes very clear that this incorporation by reference did not change what was intended to be the invention of the '894 Patent: "this invention concentrates upon the ground fault circuit interrupting features of the invention."(Col. 1, ll. 35-37). Accordingly, the '894 claims must be directed to that invention, i.e., a GFCI.

### Reading The '894 Specification As It Would Be Understood By One Of Ordinary Skill In The Art, The Claims Must Be Construed In Terms Of A GFCI System

In *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1341, 1345 (Fed. Cir. 2001), the Federal Circuit held that "[w]here the specification makes clear that an invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent." *Scimed*, 242 F.3d at 1345. A particular structure can be deemed outside the reach of the claims because that structure is clearly excluded from the claims, whether the exclusion is express or implied. *Id.*

As is explained by Steve Campolo in his Expert Report and concurrently filed Declaration one skilled in the art would not consider using in a GFCI system, the flip-flop cam system of the '338/'945 Patents. GFCI's must not permit a "sequential actuation of coil 74" which would permit the circuit to be reclosed ('338 Patent, Col. 9, line 50 – Col. 10, line 15)(Exhibit D, ¶8). Such a flip-flop cam system is not at all suitable for the GFCI invention of the '894 Patent, because the requirements of the art-recognized standards for a GFCI do not permit the GFCI to automatically reclose a circuit upon the receipt of a subsequent electrical or electronic signal. That is, although the '338/'945 Patents "cam means" disclosure, may be incorporated into the '894 Patent specification, it must be excluded from the claims of the '894 Patent because its function is not part of what one skilled in the art would recognize as proper for an invention directed to a GFCI, *Multiform Dessicants*, *supra*, and *Scimed*, *supra*.

Defendants appear to argue that the Court may ignore this requirement as to the understanding of "one of ordinary skill in the art", but also submit an improperly belated "Expert Report" of an Engineer.  It is submitted that by failing to submit the expert report in accordance with the schedule set by the Court, at a time when the discovery period has passed, the defendants have waived their right to submit expert testimony and the Haynes material should be disregarded. Apparently the defendants did not consider the documents especially relevant, as they nowhere apply the information to their arguments, nor do they offer the expert up for a deposition. Mr. Haynes is not apparently retained by defendants. Absent the ability to take the deposition the declaration is improper.

Defendants do argue that expert testimony on the issue of the knowledge of one skilled in the art is not "necessary or proper".  The defendants argue that the patent involves "simple technology and relatively straightforward claim language".  However, we are dealing with the technology of electricity and magnetism, matters which are not usually considered to be self-evident or intuitive to the layman.  Certainly the understanding of the necessary features of a GFCI is not something generally understood.  Accordingly, Mr. Campolo's testimony is not intended to change of contradict the language of the claim, but to explain its implicit meaning to the persons, such as he himself, who are skilled in the art of electrical circuit breakers.  As the Federal Circuit recognized, even "words of ordinary usage must nonetheless be construed in the context of the patent documents.  Thus, the court must determine how a person of experience in the field of this invention would, upon reading the patent documents, understand the words used to define the invention." *Toro v. White Cons Indus., Inc., supra.*

When reference is made to the '894 specification, it is clear from the Title ("GROUND FAULT CIRCUIT INTERRUPTING SYSTEM") and from the text of the "BACKGROUND

AND SUMMARY OF THE INVENTION" portion of the specification, that the invention disclosed in this '894 Patent is a "ground fault circuit interrupting system," or device. The system defined by the '894 claims is one that is implicitly limited by that disclosure, *Scimed, supra*.

