## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| LEVITON MANUFACTURING, INC. | ) |
| (Plaintiffs) | ) |
| v. | )    01CV3855 AMD |
| UNIVERSAL SECURITY INSTRUMENTS, INC. | ) |
| and | ) |
| USI ELECTRIC, INC. | ) |
| (Defendants) | ) |

## EXPERT WITNESS REPORT OF LAWRENCE J. GOFFNEY, JR.

### I.   INTRODUCTION

#### A.   Retention In This Matter

1.    Universal Security Instruments, Inc. and USI Electric, Inc. (jointly and severally "USI") have retained me as an expert consultant in the above-captioned case involving Leviton Manufacturing, Inc. ("Leviton"). I submit this report pursuant to Federal Rule of Civil Procedure 26(a)(2).

2.    I have been asked to explain my understanding of the practices and procedures before the PTO that applied during the prosecution[1] of patent application Serial No. 06/431,982 (the "'982 application") that issued as United States patent No. 4,518,945 (the "'945 patent"), patent application Serial No. 558,262 (the "'262 application") and patent application

---

[1] The term "prosecution" is the process of initiating and pursuing in the PTO an application for claims to an invention. The pursuit usually involves exchanges of documents and other written communications between the PTO and the applicant/ inventor or the applicant/inventor's patent attorney or agent. The outcome of a prosecution is the awarding of claims to the applicant or applicants by the PTO's granting a patent to the applicant or applicants.

Serial No. 716,991 (the "'991 application") that issued as U.S. Patent No. 4,595,894 (the "894 patent") (all three applications being called in this report the "Doyle-Rivera applications").

3.    The purpose of my testimony will be to set forth an appropriate framework for understanding the transactions between, on the one hand, Messrs. Richard C. Doyle and Lester Rivers, the inventors of the subject matter claimed in the Doyle-Rivera applications that lead to the issuance of the '894 patent, and their representatives before the PTO and, on the other hand, the examiners of these patent applications and the Commissioner's designee for issuing certificates of correction for mistakes in the published '894 patent.

4.    I have also been asked to opine whether USI had access to information by which it could ascertain the scope of claim 1 of the flawed '894 patent.

5.    I also have been asked to opine on whether material information that should have been disclosed to the PTO was not disclosed by Mr. Richard C. Doyle and Mr. Lester Rivera, their representatives before the PTO, or others who were associated with Leviton and who participated in the preparation or prosecution of any of the Doyle-Rivera applications.

6.    I understand that it is improper for an attorney who is not acting as counsel in this case to instruct the judge (or jury) on the law. I also understand that it is improper for a patent practice and procedure expert to instruct the judge (or jury) on the law. I do not intend to have my analyses flawed by overstepping my role as an expert on the practice and procedure of the United States Patent and Trademark Office ("PTO") by opining on the law. Accordingly, I refer in this declaration to statutes and regulations only as the Manual of Patent Examining Procedure (the "M.P.E.P.") uses those references. The M.P.E.P. is not law; rather, it sets forth, as administrative policy, procedures that any patent examiner in the PTO is "required or authorized to follow in appropriate cases in the normal examination of a patent application."

[*See* the Forward to the M.P.E.P.]. I proffer M.P.E.P. instructions and guidance as what a "reasonable examiner" would have done, since any examiner should follow the M.P.E.P. Finally on this point, since examiners, even Primary Examiners, were not designated by statute to examine patents (the statute only designated the Commissioner as being authorized to examine or superintend the examination of applications) no particular examiner's examination is considered authorized unless it complies with the M.P.E.P., I will not talk about particular examiners that I knew at the PTO or my own particular practice as an examiner in the PTO as a basis for interpreting the actions of an examiner in the examination of the Doyle-Rivera applications.

7.    I am receiving $400 per hour, which is my standard consulting fee, for my work in this matter. My compensation is not dependent upon my testimony or the outcome of this litigation.

**B.    Qualifications**

8.    I am a patent attorney registered to practice before the United States Patent and Trademark Office (the "PTO"). I am a former Assistant Commissioner of Patents and Trademarks of the United States ("Assistant Commissioner for Patents"), and the former Acting Deputy Assistant Secretary of Commerce and Deputy Commissioner of Patents and Trademarks, the third and second ranked executive positions in the PTO, respectively. Further, I have been a patent examiner at the PTO.

9.    I am licensed to practice law before the state and federal courts of the State of Michigan and before other federal courts, including the U.S. Court of Appeals for the Federal Circuit. I am active in the intellectual property bar, having served as chairman and member of various intellectual property association committees, and I have lectured frequently

about patent law, patent policy, and policy and procedures of the PTO to local, state, national, and foreign bar associations, and to scientific and technical communities.

10.    Prior to my appointment as Assistant Commissioner for Patents, I was a patent attorney and partner specializing in intellectual property law at the law firm of Dykema Gossett PLLC, with its principal offices located in Detroit, Michigan. I was also resident in its Bloomfield Hills, Michigan, offices.

11.    While at Dykema Gossett, I served as the partner in charge of reviewing all correspondence issuing from the intellectual property section of Dykema Gossett. As a particular part of that responsibility, I was to review all opinion letters from the section in addition to those opinion letters over my signature or initialed by me to indicate my substantive review of an opinion letter written by a senior associate.

12.    For a short time before joining Dykema Gossett, I was associated with the law firm of Cullen, Sloman, which merged with Dykema Gossett. Both at Dykema Gossett and Cullen, Sloman, I conducted and managed patent clearance[2] searches and wrote infringement and validity opinions for clients, as well as prosecuted patent and trademark applications, counseled clients on all types of intellectual property, and managed and supported litigation matters.

13.    Before I was engaged in private practice in the State of Michigan, I was a patent examiner in the PTO.

14.    I have been a law professor on the faculties of the University of Texas and the University of Detroit, as well as a visiting law professor at the University of Wisconsin and a Fellow in Law and the Humanities at Harvard University and the Harvard Law School.

---

[2] I use the term "patent clearance" to mean advising a client that the client was free to engage in an activity without facing liability for infringement of a patent.

15.    I served as the Assistant Commissioner for Patents from 1994 to 1996. As Assistant Commissioner for Patents, I was responsible for all aspects of the functioning of the United States patent organization (the "Patent Office"), including the prosecution of patent applications, the training of patent examiners and the evaluation of the work of all patent examiners. I visited the European Patent Office and other foreign patent offices, studied their examining procedures, and attended Trilateral Meetings with officials of the European Patent Office and the Japanese Patent Office in an ongoing project directed to understanding and improving examination procedures in all patent offices. As Assistant Commissioner for Patents and later as Deputy Commissioner of Patents and Trademarks, I was a judge on the Board of Patent Appeals and Interferences, reviewing appeals from final rejections of applications made by patent examiners.

16.    Beginning in 1996, I served as Acting Deputy Assistant Secretary of Commerce and Deputy Commissioner of Patents and Trademarks, during which time I oversaw the policy arm of the PTO, including the Office of Legislative and International Affairs, the Office of Enrollment and Discipline, and the Office of Patent Quality Review. I traveled extensively to foreign countries under the auspices of the Department of Commerce and the World Intellectual Property Organization of the United Nations, advising ministers and foreign officials on U.S. intellectual property policy and the Agreement on Trade Related Aspects of Intellectual Property. Also in this role, I reviewed the examination standards set by the United States Patent Office, including the performance of patent examiners in their dispositions of patent applications. I authorized regulations for both enrollment and discipline of patent attorneys and agents practicing before the PTO and oversaw and authorized the disciplining of attorneys and agents, such as those who engaged in fraud on the PTO.

17.    Following my tenure as Acting Deputy Assistant Secretary of Commerce and Deputy Commissioner of Patents and Trademarks, I joined the law firm of Akin, Gump, Strauss, Hauer & Feld, L.L.P., as a partner in the firm's intellectual property law practice. I was a partner there until January 2000.

18.    Since January 2000, I have been engaged in a patent litigation consulting practice, often serving as an expert witness on patent practice and procedure before the PTO.

