IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | |
|---|---|
| PLAINTIFF MANUFACTURING, INC. )<br>)<br>(Plaintiff) )<br>)<br>v. )<br>)<br>UNIVERSAL SECURITY INSTRUMENTS, INC.)<br>USI ELECTRIC, INC. )<br>)<br>(Defendants) ) | 01CV3855 AMD |

**DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' CROSS-MOTION
FOR SUMMARY JUDGMENT OF INVALIDITY**

Defendants, Universal Security Instruments, Inc. and USI Electric, Inc. (hereafter collectively referred to as "USI"), through their attorneys, hereby submit this brief reply to address a few issues raised in Plaintiff's opposition and reply.

**REPLY**

**I. DOUBLE PATENTING**

Plaintiff finds itself in a desperate position. In its latest attempt to avoid the impact of the incorporation of by reference of the '945 patent in its entirety, Plaintiff points to the language of MPEP § 2181 regarding incorporated documents and the need to amend the specification to include the material incorporated by reference. See Plaintiff's Reply Br. at 3-5. According to Plaintiff, "if the examiner believed that the '894 Patent claims were broad enough to cover [both structures] . . . then it would have been required that the examiner take that additional disclosure and insert it directly into the specification of the '894 Patent

(MPEP § 2181)." *Id.* at 4. Unfortunately for Plaintiff, the requirements in MPEP § 2181 it relies upon **did not exist** in the MPEP **until February 2003**. Thus, there is absolutely no factual basis for Plaintiff's assertions about the beliefs and behavior of the Examiner from almost 20 years ago.[1]

To demonstrate Plaintiff's erroneous and reckless reliance on an MPEP requirement which was not in effect at the time the application was examined, attached hereto as Exhibit 1 is the Introductory pages to the MPEP, 8th Ed., 1st Revision, dated February 2003. As set forth on page 1 of these pages, the First Revision of the Eighth Edition introduced a new chapter 2100 (which includes § 2181), which replaced the prior chapter of the original Eighth Edition. *See* Exhibit 1, MPEP 8th Ed., 1st Rev. at 1. Further as set forth on page 16 of the Introductory pages, section 2181 was revised to include new requirements for examining applications with respect to §112 issues.

Attached hereto as Exhibit 2 is MPEP § 2181 as it existed in the original Eighth Edition before the 2003 revision. *See* Exhibit 2, MPEP 8th Ed. at § 2181. Noticeably missing from the Eighth Edition is the language the Plaintiff now relies upon.

What has remained constant since the application was filed is MPEP § 608.01(p). *See* Exhibit 3, MPEP § 608.01(p), 4th Ed. (June 1979) and MPEP § 608.01(p), 5th Ed., Rev. 16 (March 1994). As already set forth in various papers on this issue, the parties agree that MPEP § 608.01(p) allows applicants to incorporate "essential material" by reference to, *inter alia*, issued U.S. Patents,

---

[1] Defendants submit that no weight should be given to Plaintiff's arguments directed to the behavior and motivations of the Examiner because the Official record of events that transpired before the PTO, and the materials considered by the Examiner during prosecution has been lost.

2

*see id.* at 608.01(p), and that material incorporated by reference will be treated as if specifically set forth in the application which incorporates the document. Consequently, the '894 patent is invalid for double patenting.

## II. DISCOVERY ISSUES

The plain truth is that the testimony of Steve Campolo given in the present suit is at odds with Mr. Campolo's testimony in the ITC proceedings. In an effort to prevent USI from using materials uncovered during the June 19, 2003 document inspection to Plaintiff's detriment in these motions, Plaintiff intentionally delayed production of these documents until August 27, 2003, long after service of Defendants' opening brief. Indeed, in their combined opposition and reply papers, Plaintiff has the gall to accuse USI of "nonfeasance" and the cause of the delays. *See* Plaintiff's Opp. Br. at 15-16.

