IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LEVITON MANUFACTURING CO., INC.,  :
     Plaintiff              :
                          :
     v.                  :     Civil No. AMD 01-3855
                          :
UNIVERSAL SECURITY         :
INSTRUMENTS, INC., et al.,    :
     Defendants       :

...o0o...

MEMORANDUM OPINION

Plaintiff, Leviton Manufacturing Co., Inc., instituted this action against Universal

Security Instruments, Inc., and USI Electric, Inc. (hereinafter referred to jointly as "USI")

for patent infringement of Leviton's patent, U.S. Patent No. 4,595,894 (issued June 17,

1986) (the "'894 patent"), entitled "Ground Fault Circuit Interrupting System." Additionally,

Leviton brought a claim for trade dress infringement. USI counterclaimed, seeking a

declaratory judgment on several grounds. Now pending, *inter alia*, are the parties' cross

motions for summary judgment.[1] The issues have been exhaustively briefed and a hearing

has been held. For the reasons stated herein, I shall grant the motions in part and deny them

---

[1]Also pending are USI's motions to compel and for sanctions; both motions are hereby denied. USI's motion to compel seeks an order compelling Leviton to produce sales catalogs from the 1984 period or, in the alternative, an order requiring Leviton to certify that such catalogs do not exist. Leviton's counsel stated on the record at the hearing that, despite a diligent search, such catalogs are not in Leviton's possession. This representation by counsel is sufficient. USI's motion for sanctions alleges that Leviton violated a confidentiality order entered in this case by sharing information learned in discovery concerning USI's sale of GFCIs with its Canadian affiliate. Leviton denies this allegation and asserts that the Canadian affiliate learned of USI's sales through the Canadian marketplace. Leviton offers the unrebutted declaration of Gabriel Massabni, an Executive of Leviton Manufacturing of Canada as support. Consequently, USI's motion for sanctions is denied as there has been no showing that the court's confidentiality order has been violated.

in part.

I.

Leviton filed its complaint on December 13, 2001, asserting a claim of patent infringement of the '894 patent under 35 U.S.C. § 271 and for trade dress infringement of its Ground Fault Circuit Interrupter ("GFCI") product under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Since June 17, 1986, Leviton has held the '894 patent as the assignee of co-inventors Richard C. Doyle and Lester Rivera. The patent expired on June 17, 2003. Unusual issues are presented in this case because the '894 patent's prosecution history is unavailable; the U.S. Patent and Trademark Office ("USPTO") lost its copy and Leviton's counsel's copy was destroyed in a fire.

The '894 patent, depicted below in Figure , is directed towards a "switching system for interrupting an electrical circuit." *See* '894 patent, Abstract.  It is a continuation in part of Leviton's U.S. Patent No. 4,518, 945 (the "'945 patent") (issued May 21, 1985) and incorporates by reference the entire contents of the '945 patent and its parent application, U.S. Patent No. 4,386, 338 (the "'338 patent") (issued May 31, 1983). *See* '894 patent, col. 1, ll. 5-16; '945 patent, col. 1, ll. 5-6.  The background and summary of the invention describes the '894 patent as a "second preferred embodiment" because it is one of a continuous series of technical developments that related to the breaking or interrupting of circuits upon the existence of predetermined conditions. *See* '894 patent, col. 1, ll. 19-25. The '894 patent claims a novel  "electromechanical and mechanical means by which, in

response to a signal, a circuit is interrupted by a physical separating of electrically conducting contacts." *See* '894 patent, col. 1, ll. 45-50.

FIG. 1, '894 patent



The incorporated '945 patent "teaches a remote control system" that includes a "novel flip-flop cam arrangement which enables the making and breaking of a circuit." *See* '945 patent, Abstract. Similarly, the '338 parent patent teaches a remote control system with a flip-flop cam arrangement. *See* '338 patent, Abstract. The disclosures and drawings in the '945 and '338 patents are identical. The sole distinction between them is that the '945 patent claims the additional function of being able to *close* (in addition to the ability to *open*) an electrical connection. The extent to which the '945 and '338 patents are incorporated into the '894 patent and the consequences of such incorporation are hotly disputed issues in this case.

-3-

FIG. 1, '338/'945 patents



A further complication in this case arises from the fact that the USPTO issued the '894 patent with an error in claim 1, its only independent claim. The error consisted of an omission of claim language that described the invention's "plunger means." Specifically, claim 1 was issued *without* the italicized text below:

> Switching apparatus for selectively interrupting an electrical connection between input and output conductors or the like, comprising, in combination: a housing; magnetizable plunger means disposed within a portion of said housing for movement between first and *second positions; electromagnetic coils means disposed within* said housing for moving said plunger means when energized from the first position to the second position;

'894 patent, col. 6, ll. 49-55. Leviton secured a certificate of correction to the '894 patent on July 12, 1988, *but the certificate of correction also contained an error*. That is, the certificate of correction inserted the missing text into *claim 2* of the '894 patent instead of into *claim 1*, the claim with the omitted text.[2] On December 11, 2001, the USPTO issued a second

---

[2]The first certificate of correction read as follows:

It is certified that an error appears in the above identified patent and that said

(continued...)

certificate of correction which inserted the missing text into claim 1 where it belonged. The present action was filed two days later.[3]

## II.

Summary judgment under Fed. R. Civ. P. 56 is appropriate in a patent case as in any other case. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795-96 (Fed. Cir.1990). Pursuant to Fed. R. Civ. P. 56 (c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material for purposes of summary judgment, if, when applied to the substantive law, it affects the outcome of the litigation. *Id*. at 248. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[4]

A party opposing a properly supported motion for summary judgment bears the

---

(...continued)

> Letter patent is hereby corrected as shown below: Column 7, line 3, Claim 2, after "and" should read –second positions; electromagnetic coil means disposed within–

[3]Leviton had filed an earlier action in this court (*i.e.*, prior to the USPTO's issuance of the second certificate of correction) but it voluntarily dismissed that case.

[4]In patent litigation, it is often the case that some dispositive issues present questions of law for the court rather than questions of fact for the factfinder, *e.g.*, whether the patentee or assignee has engaged in double patenting. As to such issues, final resolution on summary judgment is often appropriate.

-5-

burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248-49. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324; *Anderson,* 477 U.S. at 252; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

III.

Leviton brings a cause of action for trademark infringement, alleging that USI markets products that utilize the trade dress and appearance of Leviton's GFCI products. USI seeks summary judgment as to that claim. Having fully considered the parties' contentions, and viewing the evidence in the light most favorable to Leviton, the nonmovant, it is clear that Leviton has made a showing sufficient to establish all the elements of its trade dress claim and therefore USI's motion shall be denied. *See Celotex*, 477 U.S. at 322.

Section 43(a) of the Lanham Act creates a cause of action for trade dress

infringement. 15 U.S.C. § 1125(a). "Trade dress" is a product's total image and overall appearance. Trade dress may include features such as size, shape, color or color combinations, texture, graphics or particular sales techniques. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n. 1 (1992).

Leviton alleges trade dress infringement by USI of the "well-known and non-functional appearance and arrangement of its ground fault circuit interrupter line." First. Am. Compl. ¶ 19.[5] To prevail on its claim of trade dress infringement, Leviton must establish that: (1) its trade dress is primarily non-functional; (2) the alleged infringement creates a likelihood of confusion; and (3) the trade dress either (a) is inherently distinctive or (b) has acquired secondary meaning. *Two Pesos, Inc.,* 505 U.S. at 769; *Ashley Furniture Indus. v. Sangiacomo N.A.,* 187 F.3d 363, 368 (4th Cir. 1999).[6]

To avoid summary judgment on the issue of non-functionality, Leviton must project evidence sufficient to prove that: (1) its trade dress is not essential to the "use or purpose of the article" and (2) that its trade dress does not "affect the cost or quality of the article." *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n. 10 (1982). A feature is functional "if exclusive use of the feature would put competitors at a significant

---

[5]At the outset, USI contends that Leviton cannot meet its burden with respect to trade dress infringement because Leviton never identified what constitutes its trade dress. USI's argument is wholly without merit as it is clear on the face of the Leviton complaint what constitutes the trade dress at issue, namely, the outward appearance of the GFCI face plate.

[6]USI does not contend that Leviton failed to present facts establishing actual confusion. Thus, it is deemed to concede, for the purpose of this motion, that the alleged infringement creates a likelihood of confusion.

nonreputation-related disadvantage." *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 657 (4th Cir. 1996) (quoting *Qualitex Co. v. Jacobson Prods.,* 514 U.S. 159, 165 (1995)).