### The Preamble In The '894 Claim 1 Gives Life And Meaning To The Claim

The significance of the preamble in the claims of the three patents under consideration, *i.e.*, the '338/'945 Patents and the '894 Patent, is that they reflect the intended function of their respective inventions. Specifically, the preamble to Claim 1 of each of the '338/'945 Patents recites "[s]witching apparatus for selectively *completing or interrupting* an electrical connection between input and output conductors."(emphasis added). That language clearly describes the cyclical, flip-flop cam arrangement of the Remote Control Switch invention of the '338/'945 specification. The preamble to Claim 1 of the '894 Patent recites "[s]witching apparatus for selectively *interrupting* an electrical connection between input and output conductors...." (emphasis added). That language clearly describes the GFCI, which only responds to an electrical or electronic signal by *interrupting* the circuit. A GFCI cannot, and should not, recycle to complete the circuit, as does the switch of the '338/'945 Patents (Exhibit D, ¶8). Clearly, the preambles in these three patents delineate the invention intended to be claimed, in accordance with the invention disclosed in their respective specifications. The preambles thus are significant in defining the invention covered by the respective claims. *Bell Comm. Research , Inc. v. Vitalink Comm. Corp.*, 55 F.3d 615, 620-621 (Fed. Cir. 1995).

The invention defined by the claims of the '894 Patent, including the preamble to Claim 1, is a switch which only "interrupts" a circuit. The "effect preamble language should be given can be resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Corning Glass Works v.*

*Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251, 1257, 9 U.S.P.Q. 2d 1962 (Fed. Cir. 1989). To read the claim in light of the specification indiscriminately to cover all types of switches, including both the GFCI type, which only interrupts the circuit, and the on/off, flip-flop type switches, that can signal both on and off remotely, "would be divorced from reality and from the context of the specification." The invention of the '894 Patent is restricted to those switches that are circuit interrupters, only. *Id.*

### The Construction Of A Claim Must Reflect The Entire Patent Record.

When construing claims of a patent, the claims must be read in terms of the disclosure of the specification and is limited by what is disclosed in the specification *C.R. Bard, Inc. v. M3 Systems Inc.,* 157 F.3d 1340, 1343 (Fed. Cir. 1998) (citing *Slimfold Mfg. Co. v. Kinkead Indus., Inc.,* 810 F.2d 1113, 116 (Fed. Cir. 1987) (observing that claims are not interpreted "in a vacuum" but are read and understood in light of the specification of which they are a part); *see also Bell Comm.,* 55 F.3d at 621 (holding that it is legal error to construe a claim by considering it in isolation. A claim must be read in view of the specification of which it is a part). This is especially true in the case of a "means-plus-function" limitation, which must be construed in accordance with 35 U.S.C. § 112, ¶ 6. That statute requires that the specification be reviewed to determine the structure disclosed to carry out the particular function defined in the claim, and their equivalents. *Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1264 (Fed. Cir. 1999).*

The specification of the '894 Patent makes very clear that its invention is a "Ground Fault Circuit Interrupting System." As such, when the '894 claims are construed in accordance with the specification and drawings in the '894 Patent, as they would be understood by one of ordinary skill in the art, they must define such a Ground Fault Circuit Interrupting System. See *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473 (Fed. Cir. 1998); *see also E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430 (Fed. Cir. 1988).

Although the "entire contents and subject matter" of the '945/'338 Patent and the '262 application are incorporated by reference in the present patent, together with "any and all of their respective 'parent' patent applications" it is clear that they are incorporated only in the context of supporting the embodiment which is actually disclosed in the original text of this '894 patent. (col. 1, lines 20-68). Just as in an interference count the interpretation of a term "must be taken from the application in which the counts originated", *Kropa v Robie*, 187 F. 2d 150, 88 U.S.P.Q. 478 (CCPA, 1951), in this case the meaning of the means plus function language must be taken from the description in the '894 Patent itself.

Accordingly, construing the language of the claims of the '894 Patent requires reference to the embodiment that meets the limitation of only providing for "interrupting an electrical connection", which is the embodiment set out in the body of the '894 Patent.

It is incontestable that the '894 Patent, on its face, "incorporates by reference as if fully set forth herein the entire content and subject matter of" the parent and grandparent applications and patents. However, the subject matter of this patent remains a ground fault circuit breaker, and not a "Remote Control System," as in the '338 Patent. To the extent one skilled in the art would recognize that portions of the Remote Control system may be useful in explaining the operation of the GFCI, it would be considered. But the flip-flop cam is clearly outside of claims to an invention for a GFCI, that require that the ultimate function be "selectively interrupting an electrical connection ...," and not both "selectively completing or interrupting ...," which is the hallmark of a remote control, on-off, or "flip-flop" switch.