19.    Attached, as Exhibit A, is my curriculum vita. Exhibit A also includes a list of publications that I have authored and a partial list of lectures that I have given in the last ten years.

### C.    Cases In Which I Testified In Trial Or Deposition During Last Four Years

20.    During the last four years, I have testified as an expert witness in court in eight cases:

- *Ziarno v. Red Cross et al.,* Civil Action No. 99 C 3430 (N.D. Ill.);

- *Driver ID Inc. v. Triple M Financing and Payment Protection Systems Inc.,* Case No. 00-70645 (E.D. Mich.);

- *Tanashin Denki Co., Ltd. v. Thomson Consumer Electronics, Inc., and Thomson Consumer Electronics Canada. Inc.,* Civil Action No. IP 99-836-C Y/G (S.D. Indiana, Indianapolis Division);

- *Utah Medical Products, Inc. v. Graphic Controls Corporation,* Civ. No. 2:97CV0475 (D. Utah, Central Div.);

- *Jeneric/Penetron, Inc. v. Dillon Company, Inc., Chemichl AG, and Chemichl, Inc.,* Civil Action Nos. 3:98-CV-818 (EBB)-LEAD and 3:99-CV-1775 (EBB) (D. Conn.);

- *Gen-Probe Incorporated v. Vysis, Inc.,* No. 99-CV-2668H AJB (S.D. Cal.);

- *In re Omeprazole Litigation,* S.D.N.Y., MDL Docket No. 1291 (1999);

- *Caterpillar Inc. v. Sturman Industries, Inc., Oded E. Sturman, and Carol K. Sturman,* C.A. No. 99-CV-1201 (C.D. Ill.); and

- *Fusion Lighting, Inc. v. Westinghouse Electric Corporation, Northrop Grumman Corporation and Edward H. Hooper*, Civ. Action No. 209848 (C.C. MD. Mont. County 2000).

21.    During the past four years, I gave deposition testimony in 19 cases, 7 of which included cases cited in the foregoing paragraph as *Driver ID v. Triple M Financing and Payment Protection Systems; Tanashin Denki v. Thomson Consumer Electronics, Inc.; Utah Medical Products v. Graphic Controls Corp.; Gen-Probe v. Vysis; In re Omeprazole Litigation; Caterpillar v. Sturman Industries; Fusion Lighting, Inc. v. Westinghouse Electric Corporation* and fourteen more cases:

- *IMT, Inc. and MTI, Inc. v. Haynes & Boone L.L.P., Jeffrey Becker and Timothy Powers*, In the County Court at Law Number Two, Dallas, Texas, Cause No. 98-10075-b;

- *C.R. Bard and Davol, Inc., v. United States Surgical Corporation*, Civil Action No. 99-286 (RRM) (D. Del.);

- *Pechiney Rhenalu v. Alcoa, Inc.*, Civil Action No. 99-301 (SLR) (D. Del.);

- *Elonex I.P. Holdings, Ltd., and Elonex PLC v. Dell Computer Corporation, Viewsonic Corp., Mag Technology USA. Inc., Princeton Graphics Systems, Inc., Micron Electronics, Inc., Mag Technology Co., Ltd., Sony Electronics, Inc., and Capetronic Computer USA (HK), Ltd.*, Civil Action No. 98-689 (GMS) (D. Del.);

- *Valeo Electrical Systems, Inc. v. Siemens Automotive Corporation*, Civil Action No. 99-CV-40430 (E.D. Mich.);

- *Don De Cristo Concrete Accessories, Inc. v. American Allsafe Company, Inc., Flex-O-Lite, Inc., and Jackson Products, Inc., d.b.a. Services & Materials Company*, SACV00-30 AHS (Eex) (C.D. Cal.);

- *Rodel, Inc., and Rodel Holdings, Inc. v. Cabot Corporation*, C.A. No. 99-256-JJF (D. Del.);

- *Genzyme Corporation, Genzyme Surgical Products Corporation, Donald P. Elliott, Lynn Halseth, Nicolas F. D'Antonio, and Nicolas J. D'Antonio v. Atrium Medical Corporation*, C.A. No. 00-958-RRM (D. Del.);

- *Leon Stambler v. RSA Security, Inc., Verisign, Inc., First Data Corporation, and Omnisky Corporation*, C.A. No. 01-0065-SLR (D. Del.); and

- *In the Matter of Certain Microlithographic Machines and Components Thereof*, Investigation No. 337-TA-468 (ITC 2002).

- *Southwest Die Corporation v. Ontario Die Company Limited, ODC International, Inc. and Ontario Die Company of America*, Civil Action No. EP-01-CA-00204-EP (W.D. Tex.);

- *Tulip computers International, B.V. v. Dell Computer Corporation*, Civil Action No. 00-981-RRM (D. Del.);

- *Isis Pharmaceuticals, Inc., v. Sequitir, Inc.*, No. 01 CV 1223 B (JFS) (S.D. Cal.); and

- *Electronic Trading Systems Corporation v. The New York Mercantile Exchange*, Civil Action No. 00-CV-7431-KMW (S.D.N.Y.).

### D.    Information Considered in Preparing Expert Report

22.    In preparing this report, I have considered the documents and other information listed in Exhibit B in light of my knowledge and experience as a patent practitioner, patent examiner, and an executive in the PTO.

## II.    GENERAL CONSIDERATIONS PERTAINING TO PATENTS

### A.    The Role of the PTO in the United States Patent System

23.    I may testify about the role of the PTO in the United States patent system as an agency of the United States government within the Department of Commerce. Its mission, however, is not defined by the commerce clause of the United States Constitution. Rather, its mission is to carry out laws passed by Congress "To promote the Progress of Science and useful arts, by securing for limited times to Authors and Inventors, the exclusive Right to their respective Writings and Discoveries." [U.S. Const. Art, § 8, cl.8.]

24.    The PTO has a part in advancing the progress of the useful arts (that is, "technology") in a number of ways. One way that the PTO helps to advance progress in technology is by granting patents only for inventions that are novel and not obvious ("nonobvious") in light of the body of information that is called "prior art," that is, information that can be established to have been generally available to the public and/or learned by the

8

inventor from another, usually before the information was disclosed in a patent application. Generally, such information is technical in nature.

25.     Another way that the PTO advances progress is by only granting patents to the inventor of the invention claimed in the application for the patent (or to a person or company whose rights to the invention comes from the inventor). The PTO requires a person applying for the invention to sign an oath or declaration attesting to his or her inventorship or other papers in case the inventor is unable to do so. By this requirement, no one is encouraged to steal or copy the invention of another person, so that each person is encouraged to develop his or her own contribution to the advancement of technology.

26.     Yet another way that the PTO advances progress is by disseminating patent documents to the public so that others may copy inventions disclosed but not claimed in patents, or invent around the claims of patents, so that claimed inventions will be available to the public to make, use, and copy the invention once the term for a patent is over.

27.     The policies of the PTO are designed to encourage individuals or business entities to expend time, money, and ingenuity to invent something new and useful and teach others to make and use the invention.

28.     To be entitled to the right to exclude others, the inventor himself or herself and/or inventors, in the case of joint inventors, themselves, must have invented the claimed invention, the invention must have been patentable, and the inventor or inventors or his, her or their assigns must comply with all of the rules and regulations of the PTO while prosecuting a patent application.

## B.    Structure of the United States Patent Office

29.    I expect to testify about how that part of the PTO that processed patent applications, which I will call the "Patent Office," was organized to examine patent applications during the 1980-1986 time frame when the Doyle-Rivera applications were pending before the PTO. My testimony will include the educational requirements for new patent examiners and their training as examiners up to and including their receipt of "signature authority" as primary examiners.

30.    Examiners in the Patent Office were generally required to have, at a minimum, a Bachelor's degree or an equivalent amount of semester-hours in a technical field of study. Examiners were grouped in Art Units of about 7 to 14 people who, for the most part, examined patents classified in the same narrowly defined art.