Rather than rehash the events that led to USI having to contact the Court regarding Plaintiff's refusal to produce the documents identified for copying, a very brief timeline is provided to demonstrate the falsity of Plaintiff's version of the delays. On June 23, 2003, USI provided a clear and detailed 5-page list of the items to be copied. Letter from William E. Bradley, Esq. to Joseph G. Lee, Esq. dated June 23, 2003. (Exhibit 4). On June 24, 2003, Plaintiff indicated that the documents would be sent to a copy service and USI would be invoiced directly. On June 25, 2003, USI wrote to counsel to remind Plaintiff that Local Rule 104.11(c) limits the amount which can be charged for copies and that it was improper to have the copy company (which charges substantially more than the amount allowed under the local rules) invoice USI directly. Letter from William E. Bradley, Esq. to Joseph G. Lee, Esq. dated June 25, 2003. (Exhibit 5). Plaintiff

3

now attempts to use this exchange of letters to fabricate a position that USI was the source of the delay because documents were held up at the copy service. See Plaintiff's Opp. Br. at 15-16. This is clearly not the case. Defendants never communicated with any copy service, let alone, had a dispute over expenses. Moreover, Plaintiff did not even begin copying the documents until at least July 8, 2003, well after any alleged dispute with a copy service.

On July 8, 2003, Plaintiff contacted USI to ask what the last bates number was in the documents produced earlier in the litigation. Obviously, if the documents had already been sent to the copy service, Plaintiff would not be asking what number the copies should start on. USI responded and expected the documents to be copied and produced the next day. See E-mail to/from William E. Bradley to H. Tamaraz dated July 8, 2003 (Exhibit 6). No documents were produced until USI threatened to contact the Court for the intentional and unexcusable delay in production. See Letter from William E. Bradley, Esq. to D. Christopher Ohly, Esq. dated July 11, 2003. (Exhibit 7). One box of documents, bates numbers LMC-USI 01594 through LMC-USI 03944 was sent out on the next day, Saturday, July 12, 2003, and received on Monday, July 14, 2003.

The documents sent out on Saturday, July 12, 2003, were only a fraction of those identified for production. Of particular interest, the deposition transcripts of Steve Campolo were amongst the documents **not** produced. Despite

4

numerous attempts to get the documents produced, it was not until August 27, 2003, that Plaintiff finally relinquished the remaining documents.[2]

Plaintiff attempts to explain away its refusal to produce the documents or respond to USI's numerous inquiries as to when the remaining documents would be produced by offering that the "delay occurred due to difficulty with payment by defendants of the copy service **after** the documents were delivered to the copiers by the plaintiff." Plaintiff's Opp. Br. at 15 (emphasis supplied). As already set forth, USI declined to be invoiced directly by the copy service two weeks before the documents were even sent for copying. More telling, however, is the fact that the documents produced on July 12, 2003, were sent by Greenberg, Traurig LLP, not some copy service (see Exhibit 8, which is the Federal Express label from the box sent on July 12, 2003), and more importantly, the box itself identifies that it contains documents bates numbered LMC-USI 01594 through LMC-USI 03944 and that it is **"Box 1 of 1"** (see Exhibit 9, which is the side of the box identifying the contents). Clearly, Plaintiff intentionally withheld the remaining documents (which were finally produced on August 27, 2003, more than two months after they were requested). "Box 1 of 1" being printed on the side of a box from a copy company could not be a clearer indication that its contents represent the universe of documents sent to be copied. Clearly, Plaintiff had no intention of producing the other documents, did not even send the documents to the copy company to be copied, and is disingenuous that there were other documents lost at a copy service of by the Defendants. All of the documents sent to the copy service were

---

[2] Certain catalogs dating back to 1993 were produced on August 1, 2003 in response to the Service of a Motion to Compel on July 24, 2003. However, the catalogs dating back to 1983 remain the subject of a Defendants' pending Motion to Compel.

returned to Greenberg, Traurig LLP and then sent to USI by Greenberg, Traurig LLP. Further, the fact that Greenberg, Traurig LLP sent the documents clearly shows that a third party copy service is not at fault. Plaintiff knew exactly what was being sent out and when. Seeing the position that Plaintiff now finds itself in, it is not surprising that an attempt to keep the transcripts of Steve Campolo out of the hands of USI was made.