Relying on *TrafFix Device Inc. v. Marketing Displays, Inc.,* 532 U.S. 23 (2001), USI argues that the existence of the '894 utility patent precludes Leviton from establishing that the appearance of its GFCI face plate is non-functional. This contention lacks merit. In *TrafFix*, the Court stated that a utility patent is "strong evidence that the features therein claimed are functional" and held that an expired patent defeated the assertion of trade dress protection sought in that case. *Id*. at 29-30. However, the Court's ruling in *TrafFix* does not prohibit a finding of protectable trade dress in all cases where a utility patent is involved. In *TrafFix*, the patent at issue disclosed a dual-spring mechanism used in temporary road signs that was the "central advance" and essential feature of the patent as well as the alleged trade dress. *Id*. at 30. The Court held that the patent holder failed to overcome the "strong evidentiary inference of functionality based on the disclosure of the dual-spring design." *Id*. at 30. The Court did not prohibit trade dress protection in all cases where features were disclosed in a utility patent. On the contrary, the Court stated that "[i]n a case where a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims . . . the manufacturer could perhaps prove that those aspects do not serve a purposes within the terms of a utility patent." *Id.* at 34. Consequently, *TrafFix* does not dictate a finding of functionality where a patent has been issued. Rather,

the Court prohibits affording trade dress protection of the central advance of an existing patent. The "central advance" of the '894 patent is not the outward appearance of the GFCI plate but rather its unique switching mechanism and ability to fit into a wall receptacle. As a result, Leviton's claim for trade dress infringement is not defeated by the mere existence of the '894 patent.[7]

To be sure, Leviton's allegation of trade dress infringement involves its GFCI's configuration and color, neither of which can be inherently distinctive. *See Qualitex,* 514 U.S. at 162-63 (holding that color cannot be inherently distinctive); *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 212 (2000) (holding that product design can never be inherently distinctive). Consequently, Leviton is left with the burden of proving secondary meaning: that the color and appearance of its GFCI identifies Leviton as the source of the product in the minds of the public. *See Inwood Labs., Inc.,* 456 U.S. at 851 n.11.

To establish secondary meaning as to color and appearance, Leviton relies on evidence that it contends shows USI's intentional copying of its GFCI product. In the Fourth Circuit, evidence of intentional direct copying establishes a prima facie case of secondary meaning sufficient to shift the burden of persuasion to defendants on that issue. *M. Kramer*

---

[7]Similarly, the fact that Leviton has permitted private labeling of its GFCI does not defeat its claim for trade dress infringement. Admittedly, exclusivity of use is evidence of secondary meaning. *U.S. Search, LLC v. U.S. Search.com, Inc.*, 300 F. 3d 517, 525 (4th Cir. 2002). However, non-exclusivity does not defeat a finding of secondary meaning, particularly here where the burden has been shifted as a result of direct evidence of copying.

*Manuf. Co., Inc. v. Andrews*, 783 F.2d 421, 448 (4th Cir. 1986); *Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 163 (4th Cir. 1990).

As a matter of law, the following deposition testimony of Harvey Grossblatt, President and Chief Financial Officer of USI, is evidence of USI's intentional copying sufficient to shift the burden of proof on the issue of secondary meaning to USI:

> Q: . . . . what is on [page 4893]?
>
> A:  4893 is an e-mail from [USI Chairman Michael Kovens] to [the manufacturer's representative, Barkley Bill,] dated August 23, 2000 talking about ivory and almond GFCI colors.
>
> Q:  In the second paragraph it says: This is the second time you have sent me samples to match up against Leviton.
>
> A: Yes.
>
> Q:  What does that refer to?
>
> A:  Color samples.  He sent them Leviton samples asking them to match up the colors.
>
> Q: Those are Leviton GFCI samples?
>
> A. Yes.

Pl. Opp'n to Mot. for Summ. J. on Count Two (Trade Dress), Ex. C at 334:19–335:9 (Dep. Test. of Harvey Grossblatt, February 12, 2003). Similarly, a series of communications from Kovens to Bill is probative of USI's attempts to copy the Leviton product. Specifically, Kovens writes "[t]he last question that [Leviton's] marketing people have deals with whether or not your factory can color match almond, ivory, brown and grey to the same color as

Leviton? If the answer is yes, can you do it on a consistent basis, order after order?" *Id*., Ex. E (Letter from Kovens to Bill dated April 27, 2000). A subsequent letter to Bill states "[w]hat are your comments about the [i]vory color from your perspective and do you believe that you can get it closer to the Leviton?" *Id.*, Ex. G (Letter from Kovens to Bill dated July 25, 2000). A later e-mail from Kovens to Bill states "[t]his is the second time that you have sent me samples to match up against Leviton. I am shocked that the samples still do not match . . ." *Id.*, Ex. H (E-mail from Kovens to Barkley, August 23, 2003). Manifestly, this evidence of copying establishes secondary meaning sufficient to shift the burden to USI under *M. Kramer*.

USI characterizes *M. Kramer's* burden shifting approach as outdated and disallowed by intervening Supreme Court opinions. However, the Supreme Court cases on which USI relies do not persuade me to conclude that the Fourth Circuit will abandon the rule of *M. Kramer*. In *Qualitex*, the Supreme Court simply held that colors can never be *inherently distinctive*; the Court nowhere states (or even suggests) that burden shifting is prohibited in the context of establishing secondary meaning. In *Wal-Mart Stores, Inc.*, the Court expanded the *Qualitex* holding and held that product design can likewise never be inherently distinctive. *Wal-Mart Stores, Inc.*, 529 U.S. at 212. There again, the Court was merely stating that product configuration must have secondary meaning; the Court did not cast doubt on *M. Kramer's* burden shifting approach. *Id*. at 215. Finally, USI's reliance on *TrafFix Devices, Inc.*, is misplaced. In *TrafFix,* as I discussed above, the Court addressed the burden on the

-11-

party alleging trade dress to show that its product configuration is not functional. *TrafFix Devices, Inc.*, 532 U.S. at 29. The Court did not reach the issue of whether the alleged trade dress had acquired secondary meaning because it held that the plaintiff did not meet its burden with respect to non-functionality. *Id.* at 34-35 ("The Lanham Act . . . does not protect trade dress in a functional design simply because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller.") In this case, Leviton has met its burden with respect to non-functionality and the burden may be shifted on the issue of secondary meaning with proof of intentional copying. *See also Larsen v. Terk Tech. Corp.*, 151 F.3d 140, 148-49 (4th Cir. 1998) (extending *M. Kramer's* burden shifting approach to trademark cases); *cf. Kaufman & Fisher Wish Co., Ltd. v. F.A.O. Schwarz*, 184 F. Supp. 2d 311, 319 n.4 (S.D.N.Y. 2001) (citing 2 MCCARTHY ON UNFAIR COMPETITION § 15:38, at 57-58 & n. 5) (describing *M. Kramer* approach as the "minority rule").

USI also suggests that *M. Kramer* does not apply to this case because the alleged trade dress in *M. Kramer* did not involve product configuration. The Fourth Circuit's ruling in *M. Kramer* is not so limited. The product at issue in *M. Kramer* was a coin-operated video poker game. The Court held that the defendants infringed on the plaintiff's trade dress by copying the "console in which the game is housed, the artwork on the glass panel upon which the video graphics are displayed and the name [of the game]." *M. Kramer*, 783 F.2d at 447. After acknowledging the lower court's finding that the defendants intentionally copied the

-12-

frontpiece as well as the console, the Fourth Circuit held that the evidence compelled "the conclusion of infringement by copying on the part of defendants." *Id*. at 450. It was the copying and not the type of trade dress that resulted in a finding of infringement. In sum, it simply is not within the province of this court to predict that the Fourth Circuit would hold that evidence that a product's configuration and colors were copied is insufficient as a matter of law to shift the burden of going forward to the defendant who copies to produce evidence of a lack of secondary meaning, and, ultimately, to assume the risk of nonpersuasion on the issue of secondary meaning. Accordingly, USI's attempt to limit *M. Kramer* is without merit and its motion for summary judgment on the trade dress claim shall be denied.

IV.

The parties' cross motions for summary judgment have raised numerous issues under the patent laws in respect to the validity and enforceability of the '894 patent, including indefiniteness, double patenting, obviousness, anticipation, inequitable conduct, and on-sale bar, and ultimately, whether Leviton has established infringement by USI as a matter of law. Furthermore, claim construction informs the resolution of several of the issues presented. I analyze all such issues below.

A.

USI seeks summary judgment on the ground that the missing language in claim 1 of the '894 patent rendered the patent indefinite under § 112, ¶ 2 and that no liability for infringement could ensue until the claim was corrected. Thus, USI contends that its liability

-13-

would accrue only from December 11, 2001, at the earliest, the date of issuance of the second certificate of correction, and persist only through June 17, 2003, the date on which the patent expired. USI also contends that both certificates of correction are invalid and that therefore it escapes liability entirely. I am persuaded by USI's former argument (but not the latter argument) and for the reasons stated herein I shall enter an order limiting its liability as requested.

1.