**Construing The 'Means Plus Function' Limitations**

Fully construing the claims of the '894 Patent requires a construction of the "means-plus-function' limitations, namely the "plunger means" and the "movable means responsive to

movement of said plunger means." Construction of these means-plus-function limitations requires reference only to the drawings and specification of the '894 Patent to determine the structural nature of these limitations based upon their stated function, as understood by one of ordinary skill in the art. Defendants seek to insinuate the incorporated disclosure of the '338 Patent into the construction of these terms. However, in the overall context of the '894 Patent, which limits the scope of the incorporation by reference to certain 'common threads', it is seen that the 'flip-flop' cam means of the '338 disclosure does not meet the required function of the claims of the '894 Patent, which are directed to circuit interrupters, not flip-flop cam switches.

When construing a "means-plus-function" limitation in accordance with 35 U.S.C. § 112, ¶ 6, the specification must be reviewed to determine the structure disclosed to carry out the particular function defined in the claim, and their equivalents. *Odetics,* 185 F.3d at 1264 . In respect to the claims of the '894 Patent, any such 'function' must be one associated with ground fault circuit interrupters, as that would be understood by persons skilled in the art. *Multiform Desiccants, Inc. v. Medzam Ltd.,* 133 F.3d 1473 (Fed. Cir. 1998); *see also E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430 (Fed. Cir. 1988).

Once it has been determined that GFCIs are the subject matter of the '894 Patent, the "movable means" can only be a part of the GFCI system described and shown in the specification and drawings of the '894 application as filed, and includes a "first movable means" that is a longitudinal element that moves longitudinally when the plunger is moved by the magnetic field generated by the coil means, and a "second movable means," which is a "latching means" that is moved away from the movable contact by the "first movable means." Specifically, the plunger 348 (referring to figure 6 of the '894 Patent) as it moves upwardly and into the coil 346, pulls the longitudinal element 354, referred to as the "banger," which in turn as

it moves upwardly, moves the latching member portions 470, which causes the latching finger 430 to be dislodged and moved away from the spring-loaded movable contact arm 462, which is thus released, releasing the spring-biased movable contact 466 to move away from the stationary contact 468, thus "interrupting" the electrical connection. As can be seen from the views of Figures 7 and 8 of the '894 Patent, even if the coil were to receive a further signal to energize and thus move the plunger again, movement of the plunger and of the banger 354 would have no effect on reclosing the contacts 466, 468, which are spring biased apart. Accordingly, the claims of the '894 Patent do not include the "flip-flop", "movable cam means" of the claims of the '338/'945 Patents. Therefore, the same invention is not described in the claims of the '338/'945 Patents as in the claims of the '894 Patent.

Accordingly, following the binding precedent of the Federal Circuit, the claims of the '894 Patent define a mechanism for a ground fault circuit interrupting switch that is different from the "flip-flop" remote switching mechanism disclosed in the specification and drawings of, or claimed in the claims of, the '338/'945 Patents. There is no basis for construing the GFCI claims of the '894 Patent as including the switch structure of the '338/'945 Patents.

It is clear that when the claims are construed properly in accordance with 35 U.S.C. § 112, ¶ 6, there is no anticipation of claim 1 of the '894 Patent by either the claims or the specification disclosure of the '338 Patent or the '945 Patent.

## CONCLUSION

Based on the foregoing, the Court should deny USI's motion for summary judgment, and should construe the claims of the '894 Patent as set out above by Leviton, so that they are all directed to a GFCI, in accordance with the language of the patent specification and claims. As a result, the Court should deny the instant motion, by finding the construction requested by plaintiff.