31.    Some examiners were assigned to Art Units on the basis of their technical expertise and background. Each art unit had about 8 to 15 examiners managed by a Supervisory Patent Examiner. Art Units were grouped in Examining Groups of about 8 to 15 Art Units over which examiners examined more broadly defined related arts, while others developed some expertise by becoming familiar with the subject matter in patents that they examined or searched. Finally, Examining Groups were grouped into generally defined mechanical arts, electrical arts, chemical arts, biotechnical arts, and some miscellaneous arts such as robotics. Examiners frequently consulted not only other examiners within their art units, but also with examiners in the more broadly defined groupings.

## C.    Training and Skill of U.S. Patent Examiners and PTO Resources Available

32.    Within each Art Unit, there were three possible rankings of examiners: (1) "Primary Examiner with full signatory authority," an examiner who had the power to dispose

10

of a patent application, either by finally rejecting the application or by allowing the patent to issue; (2) "examiner with partial signatory authority," who had the power to make non-final rejections without having those rejections countersigned by a Primary Examiner; and (3) "assistant examiners without any signatory authority," who were required to have all rejections and actions countersigned by a Primary Examiner. Each Supervisory Patent Examiner, often called a "S.P.E." and sometimes called a "Spee," was a Primary Examiner.

33.    All examiners who were not Primary Examiners were engaged in a training regimen. New examiners received classroom training before they actually began their examining duties. This initial training was called "Patent Examiner Initial Training" or "PEIT." PEIT was conducted as a one to two week overview of patent examining and the patent law as it related to patent examining. This was followed by ongoing training in patent examination that alternated between classroom training and testing in the Patent Academy, which was an on campus facility among the numerous buildings occupied by employees of the PTO.

**D.    The Patent Application**

34.    In order to get a patent on an invention during the 1980-1986 time frame, an applicant for a patent, who under PTO procedure was the inventor of the subject matter of that patent, had to file a patent application in the PTO in which the inventor described the invention, as well as how to make and use it, and claimed the invention that the inventor wanted as his or her property. The applicant prosecuted this application in the PTO and, during this prosecution, had to convince an examiner to grant a patent. Usually this required some bargaining between the inventor and the examiner.

11

35.    The application was comprised of several documents.  The applicant himself could have drafted the initial specification, including the claims, but more likely, an attorney or patent agent drafted these documents

36.    Certain parts of the patent application would later be incorporated into the document that is called a "patent."  Included among the parts of the application included in the patent is the relatively lengthy document section called the specification, which is typically accompanied by one or more drawings that are used with the specification to describe the invention.  The "specification" in the patent is as it was originally filed or amended during the prosecution of the application.

37.    The specification in the application contained a written description of the invention and the claims to the invention.  The written description, itself, was usually divided into several sections that might have been designated respectively as (1) the cross-reference to related applications (if there was a cross-reference), (2) the Background of the Invention, (3) the Brief Description of the Drawings (if there were any drawings), (4) the Summary of the Invention, and (5) the Detailed Description of the Invention.

38.    Claims were found in the last section of the specification, in one or more short, numbered paragraphs at the end of the specification that we call "claims." Claims were very important because they would be the only way the public has of knowing exactly what the result was of the prosecution bargaining process between the applicant and the examiner.  The claims define the invention, and in so doing they serve two crucial functions:  (1) they give the PTO examiner a definition of the scope of the invention to see whether it is patentable (as discussed below), and (2) they tell the public exactly what it is that would constitute an infringement of the patent.  Moreover, because it is the claims that define the invention, it is

12

essential that they clearly delineate the boundaries, or the "metes and bounds," of the invention. If one of ordinary skill cannot determine the metes and bounds of the claim, the claim is said to be "indefinite" and is invalid. If it is not possible for someone else such as a competitor to be able to tell with certainty whether what it plans to do would infringe a patent or not, the whole system breaks down – the competitor is discouraged from looking for noninfringing alternatives and the public loses the benefit of innovation.

39.    A patent application might have contained claims to an invention that was disclosed in an earlier filed application (called the "parent application"). Such an application could receive the benefit of the filing date of the parent application. This benefit would allow the later-filed application to avoid prior art that predated the actual filing date of the later filed application but followed the filing date of the parent application. One of the requisites for receiving the benefit of the earlier filing date of the parent application was that the later-filed application had to contain, in the original or amended form, a cross-reference to the earlier filed (parent) application. Another requirement was that both the earlier-filed application and the later-filed application had to be copending in the PTO at some point in time. Still another requirement, after a 1984 amendment, was that at least one of the inventors of subject matter claimed in the application seeking the benefit had to be one of the inventors listed in the parent application.

40.    One such type of later-filed application receiving the benefit of earlier dates was called a "continuation," in accordance with its relationship with an earlier filed application. Continuations only claimed subject matter that was disclosed in the earlier filed application, that is, the parent application.    Another type of later-filed application was a "continuation-in-part." A continuation-in-part was an application for one of more claims based

on the disclosure of the parent application and for new claims to new subject matter in the disclosure of the continuation-in-part that was not disclosed in the parent application. Claims based on the new matter are not entitled to the earlier priority date of the patent application.

### E.    Information Kept by the PTO on Patent Applications and Their Prosecutions

41.    I may testify about certain information that was kept in the files of the PTO after an application issued as a patent. During the 1980-1986 time frame and thereafter, each patent application filed in the PTO was placed in a file wrapper. Each file wrapper was labeled with certain information, such the applicant's name and address, the filing date of the application, and the patent application Serial No.'s or U.S. Patent No.'s and filing date of prior applications from which the application might receive an earlier, priority filing date. The application included the original specification filed with the PTO and other documents. The application and subsequent documents and correspondence between the applicants (through their patent attorney) and the PTO also were placed in a file wrapper and collected as a "file history" of the patent prosecution (the file history is also called the "prosecution history"). After the prosecution of the patent application, the file wrapper and its prosecution history contents were stored in the PTO. When the patent issued from the application, the file wrapper and its prosecution history contents were made available to the public.

42.    At least since the 1980's and thereafter, the PTO had the Patent Application Location Monitoring system or "PALM" that PTO personnel used to retrieve information related to the prosecution histories of patents. PALM is and has been a PTO computer records system that listed the status and subject only contents of each patent application. PALM, however, was not available to the public or the applicant and his or her representatives. But in 1999 only some of this limited information in PALM was made available

to applicants and their representatives via the Internet through the Patent Application Information Retrieval system or PAIR. PAIR was to be used to determine if an issue fee had been received and if a fee transmittal form or some other paper had been entered into the file wrapper, not to reconstruct the file wrapper. PAIR was made available to the public to provide access such information made available to the applicant and his or her patent attorney or agent once the patent application had been published or a patent issued from the application.

### F.    The Patenting Process

43.    During the pertinent time frame, the patenting process in the PTO for a patent application was an administrative process that followed the policies of the PTO as reflected in the Manual of Patent Office Procedure (the "M.P.E.P."). Those policies strove to conform to the laws and regulations of 35 U.S.C. § 1 et seq. and 37 CFR § 1.1 *et seq.*

44.    To obtain a patent during the 1980-1986 time frame, an inventor filed a patent application in the PTO. The application might have contained one or more drawings that illustrated the invention and contained a specification, which included a written description of the invention, and one or more claims, which defined the scope of protection sought for the invention.

45.    Upon receipt in the PTO, the application was referred to a receiving branch that checked to make sure that the application included all the requisite parts. The application was then classified based on its technology and sent to an examining group having technical competence in the subject matter to which the application related. Within the group, the application was further assigned to an Art Unit based on the application's particular subject matter and then to a patent examiner within that Art Unit for consideration.

46.    The examiner reviewed the application to learn what the invention was and what was being claimed. In particular, the examiner carefully reviewed the claims, since they determined what exclusive rights would be obtained if a patent were to be issued.

47.    In the ordinary course of examining a patent application, an examiner, after reviewing a patent application, conducted a search of the art relating to the claimed invention. The examiner reviewed the PTO patent and literature files, which were organized in a system of classification by technology.