### III. 35 U.S.C § 102(B) "ON-SALE BAR" AND INEQUITABLE CONDUCT

As set forth in Plaintiff's brief, it is true that Mr. Campolo testified that he had no knowledge of sales of the '894 type GFCI (model nos. 6599, 6598, and 6590) prior to 1985. See Plaintiff's Opp. Br. at 16. However, Mr. Campolo was also examined in connection with a number of documents dated prior to the critical "on-sale bar" date related to GFCI model no. 6599 and 6598 and indicated that those documents did not suggest that these GFCIs were on-sale. See Deposition of Steve Campolo, February 6, 2003, 01-CV-3855 (D. Md.) at 81:14 to 92:9 (hereinafter "Campolo Depo. Tr.")(Exhibit 10)(filed Under Seal). Of particular pertinence to the present controversy is the testimony, and Mr. Sutton's blatant coaching of the witness, relating to catalog numbers and products being on-sale:

REDACTED

**REDACTED**

REDACTED

Deposition of Steve Campolo, January 23, 2003, ITC-TA-337-478 at 318-19 (emphasis added)(Exhibit 11)(filed Under Seal).

In view of the foregoing, it is no wonder that Leviton attempted to keep these transcripts from USI. As expected, the recent production of this transcript at a minimum presents an on-sale bar issue. In fact, the evidence is such that summary judgment in USI's favor is warranted. The ITC did not enter summary judgment against Leviton on the on-sale issue because no documents dated prior to April 1, 1984 were presented. That evidentiary problem does not exist in this case. Indeed, a number of the documents on which Mr. Campolo was examined are prior to that date. See Campolo Depo. Tr. at at 81:14 to 92:9 (Exhibit 10). Unquestionably, at a minimum, the adverse inference exists that Mr. Campolo's later testimony was a self-serving attempt to save the patent from invalidity for being on-sale more than 1 year prior to the filing of the '894 patent.

As set forth in USI's opposition and cross-motion, the potential on-sale activity and its apparent non-disclosure to the PTO present serious inequitable conduct issues. Also, despite Plaintiff's arguments to the contrary, there is **nothing** on the face of the '894 patent that would indicate that the Examiner knew of or considered the '338 patent or any of the references cited in the '262 application. Plaintiff's own patent expert already conceded this point. Clearly, important factual issues remain to be decided in connection with the inequitable conduct defense raised in this case.

## IV. PATENT MISUSE

Plaintiff mistakenly states that USI's patent misuse defense is based upon the issues it discusses in its brief. Notably missing from Plaintiff's papers is any discussion of one of the main issues raised by USI in its interrogatory answers as to its misuse defense:

> In filing suit, Plaintiff coupled the patent infringement claim with a trade dress infringement claim. Plaintiff does not have any identifiable or protectable trade dress. The trade dress count was presented solely in an effort to extend the temporal and subject matter scope of the patent and hinder competition. Specifically, knowing the patent was soon to expire, Plaintiff alleged trade dress infringement because trade dress may be protectable in perpetuity. Plaintiff's scheme was to coerce smaller competitors to seek settlement of lawsuits to avoid the crippling expense of litigation. In seeking to avoid such expenses, Plaintiff would force the smaller companies to agree to settlement terms requiring them to leave the GFCI market all together or to agree to the payment of large royalties in perpetuity. Plaintiff's actions constitute an unlawful tying arrangement and are acts of patent misuse.
>
> Also in connection with its smaller victims, even if they agreed to leave the market all together, Plaintiff would still force these smaller companies into signing settlement terms that illicit their acknowledgement that the '894 patent is valid and enforceable and that Plaintiff has a recognized and protectable (yet unspecified) trade dress. Plaintiff would then use these agreements to leverage other companies and to ensure that the smaller companies cannot reenter the market after the expiration

9

of the '894 patent. Plaintiff's actions are an unlawful attempt to extend the temporal scope of its patent and constitutes acts of misuse.

See Defendants' Response to Interrogatory No. 14.

Further, there are a number of fact issues presented by USI's other allegations and in its interrogatory response which preclude summary judgment on this issue. In addition, it is noteworthy to point out that Plaintiff, in its moving papers, also fails to address other defenses raised by USI, including, laches, prosecution laches, and intervening rights.

## CONCLUSION

In view of the foregoing, Defendants' respectfully request that Plaintiff's motion for summary judgment of validity and enforceability be denied, and Defendants' cross-motion for summary judgment of invalidity and unenforceability be granted.

Respectfully submitted,

UNIVERSAL SECURITY INSTRUMENTS INC.
USI ELECTRIC, INC.

By: _____
Maurice U. Cahn, Esq.
Frederick N. Samuels, Esq.
William E. Bradley, Esq.
CAHN & SAMUELS, LLP
2000 P Street, NW, Suite 200
Washington, D.C. 20036
(202) 331-8777 (Phone)
(202) 331-3838 (FAX)