A patent is presumed valid and the law places the burden of proof on the party challenging a patent to prove its invalidity. 35 U.S.C. § 282. However, for a patentee to secure the benefit of the presumption, the patentee must accurately and precisely comply with specific statutory requirements. *United Carbon Co., et al. v. Binney & Smith Co.*, 317 U.S. 228, 232 (1942). The statutory definiteness requirement mandates that the patent specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  35 U.S.C. 112, ¶ 2.  This provision requires that a patent's claims meet two elements.  *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1377 (Fed. Cir. 2000).  First, the claim should "set forth what the applicant regards as his invention." *Id*. Second, "it must do so with sufficient particularity and distinctness, *i.e.*, the claim must be sufficiently 'definite.'" *Id*. The issue presented by the omission of claim language in claim 1 of the '894 patent involves the second element, definiteness. Its resolution depends on whether, on the one hand, definiteness may be

-14-

established by resorting to the patent specification, or, on the other hand, claim language must stand alone.

Claims are generally read without reference to additional written description; instead "[c]laim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[T]he claims define the scope of the right to exclude" and, therefore, the party wishing to rely on the specification must identify a term in the claim that "would draw in" statements in the specification. *Id.*; *Personalized Media Communications v. U.S. Int'l Trade Comm'n*, 161 F.3d 696, 706 (Fed. Cir. 1998). Consequently, if it is unnecessary to look to the specification "to interpret what the patentee means by a particular term or phrase in a claim," the specification limitation "is extraneous and cannot limit the claim." *Renishaw PLC,* 158 F.3d at 1249. *See also Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993).

In order to cure claim 1 of its indefiniteness resulting from the admittedly missing language, I would be forced to look to the specification to *add* words to the claims, not merely to *interpret* the words used in the claim. This approach is prohibited by the Federal Circuit's recent decision in *Allen Engineering Corp. v. Bartell Indus.*, 299 F.3d 1336 (Fed. Cir. 2002). In *Allen Engineering*, a patent's claim ended in the middle of a limitation. The *Allen Engineering* court determined that the truncated limitation was indefinite because it is "impossible to discern [the patent claims'] scope . . . ." *Id.* at 1349. Tellingly, the Court did not first search the written description for language that could define the patent's scope before

reaching its conclusion. The "omitted language" rule of *Allen Engineering* applies here.

Leviton seeks the application of a different rule of decision. Relying on *Isco Int'l, Inc. v. Conductus, Inc.*, No. CIV. A 01-47-GMS, 2003 WL 276250, at *7 (D. Del. February 10, 2003), Leviton contends that I must resort to the written description because the error in the '894 claim resulted from a clerical or a typographical error of the USPTO. In *Isco*, the word "planar" was inserted into a claim where it did not belong. After noting that the error was minor, the district court stated that because the mistake was a typographical error that would have been apparent to someone skilled in the art, the error should be disregarded. *Id.* at 4 n. 4. The district court reasoned that "typographical errors are regularly disregarded by courts when the error is apparent in light of the claims, specification or file history." *Id.* at 5.

Leviton's reliance on *Isco* is misplaced. *Isco* and the cases cited therein involved *minor* errors involving one or two words. *Id.* at *5 (*citing Lemelson v. General Mills, Inc.*, 968 F.2d 1202, 1204 n. 3 (Fed. Cir. 1992) (construing a claim preamble to include the word "toy" because the omission was clearly an error); *EMI Group North Am., Inc. v. Cypress Semiconductor Corp.*, 68 F. Supp. 2d 421, 438 (D. Del. 1999), *aff'd in relevant part*, 268 F.3d 1342 (Fed. Cir. 2001) (reading claim to read "claim 1" instead of "claim 2" and "1,000" instead of "10,000"); *Bailey v. Dart Container Corp. of Michigan*, 157 F. Supp. 2d 110, 124 n.7 (D. Mass. 2001) (construing "vent hold" to read "vent hole" where the evidence suggested the error was typographical)). Here, the error in the USPTO's issuance of the patent resulted in the omission of seven words from the '894 patent's only independent claim. This error

stands in marked contrast to the cases on which Leviton relies, where only one or two words were omitted or misspelled.

Leviton also urges me to follow the lead of the United States District Court for the Northern District of California in a prior case involving the '894 patent and conclude that the issuance of a certificate of correction was unnecessary to render the '894 patent definite under 35 U.S.C. 112, ¶ 2. Prior to the Federal Circuit's ruling in *Allen Engineering*, in *Leviton Manuf. Co. v. Orbit Electric & Lighting, Inc.,* cv 99-05861 (N.D. Cal. September 14, 2001), a district court reached a different conclusion from the one I reach here in a suit by Leviton against a different defendant. Orbit, the defendant there, like USI, sought a judgment as a matter of law that the '894 patent was invalid for indefiniteness as issued and as corrected by the first certificate of correction.[8] Not having the benefit of the Federal Circuit's more recent decision in *Allen*, the district court relied in large part on *S3, Inc. v. Nvidia Corp.*, 259 F.3d 1364 (Fed. Cir. 2001), and *Solomon v. Kimberly Clark Corp.*, 216 F.3d. 1372 (Fed. Cir. 2000), to conclude that the '894 patent, when read in light of the specification with the understanding of one of ordinary skill in the art, was not indefinite under § 112, ¶ 2. However, the Federal Circuit decisions on which the district court relied do not change the result dictated by *Allen Engineering*.

In *S3, Inc.*, the party challenging the patent's validity argued that specific terms in the claims were ambiguous rendering the patent indefinite. The Federal Circuit held that the

_____

[8]The second certificate of correction had not been issued at the time of the district court's decision.

words in the claim were not ambiguous because the meaning of the terms at issue was revealed by a review of the written description. *S3, Inc.*, 259 F.3d at 1369-1370. The Court resorted to the specification to divine the meaning of actual text in the claims, not to add language that was missing as Leviton requests here. Similarly, *Solomon* does not support Leviton's approach. In *Solomon*, the Court upheld a patent where the alleged infringer stated that the claims were indefinite because the claim language conflicted with the inventor's testimony as to what was invented. *Solomon*, 216 F.3d at 1377. The Court stated that only the claims and the specification should be considered, and not outside extrinsic evidence, in determining whether the claims are definite. *Id.* at 1378. Ultimately, the reasoning in *Orbit*, while not unreasonable in light of existing precedent at the time the decision was reached, does not dictate the same result in this case. It is clear, then, that under *Allen Engineering*, prior to the USPTO's issuance of the second certificate of correction, the '894 patent was undoubtedly indefinite under §112, ¶ 2.

There is no dispute that certificates of correction have only prospective effect under *Southwest Software v. Harlequin*, 226 F.3d 1280, 1296 (Fed. Cir. 2000). Consequently, to the extent that the '894 patent was invalid for indefiniteness until the issuance of the second certificate of correction, USI's potential liability for alleged infringement accrues only on December 11, 2001, and continues up until the patent's expiration in June 2003.

2.

USI also seeks summary judgment of invalidity on the ground that the '894 patent

-18-

remained fatally indefinite under § 112, ¶ 2 even *after* December 11, 2001, because the second certificate of correction, which (finally) added the missing claim language to claim 1 of the '894 patent, was improperly issued under the Manual of Patent Examining Procedure ("MPEP") section 1485. Therefore, USI contends, the second certificate of correction must be disregarded. I reject the premise that the second certificate of correction must be disregarded and I therefore reject USI's contention that the '894 patent is invalid.

Under 35 U.S.C. § 254, a certificate of correction may be issued "[w]henever a mistake in a patent, incurred through the fault of the [USPTO] is clearly disclosed by the records of the Office . . . ." 35 U.S.C. § 254; 37 C.F.R. § 1.322. MPEP section 1485 further states that "a determination as to whether an error has been made, the responsibility of the error, if any, and whether the error is of such a nature as to justify the issuance of a certificate of correction will be made by the Certificate of Correction Branch." USI interprets the MPEP guidelines as requiring that a Patent Examiner review the *file history* before authorizing a certificate of correction, and because the '894 patent's file history was not available for review when the second certificate of correction issued in December 2003, USPTO could not have fulfilled the mandate of the MPEP section 1485, thus rendering the second certificate of correction invalid. Although USI acknowledges that the USPTO could have reviewed the microfilm of the originally filed application and the Patent Application Information Retrieval System (PAIR)[9] to determine the source of the '894 patent's error, USI maintains that these

---

[9]PAIR provides information located in the USPTO's Patent Application Location Monitoring

(continued...)

are not sufficient substitutes for the file wrapper because the microfilm and PAIR records fail to disclose the actual content of all communications between the applicant and the USPTO, as well as any Examiner amendments. Consequently, contends USI, neither the microfilm nor the PAIR printout clearly disclosed the nature and source of the error as required under § 254. USI's position is without merit.

Certificates of correction, like issued patents, are presumed valid. *Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358, 1367 n. 1 (Fed. Cir. 2001). This presumption, based on the assumption of the administrative correctness of USPTO actions, can only be overcome by clear and convincing evidence. *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1569 (Fed. Cir. 1996) (citing *Interconnect Planning Corp. v. Feil*, 774 F.3d 1132, 1139 (Fed. Cir. 1996). USI has failed to overcome the presumption. While USI correctly argues that without the file history it is not possible to establish conclusively what transpired during the prosecution of the '894 patent, USI cannot point to any specific evidence that the certificate of correction was improperly issued. Instead, USI merely assumes that the file history would have contained information to limit the scope of the second certificate of correction. There is no basis in common sense, and no precedent from the Federal Circuit, to support a reversal of the presumption of regularity and validity that USI seeks here.