Dated: August 7, 2003

Respectfully submitted,

_____/s/_____
D. Christopher Ohly, Esq.
BLANK ROME COMISKY & McCAULEY, LLP
250 West Pratt Street
Suite 1100
Baltimore, MD 21201
Telephone:  (410) 659-1400
Facsimile:  (410) 659-1414

Paul J. Sutton
Joseph M. Manak
Barry G. Magidoff
Joseph G. Lee
GREENBERG TRAURIG, LLP
885 Third Avenue
New York, New York 10022
Telephone:  (212) 801-2100
Facsimile:  (212) 688-2449

Attorneys for Plaintiff
LEVITON MANUFACTURING CO., INC.

*EXHIBIT A1*

*CLAIMS OF THE '338 PATENT*

1. Switching apparatus for selectively completing or interrupting an electrical connection between input and output conductors, or the like, comprising, in combination: a housing; a magnetizable armature disposed within a portion of said housing and being movable between first and second positions; electromagnet coil means disposed within said housing for moving said armature when energized from the first position to the second position; an input contact electrically connected to said input conductor; an output contact electrically connected to said output conductor; strap means for mounting the switching apparatus upon a selected surface, said strap means including portions thereof which define a path of the magnetic field generated by said coil means to influence the position of said armature, and movable cam means responsive to movement of said armature for influencing a separation of said input and output contacts, thereby interrupting electrical connection between them.

2. Apparatus according to claim 1, further including movable actuating means having portions thereof in contact with said armature means for influencing the position of said cam means.

3. Apparatus according to claim 2, wherein said cam means includes portions thereof disposed in the path of said actuating means.

4. Apparatus according to claim 1, wherein said cam means is supported for rotary movement about an axis which substantially coincides with an axis of entry of an electrical connector to be joined with the switching apparatus.

EXHIBIT A2

CLAIMS OF U.S. PATENT NO. 4518945

1. Switching apparatus for selectively completing or interrupting an electrical connection between input and output conductors, or the like, comprising, in combination: a housing; a magnetizable armature disposed within a portion of said housing and being movable between first and second positions; electromagnet coil means disposed within said housing for moving said armature when energized from the first position to the second position; an input contact electrically connected to said input conductor; an output contact electrically connected to said output conduct; strap means for mounting the switching apparatus upon a selected surface, said strap means including portions thereof which define a path of the magnetic field generated by said coil means to influence the position of said armature, and movable cam means responsive to movement of said armature for influencing a separation of said input and output contacts, thereby interrupting electrical connection between them, said apparatus further including movable actuating means having portions thereof in contact with said armature means for influencing the position of said cam means, said movable actuating means including kicking means for contacting and causing alternating rotary and counter-direction rotary movements of said cam means in response to movement of said armature, said rotary and counter-direction rotary movements causing electrical paths to open and close, said movable cam means being formed with an opening therethrough, thereby providing a recess into which a conducting pin of an electrical plug is able to be positioned, during use, without interfering with the operation of both the cam means and parts with which it cooperatively engages.

2. Apparatus according to claim 1, wherein said cam means includes portions thereof disposed in the path of said actuating means.

3. Apparatus according to claim 1, wherein said cam means is supported for rotary movement about an axis which substantially coincides with an axis of entry of an electrical connector to be joined with the switching apparatus.

4. A system for controlling lighting and electrical apparatus within an electrically wired building comprising in combination: a power main of the building, at least one power outlet of the main, a transmitter unit having: input means for entering of any of a plurality of addresses into the transmitter unit, means for generating synchronously with the mains voltage, a multibit digital signal, comprising a multibit digital address signal representing an entered address, the digital signal being modulated on a carrier the frequency of which is a plurality of times greater than mains frequency, so that the bits of the digital signal comprise predetermined numbers of cycles of the carrier, the predetermined numbers depending upon the bit values, a period within each bit occurring near a zero crossing point of the mains voltage, and output means for coupling the modulated digital signal onto the main, and at least one slave unit for controlling the supply of power to an apparatus and having: means for defining an address for that slave unit, a power input coupled to the main within the building, means for receiving from said power input said digital signal, means for recognizing the logical values of the bits of the received digital signal by counting during said period the number of cycles of the carrier and determining the value of the bit with respect to non-overlapping number ranges one of which will contain the counted