48.    Examiners were to thoroughly search for prior art.    Prior to computerization of the patent office, in the 1980s through the mid-1990s, some examiners conducted these searches in paper files arranged in flat file drawers called "shoes." A single drawer or several drawers might have housed one or more subclasses within a class of technology related to the invention and analogous technology (called "analogous art") that an examiner might have determined to be relevant to the invention. Some examiners conducted searches of the then-available on-line databases in order to find references that were the most relevant prior art to the invention being claimed. Some examiners conducted both paper-file and database searches.

49.    There were understandable limitations to this system of searching. The PTO's extensive files of prior art were far from exhaustive by their very nature. Certain prior art, such as textbooks, videos, professional and trade magazines—including magazines on electronic equipment, newsletters and newspapers, sales brochures, and millions of technical drawings and specifications of inventions that were not patented, never found their way into the PTO's files. Certain other information bearing on the lack of novelty or obviousness of an

applicant's invention and the loss of rights to patent the invention were not likely to be found or could not be kept in the PTO's files.

50.    Limitations on the searching system at the PTO also resulted from the way that the files were used. Many references that were in the PTO's paper search files at one time or another were missing at times when examiners were searching for them, either because other examiners were using such references or members of the public, who often searched in the examiners' search rooms, had taken references from files.

51.    There was also a limitation on the time that an examiner had to search prior art. Because of the many applications that were filed in the PTO for examination and processing by a limited number of patent examiners, each examiner was placed on a production schedule. Thus, each examiner was to allocate only so many hours to examine and search the subject matter of an application and to dispose of it either by finally rejecting it (forcing the applicant to abandon it or appeal the examiner's rejections) or allowing it to be issued as a patent. To meet that schedule, which almost all examiners desired to do to be eligible for pay raises, promotions, and pay bonuses, an examiner could hardly afford to render an exhaustive search on each application.

52.    Because of the time constraints and search limitations, each examiner depended on the candor of the applicant or applicants in a particular case to provide "material" information that the applicant or certain others associated with them knew about. In fact, each inventor named in the application, each attorney or agent who prepared or prosecuted the application, and each other person who was substantively involved in the preparation or prosecution of the application while he or she was associated with the inventor, with the assignee

of the patent application, or with anyone to whom there was an obligation to assign, owed a duty to disclose such information in accordance with PTO policy and regulations.

53.    After studying the prior art uncovered during the search or provided by the applicants, the examiner in a particular case sent an Office Action to the applicant's agent or attorney. The Office Action was a letter stating the Patent Office's position with respect to the application. In a few, rather unusual cases, first Office Actions informed applicants that all claims were allowed without change and that the application issued as a patent. It was much more common, however, for an examiner to reject some or all of an application's claims. A common ground for rejection was the examiner's position that the claims were not patentable over the prior art cited by the examiner.

54.    A first rejection often induced a response from the applicant upon which the examiner would later comment. In this manner, the examiner and the applicant engaged in a give-and-take discussion that focused more clearly than the written disclosure on exactly what was inventive and nonobvious about the invention claimed in the application in light of the prior art.

55.    The applicant's agent or attorney usually responded to the examiner after he or she had studied the Office Action. The applicant's reply was known as a response. It may have included an amendment. In a response to an Office Action, the attorney might have cancelled or amended the application's claims and included remarks explaining why, in his or her opinion, the claims were patentable. Sometimes the attorney might have submitted only remarks without amending the claims. The remarks in either case would provide the examiner with further insight into the relationship between the claimed invention and the prior art cited by the examiner in rejecting the claims.

56.    Upon receipt of the applicant's response, the examiner reviewed the response and any amendments to the claims. If the examiner then agreed that the claims were patentable, he or she allowed the application and sent it to another branch to be issued as a patent. If the examiner did not agree with the attorney, he or she again rejected one or more claims through a second Office Action sent to the attorney. Even after this second Office Action, which was often deemed "final," the attorney still had the opportunity to convince the examiner that the claims were patentable through the submission of another amendment and perhaps an interview with the examiner. If the applicant overcame the examiner's rejection, the examiner would allow the claims and a patent would issue.

57.    If the examiner maintained his or her rejection of claims, even while allowing other claims, the applicant could appeal the examiner's decision to the Board of Patent Appeals and Interferences and, if dissatisfied with the board's holding, to a federal court.

58.    Through this exchange of Office Actions and responses (which is called "patent prosecution"), the PTO provided a clear record to the public to review and understand the reasons for allowance of patent claims. This exchange permitted the enforcement of the statutory requirements for a patent: that the invention be novel, nonobvious, and written in such a manner that one skilled in the art could make and use the claimed invention. Each U.S. patent application had to satisfy these standards before it was allowed to issue as a U.S. patent.

59.    I may testify specifically about examination of the specification in a patent application during prosecution during the 1980-1986 time frame.

60.    Patent examiners were expected to determine whether the specification of each application contained a sufficient written description of the invention to show that the applicant was in possession of the invention at the time of the application was filed. See

M.P.E.P. § 2163. Patent examiners were also expected to determine whether the specification and claims would enable a person of ordinary skill in the art to make and use the claimed invention. See § 2164.

61.     Examiners were not only to evaluate the specification of a patent application in respect of the written description and enablement requirements, but also in respect of the best mode requirement. See M.P.E.P. § 2161. Regarding the best mode requirement, examiners were taught that inventors should not be permitted to disclose second best embodiments of their invention while keeping the best embodiment for themselves. See M.P.E.P. § 2165.

62.     I may also testify more specifically about examination of the structure of claims during prosecution during the pertinent time frame. An examiner was expected to determine if the claims of an application particularly pointed out and distinctly claimed the subject matter of the invention. This was often called the "definiteness" requirement. The examiner evaluated the definiteness of claim language in light of the prior art, and the disclosure in the specification, as those of ordinary skill in the art to which the invention pertained would have interpreted it. Examiners were instructed to reject indefinite claims.

63.     A patent examiner was required to determine whether a claim was anti-cipated by one or more prior art references and, therefore, not directed to novel subject matter. This required the examiner to determine that a prior art reference discloses, expressly or by implication, each and every element or step of the claim including all limitations of the claim

64.     A patent examiner was also required to determine whether a claim was directed to obvious subject matter. Where no single prior art reference disclosed each and every element of the claim, but where, together, a collection of prior art references discloses each and

every element of the claim, the examiner was to conclude that the claim was directed to novel subject matter; however, if prior to the invention there were a teaching, suggestion, or reason to combine the references, the examiner would have considered that the claim was directed to obvious subject matter.

### G.    The Certificate Of Correction

65.    A patentee or the patentee's assignee could request the PTO to issue a Certificate of Correction for mistake that incurred through the fault of the PTO.   The PTO could issue a Certificate of Correction, without charge. The Certificate of Correction would state the fact and nature of the mistake and would be recorded in the patent records of the PTO.   A printed copy of the Certificate of Correction would be attached to each printed copy of the patent and be considered a part of the original patent.   The patent and the Certificate of Correction would then be considered as part of the original patent. The mistake, however, had to be clearly disclosed by the records in the PTO. [See M.P.E.P. § 1480, citing 35 USC § 254 and 37 CFR § 1.322].

### H.    Reexamination

66.    The inventor listed on a patent that, through error without any deceptive intention, would have been deemed wholly or partly inoperative or invalid owing to a defective specification could have filed, with the ascent of all of the assignees of the original patent, a reissue application for a reissued patent.   After examination of the patent by the PTO and the allowance of claims, the PTO was required, upon on the surrender of the defective patent and the payment of a fee required by law, to reissue the patent for the invention disclosed in the original patent, in accordance with the new and amended reissue application correcting the defect.   No reissued patent shall be granted enlarging the scope of the claims of the original patent unless

applied for within two years from the grant of the original patent. [See M.P.E.P. § 1401, citing 35 USC § 251].