In any event, the MPEP does not require the file wrapper to be examined prior to

---

(...continued)
system (PALM) to the public via the Internet.

issuance of a certificate of correction. Rather, MPEP section 1485 simply states that the Certificate of Correction Branch will determine whether an error in a patent allows for the issuance of a certificate of correction.  There is no clear and convincing evidence that this determination was not properly reached. As a consequence, the failure (the inability, really) to consult the file wrapper prior to issuance of the second certificate of correction in December 2003 does not dictate a finding that the certificate of correction was improperly issued.

Finally, even if it is assumed that the prosecution history is necessary to support the USPTO's issuance of a certificate of correction, there is no indication that the prosecution history was unavailable when it issued the *first* certificate of correction in 1988.  Although the first certificate of correction did not properly correct the '894 patent, it was a substantive correction that the USPTO presumably granted after reviewing the file history. Therefore, it would not have been necessary for the USPTO to revisit the file history prior to granting the second certificate of correction when the USPTO was merely asked to take the ministerial act of moving the added text from claim 2 to claim 1.

For these reasons, I find and conclude that the second certificate of correction was properly granted  and USI's motion for summary judgment that the '894 patent remained indefinite under §112, ¶ 2 after December 11, 2001, shall be denied.

## B.

USI also seeks summary judgment on the ground that the '894 patent is invalid for

double patenting. USI argues that Leviton's '945 and '338 patents' specific claims are encompassed in the more generic '894 patent, which renders the '894 patent invalid for double patenting. I find, to the contrary, however, that the '894 claims do not encompass all aspects of the earlier patents. Accordingly, I shall deny USI's motion.

1.

Obviousness-type double patenting invalidates later issued patents with claims that are not patentably distinct from claims in earlier, commonly-owned patents. *Eli Lilly v. Barr*, 251 F.3d 955, 967 (Fed. Cir. 2001). The doctrine disallows generic patent claims that broadly cover specific claims disclosed in earlier patents. *Id*. Obviousness-type double patenting prohibits a patentee from extending a patent's life by obtaining a new patent that essentially describes the same invention as the earlier patent. When a party alleges obviousness-type double patenting, the court must determine whether the later patent at issue describes an obvious variation of a prior commonly-owned patent. *In re Goodman*, 11 F.3d 1046, 1053 (Fed. Cir. 1993).

A double patenting inquiry involves two steps. First, the court construes claims in the relevant patents and identifies the difference in subject matter. *Eli Lilly,* 151 F.3d at 968 (citing *Georgia-Pacific Corp. v. United States Gypsum, Co.*, 195 F.3d 1322, 1326 (Fed. Cir. 1999)). Second, the court determines whether the difference in subject matter between the claims renders the later claims patentably distinct. *Id.* A later claim is not patentably distinct from an earlier patent claim if the later claim is obvious over the earlier claim. *Id*. USI's

motion for summary judgment asserts that the '894 patent is invalid for double patenting because the '894 patent's "broad" means-plus-function claims not only cover the '894 embodiment but also Leviton's '338 and '945 embodiments. Specifically, USI points to the '894's "movable cam means" and argues that its function can be performed by structures that are found in the '894 patent as well as the earlier Leviton patents. Leviton, contends, to the contrary, that when the claims in the three Leviton patents are properly read with the understanding of one skilled in the art, the '894 claims–which are directed towards a GFCI–could never encompass structures found in the remote controlled system that is described by the '338 and '945 inventions. For the reasons explained below, I agree with Leviton.

2.

The principles of claim construction are well-established. A patent's claims provide the formal definition of a patented invention. *E.I. Du. Pont de Meours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) (citing *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 395-96 (Ct. Cl. 1967)). The claims are construed from the perspective of a person of ordinary skill in the field of invention. *Hoechst Celanese Corp. v. B.P. Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996). The court may not use the specification to broaden or narrow the claims to give the patentee something different than what was set forth. *E.I. Du. Pont de Meours,* 849 F.2d at 1433 (citing *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867 (Fed. Cir. 1985)).

-23-

The claims at issue in the '894 patent are written in means-plus-function format. A means-plus-function claim is one that refers to a "means" for performing a given function without specifying the structure for performing that function. 35 U.S.C. § 112*, ¶ 6; Chiuminatta Concrete Concepts v. Cardinal Indus.*, 145 F.3d 1303, 1307-08 (Fed. Cir. 1998). Use of the term "means" in a claim raises a presumption that § 112, ¶ 6 applies. *QSI Indus., Inc. v. Mike's Train House, Inc.*, 230 F. Supp. 2d 1240, 1244 (D. Or. 2002) (citing *Kemco Sales, Inc. v. Control Papers Co., Inc.*, 208 F.3d 1352, 1361 (Fed. Cir. 2000)).

The court employs a two-step process for construing means-plus-function claims. First, the court, uses ordinary principles of claim construction to determine the function as explicitly set forth in the claims. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002) (internal citations omitted). Second, the court determines, from the perspective of one of ordinary skill in the art, what structure, if any, disclosed in the specification corresponds to the claimed function. *Id.* Any such specification must clearly associate the structure with the performance of the function. *Id.* Alternative embodiments may disclose different corresponding structures. *Id.* at 1113-114. *See also Serrano v. Telular Corp.,* 111 F.3d 1578, 1583 (Fed. Cir. 1997).

All of the claims, regardless of their format, should be construed in light of the specification. *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340-41 (Fed. Cir. 2001) (internal citations omitted). If the specification clearly excludes a particular feature, "that feature is deemed to be outside the reach of the claims of the patent,

even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Id.* at 1341; *see also Multiform Dessiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1479 (Fed. Cir. 1998).

A patent's preamble is also a tool for the court in construing a patent's claims. The importance of the claim preamble in limiting claims is dictated by the words in the preamble itself. *Bell Comm. Research, Inc. v. Vitalink Comm. Corp.*, 55 F.3d 615, 620 (1995). If the words suggest that the preamble is necessary to give life, meaning and vitality to the claims, then it should be read in that manner. *Id.* at 620-21. Further, "[w]here a patentee uses the claim preamble to recite structural limitations of his claimed invention, the [USPTO] and courts give effect to that usage." *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997).

Having identified the rules of construction, I next turn to construe the relevant claims of the patents at issue.

3.

The relevant claims are the "movable  means" and the "movable cam means" described in the '338/'945[10] and '894 patents, respectively, because it is those structures which render the later '894 patent patentably distinct from the earlier Leviton patents.

The '338 patent has four claims that together describe a switching apparatus for selectively completing or interrupting an electrical connection between input and output

---

[10]The '945 patent is continuation of the '338 patent and has an identical specification. The only difference is that the '945 patent is narrower. It avoids double patenting by including a terminal disclaimer which forfeited the portion of its statutory term extending beyond the life of the '338 patent.

contacts.  At issue here is claim 1, which recites a movable cam means and reads, in pertinent part, "moveable cam means responsive to said armature for influencing a separation of said input and output contacts, thereby interrupting electrical connection between them." *See* '338 patent, col. 10, ll. 39-43.  The function of the movable cam means is to interrupt an electrical connection by separating the electrical contacts upon energization of the coil in response to a fault. *See* '338 patent, col. 10, ll. 40-42. The structure capable of performing as the '338 movable cam means is recited in the written description which states that when coil 74 is actuated, movable cam means 132 moves in a clockwise motion to move the movable contacts away from the fixed contacts and consequently interrupt the electrical connection. *See* '894 patent, col. 9, ll. 15-32. A subsequent actuation of the coil moves the cam in a counter clockwise direction to the position where the cam means began, bringing the contacts back together and completing the interruption. *See* '338 patent, col. 9-10, ll. 50-12.

Claim 1 of the '945 patent also claims a movable cam means that is responsive to movement by an armature that ultimately influences a separation of said input and output contacts. *See* '945 patent, col. 10, ll. 25-30. The movable cam means recited in the '945 patent has the function of reconnecting the electrical current using the movable actuating means that causes the cam means to move in rotary and counter direction rotary movements. *See* '945 patent, col. 10, ll. 36-39. The structure in the '945 capable of performing this function is similarly included in the patent's written description as movable cam means 132. Specifically, the written description recites a movable cam means that breaks the electrical

connection between the input and output contacts and keeps them separated until the next

actuation of the coil. *See* '945 patent, col. 9, ll. 23-40.  The following figures from the '338

and '945 patents depict the relevant structures in the patents:

FIG. 9, '338/'945 patents[11]                    FIG. 10, '338/'945 patents



The

'894 patent has four claims directed to a switching apparatus for selectively interrupting an

electrical connection between input and output conductors and recites a "movable means" that

influences a separation of input and output contacts. *See* '894 patent, col. 6, ll. 62-65.  The

movable means claimed in the '894 patent is described as a "movable means responsive to

movement of said plunger means for influencing a separation of said input and output

contacts, thereby interrupting electrical connection between them." *See* '894 patent, col. 6,

---

[11]The movable contacts are represented in Figures 9 and 10 as 196 and 198 while the fixed contacts are represented as 214 and 216.

ll. 63-66.  An examination of the '894 written description reveals the structure capable of

performing this function as including a banger dog that causes

> rear banger dogs 362 to "bang" or hit against latching member portions 470,
> dislodging latching fingers 430 from engagement with the undersides of ends
> 460 of the movable contacts as a result of the rearward pivotal movement of the
> latching members, with the further result that the movable contact arms 462
> swing downwardly under spring pressure such that the contacts are separated,
> thereby "breaking" or interrupting the normally closed operating circuit. The
> circuit remains open until reset by means of the reset button 444 in the manner
> already described.