number, and means for comparing the digital address signal received by the receiving means with the address of the defining means and for rendering the slave unit operable to effect an apparatus power supply control operation when correspondence is found between said address and the digital address signal, said transmitter being coupled to a power outlet of the main so as to be usable optionally at various places within the building, a switching apparatus for selectively completing or interrupting an electrical connection between input and output conductors, the switching apparatus comprising: a housing including a normally accessible face portion; a magnetizable armature disposed within a portion of said housing and being movable between first and second positions; electromagnet coil means disposed within said housing for moving said armature when energized from the first position to the second position; an input contact electrically connected to said input conductor; an output contact electrically connected to said output conductor; strap means for mounting the switching apparatus upon a selected surface, said strap means including portions thereof which define a path of the magnetic field generated by said coil means to influence the position of said armature, and movable cam means responsive to movement of said armature for influencing a separation of said input and output contacts, thereby interrupting electrical connection between them, said apparatus further including movable actuating means having portions thereof in contact with said armature means for influencing the position of said cam means, said movable actuating means including kicking means for contacting and causing alternating rotary and counter-direction rotary movements of said cam means in response to movement of said armature, said rotary and counter-direction rotary movements causing electrical paths to open and close.

5. A slave unit for use in connection with a domestic electrical power main, or the like, comprising, in combination: means for connecting the power input of an electrical apparatus to the unit; a current control means for controlling the energization of the apparatus; means for defining an address for the unit; and means responsive to a multibit digital signal arriving at the unit, modulated on a carrier having a frequency a plurality of times greater than the main frequency, the responsive means including counting means for counting the number of cycles of the carrier in periods which are short in relation to a half-cycle of the mains voltage and which are substantially near zero crossing points of the main voltage; means for determining the values of the bits with respect to non-overlapping ranges one of which will contain the counted numbers of said periods; and a comparator for comparing the address defined by the defining means with one portion of the digital signal and for producing a signal to control the current control device in dependence upon another portion of the digital signal when correspondence is found between said address and said one portion of the digital signal, said slave unit including a switching apparatus for selectively completing or interrupting an electrical connection between input and output conductors, the switching apparatus comprising a housing including a normally accessible face portion; a magnetizable armature disposed within a portion of said housing and being movable between first and second positions; electromagnet coil means disposed within said housing for moving said armature when energized from the first position; an input contact electrically connected to said input conductor; an output contact electrically connected to said output conductor; straps means for mounting the switching apparatus upon a selected surface, said strap means including portions thereof which define a path of the magnetic field generated by said coil means to influence the position of said armature, and movable cam means responsive to movement of said armature for influencing a separation of said input and output contacts, thereby interrupting electrical connection between them, said apparatus further including

movable actuating means having portions thereof in contact with said armature means for influencing the position of said cam means, said movable actuating means including kicking means for contacting and causing alternating rotary and counter-direction rotary movements of said cam means in response to movement of said armature, said rotary and counter-direction rotary movements causing electrical paths to open and close.

EXHIBIT A3

CLAIMS OF U.S. PATENT NO. 4595894

1. Switching apparatus for selectively interrupting an electrical connection between input and output conductors, or the like, comprising, in combination: a housing; magnetizable plunger means disposed within a portion of said housing for movement between first and said housing for moving said plunger means when energized from the first position to the second position; an input contact electrically connected to said input conductor; an output contact electrically connected to said output conductor; strap means for mounting the switching apparatus upon a selected surface, said strap means including portions thereof which define a path of the magnetic field generated by said coil means to influence the position of said plunger means, and movable means responsive to movement of said plunger means for influencing a separation of said input and output contacts, thereby interrupting electrical connection between them, said movable means including first and second movable members, movement of said second member being caused by movement of said first member.

2. Switching apparatus according to claim 1, wherein said first member is movable with and opperatively connected to said plunger means.

3. Switching apparatus according to claim 1, wherein said plunger means comprises a plunger member formed with a relatively elongated portion which extends into portions of said electromagnetic coil means.

4. Switching apparatus according to claim 1, further including spring means for returning said plunger means to said first position after energization of said coil means.