## I.    Duty of Disclosure

67.    I expect to testify about what the PTO expected of certain classes of individuals involved in the filing and/or prosecution of a patent application. During the pertinent time frame, these classes of individuals owed a duty of candor and good faith to the PTO with regard to each application, which very specifically included a duty to disclose to the examiner all information known to them to be "material" to patentability of claims in the application. The duty fell on (1) each inventor of subject matter claimed in an application, (2) each patent attorney or agent that worked on the preparation and prosecution of the application, and (3) each other individual who was substantially involved in the preparation and prosecution of the application and who was associated with the individual or company to whom the application was assigned or to whom there was an obligation to assign the application. The duty was codified in the Rules of Practice in Patent Cases before the PTO (Title 37 of the United States Code of Federal Regulations, Chapter 1, Part 1) as "Rule 56." Although Rule 56 defined the duty differently before and after March 16, 1992, the classes of individuals owing the duty were the same.

68.    These individuals were under a duty to disclose prior art and other information, including information pertaining to a prima facie case of obviousness-type double patenting, that was not cumulative of information already considered by the examiner and was material to patentability.

69.    Prior to March 16, 1992, Rule 56 required a duty of disclosure as follows:

§ 1.56 DUTY OF DISCLOSURE

(a)    A duty of candor and good faith toward the patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other

individual who is substantively involved in the preparation of prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application. **Such information is material when there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.** The duty is commensurate with the degree of involvement in the preparation or prosecution of the application. [Emphasis added.]

70.　　Prior to March 1992, a breach of the duty to disclose material information was expressed in terms of "inequitable conduct" and "fraud on the Patent Office." Disclosure of material information, even if the applicant thought that the disclosure would be against the applicant's interest in having a patent application issue as a patent, would have been necessary to comply with a duty of candor codified in the Rules of Practice before the PTO (Rule 56, 37 CFR § 1.56).

71.　　As explained above, the time and resource constraints on examiners placed them in a position of reliance upon applicants and others upon whom the duty to disclose fell to serve the public interest for the most effective patent examination, which "occurs when, at the time an application is being examined, the [PTO] is aware of and evaluates the teachings of all information material to patentability." See 37 CFR § 1.56

## III.　THE FILE HISTORIES OF THE DOYLE-RIVERA APPLICATIONS

72.　　I may be asked to testify about the prosecution histories of the patent applications Serial No. 06/431,982 (the "'945 application") which issued as the '945 patent, and Serial No.　06/558,262 (the "'262 application"), which was abandoned, and Serial No. 06/716,991 (the "'991 application"), which matured into the '894 patent. The '945 and '262 applications were chosen from the "family tree" of the '894 patent, because according to column 1, lines 6-16, of the '894 patent, only these applications were cross-referenced and incorporated

by reference in the '894 patent. Their respective "parent" applications were not copending with them when the '894 application was filed and prosecuted and so were not incorporated by reference. [See column 1, lines 15 and 16, of the '894 patent.]

73.     If I am called upon to do so, I expect to "walk" through the prosecution histories of these applications and explain such terms and procedures as necessary to understand their prosecution.

### A.     The '982 Application [The '945 Patent]

74.     On September 30, 1982, the '982 application, which matured as the '945 patent, was filed as a file wrapper continuation of patent application No. 207,534 (the "'534 application"), which matured as U.S. Patent No. 4,386,338 (the "'338 patent). The original application had eight claims, four of which were independent claims. Messrs. Doyle and Rivera were listed as joint inventors and applicants. Mr. Paul J. Sutton was given power of attorney to prosecute this application before the PTO.

75.     On October 7, 1983, a Preliminary Amendment was filed with the PTO amending claim 1. In the remarks to the Preliminary Amendment, the applicant remarked that the Preliminary Amendment sought to present an independent claim "with features patentably distinct from prior art." In making the amendment, however, the applicants neglected to bracket a period at the end of the original claim and to underline portions of the additional language added to the claim.

76.     On October 18, 1983, the examiner assigned to the case, Examiner Swann, sent a communication to the applicants indicating that their amendment to claim 1 did not comply with the rules for the manner of making amendments and was therefore considered

24

nonresponsive. The examiner invited the applicants to file a supplemental paper complying with the requirements of the rule.

77.    On November 10, 1983, Mr. Sutton, the applicants' representative, met at the PTO with Examiner Swann for an examiner's interview. According to the Examiner Interview Summary Record sent to the applicants on November 14, 1983, the examiner pointed out to Mr. Sutton the exact violations of the rule on the manner of making amendments.

78.    On November 11, 1983, the applicants sent a Supplemental Preliminary Amendment to the examiner correcting the manner of making the amendment to claim 1 in the original Preliminary Amendment. A Terminal Disclaimer with respect to U.S. Patent No. 4,386,338 was submitted with the Supplemental Preliminary Amendment.

79.    On January 18, 1984, the examiner sent to the applicants an Office Action rejecting claims 1-8. The examiner objected to informalities in the specification. With regard to the rejected claims, claims were rejected as being indefinite because of, in some cases, extraneous words and, in other cases, dropped words. The examiner also thought that the specification failed to provide an adequate written description of the invention in that the specification did not provide for the overall control system details that were recited in claims 6 and 7. Accordingly claims 6 and 7 were rejected as not being supported by the written description elsewhere in the specification. The examiner also rejected all of the claims on double patenting grounds because, according to the examiner a "'continuation' is by definition directed to the same invention as the parent and an invention is entitled only to one patent." The examiner noted that the application purported to be a continuation of the '534 application, which had issued as the '338 patent. According to the examiner, "the proper means to correct errors in a

25

patent is by reissue." No mention was made by the examiner about correcting the '338 patent by a Certificate of Correction.

80.    On May 21, 1984, after requesting an extension of time in which to reply to the examiner's January 18, 1984, Office Action, the applicants filed an Amendment. In the Amendment, the applicant corrected informalities in the specification, and added references to issued patents. The applicants also amended the claims. With regard to the amendments of the claims, the applicants asserted that they were amended to "present a single independent claim which patentably distinguishes over each and all of the references are record, whether taken singly or in any combination with one another."

81.    On June 18, 1984, the examiner sent a communication to the applicants noting that the applicants did not respond to the rejections of claims 1-8 as being indefinite, the specification as failing to provide an adequate written description of the invention, and the rejection of claims 6 and 7 as claiming the overall control system details without a written description support in the specification.

82.    On or about July 6, 1984, the applicants filed another Supplemental Amendment in which they addressed the "control system details" which they said were respectfully well known in the art as referenced in the specification with regard to U.S. Patent No.'s 4,200,862 and 4,189,713. The applicants also canceled claim 8.

83.    On September 19, 1984, the examiner sent a final Office Action addressing claims 1-7 remaining in the application. Claims 1 and 5-7 were allowed. Claims 2-4 were rejected as being indefinite. According to the examiner, claims 2 and 3 seemed entirely superfluous in view of language in claim 1. The examiner found a number of informalities in the

specification, including extraneous words and misspellings. The examiner pointed to yet another mistake in a response by the applicants. Thus, the examiner said,

> 3.    In the amendment filed May 21, 1984, it seems the three amendments proposed for page 1 should be directed to page 2. Further, this second of those proposed amendments (directly "before line 6") is incomplete. None of the three has been entered. [Office Action of September 19, 1984, page 2, paragraph 3.]

84.    On December 21, 1984, the applicants filed an "Amendment After Final Rejection" in which the applicants addressed several informalities and canceled claims 2 and 3. Claim 4 was amended to depend from the allowed claim 1.

85.    On January 9, 1985, the examiner sent to the applicants a Notice of Allowance and Issue Fee Due.

86.    On May 21, 1985, the '982 patent issued.

87.    According to PAIR information, on June 15, 2001, the file wrapper and its prosecution history contents for this case were reported lost. On the same day and officials search was conducted. After several days, on June 27, 2001, the officials search was terminated. On the same day, the case was reportedly found. On February 7, however, the file was marked lost.

## B.    The '262 Application

88.    On December 5, 1983, the '262 application was filed in the PTO as a continuation-in-part of patent application Serial No. 06/431,982 (the "'982 application"). Messrs. Doyle and Rivera were listed as the inventors and applicants of this application. Two independent claims were filed. Power of attorney was granted to Mr. Sutton again. The application was filed without a signed oath or declaration.

89.     On July 25, 1984, the PTO sent the applicants a Notice to File Missing Parts of Application -- Filing Date Granted, giving notice that the signed oath or declaration had not been filed.