*See* '894 patent, col. 5, l. 62-col. 6, l. 4.  The figures below depict these structures:

FIG. 6, '894 patent               FIG. 7, '894 patent



In addition to the structure just described, USI maintains that the '945 patent's

movable cam means can perform the '894 movable means function. The '894 patent is a continuation in part of the '945 patent and encompasses a description of a previously undisclosed second preferred embodiment of the invention.  Thus, the court must construe the '894 means-plus-function claims by examining both patents for structures capable of performing the relevant functions. *See Ishida Co. Ltd. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000).  However, "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed outside of the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."  *Scimed Life Sys., Inc.,* 242 F.3d at 1341.

Throughout its specification, the '894 patent clearly explains that *any structure performing its functions may only break and not reclose the electrical circuit*. The "Background and Summary" of the '894 patent clearly describes the purpose of the '894 patent as a switch that is capable of "opening or interrupting a circuit." *See* '894 patent, col. 1, ll. 51-64. Similarly, the "description of preferred embodiment" describes the '894 embodiment as requiring a manual reconnecting "by means of the reset button 44." *See* '894 patent, col. 6, ll. 3-4.  The preamble limits the claims to a GFCI by stating that the '894 patent claims a "[s]witching apparatus for selectively interrupting an electrical connection between input and output conductors, or the like . . ." and saying nothing about allowing the

connection to be reclosed.[12] *See* '894 patent, col. 6 , ll. 49-51.

In contrast, the written descriptions of the '945 patent and its parent '338 clearly describe a flip-flop cam arrangement that not only interrupts *but also completes* an electrical connection between input and output conductors. The '338 preamble references a "switching apparatus for selectively *completing* or interrupting an electrical connection between input and output conductors." *See* '338 patent, col. 10, ll. 24-26 (emphasis added). The '338 "Summary" describes a "flip-flop cam arrangement" or a remote controlled, successive cycle of interrupting and completing of a circuit, in response to a series of electronic signals. *See* '338 patent, col. 1, l. 67. The '945 patent includes an identical preamble and also defines a "remote control switch" which is cyclically operated by a flip-flop cam arrangement. *See* '945 patent, col. 10, ll. 12-15, 30-14. Thus, the '338 and '945 patents clearly describe a structure that is different from a GFCI and it would be inappropriate for the court to identify the '945 structure as capable of performing the means function described in the '894 patent. *See Wang Lab., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999) ("The usage 'preferred' does not itself broaden the claims beyond their support in the specification.")

The '894 patent's incorporation by reference language does not change this result. The '894 patent states that it "incorporates by reference as if fully set forth the entire contents

---

[12]The '894 patent's preamble is properly considered to be a claim limitation. The '894 patent's claims recite an "input contact electrically connected to said input conductor; and output contact electrically connected to said output conductor." *See* '894 patent, col. 6, ll. 55-58. The words "said input conductor" and "said output conductor" require one reading the patent to refer back to the preamble. Therefore, it is appropriate to say that the preamble gives life and meaning to the patent claims. *See Corning Glass Works v. Sumitomo Elec. U.S.A.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989).

and subject matter thereof of any and all of [the '945 patent] and [its] respective parent application to which it is copending." *See* '894 patent, col. 1, ll. 12-16.  This statement does not expand the scope of the '894 patent to include structures which serve as remote controlled cam arrangements. Instead, as the '894 patent clearly states, it incorporates the parent patents because it is

> another in a continuous series of technical developments relating, directly or indirectly, to the breaking or interruptions of circuits upon the existence of predetermined conditions. Because of this common thread that runs through these developments, the author hereof has chosen to group same within this continuation in part application, rather than file same in a separate and distinct patent application. This will also serve to aid the Examiner in considering, collectively, the prior art to record in all applications.

*See* '894 patent, col. 1, ll. 22-31. The specification further provides that "the second embodiment of this invention concentrates upon the ground fault circuit interrupting features of the invention." *See* '894 patent, col. 1, ll. 35-37. This reference to ground fault circuit interrupting has special meaning to one of ordinary skill in the art, a meaning which could not include the flip-flop cam arrangement. *See* Pl. Opp'n and Cross Motion for No Invalidity for Double Patenting, Ex. C, ¶ 8 (Declaration of Steve Campolo, Vice President of Engineering, Personnel Protection Products at Leviton) ("Campolo Declaration").  The '338 structure allows for a "sequential actuation of coil 74" which would permit the circuit to be reclosed. *See* '338 patent, col. 9, ll. 50- col. 10, ll. 15.  This is not permissible in a GFCI and USI's identification of the ''338/'945 cam means as a structure capable of performing as a movable cam means is inaccurate.

4.

The relevant claims having been construed as set forth above, it is readily apparent that material differences exist in the subject matter of the inventions and thus, that the subject matter of each is patentably distinct.

Contrary to USI's contention that claim 1 of the '894 patent covers a broader, more generic scope than the '338 and '945 patent claims, I find that the '894 patent describes a completely different invention that is patentably distinct from the earlier Leviton patents. The structures in the parent applications describe a system whereby the electrical contacts are automatically reclosed in a continuous fashion. The invention claimed in the '894 patent can never automatically reclose the electrical connection. Accordingly, USI's motion for invalidity of the '894 patent on the ground of double patenting shall be denied.

C.

USI seeks summary judgment on the ground that the '894 is invalid under 35 U.S.C. § 102(b) as anticipated by the '338 patent, U.S. Patent No. 4,263,637 (the "'637 patent") (issued April 21, 1981), and U.S. Patent No. 4,010,431 (the "'431 patent") (issued March 1, 1977). This contention lacks merit.

Anticipation is a question of fact. *Scripps Clinic & Research v. Genetech, Inc.*, 927 F.2d 1565, 1576 (Fed Cir. 1991) (citing *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F. 2d 613, 619 (Fed. Cir. 1985), *cert. dismissed,* 474 U.S. 976 (1985)). An invention is anticipated under 35 U.S.C. § 102 (b) if it was "described in a printed publication in this . .

. country . . . more that one year prior to the date of application for patent in the United States." 35 U.S.C. § 102(b); *Helifix Ltd. v. Block-Lock, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000). A finding of anticipation will only result where a single prior art reference discloses every limitation of each claim of the patent in suit. *Scripps,* 927 F.2d at 1576 (citing *Carella v. Starlight Archery & Pro Line Co.*, 804 F.2d 135, 138 (Fed. Cir. 1983); *RCA Corp. v. Applied Digital Data Sys., Inc.*, 730 F. 2d 1440, 1444 (Fed. Cir. 1984)). It is not enough for a prior art to *almost* meet that standard. *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) (emphasis added). Rather, there must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of invention. *Id*. Further, the elements in the anticipatory prior art must be arranged as in the claim. *Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1458 (Fed Cir. 1984) (citing *Connell*, 722 F.2d 1542 (Fed. Cir. 1983); *SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365 (Fed. Cir. 1983)).

An anticipation inquiry requires a two step analysis. First, the court must construe the claims. *Helifix Ltd.,* 208 F.3d at 1346. Second, the court must compare the construed claim to the prior art to determine whether the prior claims anticipate the later claims. *Id*. USI asserts that the '338, '637 and '431 patents all anticipate the '894 patent. However, when the claims of the prior art are compared with the '894 claims, it is clear that they do not.

The '894 patent is not anticipated by the '338 patent. Here, a finding of anticipation is dependent on the court finding that the '945 patent is fully incorporated by reference in the

'894 patent. USI asserts the same argument that it presented on the issue of double patenting and maintains that a finding of anticipation is automatic where a generic patent is issued after the issuance of a species patent. Regardless of whether a generic patent is necessarily void for anticipation, the '338 patent does not anticipate the '894 patent because the '338 movable cam means could never be used in the invention claimed in the '894 patent.