90.     On August 3, 1984, the applicants filed in the PTO, a communication advising the PTO that a Declaration For Patent Application was executed by the inventors on June 20, 1984, and mailed to the PTO on June 26, 1984.  A copy of the declaration and its cover letter were enclosed.

91.     On March 14, 1985, the examiner assigned to the case, Supervisory Patent Examiner A.D. Pellinen, sent an Office Action to the applicants rejecting the two claims of the application.  The claims were rejected as being anticipated by U.S. Patent No. 4,001,647 issued to Klein et al., which to the examiner found during the search of the PTO records.  The examiner complained that the "application was filed with insufficient heading space such that lying 1 or [*sic.*] Each of pages 1-5, 7-26 and claim to [was] mutilated.  The examiner found that there was no common disclosure between the present application and the '982 application such that some of the subject matter could obtain the filing date of the '982 application. The examiner objected to the Abstract of the Disclosure because it was not in conformance with M.P.E.P. § 608.01 (b). Informalities in the disclosure were objected to.

92.     On September 9, 1985, after requesting an extension of time to respond to the March 14, 1985, Office Action, the applicants filed an Amendment.  The applicants made several amendments to the specification to clear up informalities, and amended claims 1 and 2. The applicants argued that their amendments to the claims overcame the rejections based on Klein.

93.    On January 13, 1986, the examiner sent an Office Action to the applicants still rejecting claims 1 and 2. According to the examiner, claims 1 and 2 were not directed to an invention that was patentably distinct from claims in a commonly assigned application Serial No. 06/558,260. The examiner, however, could not find any information directly indicating that the conflicting inventions were commonly owned at the time the invention was made. Therefore, the examiner required that the assignee show that the conflicting inventions for commonly owned at the time the invention of the '262 application was made or name the first inventor of the conflicting subject matter. Accordingly the examiner provisionally rejected claims 1 and 2 under the judicially created doctrine of obviousness-type double patenting. The examiner also rejected claims 1 and 2 as being obvious over U.S. Patent No. 4,464,582 issued to Aragaki et al. in view of Klein et al. the examiner said that he considered the applicants' arguments concerning claims 1 and 2 but that he had deemed them to be moot as a result of the new grounds for rejection of those claims.

94.    After the applicants petitioned for an extension of time to reply to the Office Action of January 13, 1986, the application was abandoned according to Notice sent on August 19, 1986.

C.    **The '991 Application [The '894 Patent]**

95.    On April 1, 1985, the '991 application was filed in the PTO, as a continuation-in-part of the '262 application and a continuation in part of the '982 application ('945 patent). Although the file wrapper is not available for this application, presumably Messrs. Doyle and Riviera were named as the inventors of the subject matter of this application and the applicants.

96.    PAIR provides just skeletal information about the progress of the application through the PTO.

97.    On April 1, 1985, a letter was received by the PTO in connection with this application. However, there is no indication of the contents of the letter or even its subject matter.

98.    On June 21, 1985, the application was docketed to an examiner in a group art unit. Inasmuch as Examiner Lincoln Donovan examined the application under the authority of Examiner E.A. Goldenberg, as indicated on the face of the '894 patent, presumably the case was docketed eventually to Examiner Donovan. However, Mr. Donovan may not have taken over the case until November 7, 1985, as PAIR indicates that the case was docketed to an examiner in a group art unit again on November 7, 1985.

99.    On December 9, 1985, the examiner prepared a Notice of Allowability, and data verification on the Notice of Allowance was completed. Further on December 10, 1985, the Notice of Allowance was sent to the applicants. No indication was given about whether there was an examiner's amendment or that reasons for Allowance were given in the Notice of Allowability.

100.    On June 17, 1986, the '894 patent was issued with the undecipherable clause in lines 5-7 of claim 1 reading "for movement between first and said housing for moving said plunger means when energized from the first position to the second position. "

101.    On June 1, 1988, there was a post issuance communication concerning a Certificate of Correction. Again, there is no indication of what the contents of the communication were.

102.    On July 12, 1988, A Certificate Of Correction was signed and sealed, indicating that column 7, line 3, which falls in claim 2 of the '894 patent, was corrected to insert after "and", "second position; electromagnetic coral means disposed to wherein." This clause as placed in claim 2 made claim 2 also undecipherable.

103.    On April 11, 1989, the file wrapper for the '894 patent was reported lost.

104.    On April 19, 1989, an official search for the file wrapper was conducted. The official search was terminated on May 17, 1989.

105.    On May 4, 1993, the file wrapper was a gain reported lost, and on May 14, 1993, an official search was conducted.

106.    Over the ensuing years, until December 1, 2000, the file wrapper was reported lost time and again and official searches were conducted and terminated. There is no record of the file wrapper having been found.

107.    On December 11, 2001, a Certificate of Correction was signed and sealed with a correction to column 6, line 53, which falls in claim 1 of the '894 patent, inserting after "and" "second positions; electromagnetic coral means disposed within..."

## IV.    OPINIONS

### A.    There Is No Record Indicating What the Corrected Claim 1 Should Have Been, And Therefore, USI Had No Notice of what it might have infringed When This Suit Was Instituted.

108.    The prosecution history of the '894 patent was lost by the PTO as early as April 11, 1989, years before any notice had been given to USI that it might be infringing one or more claims of the '894 patent.

109. Claim 1, the only independent claim of the '894 patent, was unintelligible until the defect in the patent claim that became the subject of the Certificate of Correction that was signed and sealed on December 11, 2001.

110. I have been informed that evidence will be presented at trial that USI did not begin making and marketing its allegedly infringing product until 1999.

111. From the date of issuance of the '894 patent until about three months after a first infringement suit was instituted against them in September 2001, no notice was available from the PTO as to the scope of claim 1 of the '894 patent, and as claim 1 is the only independent claim of that patent, there was no notice from the PTO about the scope of any of the dependent claims of the '894 patent.

112. Even though USI may have exercised care in having the records of the PTO searched to ascertain from the file history what the scope of the claims might be, there were no records available that would help USI ascertain the scope of the claims and therefore the scope of the claims could not be ascertained.

**B.    There Is No Basis for the Issuance of the December 11, 2001 Certificate of Correction**

113. According to the M.P.E.P., which cites 35 USC § 254, a Certificate of Correction may only be a issued when a mistake in a patent incurred through the fault of the PTO "is *clearly disclosed in the records* of the [PTO]." [Emphasis added.] When the Certificate of Correction was considered by the PTO, the record (the file history containing the prosecution history) of the '894 patent and application was lost and had been lost for over 12 years. Consequently, no PTO personnel could have found that the mistake was clearly disclosed in the records. Thus, in my opinion, the Certificate of Correction could not have been issued following the requirements or with the authorization of the M.P.E.P.

114.    Since there is no indication that the Commissioner, himself, authorized suspension of the rules, the party issuing the Certificate of Correction, in my opinion, was without authority to do so.

115.    Information that would have come from the microfilm of the originally filed patent application would not have helped, because actions took place after the filing of the application.  PAIR would not have helped because it does not indicate the contents of the correspondence between the examiner and the applicants, that is, the statements and/or arguments made by the examiner and/or the applicants.  Furthermore, PAIR is not necessarily complete with regard to all of the transactions that took place before the PTO during the prosecution of the application.

116.    In any event, PAIR indicates that correspondence was exchanged in the prosecution of the '894 application, but it does not indicate whether the correspondence might have had substantive arguments or suggestions for the claims that the examiner actually allowed.  Furthermore, PAIR shows that a Notice of Allowance was sent out at a certain time, but it does not necessarily indicate whether an examiner's amendment accompanied the Notice.  One word that might have amended the claim could have been enough to change the scope of the claims that Leviton now asserts were issued.

### C.    In My Opinion, the Inventor of the '894 Patent Should Have Applied for a Reissue of the Patent.

117.    Because, in my opinion, a certificate of correction could not have been issued without the file wrapper containing the prosecution history of the '894 patent, the only recourse available to the patentee was to file a reissue application.