The '637 patent recites a "Ground Fault Receptacle" patented by Charles W. Draper and Raymond H. Legatti. Although the '637 patent, like the '894 patent describes an "electric receptacle for trade size outlet boxes" that incorporates a ground fault circuit interrupting mechanism, *see* '637 patent, Abstract, a comparison of the '637 patent to the '894 claim limitations reveals that the '637 patent fails to disclose every single element of the claimed invention. Specifically, the '637 patent does not include the "banger dog and latch" system found in the '894 patent. *See* '894 patent, col. 5, ll. 62-63. Additionally, the features of the '894 patent are not located in the same position as those recited by the '637 patent. The '894 patent places its planar mounting strap, strap 326, immediately adjacent to the electromagnetic coil, 346 coil assembly, not merely in close proximity. *See* '894 patent, Fig. 3. In contrast, the '637 strap makes four right angle bends along its principal length and avoids the front face of the housing, placing the strap close to, but not immediately adjacent to the coil. *See* '637 patent, Fig. 1, 3. Ultimately, these distinctions preclude a finding that the '637 patent anticipates the '894 patent.

Similarly, the '894 patent is not anticipated by the '431 patent. The '431 patent does

not include the strap means positioned immediately next to the solenoid coil that is claimed

by the '894 patent but rather uses a mounting plate to attach the apparatus to the selected

surface. Additionally, the '431 patent does not disclose the "banger and dog latching" system.

Finally, USI's blanket statement that the '431 patent discloses numerous structures

corresponding the claimed movable means is not sufficient to render '894 anticipated.

Because no single reference discloses all of its elements, the '894 patent is not invalid for

anticipation under § 102.

D.

USI also seeks summary judgment of invalidity on the ground of obviousness under

35 U.S.C. § 103. USI argues that the '637 and '431 patents, as well as U.S. Patent No.,

4,001, 652 (issued Jan. 4, 1977)( the "'652 patent"), when read in combination with the '338

patent, render the '894 patent invalid for statutory obviousness. Leviton has filed a cross

motion on this issue as well.

A patent is rendered invalid for statutory obviousness if "the differences between the

subject matter sought to be patented and the prior art are such that the subject matter as a

whole would have been obvious at the time the invention was made to a person having

ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. Obviousness

is an issue of law. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). However, there are

"several factual inquiries which underlie [an obviousness] determination." *Sibia*

*Neurosciences, Inc. v. Cadus Pharm. Co.*, 225 F.3d 1349, 1355 (Fed. Cir. 2000). In

-35-

determining whether a patent is invalid for obviousness under § 103, the court should examine (1) the scope and content of the prior art; (2) the level of ordinary skill on the field of invention; (3) the differences between the claimed invention and the prior art; and (4) any objective evidence of non-obviousness. *Id*.; *Graham*, 383 U.S. at 17-18.

At the outset, the scope and content of the prior art "must be reasonably pertinent to the particular problem with which the inventor was involved." *Glaxo Wellcome, Inc. v. Pharmadyne*, 32 F. Supp. 2d 265, 293 (D. Md. 1998). The prior art encompasses not only the field of the inventor's endeavor but also any analogous art. *Id*. (citing *In re GPAC, Inc*., 57 F.3d 1573, 1577-78 (Fed. Cir. 1995)). A reference is analogous art when a person of ordinary skill would reasonably have consulted it and applied its teaching in seeking a solution to the problem that the inventor was attempting to solve. *Id*. (citing *Markman v. Lehman*, 987 F. Supp. 25, 29 (D.D.C. 1997)). As a consequence, the inquiry also requires the court to determine the level of ordinary skill that will apply. The objective evidence of non-obviousness includes evidence such as long felt needs, failure of others to design the invention, and commercial success. *Id*. (citing *Graham*, 383 U.S. at 17 (1966), *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1573 (Fed. Cir. 1987), *cert. denied*, 481 U.S. 1052 (1987); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1545 (Fed. Cir. 1983), *cert denied,* 469 U.S. 851 (1984)). These secondary considerations "may often be the most probative and cogent evidence in the record. They are to be considered as part of all of the evidence, not just when the decisionmaker remains in doubt after reviewing the art."

*Stratoflex, Inc. v. Aeroquirp Corp.,* 713 F.2d 1530, 1538-39 (Fed. Cir. 1983).

A finding of obviousness requires a rigorous application of the requirement for a showing of the teaching or motivation to combine prior art references. *In re Dembiczak*, 175 F.3d 994, 999 (Fed. Cir. 1999), *abrogated on other grounds by In re Gartside,* 203 F. 3d 1305 (Fed. Cir. 2000) ("Combining prior art references without evidence of such suggestion, teaching, or motivation simply takes the inventor's disclosure as a blueprint for piecing together the prior art to defeat patentability–the essence of hindsight.")

USI relies on the following as relevant prior art for the obviousness inquiry: '338, '652, '637, and '431 patents. The parties do not dispute that these patents constitute prior art nor the level of skill to be applied. Therefore, in conducting my obviousness inquiry, I will consider only the differences in the relevant art and the secondary considerations of non-obviousness.

### i. '637 in Combination With the '338 Patent

The '637 patent discloses an electrical receptacle with a GFCI apparatus for selectively interrupting an electrical connection between input and output conductors. USI contends that the '637 patent in combination with the '338 patent renders the '894 patent invalid under § 103 because it would have been obvious to one of ordinary skill in the art to take the minor step of combining the '637 patent with '338 patent to take advantage of the magnetic function of the '338 strap and create the '894 GFCI. I disagree.

USI fails to provide clear and convincing evidence that it would be obvious to a person

of ordinary skill in the art to use the '338 mounting strap in the '637 patent but rather relies
on its conclusory statement that the change is minor. USI has not pointed to any "specific
teaching or references" in the '637 or '338 patents that would lead someone of ordinary skill
in the art to combine the two patents in such a way as to create the '894 invention. *See Symbol
Tech., Inc. v. Opticon*, 935 F.2d 1569, 1577-78 (Fed. Cir. 1991)(citing *Smithkline Diagnostics
v. Helena Labs.*, 859 F.2d 878, 887 (Fed. Cir. 1988). USI's broad conclusory statements are
insufficient to render the '894 patent invalid for obviousness. *See In re Dembiczak*, 175 F.3d
at 999 ("Our case law makes clear that the best defense against the subtle but powerful
attraction of a hindsight-based obviousness analysis is rigorous application of the requirement
for a showing of the teaching or motivation to combine prior art references.")  There is no
basis to conclude that the '637 patent combined with the '338 patent renders the '894 patent
obvious.

    *ii.  '652 Patent in Combination With the '338 Patent*

USI also argues that the '652 patent in combination with the '338 patent renders the
'894 patent invalid for obviousness. However, as Leviton's expert, Steven Campolo, explains,
substituting the '652 patent's U-shaped frame with the '338 strap means to create the '894
invention would be impossible, and even if it could be replaced, the '652 strap would not be
immediately adjacent to the coil as disclosed by the '894 patent. Pl. Opp'n to Def. Mot. for
Summ. J. for Double Patenting, Ex. C ¶ 8 (Campolo Declaration). More importantly,
notwithstanding its conclusion that the described change is minor, USI fails to provide any

evidence that one of ordinary skill would be motivated to use the '338 strap in the '652 invention to take advantage of the magnetic field generated by the coil. Here, as with the '637 patent, USI fails to make the necessary showing by clear and convincing evidence.

### iii.  '431 Patent in Combination With the '338 Patent

USI contends that the '431 patent in combination with the '338 patent renders  '894 invalid for obviousness because it discloses all of the '894 subject matter *except for the strap means*. USI again argues that it would have been obvious to one skilled in the art to use the '338 mounting strap in place of the '431 mounting plate rendering the '894 patent invalid for obviousness because the change is minor. Additionally, USI argues that although the '431 patent lacks the '894 patent's spring means for returning the plunger to the first position, the use of a spring means was well known at the time of the invention and it would have been obvious to one of ordinary skill in the art to use a spring means for its simplicity and low cost. Again, however, USI offers no evidence to suggest why one of ordinary skill in the art would be motivated to use the '338 strap means in the '431 patent other than the mere assertion that the change is a minor one.[13] I must reject such conclusory assertions.

### iv.  Secondary Considerations

In reaching a determination of obviousness, the court must evaluate any objective evidence of non-obviousness such as commercial success, long felt but unsolved needs,

---

[13]Leviton points out other distinctions that render the '431 patent sufficiently different from the '894 patent. Namely, the electromagnetic coil means 147 in the '431 patent is located towards the bottom of the housing whereas the strap is at the upper portion of the housing.  Further, the switch mechanism does not include the banger and latching system.  It is unnecessary to reach these grounds as the failure to include the magnetic strap is sufficient to defeat USI's claim for obviousness.

failure of others to design the invention and unexpected results. *See Glaxo*, F. Supp. 2d at 294. These factors are considered as part of the totality of the evidence that is used to reach the ultimate obviousness conclusion. *Id.*; *Richardson-Vicks, Inc. v. Upjohn Co.* , 122 F.3d 1476, 1483 (Fed. Cir. 1997). The prior art must first create the prima facie case for obviousness, which can then be rebutted by secondary considerations. *Glaxo*, F. Supp. 2d at 294 (citing *Graham*, 383 U.S. at 18). Evidence of secondary considerations weighs in favor of non-obviousness although the lack of evidence does not weigh in favor of obviousness. *Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d 870, 877 (Fed. Cir. 1993). USI has failed to establish the prima facie case of obviousness; thus, there is no need for Leviton to rely on secondary considerations. Nonetheless, it is worth noting that Leviton has offered uncontroverted evidence relating to secondary considerations that would preclude a finding of obviousness.