118.    The reissue application would be particularly suited for this case, because during the prosecution of the reissue application, a new prosecution history would be developed.

It would appear to me that this would be the only alternative that would protect the public and grant the patentee of the issued '894 patent prospective rights.

119.    In my opinion, the patentee of the '894 patent showed the negligence displayed throughout the prosecution of the case, in which several amendments were deemed nonresponsive and there were a number of errors made in drafting claims in specifications throughout the prosecution of the case.  Without the record, one does not know if indeed the mistake in claim 1 or the Certificate of Correction was through the fault of the PTO or yet another of the many errors made by the applicants' drafting specification and claims.  In my opinion, the applicants had every opportunity to clear up any errors made by the PTO during the ensuing 15 years since the issuance of the patent.  I would expect that a competent practitioner prosecuting before the PTO would have checked the claims of the patent immediately after the patent issued and would have done the same with regard to Certificates of Correction.

**D.    The Applicants And Others Who Had a Duty under Rule 56 Did Not Disclose the '338 Patent, Which Contained Material Information**

120.    The applicants, their attorney, Mr. Sutton, and others associated with Leviton who helped prepare or prosecute the '894 application, had a duty under Rule 56 to disclose to the PTO material information.  During the pendency of the '894 application, material information was defined as information for which there was a substantial likelihood that a reasonable examiner would have considered it important in deciding whether to allow the application to issue as a patent.

121.    It is my understanding that there will be testimony at trial from a technical expert who is of the opinion that claim 1 of the '894 patent, if it were capable of being corrected by the December 11, 2001, Certificate of Correction, is anticipated by claim 1 and/or claim 2 of the '338 patent.    It is my understanding that, in any event, the technical expert's testimony will

34

be that claim 1 of the '894 patent is but an obvious variation of claim 1 and/or claim 2 of the '338 patent and would extend the monopoly of claim 1 of the ' 338 patent. If such testimony is accepted, then claim 1 of the '894 patent would be a double patenting of claim 1 and/or claim 2 of the '338 patent.

122.    To be sure, without depending upon a technical reading of the claims, I am of the opinion that claim 1 of the '894 patent is the same as claim 1 and/or claim 2 of the '338 patent except for the use of specific "means-plus-function" limitations in claim 1 of the '894 patent.

123.    A structure corresponding to claim 1 of the '894 patent is described in the specification of the '945 patent that is incorporated into the specification of the '894 patent. It is also the same structure described in the specification of the '338 patent. Accordingly, the structure described in the specification of the '338 patent is the same as the structure incorporated into the specification of the '894 patent that corresponds to claim 1. Therefore, one interpretation of claim 1 of the '894 patent is the same as claim 1 and/or claim 2 of the '338 patent, and therefore, claim 1 of the '894 patent is a statutory double patenting of claim 1 and/or claim 2 of the '338 patent.

124.    There is more than a substantial likelihood that a reasonable examiner would have found the double patenting information concerning claim 1 of the '894 patent and the '338 patent important in deciding whether to pass the independent claim in the '894 application to issue. There is at least a prima facie case of double patenting. In the alternative, on the echo testimony of the technical expert, claim 1 of the '894 is an obviousness-type double patenting of the ' 338 patent and was, therefore, material. This information about the '338 patent was not cumulative of any other information before the PTO concerning the double patenting issue.

## V. CONCLUDING REMARKS

126.   I understand that discovery is ongoing in this case. I therefore ask that the court allow me to adjust or supplement my report after I have had the opportunity to review deposition testimony or in light of additional documents that may be brought to my attention. I also ask that the court to allow me to supplement my analysis in light of any critique of my report or opinions advanced by or on behalf of Leviton. To date, I have not prepared any exhibits summarizing opinions or illustrating points made in this report, but I expect to do so for use at trial in accordance with the court's orders.

Executed on: February 24, 2002

_____
Lawrence J. Goffney, Jr.

36

**Lawrence J. Goffney, Jr.,** consults on intellectual property and serves as an expert witness on patent issues, including proceedings before the United States patent and Trademark Office (the "USPTO"). Before devoting full time to his consultancy service, he was a partner with Akin, Gump, Strauss, Hauer & Feld, L.L.P., in Washington, where he was a member of the firm's intellectual property practice. He has taught, held appointed office, been a patent examiner and represented Fortune 500 organizations, small businesses and universities in connection with all aspects of intellectual property.

From 1996 until 1998, prior to joining Akin, Gump, Mr. Goffney was the Acting Deputy Assistant Secretary of Commerce and Deputy Commissioner of patents and Trademarks at the USPTO, a position to which he had been designated by the Secretary of Commerce. He was responsible for overseeing the policy arm of the USPTO, including the Office of Legislative and International Affairs, the Office of Enrollment and Discipline, the Board of patent Appeals and Interferences, the Trademark Trial and Appeals Board, the respective Offices of patent and Trademark Quality Review. He traveled extensively to foreign countries under the auspices of the Department of Commerce, the USPTO and the World Intellectual Property Organization of the United Nations, advising foreign officials on U.S. intellectual property policy and Trade Related Aspects of Intellectual Property standards for World Trade Organization members.

In 1994, he had been appointed by the President and confirmed by the Senate to the position of Assistant Commissioner for patents, in which capacity he ran the entire U.S. official patent process (the "patent Office") from application to issue. In this capacity, and later as Deputy Commissioner, he attended Trilateral Meetings officials of the European patent Office and the Japanese patent Office in an ongoing project by the three major three patent offices of the world directed to understanding each other's examination procedures and operations so that they can cooperate with one another to bring about quality examinations in all of the offices.

Prior to entering government service as a senior official in January, 1994, Mr. Goffney was a partner in the Michigan based law firm of Dykema Gossett, where he practiced in the intellectual property practice group, focusing on patent, trademark and copyright litigation; patent prosecution; and patent, trademark and copyright transactional work. From 1974 until 1983, he was a law professor on the faculties of the University of Texas and the University of Detroit, a visiting professor at the University of Wisconsin and a Harvard Fellow in Law and the Humanities. Mr. Goffney taught courses in patent, trademark and copyright law as well as remedies, antitrust, torts, and creditor's rights. From 1984 until 1986, he examined patents and worked on other projects in the USPTO. From 1986 until his appointment as Assistant Commissioner, he was engaged in private practice.

Mr. Goffney received a B.S. with honors in 1970 from Oakland University. He attended Carnegie Institute of Technology (now Carnegie-Mellon University). He received a J.D. in 1974 from the University of Detroit and an LL.M. in 1974 from Columbia University, where he was a Burton Fellow in Intellectual Property. In 1975, Mr. Goffney received a certificate from the Parker School in Foreign and Comparative Law at Columbia University.

Mr. Goffney is registered to practice before the U.S. patent and Trademark Office. He is licensed to practice before the state and federal courts in the State of Michigan and before other federal courts, including the U.S. Court of Appeals for the Federal Circuit. He often lectures to local, state, national and foreign bar associations, as well as to scientific and technical audiences.

**Exhibit A**
Bio

# Lawrence J. Goffney, Jr.

120 Waterford Place
Alexandria, VA 22314
*Telephone*: (703) 518-0217
*Facsimile*: (703) 832-6539

## SUMMARY

Lawrence ("Larry") Goffney consults on intellectual property and serves as an expert witness on patent issues. He has taught, held appointed office in the United States Department of Commerce and the patent and Trademark Office, been a patent examiner, and practiced law as a partner in two large law firms where he represented Fortune 500 organizations, small businesses and universities in connection with all aspects of intellectual property.

## PROFESSIONAL EXPERIENCE

**LGoffney—Alexandria, VA**                                          **2000-Present**

- Consultant on practices and procedures in the United States patent and Trademark Office

- Expert witness on patent issues, including practices and procedures in the United States patent and Trademark Office

**Akin, Gump, Strauss, Hauer & Feld, L.L.P.—Washington, DC**          **1998-2000**

- Partner in Washington, DC, Office and member of the firm's intellectual property practice.