Evidence of copying suggests non-obviousness. *Windsurfing Int'l, Inc. v. AMF*, 782 F.2d 995, 1000 (Fed Cir. 1986 ), *cert. denied*, 477 U.S. 905, (1986). Correspondence between USI and its supplier acknowledges that USI copied the Leviton invention. Furthermore, the commercial embodiment of the '894 patent has resulted in great commercial success for Leviton.[14] *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (1988) ("The commercial response to an invention is significant to determinations of obviousness, and is entitled to fair weight.") (internal citations omitted). Combined this

---

[14]Leviton has sold in excess of 194,700,000 units since 1986, which amounts to sales of over one billion dollars.

uncontroverted evidence strengthens the position that the '894 patent is not invalid for obviousness.

E.

USI also seeks summary judgment of unenforceability of the '894 patent on the ground of inequitable conduct. USI alleges, *inter alia*, that Leviton acted inequitably by failing to bring the '338 patent to the attention of the USPTO examiner during the '894 patent application process. This contention lacks merit.[15]

Inequitable conduct results when a patentee fails to "disclose material information or [submits] false material information during prosecution of a patent with intent to deceive." *Glaxo,* 32 F. Supp.2d at 305 (citing *Gambro Lundia AB v. Baxter Healthcare Corp.,* 110 F.3d 1573, 1580 (Fed. Cir. 1997)). A patent applicant has a duty to call to the attention of the USPTO all non-cumulative information which a reasonable patent examiner would consider pertinent when reviewing patentability of the patent claims being pursued. *Id.* An applicant who willfully violates this obligation renders the patent unenforceable. *Id.* (citing *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 816 (1945)). USI, as the party alleging inequitable conduct, has the burden of establishing by clear and convincing evidence: (1) the materiality of misstatements and/or omissions; and (2) that the misstatements and/or omissions were intentionally made with the specific intent to deceive.

---

[15]USI also bases its assertion of inequitable conduct on the fact that the '894 patent was subject to an on-sale bar. As discussed, *infra*, there remain for resolution genuine disputes of material fact related to the on-sale bar issue. Therefore, a genuine dispute of material fact as to whether inequitable conduct occurred as a result of sales of the '894 invention more than one year prior to the filing of the '894 patent application may be presented at trial.

*Id*. at 305.  "Materiality is measured in terms of 'whether there is a substantial likelihood that a reasonable examiner would consider the omission or misrepresentation important in deciding whether to issue the patent.'" *Id.; Fox Indus., Inc. v. Structural Pres. Sys., Inc*, 922 F.2d 801, 803 (Fed. Cir. 1990) (citing *J.P. Stevens & Co. v. Lex Text Ltd.,* 747 F.2d 1553, 1559 (Fed. Cir. 1984), *cert. denied*, 747 U.S. 822 (1985)).  In order to establish an "intent to deceive," USI must meet a substantial challenge; it must provide the court evidence of a factual basis for finding deceptive intent. *Herbert v. Lisle Corp*, 99 F.3d 1109, 1116 (Fed. Cir. 1996) (citing *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 822 (Fed. Cir. 1992)). The alleged inequitable conduct,"viewed in light of all of the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1189 (Fed. Cir. 1993). As intent can rarely be proven by direct evidence, "it is most often proven by a showing of acts the natural consequences of which are presumably intended by the actor." *Merck & Co., Inc. v. Danbury Pharmacal, Inc*., 873 F.2d 1418, 1422 (Fed. Cir. 1989) (quoting *Kansas Jack, Inc. v. Kuhn*, 719 F.2d. 1144, 1151 (1983)). The court's role is to balance the materiality and intent to determine, "whether the scales tilt to a conclusion that inequitable conduct occurred." *J.P. Stevens*, 747 F.2d at 1560.

With respect to materiality, USI maintains that the '338 patent, which USI argues was not presented to the Patent Examiner, is a material reference because it could have rendered the '894 patent invalid for double patenting. *Dayco v. Total Containment*, 329 F.3d 1358,

1365 (Fed. Cir. 2003). A "patentee facing a high level of materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead.'" *FMC Corp. v. Manitowoc Co., Inc*., 835 F.2d 1411, 1416 (Fed. Cir. 1987). USI also points to the '262 application–which was incorporated by reference in the '894 patent– but was ultimately rejected and abandoned, in arguing that the rejection of a substantially similar invention is inconsistent with the position that '894 invention is patentable. *Dayco*, 329 F.3d at 1368 (Fed. Cir. 2003).

USI's argument is without merit. The '338 patent was before the examiner reviewing the '894 patent. The '894 patent specifically incorporates by reference the '338 patent by stating:

> The present application is a continuation in part of the applicants' both pending United States patent applications Ser. Nos. 431, 982 now [the '945 patent] . . . And Ser. No. 558,262 . . . and incorporates by reference as if fully set forth herein the entire contents and subject matter thereof and any and all of their respective "parent" patent applications to which they are co-pending.

*See* '894 patent, col. 1, ll. 5-15. An examiner would have retrieved all related parent applications for review as required by the MPEP Chapter 904 which states that "[i]n all continuing applications, the parent applications should be reviewed by the examiner for pertinent prior art." To the extent that the '894 references the '945 patent which is a continuation of the '338 patent, the '338 patent was made available to the examiner as required. The same is true of the '262 application which is clearly cited in the '894 patent. USI has failed to produced clear and convincing evidence of intent to deceive.

F.

USI also seeks summary judgment of unenforceability of the '894 patent on the ground

of patent misuse arising from Leviton's pursuit of its trade dress infringement claim. "Patent

misuse arises in equity, and a holding of misuse renders the patent unenforceable until the

misuse is purged; it does not itself invalidate the patent." *C.R. Baird. v. M3 Sys., Inc.*, 157

F.3d 1340, 1372 (Fed. Cir. 1998). Patent misuse will be found where a party uses its patent

to gain unfair commercial advantage through actions that extend the patent's effect beyond

the scope of the patent grant. *Id*. USI's allegations of patent misuse arise from Leviton's

pursuit of its trade dress infringement claim.[16]  USI contends that because Leviton does not

have any identifiable trade dress, the trade dress count was presented solely to extend the life

of the patent in perpetuity.

Here, again, USI's argument is unpersuasive. Other than mere allegations that

Leviton's complaint was part of a larger "scheme to coerce smaller competitors to seek

settlement of lawsuits" and "pay large royalties in perpetuity" for use of Leviton's trade dress,

USI did not present any evidence of an "unlawful tying." *Kingsdown Med. Consultants, Ltd.*

*v. Pharm. Corp.*, 863 F.2d 867, 872 (Fed. Cir. 1988) (Inequitable conduct resides in failure

to disclose material information, or submission of false material information, with an intent

to deceive, and those two elements, materiality and intent, must be proven by clear and

---

[16]Additionally, USI alleges that Leviton's failure to identify the existence of the grandparent '338 patent during prosecution of the '894 patent constitutes inequitable conduct.  Again, the '945 patent, which is a continuation of the '338 patent, is expressly incorporated by reference in '894.  Because an Examiner must review each successive parent application during the patent application process, the '338 patent was clearly disclosed in the '894 patent by the reference to the '945 patent.

convincing evidence.") (internal citations omitted.)  On the contrary, as discussed, *supra*, Leviton's trade dress claim survives summary judgment. Because Leviton's trade dress claim is based on a reasonable application of extant legal precedent and cannot be dismissed on summary judgment, USI's allegations of patent misuse are unsupported and USI's motion is denied.

G.

Leviton seeks summary judgement on the issue of patent infringement.[17]  A determination of patent infringement involves two steps.  First, the court must construe the claims as a matter of law.  *Voice Tech. Group, Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 612 (Fed. Cir. 1999); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir. 1995), *aff'd,* 517 U.S. 370 (1996).  Second, the claims are applied to the accused device.  *Voice Tech., Group, Inc.,* 164 F.3d at 612*; Markman,* 52 F.3d at 976. A patent is infringed when all of the patent's claim elements are found, either literally or by a substantial equivalent, in the accused product. *Vehicular Tech. Corp v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1088 (Fed. Cir. 1998).