- Advocacy for firm's clients having intellectual property issues in legislation before Congress

- Practice in client counseling, licensing, and litigation regarding intellectual property issues

**Acting Deputy Assistant Secretary of Commerce and—USPTO**           **1996-1998**
**Deputy Commissioner of patents and Trademarks**

- Designated by the Secretary of Commerce

- Responsible for overseeing the policy arm of the USPTO, including the Office of Legislative and International Affairs, the Office of Enrollment and Discipline, the Board of patent Appeals and Interferences, the Trademark Trial and Appeals Board, the respective Offices of patent and Trademark Quality Review

- Traveled extensively to foreign countries under the auspices of the Department of Commerce, the USPTO and the World Intellectual Property Organization of the United Nations, advising foreign officials on U.S. intellectual property policy and Trade Related Aspects of Intellectual Property standards for World Trade Organization members

- Attended Diplomatic Conferences at the World Intellectual Property Organization at its headquarters in Geneva, Switzerland

- Attended Trilateral Meetings with officials of the European patent Office and the Japanese patent Office

**Exhibit A**
Page 1 of Resume/Vita

- Still held office as Assistant Commissioner of patents and Trademarks

### Assistant Commissioner for patents—USPTO                    1994-1998

- Appointed by the President and confirmed by the Senate
- Ran the entire U.S. official patent process (the "patent Office") from application to issue
- Attended Trilateral Meetings with officials of the European patent Office and the Japanese patent Office in an ongoing project by the three major patent offices of the world directed to understanding each other's examination procedures and operations so that they can cooperate with one another to bring about quality examinations in all of the offices

### Dykema Gossett—Detroit and Bloomfield Hills, MI                1988-1994

- Partner and, before that, Associate in the intellectual property practice group of the then largest Michigan based firm with offices nation wide
- Practice focused on extensive patent prosecution; patent, trademark and copyright litigation; and patent, trademark and copyright transactional work.

### Cullen, Sloman, Cantor, Grauer, Scott & Rutherford—Detroit, MI    1986-1988

- Associate
- Practice focused on extensive patent prosecution; patent, trademark and copyright litigation; and patent, trademark and copyright transactional work.

### United States patent and Trademark Office—Crystal City, VA        1984-1986

- Examiner in Sheet Feeding and Shock Absorber and Brakes arts

### Hoffman & Wheeler, Amarillo, TX                                1983-1984

- Of Counsel

### University of Texas School of Law                              1979-1983

- Visiting Professor 1979-1980
- Assistant Professor 1981-1983
- Taught courses in Remedies, Creditors Rights and Bankruptcy, Antitrust, Torts, Intellectual Property, patent Prosecution, and Legal History
- Served as counsel to University President and as Chairman and member of a number of University committees

### University of Detroit School of Law                            1978-1979
####                                                              1974-1976
####                                                 Summers 1974-1982

- Assistant Professor and Assistant Dean (resident only 3 years—1974-76 and 1979)
- Taught courses in Remedies, Creditors Rights and Bankruptcy, Antitrust, Torts, Business Torts, Trademarks, Jurisprudence, Intellectual Property, patent Prosecution, and Legal History
- Served as Chairman and member of a number of committees

**Exhibit A**
Page 2 of Resume/Vita

- Ran special Summer Institute for beginning law students

**University of Wisconsin Law School**                                      **1977-1978**
- Visiting Professor
- Taught courses in Remedies and Torts

**Harvard University and Harvard University Law School**                    **1976-1977**
- Fellow in Law and the Humanities
- Member of think tank
- Lectured on Slavery issues

## EDUCATION

**Certificate—Parker School of Foreign and Comparative Law**                **1975**
**Columbia University School of Law, N.Y.**

**LL.M.—Columbia University School of Law, N.Y.**                           **1974**
- Burton Fellow in Intellectual Property

**J.D.—University of Detroit School of Law, Detroit, MI**                   **1973**

- Dean's Award
- Journal of Urban Law (Law Review)

- Alpha Sigma Nu (National Jesuit Honor Society)

**B.S.—Oakland University, Rochester, MI**                                  **1970**
- Honors in Electrical Engineering
- Tau Beta Pi
- Attended Carnegie Institute of Technology before finishing last year at Oakland
  University.

## BAR ADMISSIONS

- State of Michigan
- U.S. District Court for the District of Michigan, Eastern Division
- U.S. District Court of the District of Michigan, Western Division
- U.S. Court of Appeals for the Federal Circuit
- United States patent and Trademark Office

## SELECTED PROFESSIONAL AFFILIATIONS

- American Intellectual Property Association
- American Bar Association, IPL Section
- National patent Law Association, Intellectual Property Law Section
- Giles Sutherland Rich American Inn of Court

**Exhibit A**
Page 3 of Resume/Vita

## PUBLICATIONS

*Digital Tech May Revolutionize Global Commerce,* NAT'L L. J., Oct. 25, 1995, at C23.

*The New patent and Trademark Office Paradigm for Design patents,* 24 AM. INTELL. PROP. L. ASS'N Q. J. 317 (1996)

*patent Harmonization Committee Report,* AM. INTELL. PROP. L. ASS'N BULL. 486 (May 1995).

WEST'S LEGAL FORMS, PATENTS, TRADEMARKS & COPYRIGHTS (Supp. 1990-93).

## PARTIAL LIST OF PRESENTATIONS AND PAPERS

*High Technology Law in the Twenty-First Century:  Second Annual High Technology Law Conference,* SUFFOLK TRANSNAT'L L. REV. 1 (Winter 1997).

*Intellectual Property Rights - Achieving TRIPS Level Protection,* APEC INDUSTRIAL PROPERTY RIGHTS SYMPOSIUM (Tokyo, August 1996)(Session 2: Achieving TRIPS Level Protection, "Keynote Address")

*New Ideas about patenting and Regulating Phytotechnical Innovations* (with *Robert G. Pinco),* NUTRACON '99 (Las Vegas, July 12-14 1999)

*Ethics for Intellectual Property Practitioners,* Arlington County Bar Association (Crystal City, VA, April 26 1997)

*Japan and the New Asia,* Keynote speech for INTELLECTUAL PROPERTY: JAPAN AND THE NEW ASIA (Wash. DC, October 21 1997)

*Materials, Processes, and Intellectual Property for the 21st Century,* SAMPE'99 (Long Beach, May 25 1999)(Presented to the Society for the Advancement of Material and Process Engineering annual world-wide convention as a part of a Special Keynote Panel)

*International Intellectual Property in the 21st Century,* 13TH ANNUAL COMPUTER LAW CONFERENCE (1999)(*Sponsored by* The University of Texas School of Law)

*patenting EST's,* PATENTING HUMAN GENES: AN INCENTIVE OR IMPEDIMENT TO RESEARCH, AMSIE'97 (Seattle, February 1997) (for the AAAS Annual Meeting and Science Innovation Exposition).

*United States Intellectual Property Policy,* PROCEEDINGS OF THE THIRD U.S.-KOREA SCIENCE AND TECHNOLOGY FORUM (Copyr. 1996, George Mason University Center for Science, Trade, and Technology Policy)

*What's New in patents? Changes to the U.S. patent Laws.* ASEE ELD 1996 CONFERENCE SESSIONS (Wash. DC 1996)

*The State of the United States patent and Trademark Office,* 41ST ANNUAL CONFERENCE ON DEVELOPMENTS IN INTELLECTUAL PROPERTY LAW AT THE JOHN MARSHALL LAW SCHOOL (Chicago, February 1997)

### Exhibit A
Publications and Presentations

**Documents Considered**

U.S. Patent No 4,595,894

U.S. Patent No. 4,518,945 and the file history

U.S. Patent No. 4,386,338 and the file history

The file history of patent application Serial No. 558,262

Patent Application Information Retrieval Reports for the '894, '945, and '338 patents

Materials relating to the application for the '894 patent and Certificate of Correction

Various provisions of the Manuel of Patent Examining Procedure

**CHRONOLOGICAL SUMMARY OF FACTS**

| Date | Event | Support |
|------|-------|---------|
|      |       |         |

**Exhibit C**
Page 1 of Chronological Summary of Facts