As discussed, *supra*, the '894 patent is written in means-plus-function format and  to construe a means-plus-function limitation drafted in accordance with § 112, ¶ 6, the recited

---

[17]USI maintains that not all of its GFCI models should be considered as potentially infringing on Leviton's patent but rather the suit should be limited to the USI GFCI's imported from the Yatai Switch Factory ("Yatai GFCIs"). USI alleges that the Shanghai Meihao devices which USI began selling in the Fall of 2002 include "a single metal post projecting from the back of the reset switch and do not include the banger or banger dog found in the Yatai devices" and described by the '894 patent. Leviton concedes that only the Yatai GFCI is charged with infringing the claims of the '894 patent. However, the issue of exactly when that product was discontinued is in dispute and is not considered here.

function within that limitation must first be identified. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d. 1082, 1087 (Fed. Cir. 2003). Then the written description is examined to determine the structure that corresponds to and performs that function. *Id*. Where alternative structures corresponding to the claimed function are described in the specification, the means are not limited to the specific structures in the preferred embodiment. *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

USI concedes that its GFCI contains all of the '894 elements except for the strap means. Only those claims that are in controversy need to be construed; consequently, only the strap means is considered here. *See Vivid Tech., Inc. v. Am. Science and Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). Claim 1 of the '894 patent recites a "strap means for mounting the switching apparatus upon a selected surface, said strap means including portions thereof which define a path of the magnetic field generated by said coil means to influence the position of said plunger means." *See* '894 patent, col. 6, ll. 58-62. The relevant features of the '894 patent are depicted below:

FIG. 3, '894 patent

The dispute regarding infringement centers on the strap means's "portions" that define

the magnetic field. USI construes the portions as including the '894 patent's pair of

"depending tabs 344 and 342" whereas Leviton identifies the portions as including only the

342 tab and the central portion of strap 326 extending below tab 342 and contacting the coil.

It is undisputed that the function of the '894's strap means is at least in part performed by the

326 strap means. *See* '894 patent, col. 3, ll. 18-21.  Strap 326 extends across the entire length

of the GFCI and is made of magnetizable steel in order to define the magnetic field. The strap

means function can also be performed by strap 22 in the '945 patent.[18]  The '945 strap 22 is created by sheet metal and includes a pair of relatively upstanding boundary ribs 48 and 50. The '894 claim recites "portions"(emphasis added) which define the magnetic path. Leviton's expert, Steve Campolo, identifies these portions as including the magnetizable strap and the 342 tab. The 342 tab enhances the "magnetic flux concentrating effect of the [326 strap]." *See*  Pl. Mot. for Summ. J. for Patent Infringement, Ex. L. at 14 (Campolo Expert Report and Disclosure). Campolo disregards the 344 tab by stating that he does not know if it will further enhance the function of the coil and maintaining that the 344 tab "does not change the functioning of the strap as required by the claim." *Id*. Campolo further states that the '945 ribs merely "provide the same magnetic function as the single axially extending central portion of the strap 325 in the '894 GFCI." *Id.*, Ex. L. at 13. Under Campolo's analysis, the strap means should be construed as including the longitudinal strap portion with the rib boundaries or the longitudinal strap with tab 342.  Tab 344 should not be construed as being included in the strap means.

USI insists that the plain language of the '894 claims requires the strap means to include  "portions" consisting tabs 342 and 344 located at opposite ends of the coil assembly.

---

[18]USI attempts to limit the '894 strap means to the "exact structures disclosed in the '894 patent because the file history is not longer available."  Simply put, USI argues that because the file history can not be examined to see what transpired during the prosecution history, under the doctrine of prosecution history estoppel, Leviton can not describe the '894 patent as a first action allowance that avoids limitation on the scope of the '894 patent claims.  USI's efforts are to no avail. USI is asking the court to draw a negative inference that the USPTO limited the '894 patent to the exact structures disclosed merely because the prosecution history was admittedly lost.  However, there is no evidence that would allow me to reach this conclusion other than USI's conclusory assertion that there is no assurance that the claim was not limited to a structure with two tabs.

*See* '894 patent, Fig. 3.  Further, USI states that the incorporated '945 patent supports USI's

construction of the term portions because the '945 patent also includes a plurality of features

other than the longitudinal portion of the strap.  Strap 22–the '945 patent's equivalent strap

means structure– includes opposing ribs 48 and 50 which form a conduit around the coil

similar to tabs 344 and 342. Accordingly, the portions described must include a plurality of

features to enhance the magnetic field other than the longitudinal strap.

Ultimately, USI's proffered claim construction is without merit.  The claimed strap

means merely requires a strap means that includes portions which define a path of the

magnetic field.  It does not further limit the claim. Any structure that is capable of defining

the path of the magnetic field using at least two of its parts will serve that function and be

within the scope of the claim. Leviton's expert, the only expert whose testimony is properly

before the court, states that the 326 strap performs that function with the 342 tab. Similarly,

the specification makes it clear that the tabs are not necessary, as it describes the conduit for

the magnetic field as requiring the strap and not the tabs. *See* '894 patent, col. 3, ll. 19-22

("[The path of the electromagnetic field] extends through strap 326.") Any invention that

includes a strap that can both mount the apparatus to the wall as well as serve as a path for

the magnetic file using two of its parts could potentially infringe on the '894 patent.

Having construed the strap means, it is clear to me that the USI GFCI device infringes

on the  '894 patent. At the outset, USI conceded that its Yatai GFCI included all of the '894

claims  except for the strap means. USI also conceded that its device includes a strap means

with one large depending tab as depicted in the '894 drawings. Having construed the '894 strap means as including only the longitudinal portion and the larger tab 342, I am constrained to conclude that the accused product infringes on the '894 patent. Leviton's motion for summary judgment of infringement shall be granted.

H.

Finally, USI contends that it has generated triable issues of fact on the issue of on-sale bar under 35 U.S.C. § 102(b). Specifically, USI offers Campolo's testimony in a proceeding before the International Trade Commission ("ITC") which suggests that the commercial embodiment of the '894 patent was on sale prior to the patent's issuance. During his deposition in this case, Campolo stated that the commercial embodiment of the '894 GFCI was not on sale prior to 1985. The following Campolo deposition testimony submitted in a different proceeding before the ITC suggests otherwise:

> Q: Do you know whether the 6590 product was included in a Leviton catalog that was distributed to the public as of the date of this revision, April 27, 1984?
>
> * * *
>
> A: I believe they were.
>
> Q: They were what?
>
> A: In the catalog.
>
> Q: And offered to the public?
>
> A: Well putting it in a catalog is an offer.
>
> Q: And that would be as of April 27th, 1984.

A: Certainly.

\*\*\*\*

Q: If the item was included in the Leviton catalog, would it be available for purchased by the public who received the catalog?

A: In general, yes. That's what it means. When we offer a product we'd like to sell it.

*See* Def. Reply in Support of Cross-Mot. for Summ. J. for Invalidity at 8, Ex. 10 (Campolo

Depo. Tr. 81:14 to 92:9).

A finding that a patent is invalid due to an on-sale bar will result if "the invention was

. . . in public use or sale in this country, more than one year prior to the date of the application

for patent in the United States." 35 U.S.C. § 102(b). The sale of an invention, including an

offer for sale, must be for commercial gain.  *STX, Inc. v. Brine*, *Inc.*, 37 F. Supp. 2d 740, 757

(D.Md. 1999), *aff'd*, 232 F.3d 588 (Fed. Cir. 2000).   A determination that an invention is

subject to an on-sale bar under § 102(b) is a question of law.  *Weatherchem Corp. v. J.Clark,*

*Inc.*, 163 F.3d 1326, 1332 (Fed. Cir. 1998).

Two conditions must be met for the on-sale bar to apply to a patent.  *Pfaff v. Wells*

*Electronics*, 525 U.S. 55 (1998). "First, the product must [have been] the subject of a

commercial offer for sale . . . Second, the  invention must [have been] ready for patenting."

*Id*. at 67.  An invention is considered ready for patenting if the challenging party can prove

either that the invention was reduced for practice before the critical date or, "that prior to the

critical date the inventor had prepared drawings or other descriptions of the invention that

were sufficiently specific to enable a person skilled in art to practice the invention." *Id*. at 67-68.

Drawing all inferences in favor of USI as the nonmovant, I am constrained to agree with USI that triable issues of fact are presented on the issue of whether enforcement of the '894 patent is subject to the on-sale bar. USI has offered deposition testimony that directly contradicts Leviton's proposition that the '894 GFCI was not available for sale one year prior to the patent's issuance. This contradiction, amounting to an admission by Leviton, *see* Fed. R. Evid. 801(d)(2), presents a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Consequently, Leviton's motion for summary judgment is denied and the issue of the '894 patent's validity in light of a potential on-sale bar remains open for consideration.

V.

Ultimately, I conclude that, as a matter of law, USI's accused GFCI infringes on the Leviton patent. However, due to the omitted language in claim 1 of the '894 patent, USI is only potentially liable for infringement after December 11, 2001, the date on which the USPTO issued the second certificate of correction. Nonetheless, triable issues of fact remain as to whether USI will escape liability entirely for patent infringement because of an on-sale bar precluding the enforcement of the '894 patent. Additionally, USI's motions to dismiss Leviton's claim for trade dress infringement; to compel production of evidence; and to show cause why sanctions should not be imposed shall be denied. An Order embodying the

determinations made herein follows.


Filed:  February 19, 2004                                    _____/s/_____
                                                            Andre M. Davis
                                                            United States District Judge